### FINRA DISPUTE RESOLUTION, INC.

IN THE MATTER OF THE ARBITRATION BETWEEN

WELLS FARGO INVESTMENTS, LLC,

Claimant

-and-

KENNETH C. SHAFFER,

Respondent.

No.

### STATEMENT OF CLAIM IN ARBITRATION

NOW COMES Claimant, Wells Fargo Investments, LLC ("Wells Fargo"), by its attorneys, Kane & Fischer, Ltd., and for its Statement of Claim in Arbitration against Kenneth C. Shaffer ("Respondent"), alleges as follows:

### PARTIES

1.     Wells Fargo, at all times material hereto, was a broker-dealer, registered as such with the U.S. Securities and Exchange Commission and, among others, the State of California. Wells Fargo is a member of the Financial Industry Regulatory Authority, Inc. ("FINRA"), f/k/a the National Association of Securities Dealers, Inc. ("NASD"). (Hereinafter, unless otherwise specified, FINRA and the NASD shall be collectively referred to as "FINRA.")

2.     Respondent was employed as a registered representative by Wells Fargo from June 2006 through October 1, 2009, in one of Wells Fargo's offices located in Folsom, California. During his employment with Wells Fargo, Respondent was an associated person of a member of FINRA.

## JURISDICTION AND HEARING VENUE

3.      FINRA has jurisdiction to hear and decide this controversy, and Respondent is bound to arbitrate in accordance with Rule 13200(a) of the FINRA Code of Arbitration Procedure for Industry Disputes.

4.      On or about January 4, 2008, Respondent voluntarily entered into a promissory note with Wells Fargo. Pursuant to the terms of the promissory note, Respondent agreed that any controversy regarding the validity, enforcement or construction of the promissory note or any dispute concerning Respondent's employment or termination of employment with Wells Fargo would be resolved by arbitration in accordance with the rules of FINRA.

5.      Wells Fargo respectfully requests that the hearing in this case be scheduled in San Francisco, California, pursuant to Rule 13213(a) of the FINRA Code of Arbitration Procedure for Industry Disputes, as it is the hearing location that is closest to the location where the associated person was employed at the time the dispute arose.

## FACTS

6.      On or about January 4, 2008, Wells Fargo loaned Respondent $111,347.00. The loan was evidenced by an unambiguous written promissory note signed by Respondent on January 4, 2008 (the "Note"), a copy of which is attached hereto as Exhibit A.

7.      By the terms of the Note, Respondent agreed to repay $111,347.00 plus simple interest at the rate of 3.58% per annum. Pursuant to the terms of the Note, Wells Fargo was to forgive the principal and interest under the Note in sixty (60) equal monthly increments commencing on the first day of the month following the disbursement of the proceeds of the Note and continuing each month thereafter, but only if Respondent had, at all times from the date of the Note, remained in the employment of Wells Fargo.[1]

---

[1] The forgiveness installments under the Note commenced on February 1, 2008.

2

8.     The Note provides, _inter alia_, that the outstanding balance due under the Note shall immediately become due and payable without notice, protest, presentment or demand upon the termination of Respondent's employment with Wells Fargo "for any reason whatsoever," and interest shall continue to accrue on the unpaid balance until the same is paid in full.

9.     The Respondent's termination from Wells Fargo occurred on October 1, 2009. At the time of his termination, there remained $74,617.76 in principal due and owing under the Note. In addition, interest at the rate of 3.58% per annum ($7.32 per day) has accrued since October 1, 2009, and will continue to accrue until Respondent has re-paid the remaining balance of the loan he received from Wells Fargo.

10.     On October 20, 2009, Wells Fargo made a written demand upon the Respondent for payment of amounts owed under the Note. A copy of the demand letter is attached hereto as Exhibit B. To date, Respondent has refused, and continues to refuse, to honor his obligation under the Note.

11.     As a result of Respondent's failure to honor his obligations to Wells Fargo, Wells Fargo has been forced to commence this action, and to retain counsel to represent it in this action. Accordingly, Wells Fargo has incurred attorneys' fees and other costs that it would not have incurred had Respondent honored his obligations to Wells Fargo. Pursuant to the terms of the Note, Respondent agreed that he would pay reasonable attorneys' fees and costs, including all fees and costs involved in collection.

12.     Wells Fargo has performed all terms and conditions required of it under the Note.

13.     There is due and owing to Wells Fargo in excess of $74,617.76, which includes: a.) $74,617.76 principal balance due and owing under the Note as of October 1, 2009; b.) interest at the rate of 3.58% per annum ($7.32 per day) on the principal balance from October 1, 2009 to the date Respondent satisfies his obligations to Wells Fargo; and c.) all costs of collection,

3

including, but not limited to, attorneys' fees, filing fees and all costs and expenses associated with arbitration.

**WHEREFORE,** Wells Fargo Investments, LLC respectfully requests that it be granted an award against Respondent for the following:

| | | |
|---|---|---|
| A. | The principal balance due and owing under the Note; | $74,617.76 |
| B | Interest at the rate of 3.58% per annum ($7.32 per day) on the principal balance due and owing under the Note from the date of default (October 1, 2009) to the date of payment; | (Unknown at this time) |
| C | The costs of collection and of this proceeding including attorneys' fees as agreed to under the terms of the Note; and | (Unknown at this time) |
| D | Any and all further relief that the panel deems just and proper. | (Unknown at this time) |

Respectfully submitted,

Wells Fargo Investments, LLC

By: _____
One of its Attorneys

Thomas A. Volz
KANE & FISCHER, LTD.
208 South LaSalle Street, Suite 1800
Chicago, IL  60604
(312) 422-7200 Telephone
(312) 422-7217 Facsimile

4

**EXHIBIT A**
**PROMISSORY NOTE DATED JANUARY 4, 2008**

# PROMISSORY NOTE

In consideration of a loan of one hundred eleven thousand three hundred forty-seven dollars ($111,347), paid to Kenneth C. Shaffer ("the Undersigned"), the Undersigned promises to pay to the order of Wells Fargo Investments, LLC ("WF") at its offices at 420 Montgomery Street, San Francisco, CA 94104, the sum of one hundred eleven thousand three hundred forty-seven dollars ($111,347), plus simple interest at a rate of 3.58% per annum on the unpaid balance.

This Note arises from and reflects a debt justly due to WF, which debt is agreed by the Undersigned to be due and payable on demand. The Undersigned may prepay the full amount due at any time without penalty. WF in its sole discretion may demand payment at any time.

The outstanding balance due under this Note shall, immediately become due and payable without notice, protest, presentment, or demand upon the happening of any of the following specified events of default:

1. The termination of the Undersigned's employment with WF (or one of its subsidiaries) for any reason whatsoever, including, but not limited to involuntary termination of the Undersigned;

2. The entry of an order for relief in a bankruptcy case in which the Undersigned is the debtor, or the making of an assignment for the benefit of creditors by the Undersigned, or the inability of the Undersigned to pay the Undersigned's debts generally as they become due, or the liabilities of the Undersigned exceeding the Undersigned's assets, or the appointment of a custodian or receiver for substantially all of the undersigned's property; or

3. The entry of an order against the Undersigned by a court or regulatory agency barring or suspending the Undersigned from the conduct of his/her employment at WF.

The Undersigned promises to advise WF in writing as soon as reasonably possible should any of the above events of default occur.

Except as otherwise set forth above, the principal and interest due under this Note shall be forgiven and taxed in sixty (60) equal monthly increments commencing on the first day of the month following the disbursement of the proceeds of the Note and continuing each month thereafter. Each increment that is forgiven shall include both principal and interest. The compensation and withholding will be reported in the appropriate pay period for each monthly forgiveness. If your earnings for the month are not sufficient to cover the withholding, you may not receive a paycheck until the entire amount of withholding is paid. If any events of default as described above occur, the unpaid and unforgiven portion of the principal amount shall become immediately due and payable to WF, and interest shall continue to accrue on the unpaid balance until the same is fully paid.

Furthermore, to the extent permissible under California law, the Undersigned agrees that any unpaid amounts due under this Note shall constitute a lien immediately reducible to cash on (1) the Undersigned's final or regular pay and (2) any brokerage accounts held in the name of the Undersigned or on which the Undersigned appears with WF (whether or not such accounts are held as joint account with another or others), until the amount of the lien has been satisfied.

Any controversy regarding the validity, enforcement or construction of this Note or any dispute concerning the Undersigned's employment or termination of employment with WF shall be resolved by arbitration under the then-prevailing Rules of the National Association of Securities Dealers ("NASD"). Any state or federal court having jurisdiction to enter such an award may enter judgment upon any award rendered by the arbitrator(s), and the Undersigned hereby waives personal service of any petitions to confirm such awards, including any papers supporting those petitions, and agree to accept service by regular mail. In the event the NASD for any reason declines to accept jurisdiction of such controversy, it shall then be resolved by a court of competent jurisdiction.

In the event any action or lawsuit is required to be brought for collection of any amount under this Note, the Undersigned promises to pay reasonable attorney's fees and costs, including all fees and costs involved in collection.

This Note shall be interpreted, enforced, and governed by the laws of the State of California. The Undersigned has reviewed the terms of this Note and has participated in its drafting, and agrees that the rule of construction by which ambiguities are resolved against the drafting party shall not apply in any interpretation of it. If any provision or any part of any provision of this Note is for any reason held to be invalid, unenforceable or contrary to public policy, law statute or ordinance, then the remainder of this Agreement shall not be affected thereby and shall remain valid and fully enforceable.

The Undersigned executes this Note without reliance on any oral representations. This Note contains the entire agreement between the Undersigned and WF with respect to the matters addressed in it, and supersedes all prior agreements, written or oral, between the Undersigned and WF on such matters. No other agreement, statement of promise made by any party with respect to any of the matters addressed in this Note will be binding or valid.

The Undersigned understands that the Undersigned is employed on an at-will basis. This Note does not constitute an agreement by WF to employ the Undersigned for a specified period of time, and the Undersigned's employment may be terminated at any time, with or without notice or cause.

The Undersigned agrees that any amounts due under this Note are not consumer debt, and that any debt incurred hereunder is not primarily for personal, family or household purposes, but for business and commercial purposes only.

2

This Note may be modified or amended only if the modification or amendment is made in writing, refers specifically to this Note, and is signed by the Undersigned and an Executive Vice President of WF. Extensions or renewals of the Undersigned's right or liabilities under this Note from time to time, with or without notice, shall not release the Undersigned from liability.

The terms of this Note shall apply to, bind, and inure to the benefit of WF and the Undersigned, and their respective heirs, successors, assigns and legal representatives.

The Undersigned agrees to treat the facts and terms of this Promissory Note as confidential and, as such, will not discuss the Promissory Note with any person except for those individuals who have a legitimate need to know including family members (if applicable), managers and human resources representatives.

Kenneth C Shaffer

Sworn to before me this 4ᵗʰ day of January, 2008

State of California,
County of Sacramento

DANNY KIRK
Comm. # 1541753
NOTARY PUBLIC-CALIFORNIA
Placer County
My Comm. Expires Jan. 6, 2009

Notary Public

3

EXHIBIT A   Page 13



# Promissory Note Amortization Schedule

Prepared for : **KENNETH C SHAFFER**

5315 GARLENDA DRIVE,
EL DORADO HILLS, CA, 95762

Original Balance: $111,347.00
Interest Rate: 3.58%
Total Number of Payments: 60
Start Date: Friday, February 01, 2008

| Payment # | Payment Date | Rate | P & I Payment | Principal | Interest | New Balance | Cumulative Interest | Yearly Total Interest |
|---|---|---|---|---|---|---|---|---|
| 1 | 2/1/2008 | 3.58% | $2,029.59 | $1,697.40 | $332.19 | $109,649.60 | $332.19 | $332.19 |
| 2 | 3/1/2008 | 3.58% | $2,029.59 | $1,702.47 | $327.12 | $107,947.13 | $659.31 | $659.31 |
| 3 | 4/1/2008 | 3.58% | $2,029.59 | $1,707.55 | $322.04 | $106,239.59 | $981.36 | $981.36 |
| 4 | 5/1/2008 | 3.58% | $2,029.59 | $1,712.64 | $316.95 | $104,526.95 | $1,298.31 | $1,298.31 |
| 5 | 6/1/2008 | 3.58% | $2,029.59 | $1,717.75 | $311.84 | $102,809.20 | $1,610.15 | $1,610.15 |
| 6 | 7/1/2008 | 3.58% | $2,029.59 | $1,722.87 | $306.72 | $101,086.32 | $1,916.86 | $1,916.86 |
| 7 | 8/1/2008 | 3.58% | $2,029.59 | $1,728.01 | $301.58 | $99,358.31 | $2,218.44 | $2,218.44 |
| 8 | 9/1/2008 | 3.58% | $2,029.59 | $1,733.17 | $296.42 | $97,625.14 | $2,514.86 | $2,514.86 |
| 9 | 10/1/2008 | 3.58% | $2,029.59 | $1,738.34 | $291.25 | $95,886.80 | $2,806.11 | $2,806.11 |
| 10 | 11/1/2008 | 3.58% | $2,029.59 | $1,743.53 | $286.06 | $94,143.27 | $3,092.17 | $3,092.17 |
| 11 | 12/1/2008 | 3.58% | $2,029.59 | $1,748.73 | $280.86 | $92,394.55 | $3,373.04 | $3,373.04 |
| 12 | 1/1/2009 | 3.58% | $2,029.59 | $1,753.94 | $275.65 | $90,640.60 | $3,648.68 | $275.65 |
| 13 | 2/1/2009 | 3.58% | $2,029.59 | $1,759.18 | $270.41 | $88,881.43 | $3,919.10 | $546.06 |
| 14 | 3/1/2009 | 3.58% | $2,029.59 | $1,764.42 | $265.17 | $87,117.00 | $4,184.26 | $811.22 |
| 15 | 4/1/2009 | 3.58% | $2,029.59 | $1,769.69 | $259.90 | $85,347.31 | $4,444.16 | $1,071.13 |
| 16 | 5/1/2009 | 3.58% | $2,029.59 | $1,774.97 | $254.62 | $83,572.34 | $4,698.78 | $1,325.75 |
| 17 | 6/1/2009 | 3.58% | $2,029.59 | $1,780.26 | $249.33 | $81,792.08 | $4,948.11 | $1,575.07 |
| 18 | 7/1/2009 | 3.58% | $2,029.59 | $1,785.57 | $244.02 | $80,006.51 | $5,192.13 | $1,819.09 |
| 19 | 8/1/2009 | 3.58% | $2,029.59 | $1,790.90 | $238.69 | $78,215.60 | $5,430.81 | $2,057.78 |
| 20 | 9/1/2009 | 3.58% | $2,029.59 | $1,796.24 | $233.35 | $76,419.36 | $5,664.16 | $2,291.12 |
| 21 | 10/1/2009 | 3.58% | $2,029.59 | $1,801.60 | $227.99 | $74,617.76 | $5,892.15 | $2,519.11 |
| 22 | 11/1/2009 | 3.58% | $2,029.59 | $1,806.98 | $222.61 | $72,810.78 | $6,114.76 | $2,741.72 |
| 23 | 12/1/2009 | 3.58% | $2,029.59 | $1,812.37 | $217.22 | $70,998.41 | $6,331.98 | $2,958.94 |
| 24 | 1/1/2010 | 3.58% | $2,029.59 | $1,817.78 | $211.81 | $69,180.63 | $6,543.79 | $211.81 |
| 25 | 2/1/2010 | 3.58% | $2,029.59 | $1,823.20 | $206.39 | $67,357.43 | $6,750.18 | $418.21 |
| 26 | 3/1/2010 | 3.58% | $2,029.59 | $1,828.64 | $200.95 | $65,528.80 | $6,951.14 | $619.16 |
| 27 | 4/1/2010 | 3.58% | $2,029.59 | $1,834.09 | $195.50 | $63,694.70 | $7,146.63 | $814.65 |

EXHIBIT A   Page 14

| Payment # | Payment Date | Rate | Payment | Principal | Interest | New Balance | Cumulative Interest | Yearly Total Interest |
|---|---|---|---|---|---|---|---|---|
| 28 | 5/1/2010 | 3.58% | $2,029.59 | $1,839.57 | $190.02 | $61,855.14 | $7,336.66 | $1,004.68 |
| 29 | 6/1/2010 | 3.58% | $2,029.59 | $1,845.05 | $184.54 | $60,010.08 | $7,521.19 | $1,189.21 |
| 30 | 7/1/2010 | 3.58% | $2,029.59 | $1,850.56 | $179.03 | $58,159.53 | $7,700.23 | $1,368.25 |
| 31 | 8/1/2010 | 3.58% | $2,029.59 | $1,856.08 | $173.51 | $56,303.45 | $7,873.74 | $1,541.76 |
| 32 | 9/1/2010 | 3.58% | $2,029.59 | $1,861.62 | $167.97 | $54,441.83 | $8,041.71 | $1,709.73 |
| 33 | 10/1/2010 | 3.58% | $2,029.59 | $1,867.17 | $162.42 | $52,574.66 | $8,204.13 | $1,872.15 |
| 34 | 11/1/2010 | 3.58% | $2,029.59 | $1,872.74 | $156.85 | $50,701.92 | $8,360.98 | $2,029.00 |
| 35 | 12/1/2010 | 3.58% | $2,029.59 | $1,878.33 | $151.26 | $48,823.59 | $8,512.24 | $2,180.27 |
| 36 | 1/1/2011 | 3.58% | $2,029.59 | $1,883.93 | $145.66 | $46,939.66 | $8,657.90 | $145.66 |
| 37 | 2/1/2011 | 3.58% | $2,029.59 | $1,889.55 | $140.04 | $45,050.11 | $8,797.94 | $285.70 |
| 38 | 3/1/2011 | 3.58% | $2,029.59 | $1,895.19 | $134.40 | $43,154.92 | $8,932.34 | $420.10 |
| 39 | 4/1/2011 | 3.58% | $2,029.59 | $1,900.84 | $128.75 | $41,254.08 | $9,061.09 | $548.85 |
| 40 | 5/1/2011 | 3.58% | $2,029.59 | $1,906.51 | $123.08 | $39,347.57 | $9,184.17 | $671.92 |
| 41 | 6/1/2011 | 3.58% | $2,029.59 | $1,912.20 | $117.39 | $37,435.37 | $9,301.56 | $789.31 |
| 42 | 7/1/2011 | 3.58% | $2,029.59 | $1,917.91 | $111.68 | $35,517.46 | $9,413.24 | $901.00 |
| 43 | 8/1/2011 | 3.58% | $2,029.59 | $1,923.63 | $105.96 | $33,593.83 | $9,519.20 | $1,006.96 |
| 44 | 9/1/2011 | 3.58% | $2,029.59 | $1,929.37 | $100.22 | $31,664.47 | $9,619.43 | $1,107.18 |
| 45 | 10/1/2011 | 3.58% | $2,029.59 | $1,935.12 | $94.47 | $29,729.35 | $9,713.90 | $1,201.65 |
| 46 | 11/1/2011 | 3.58% | $2,029.59 | $1,940.90 | $88.69 | $27,788.45 | $9,802.59 | $1,290.35 |
| 47 | 12/1/2011 | 3.58% | $2,029.59 | $1,946.69 | $82.90 | $25,841.77 | $9,885.50 | $1,373.25 |
| 48 | 1/1/2012 | 3.58% | $2,029.59 | $1,952.49 | $77.10 | $23,889.27 | $9,962.59 | $77.10 |
| 49 | 2/1/2012 | 3.58% | $2,029.59 | $1,958.32 | $71.27 | $21,930.95 | $10,033.86 | $148.37 |
| 50 | 3/1/2012 | 3.58% | $2,029.59 | $1,964.16 | $65.43 | $19,966.79 | $10,099.29 | $213.80 |
| 51 | 4/1/2012 | 3.58% | $2,029.59 | $1,970.02 | $59.57 | $17,996.77 | $10,158.86 | $273.37 |
| 52 | 5/1/2012 | 3.58% | $2,029.59 | $1,975.90 | $53.69 | $16,020.88 | $10,212.56 | $327.06 |
| 53 | 6/1/2012 | 3.58% | $2,029.59 | $1,981.79 | $47.80 | $14,039.08 | $10,260.35 | $374.86 |
| 54 | 7/1/2012 | 3.58% | $2,029.59 | $1,987.70 | $41.89 | $12,051.38 | $10,302.24 | $416.74 |
| 55 | 8/1/2012 | 3.58% | $2,029.59 | $1,993.63 | $35.96 | $10,057.74 | $10,338.19 | $452.70 |
| 56 | 9/1/2012 | 3.58% | $2,029.59 | $1,999.58 | $30.01 | $8,058.16 | $10,368.20 | $482.71 |
| 57 | 10/1/2012 | 3.58% | $2,029.59 | $2,005.55 | $24.04 | $6,052.61 | $10,392.24 | $506.75 |
| 58 | 11/1/2012 | 3.58% | $2,029.59 | $2,011.53 | $18.06 | $4,041.08 | $10,410.30 | $524.81 |
| 59 | 12/1/2012 | 3.58% | $2,029.59 | $2,017.53 | $12.06 | $2,023.55 | $10,422.36 | $536.87 |
| 60 | 1/1/2013 | 3.58% | $2,029.46 | $2,023.55 | $6.04 | $0.00 | $10,428.40 | $6.04 |
| | | | $121,775.27 | $111,347.00 | $10,428.40 | | | |

**EXHIBIT B**
**DEMAND LETTER**

# Kane & Fischer, Ltd.

Attorneys & Counselors
208 South LaSalle Street
Suite 1800
Chicago, IL 60604
312.422.7200
Fax: 312.422.7217

Jason R. Lindsay
312.422.7212
jlindsay@kfltd.com

October 20, 2009

**CERTIFIED MAIL/RETURN RECEIPT
REQUESTED AND REGULAR MAIL**
Kenneth C. Shaffer
5315 Garlenda Dr
El Dorado Hills, CA 95762

Re:  Wells Fargo Investments, LLC / Kenneth C. Shaffer
       Total Amount Due as of October 20, 2009: $74,756.84
       Our File Number: 5248z008

Dear Mr. Shaffer:

Wells Fargo Investments, LLC ("Wells Fargo") has referred a collection claim to me relating to a Promissory Note that you entered into with Wells Fargo on or about January 4, 2008 (the "Note"). As of today's date, the total amount that you owe to Wells Fargo under the Note is $74,756.84.

Pursuant to the terms of the Note, the principal balance due at the time of your termination from Wells Fargo on October 1, 2009 was $74,617.76. Also, pursuant to the terms of the Note, interest at the rate of 3.58% per annum ($7.32 per day) has accrued since October 1, 2009, and will continue to accrue until the Note is paid. As of today's date, that additional interest amounts to $139.08. Accordingly, as of today's date, the balance owed on the Note is $74,756.84, and interest is accruing at the rate of $7.32 per day.

If you want to resolve this matter without an arbitration proceeding, you must, within thirty days, either pay the balance owed (by forwarding a check to this office in the amount of $74,756.84, plus additional accrued interest, made payable to **Wells Fargo Investments, LLC**), or call me at 312/422-7212 to work out acceptable arrangements for payment to be made. If you do neither of these things, or if we are unable to work out acceptable arrangements, I will be entitled to file an arbitration proceeding against you with FINRA Dispute Resolution, Inc. seeking the collection of the full amount of the debt, including accrued and accruing interest, attorneys' fees and costs, pursuant to the terms of the Notes, when the thirty days have expired.

Federal law gives you thirty days after you receive this letter to dispute the validity of the debt or any part of it. If you do not dispute it within that period, I will assume that it is valid. If you do dispute it, by notifying me in writing to that effect, I am required by law to obtain and mail to you proof of the debt. Also according to federal law, if you request proof of the debt or the name and address of the original creditor within the thirty-day period that begins with your receipt of this letter, the law requires me to suspend my efforts (through litigation or otherwise) to collect the debt until I mail the requested information to you.

EXHIBIT A   Page 17

# Kane & Fischer, Ltd.

Kenneth C. Shaffer
October 20, 2009
Page 2

I am enclosing herewith a copy of the Note, as well as a related Amortization Schedule, as proof of the debt. In addition, please be advised at this time that the original creditor of the debt is Wells Fargo Investments, LLC whose corporate address is 420 Montgomery Street, San Francisco, California 94104. Since I am supplying you now with proof of the debt and the name and address of the original creditor, I will not be required by law to suspend my efforts to collect the debt.

This is an attempt to collect a debt on behalf of Wells Fargo Investments, LLC, and any information obtained will be used for that purpose.

Very truly yours,

KANE & FISCHER, LTD.

Jason R. Lindsay

JRL/gmc
Enclosures

FINRA Arbitration
SUBMISSION AGREEMENT

Claimant(s)

---

In the matter of the Arbitration Between

WELLS FARGO INVESTMENTS, LLC,

    Claimant,

        -and-

KENNETH C. SHAFFER

    Respondent.

No.

---

1.    The undersigned parties ("parties") hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers and all related cross claims, counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

2.    The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration and the parties agree to be bound by these procedures and rules.

3.    The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.

4.    The parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement. The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5.    The parties hereto have signed and acknowledged the foregoing Submission Agreement.

WELLS FARGO INVESTMENTS, LLC   By: Charles W. Daggs, III, Chief Executive Officer
Claimant Name (please print)

_____       2 2-10_____

Claimant Signature                        Date
State Capacity if other than individual (example: Executor, Trustee, Corporate Officer)

EXHIBIT A   Page 19



KANE & FISCHER, LTD.
205 SOUTH LA SALLE • SUITE 1800
CHICAGO, ILLINOIS 60604

9119

PAY    *TWO THOUSAND, EIGHT HUNDRED FIFTY AND 00/100 DOLLARS*

TO
THE
ORDER
OF

FINRA Dispute Resolution
One Liberty Plaza, 27th Floor
165 Broadway
New York NY  10006

THE NORTHERN TRUST COMPANY
CHICAGO, ILLINOIS

DATE    2/15/10
02/16/10
CHECK NO.    9119
AMOUNT    *****$2,850.00

KANE & FISCHER, LTD.

NASD FINRA Dispute Resolution

| Voucher | Date | Invoice Description | Matter | Amount |
|---------|------|---------------------|--------|--------|
| 17023 | 02/16/10 | File Statement of Claim - Shaffer | 5248z/008 | 2,850.00 |

9119
Amount
2,850.00

02/16/10    Total Paid    2,850.00

EXHIBIT A   Page 20

4-12-2010



RECEIVED
APR 14 2010
...scher, Lid.

Regarding the demand from Wells Fargo Investments, my former employer, for payment of unamortized Promissory note amounts from myself, Kenneth C. Shaffer, a former employee, I attest to the following and am willing to relate the details of this situation under oath.

I joined Wells fargo Investments in June of 2006 with the oral promise of being introduced to affluent investors and being assigned 15 million dollars worth of affluent client accounts, doubling the size of my existing client base. It was also explained that I would be eligible for a "bonus" payment based on my performance over the first 18 months, which was to be paid to me in the form of a promissory note, the details and risks of which were never explained or fully understood by me. The promises of affluent account intoduction, and the transferring of existing accounts were never completed, creating a situation of detrimental reliance. I complained in e-mails starting in 2008 that these original promises were never kept, and in fact, I had personally witnessed favoritism, reckless behavior and other ethical violations by Wells Fargo Investments, and wished to terminate our relationship. I was told not to put complaints in e-mail form because of regulatory concerns.

In subsequent months I was subjected to production quotas not in effect at the time of my hiring or at the time of the promissory note award, and threatened with termination based only on production amounts, even during the period in late 2008 when financial markets were in free fall. During this period I developed severe respritory problems which I believe were stress related, and was denied disability benefits. My production quota was raised in early 2009, while my revenue from new accounts was halved by the addition of licensed employees. I was again threatened with termination in February of 2009 for missing my sales quota by 500 dollars. I complained of unfair treatment and witheld compensation.

I was terminated without warning on October 1st, 2009 by a Ms. Mary Mortensen who explained to me that I was being "termed out" for two minor violations, accidental on my part, which Ms. Mortensen stated would not ordinarily have been grounds for termination but an exception was made in my case because of the critical e-mails and statements that I had made. One week before this I had received an e-mail from my immediate supervisor, Jan Krug, stating that it was "business as usual" until I started at a new branch in November. I believe that this created a condition of promissory estoppel.

I believe that the original promissory note is not enforceable because it violates employment law by penalizing a terminated employee, and is unconscionable because it's terms require repayment of amounts even following discriminatory or retaliatory termination. There is also violation of the implied covenent of good faith and fair dealing, and breech of fiduciary responsibility by Wells Fargo Investments. This particular promissory note also violates article 75, Bills of Exchange and Promisory Note Act, item #2. The promissory note also did not specify or alude to the possibility of future production goals which could result in termination, were unfair and unequally applied.

I have suffered both financially and emotionally as a result of Wells Fargo"s actions including discrimination, wrongful termination, witholding of disability benefits, and withheld compensation. I have been the victim of detrimental reliance and suffered promissory estopple, see exhibits attached, and have been unable to secure another position because of the termination notes on my u-5, and refusal of Wells Fargo to provide me production records, which I believe is an infraction of Calif. "right to work" regulations. I request that the promissory note is found to be void and unenforceable.

Thank You,

Ken Shaffer

EXHIBIT B   Page 21

**FINRA ARBITRATION Submission Agreement**

In the Matter of the Arbitration Between

Name(s) of Claimant(s)

Wells Fargo Investments, LLC

10-00773

Name(s) of Respondent(s)

Kenneth C. Shaffer

1.  The undersigned parties ("parties") hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

2.  The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules.

3.  The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s).  The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.

4.  The parties agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement.  The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

_____          4-12-2010
Kenneth C. Shaffer                                                    Date
State Capacity if other than individual (e.g., executor, trustee, corporate officer)


LC43A: SUBMISSION AGREEMENT
ldr: 02/09/2009

RECIPIENTS:
    Kenneth C. Shaffer
    5315 Garlenda Dr., El Dorado Hills, CA 95762


EXHIBIT B   Page 23

MY RESPONSE LETTER TO
KANE & FISCHER DEMAND

Dear Mr. Lindsay:

Recieved your letter regarding the promisory note balance. Unfortunately, at this time I have no job, and approximately twenty thousand dollars to my name. My burn rate is approximately 5K per month, meaning in 4 months, I will be withdrawing from a small IRA in order to survive. My home, formerly my most valuable asset, is now worth substantially less than I paid for it, resulting in minimal equity. I am very likely a candidate for bankruptcy proceedings, if I could afford the legal expense.

I have been unable to secure other employment of any type, and specifically as a Financial Advisor, because I was given no advance notice of my termination and have no client or production records. I believe that Wells Fargo has breeched my rights under California's "right to work" statutes, and is guilty of other employee rights violations.

The termination which results in this request for the return of the promisory note amounts is completely unwarranted, and in fact, I was told by the Branch Administrative Manager, Mary Mortensen, that the events sited would not be grounds for termination if it were not for my criticism of the firm. Prior to my termination on October 1st, I had no reason to believe I would be terminated, and in fact, recieved an e-mail from my immediate supervisor, Jan Krug, approximately one week before my termination that it was "business as usual" until November, when I was to start working at a new branch. I believe that this created a situation of promissory estoppel.

When I asked Wells Fargo for a trailing 12 month production record, I was denied. This record is mandatory information for most hiring firms, I believe that this is a violation of California "right to work" laws.

I recieved a call from a representative of the State unemployment office who told me that Wells fargo had reported to them that I had purposely intended to be fired, resulting in no unemployment payments and possible waiver of COBRA benefits. This is completely false, and in fact, I have been warned that termination could trigger a demand to return earlier bonus amounts, resulting in mental duress and undue pressure to make sure that I would not be terminated.

Additionally, when I was hired I was promised 15 million dollars in affluent client accounts, and the opportunity to meet regularly with affluent investors creating a situation of detrimental reliance. I was assigned to a new branch of Wells Fargo with a tiny asset base, and struggeled to produce a minimal income from the client base which I brought to the firm. This stress resulted in illness which my doctor recommended time off to recover from. Through the Wells fargo employee benefits department, I was led to believe that this was a qualifying short term disability, later denied by Metropliltan Insurance Co. My medical records at this time included a recommendation to take time off for voice rest due to persistant laryngospasm and sleep apnea symtoms, as well as treatment for depression. Metropolitan told me that it was difficult to obtain the required information from my Kaiser Physician, and that the records they recieved did not support a valid claim.

These events, and blatant favoritism towards Financial Consultants hired by managers who benefit from their success ( the manager who hired me has been terminated), pressure to meet minimum production goals while having revenues witheld through a punitive FC/ Licensed banker sharing arrangement, and

lack of adequate compensation for time spent in manadatory, non revenue producing activities have resulted in extreme hardship, frustration, and depression.

I have been told that these outstanding promissory note amounts are considered by Wells Fargo to be "blood money" by Mary Mortensen, Branch Administrative Manager, and now fear for my own and my family's safety. No one ever explained the ramifications of the promisory note to me originally, especially in regard to future production quotas that were never discussed or in effect at the time, or the possibility of arbitrary termination.

Ken Shaffer

**Shaffer, Kenneth C.**

| | |
|---|---|
| From: | Shaffer, Kenneth C. |
| Sent: | Monday, March 09, 2009 4:31 PM |
| To: | Webster, Mark D. (PCS); Hamill, Leo P. |
| Subject: | Fair and reasonable? |

Hi Mark- I have been issued a "formal written warning" for unsatisfactory production from Barbara. My monthly goal is 20,666 (80%). For February, I had total production of 20,100, missing the mark by 500 dollars. My year to date is 41,439, an average of 20,719.50 per month, and higher than the original requirement. I am now being threatened with termination, at a time when, prior to this meeting, I felt like I was gaining momentum- For March, I have booked my 1st Transamerica Inheritance Builder Sale, received my first "Inforce Policy review", and booked business in fixed annuities. I feel my branch relations are excellent, and I have no customer complaints. I was 14th out of 29 reps for the month of February, and am 8th in % to goal.

Complicating the situation is the fact that I have an outstanding promissory note- Barbara has informed me that the unamortized amount would be due back to Wells, a financially disastrous situation. I cannot believe that the Ms. Brandell is subjecting not only myself, but other FCs to this type of mental duress at a time of financial crisis. Do you think this is fair and reasonable?

I think one of the sources of this discriminatory behavior is that I took 8 weeks off last year, Oct. and Nov., for a health problem that I am still being treated for- I currently take 8 pills a day! I was denied short term disability from Metropolitan Insurance with the explanation the my medical records did not support disability payments- even though I would assume the recommendation to take time off was part of my records. They effectively over ruled my Doctor- amazing. This situation affected my productivity before I left, and I had 2 months of 0 production. Barbara states that the condition of written warning is based on last year's production as well. I was on track to achieve my annual goal last year until July. I believe my treatment is partially based on verifiable illness.

Since I am now in a "sudden death" situation, I must also tell you as well that, after 30 Years of no entries on my u-4, I am very concerned with complaints and law suits arising from reckless behavior on the part of the firm- the push on "reverse convertibles", resulting in the unexplained disappearance of one of their strongest converts, Suggestion that health questions regarding insurance be less than fully truthful, and the misrepresentation of income from Insurance policies.

I am hoping that I can be on more than a "month to month" plan, which is only reasonable since it could compromise my ability to suggest the best course of action for my clients. I am available to verify and discuss any of these items at your request, and will continue to provide the very best support for clients and team members.

*Ken Shaffer*
Financial Consultant
Wells Fargo Investments·

M-W-F- 916 984-1179
T-Th -916 364-3571
*Investment and Insurance Products*
*Are Not insured by the FDIC or any other federal government agency.*
*Are Not deposits of or guaranteed by the Bank or any Bank affiliate*
*May Lose Value*

*Wells Fargo Investments, LLC (member SIPC) is a non-bank affiliate of Wells Fargo & Company.*

*The Information in this email is confidential. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance to it, is prohibited and may be unlawful. Trade Orders cannot be accepted by e-mail.*

1



**Claim for Disability Insurance Benefits – Doctor's Certificate**

TYPE or PRINT with BLACK INK.

| 34. PATIENT'S FILE NUMBER | 35. PATIENT'S SOCIAL SECURITY NO. | 36. PATIENT'S LAST NAME |
|---|---|---|
| 000001850482 | | SHAFFER |

| 37. DOCTOR'S NAME AS SHOWN ON LICENSE | 38. DOCTOR'S TELEPHONE NUMBER | 39. DOCTOR'S STATE LICENSE NO. |
|---|---|---|
| ROSE ARELLANES MD | 916/817-5200 | A66839 |

40. DOCTOR'S ADDRESS – NUMBER AND STREET, CITY, STATE, COUNTRY (IF NOT USA), ZIP CODE. POST OFFICE BOX NUMBER IS NOT ACCEPTED AS THE SOLE ADDRESS

Medical Secretaries
2155 Iron Point Road, Folsom, CA 95630

41. THIS PATIENT HAS BEEN UNDER MY CARE AND TREATMENT FOR THIS MEDICAL PROBLEM
FROM 12/28/2006 TO 9/10/2008 AT INTERVALS OF ☐ DAILY ☐ WEEKLY ☐ MONTHLY ☒ AS NEEDED

| 42. AT ANY TIME DURING YOUR ATTENDANCE FOR THIS MEDICAL PROBLEM, HAS THE PATIENT BEEN INCAPABLE OF PERFORMING HIS/HER REGULAR OR CUSTOMARY WORK? ☐ NO – SKIP TO THE DOCTOR'S CERTIFICATION SECTION ☒ YES – ENTER DATE DISABILITY BEGAN: 9/22/2008 | 43. DATE YOU RELEASED OR ANTICIPATE RELEASING PATIENT TO RETURN TO HIS/HER REGULAR / CUSTOMARY WORK ("UNKNOWN," "INDEFINITE," ETC., NOT ACCEPTED.) 11/2/2008 |
|---|---|

| 44. ICD9 DISEASE CODE, PRIMARY (REQUIRED UNLESS DIAGNOSIS NOT YET OBTAINED) | 45. ICD9 DISEASE CODE(S), SECONDARY |
|---|---|
| 478.75 LARYNGEAL SPASM | 308.9 530.81 |

46. DIAGNOSIS (REQUIRED) – IF NO DIAGNOSIS HAS BEEN DETERMINED, ENTER OBJECTIVE FINDINGS OR A DETAILED STATEMENT OF SYMPTOMS
54 YEAR OLD MALE WITH A HISTORY OF CHRONIC THROAT PROBLEMS. HAVING COUGHING AND CHOKING EPISODES AS WELL AS REFLUX PROBLEMS. STRESSED AS HIS THROAT IS EFFECTING HIS WORK, FEELS A LOT OF STRESS AND UNSUPPORTED AS IT IS DIFFICULT FOR HIM TO TALK ALL DAY. OFF WORK FOR VOICE REST GIVEN CURRENT LARYNGOSPASM. TRIAL OF ZOLOFT TO SEE IF IT CAN HELP DEAL WITH ANXIETY OF HIS MEDICAL CONDITION AND WORK.

47. FINDINGS – STATE NATURE, SEVERITY, AND EXTENT OF THE INCAPACITATING DISEASE OR INJURY. INCLUDE ANY OTHER DISABLING CONDITIONS

| 48. TYPE OF TREATMENT / MEDICATION RENDERED TO PATIENT MEDICATION, REFERRED TO BMC AND WILL BE EVALUATION BY HEENT AGAIN. | 49. IF PATIENT WAS HOSPITALIZED, PROVIDE DATES OF ENTRY AND DISCHARGE __/__/__ TO __/__/__ |
|---|---|

| 50. DATE AND TYPE OF SURGERY / PROCEDURE PERFORMED OR TO BE PERFORMED __/__/__ | ICD9 PROCEDURE CODE(S) |
|---|---|

| 51. IF PATIENT IS NOW PREGNANT OR HAS BEEN PREGNANT, WHAT DATE DID PREGNANCY TERMINATE OR WHAT DATE DO YOU EXPECT DELIVERY? __/__/__ | 52. IF PREGNANCY IS / WAS ABNORMAL, STATE THE ABNORMAL AND INVOLUNTARY COMPLICATION CAUSING MATERNAL DISABILITY |
|---|---|

| 53. BASED ON YOUR EXAMINATION OF PATIENT, IS THIS DISABILITY THE RESULT OF "OCCUPATION," EITHER AS AN "INDUSTRIAL ACCIDENT" OR AS AN "OCCUPATIONAL DISEASE"? (INCLUDE SITUATIONS WHERE PATIENT'S OCCUPATION HAS AGGRAVATED PRE-EXISTING CONDITIONS.) ☐ YES ☒ NO | 54. ARE YOU COMPLETING THIS FORM FOR THE SOLE PURPOSE OF REFERRAL / RECOMMENDATION TO AN ALCOHOLIC RECOVERY HOME OR DRUG-FREE RESIDENTIAL FACILITY AS INDICATED BY THE PATIENT IN QUESTION 23? ☐ YES ☒ NO | 55. WOULD DISCLOSURE OF THIS INFORMATION TO YOUR PATIENT BE MEDICALLY OR PSYCHOLOGICALLY DETRIMENTAL? ☐ YES ☒ NO |
|---|---|---|

Doctor's Certification and Signature (REQUIRED): Having considered the patient's regular or customary work, I certify under penalty of perjury that, based on my examination, this Doctor's Certificate truly describes the patient's disability (if any) and the estimated duration thereof.

I further certify that I am a _____ FAMILY PRACTICE _____ licensed to practice in the State of CA.
(TYPE OF DOCTOR)    (SPECIALTY, IF ANY)

Rome Mattos, Auth Signer for ROSE ARELLANES MD

*Rose Arellanes MD/rm*
ORIGINAL SIGNATURE OF ATTENDING DOCTOR – RUBBER STAMP IS NOT ACCEPTABLE

10/1/2008
DATE SIGNED

Under sections 2116 and 2122 of the California Unemployment Insurance Code, it is a violation for any individual who, with intent to defraud, falsely certifies the medical condition of any person in order to obtain disability insurance benefits, whether for the maker or for any other person, and is punishable by imprisonment and/or a fine not exceeding $20,000. Section 1143 requires additional administrative penalties.

DE 2501  Rev. 76  (9-05) (DI Branch)                                                              page 3

Wells Fargo Leave management:

Attached you will find the family leave form which I was requested to submit because Metropolitan declined to pay disability benefits. There reasoning, as explained to me, was that Kaiser's medical records do not "support" disability pay. One of Kaiser's medical records is a recommendation to take time off after dealing with a severe case of acid reflux for more than a year.

I am affected by gagging and coughing, hoarseness, symptoms of laryngitis, and esophageal spasms. I have been referred to an ENT specialist, who thinks that my symptoms warrant seeing a Gastro-intestinal specialist. I have tried to work through this for over a year because of my commission only pay status and minimal disability benefits.

Recently, my choking and coughing episodes have worsened, and I have become depressed over this situation and decided to take my doctors advice. I was instructed to call the benefits department, and explained my situation and my doctor's recommendation, and was explained my disability benefits by a representative. At no time was it mentioned that a doctor's recommendation was not suitable for a short term medical leave. At this point I have been prescribed Zoloft for depression, and another medication for panic attacks, I have spoken with a therapist at Kaiser, and another at Metropolitan, Ann Marie, who told me that these symptoms, medical and physical, fill the requirement for disability pay, and that she would contact me the following week- I never heard from her, and upon contacting my case manager, Nancy Weird, I was informed that my request has been denied. I wonder if our high level management team would receive the same kind of treatment if they were sick?

Wells Fargo needs to contact Metropolitan and tell them that Wells Fargo employees should not be subjected to treatment like this, and if they cannot rectify this situation, should stop working with Metropolitan, and pay my disability benefits themselves. My signing this family leave form does not constitute an agreement by me to not receive disability benefits.

Regards,

Metropolitan Life Disability Claims:

I am requesting reconsideration of my disability case 356809177639. I understand my medical condition has been judged not to be severe enough to warrant disability pay. I would like to give you more complete information, which you can confirm with my physician, in order to make a fair decision.

In December of 2007, I started uncontrollable coughing and was seen by my physician. She concluded that my symptoms were caused by Acid Reflux, and prescribed medication, exercise, and diet change. She also suggested I take some time off work, which I declined because I work on commission only, and was not sure that I would have access to disability payments. I have followed all of her other recommendations, and am still effected, and limited by, symptoms caused by Acid Reflux including larynospasm and laryngitis. I am constantly coughing and clearing my throat which makes my effectiveness in my position at Wells Fargo, entailing constant in-person and telephone conversations, severely compromised. Most client meetings require continued speaking on my part, and are punctuated by coughing spells and throat clearing. When I try to stifle the coughing, my eyes water and redden, Often I have to excuse myself to drink water. On some occasions I cough up mucous, and must decide whether to swallow it or spit into a Kleenex. These episodes severely compromise the effectiveness of my sales presentations. Many nights I am awakened by a choking reflex and symptoms of sleep apnea, as well as continuous coughing and burning of the throat. I feel like I have had a bad cold for the last 22 months, with persistent hoarseness, scratchy throat, and tiredness. During this time my production (sales) has declined resulting in warnings from management, and instructions to increase my activities, at a time when I am struggling to meet minimum activity requirements. I now find it impossible to meet the stringent time requirements required of my position.

This health situation, and lack of improvement, has led to a condition of depression, exacerbated by the volatility and decline of the financial markets, and the demands of my position. I have been prescribed the anti-depressant Zoloft.

I understand that there is some question about why there was a delay between the time that my physician suggested taking time off to recover and my last day at work. I felt it necessary and responsible to complete projects that I was working on, especially to generate a living wage for my family, and obtain clearance from my company for the time I would miss. I was not participating completely in work activities, and not putting in the required hours, which I am physically and psychologically unable to do. My position does not allow part time hours. Actually, my physician recommended taking time off in January of 2007, which I declined because of my commission based compensation. At this time however, with very little improvement in my health, I see no other option. I have attached the report I received today from an ENT specialist, who has referred me to a gastro-intestinal specialist. Also attached is the report my primary care physician to the State disability department.

*Ken Shafler*          10/16/08

Shaffer, Kenneth C.

## PROMISSORY ESTOPPEL

| | |
|---|---|
| From: | Krug, Jan M. |
| Sent: | Wednesday, September 23, 2009 1:32 PM — 1 WEEK BEFORE MY TERMINATION |
| To: | Shaffer, Kenneth C.; Obenchain, Christopher T. |
| Subject: | Micron and Douglas/Auburn-Folsom Stores |

Hi Ken and Chris: I have just received word that Jim U'Ren whom we had slated to assume coverage of the Micron store will delay his return from medical LOA per his doctor's orders until Nov. 1, 2009. Because of that, we will delay the store coverage changes until he returns. I do apologize for the confusion. So, it's business as usual until the end of October! Thanks

*Jan M. Krug*

Wells Fargo Investments
Vice President
Regional Sales Manager
Private Client Services
1512 Eureka Road Suite 300
Roseville, CA 95661
(916) 788-4532

1

HI- I have been summoned to Jan Krug's office to be terminated after a conversation yesterday relating to sales performance and a 400 dollar overcharge of a client account. I came in @ 29K last month, compared to a monthly minimum requirement of 25K. Our conversation today concerned an e-mail that I sent to a client in an e-mail reviewing the status of 8K in MLCDs. I have repeatedly pointed out that the 50% revenue credit given FCs for joint FC/LB business was not fair, and that the deleted production should at least be considered for purposes of grid payout, and goal attainment. The FC/LB split is nothing more than gaming of the FCs production and compensation. I believe my termination is based on this assessment and the other ethical and regulatory issues that I have previously raised.

I was also mislead and lied to by Mark Webster and John Scambrey during recruitment, promised that I would be able to meet with affluent investors regularly and be assigned 15 million dollars in affluent client accounts. I am sure this is no news to you Ms. Copeland, recruiting violations are the norm at Wells Fargo, and there are many FCs that can attest to that.

I would like to say in parting, that in 30 years I have never been involved with a more dishonest and cut throat sales organization and that Ms. Krug and Mr. Webster are guilty of numerous recruiting and compliance violations. I will be exploring this situation with an attorney.

*Ken Shaffer*
Financial Consultant,
Wells Fargo Investments

M-W-F- 916 984-1179      Customer Service- 866-281-7436
T-Th  -916 364-3571
*Investment and Insurance Products*
- *Are Not insured by the FDIC or any other federal government agency.*
- *Are Not deposits of or guaranteed by the Bank or any Bank affiliate*
- *May Lose Value*

*Wells Fargo Investments, LLC (member SIPC) is a non-bank affiliate of Wells Fargo & Company.*

*The Information in this email is confidential. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance to it, is prohibited and may be unlawful. Trade Orders cannot be accepted by e-mail.*

WRONGFUL TERMINATION - MY
RESPONSE TO FINRA INQUIRY.

Jan 11, 2010

Dear Mr. Rahmer:

Regarding your request for additional information about Wells Fargo's U5 filing, please be advised that the firm named these incidents as part of a vengeful and arbitrary response to my complaints regarding their own professional misconduct and my own stated intent to terminate our relationship. I will not go into the details unless you request them, but I had complained in e-mails of the firm's reckless behavior, favoritism, undue pressure, and withheld compensation. I have been registered for 30 years and have never had a serious client complaint, judgement, or item requiring explanation before this.

In regard to the first item, exceeding commision schedule markups, this was simply an error in calculation on my part- I discussed this trade, and the amount of the commision (1000.00) with my clients of 15 years. I did not realize that the amount of the commision exceeded guidelines, and did not recieve any warning from the Thompson Financial order entry system the firm uses that the principle amount involved did not support this charge. The over charges amounted to approximately 130 and 140 dollars on each trade, and since I was advised of the over charge the next day, I assume the trade was corrected, which I willingly authorized when I was informed of the miscalculation. I was told by Ms. Mary Mortensen, compliance manager, that this would not ordinarily be a terminable offense, but an exception was made in my case due to my honesty in describing how I arrived at the 1000 dollar commision amount- to insure that I conformed to the firm's minimum production requirements in order to avoid termination. I had been threatened with termination for missing a monthly sales goal by 500 dollars previously, and was repeatedly warned that termination would result in a demand to return unamoritized amounts of an earlier bonus. There was no client complaint, in fact these clients are personal friends and feel that I have done an excellent job for them over the years.

The second item, received a written complaint that was not forwarded, concerns an e-mail I recieved from a client who did not find his 8,000 dollar investment in a S&P 500 linked Certificate of Deposit among his bank account statements, and had concerns about where his funds had gone. I called him immediately after recieving the e-mail and explained that his funds were in the separate brokerage account that we had opened with his approval several months earlier, and in fact the CD was maturing the following month and would return his full principle amount. He told me he then understood, and had no further concerns. I did not consider this a complaint, rather a misunderstanding, and did not forward.

As a result of this discriminatory behavior, comments on my U5, and the firm's unwillingness to provide me a trailing 12 month commision statement, I have been unable to find other employment, and am rapidly burning through my dwindling savings, resulting in financial hardship and depression. I was given 1 hour to report to my supervisors office after being informed of my termination, this after receiveing an e-mail one week earlier informing me of a new branch assignment, and being told untill then it was "business as usual". I feel the firm has violated various "right to work" regulations, and has sent me a demand letter to repay over 70K of previously awarded bonuses. In conversations with Ms. Mortensen, she refferred to these bonus amounts as "blood money", causing me additional worry and concern. I am wondering if FINRA or any other agency is available to help me, as I cannot afford the cost of an attorney.

Regards,


Ken Shaffer

EXHIBIT B   Page 32



FINRA
COUNTERCLAIM
ARB#10-00773



EXHIBIT C   Page 33

**I.   PARTIES**

CLAIMANT(S): (Provide this information even if you are represented by counsel.)

*KENNETH C. SHAFFOR*
Name
*5315 GARLENDA DR.*
Address
*EL DORADO HILLS , CALIF.*        *95762*
City                              State                    Zip Code
*(916) 941-9557*                                           *shaffero204@sbcglobal.net*
Daytime Telephone                 Fax #                    Email Address

Residence during the time of the dispute (if different from above):

_____
Name

_____
Address

_____
City                              State                    Zip Code

Claimant is a:
☐ Public customer    ☐ Broker-dealer        ☒ Person associated with a broker-dealer
                     BD #                    CRD #  *871643*

**Claimant's Counsel/Representative (if applicable):** (Note: FINRA requires that persons representing Florida investors in arbitration proceedings conducted in or outside of the State of Florida affirm either that they are licensed to practice law and provide a bar identification number, or that they are not receiving compensation in connection with representing the party in the arbitration proceeding.)

_____
Name                                          Bar ID # (if applicable)

_____
Address

_____
City                              State                    Zip Code

_____
Business Telephone                Fax #                    Email Address

**If needed, copy this page to list additional claimants.**

14

EXHIBIT C   Page 34

RESPONDENT(S)

Respondent #1:

*WELLS FARGO INVESTMENTS, LLC*
Name

*550 CALIFORNIA ST, 6TH FLR*
Address (if known)

*SAN FRANCISCO        CALIF.*                    *94104*
City                         State                    Zip Code

*(415) 975-6227        (415) 975-6227*
Business Telephone         Fax                    Email Address

Respondent #1 is a:
☐ Public customer    ☒ Broker-dealer    ☐ Person associated with a broker-dealer

BD # *8-38588*    CRD # *10582*

Respondent #2:

Name

Address (if known)

City                         State                    Zip Code

Business Telephone         Fax #                    Email Address

Respondent #2 is a :
☐ Public customer    ☐ Broker-dealer    ☐ Person associated with a broker-dealer

BD #              CRD #

If needed, copy this page to list additional respondents.

15

EXHIBIT C   Page 35

II.  CLAIMS

**Accounts:** If the dispute or claim involves activity with respect to an account or accounts, please list each account and indicate the type of account it is (*e.g.*, joint account, custodial account, etc.)

**1.**

| | |
|---|---|
| Name (exactly as it appears on the account) | Type of Account |
| Name of Firm and Branch Office | Date Account Opened |
| Name of Registered Representative | Account Number |

**2.**

| | |
|---|---|
| Name (exactly as it appears on the account) | Type of Account |
| Name of Firm and Branch Office | Date Account Opened |
| Name of Registered Representative | Account Number |

**3.**

| | |
|---|---|
| Name (exactly as it appears on the account) | Type of Account |
| Name of Firm and Branch Office | Date Account Opened |
| Name of Registered Representative | Account Number |

**If needed, copy this page to list additional accounts.**

16

EXHIBIT C   Page 36

**Type of Dispute: (Check where applicable)**

**a.   Account Related**

| | | |
|---|---|---|
| Breach of Contract | Exchanges | Transfer |
| Collection | Failure to Supervise | Other |
| Dividends | Margin Calls | |
| Errors/Charges | Negligence | |

**b.   Executions**

| | | |
|---|---|---|
| Execution Price | Incorrect Quantity | Other |
| Failure to Execute | Limit Versus Market Order | |

**c.   Account Activity**

| | | |
|---|---|---|
| Breach of Fiduciary Duty | Misrepresentations | Unauthorized Trading |
| Churning | Omission of Facts | Other |
| Manipulations | Suitability | |

**d.)   Employment**

| | | | | |
|---|---|---|---|---|
| | Breach of Contract | | Discrimination National Origin | Partnerships |
| X | Commissions | | Discrimination Race | X Promissory Notes |
| X | Compensation | | Discrimination Religion | Sexual Harassment |
| | Discrimination Age | | Discrimination Sexual Preference | Training Contracts |
| X | Discrimination Disability | | Libel or Slander | X Wrongful Termination |
| | Discrimination Gender | X | Libel or Slander on Form U-5 | Other |

**e.   Trading Dispute**

| | | |
|---|---|---|
| Buy-In | Markups | Transfers |
| D.K.s | Sell Outs | Other |
| Manipulation | Stock Loan | |

**f.   Other**

| | | | |
|---|---|---|---|
| | Clearing Dispute | Indemnification | Underwriting |
| X | Defamation | Raiding Disputes | Other |

**Type of Security(ies). Financial Instrument(s). and/or Investment(s) involved in the Dispute:**

| | | |
|---|---|---|
| Annuities | "Fannie Maes" | Options |
| Variable Annuities | "Freddie Macs" | Preferred Stock |
| Auction-Rate Securities | Futures | Private Equities |
| Certificates of Deposit | "Ginnie Maes" | Real Estate Investment Trust |
| Collateralized Debt Obligations (CDOs) | Government Securities | Repurchase Agreements |
| Collateralized Mortgage Obligations (CMOs) | Hedge Funds | Reverse Repurchase Agreements |
| Commodities (Other than Futures) | Limited Partnerships | Stock Index Futures |
| Common Stock | Municipal Bonds | Structured Products |
| Corporate Bonds | Municipal Bond Funds | Warrants/Rights |
| Exchange-Traded Funds | Mutual Funds | Other: |

· 17

EXHIBIT C   Page 37 .

III.   RELIEF REQUESTED

1.   Damages

Actual Damages Requested                                        $  170,000   1.
(monetary sum required to compensate a party for
his or her loss excluding interests and expenses)

Punitive Damages Requested                                          830,000   2.
(monetary amount intended to punish the wrongdoer)

*  AMOUNT IN DISPUTE:   1,000,000   3.

*  Use this amount to calculate the correct filing fee and hearing
session deposit in Part IV. This amount *must* match the amount
stated in your claim.

Interest
(include calculations, if possible)                              _____

2.   Other Type of Relief Requested

Specific Performance (Specify the type of specific performance sought)
(specific performance requires parties to take an action, such as turning over ownership of stocks)
ADJUST U5 ENTRIES

Injunctive Relief (Specify the type of injunctive relief sought)
(injunctions require parties to refrain from certain actions)
STOP WRONGFUL TERMINATIONS, INFORM T COUNCIL TERMINATED EMPLOYEES
OF RIGHTS, EFFECT OF U-5 ENTRIES, PROVIDE TERMINATED EMPLOYEES T-12 RECORDS

3.   Costs

(Provide specific amounts, if known. If not known, please mark an "X" to indicate the costs you are requesting)

Forum Fees
500
Attorney's Fees

Witness and Production Fees
1575- FINRA FEE
Other Case-Related Costs

18

EXHIBIT C   Page 38

Customer or Associated Person Claimant

<u>IV.</u>   <u>FEES</u>

**TO DETERMINE THE CORRECT FEE, USE THE <u>"AMOUNT IN DISPUTE"</u> FIGURE ON LINE 3, PAGE 18.**

If you are a *CUSTOMER OR ASSOCIATED PERSON CLAIMANT* use this table (Rule 12900 of the *Customer Code* or Rule 13900 of the *Industry Code*) to determine the filing fee that **MUST** accompany a Statement of Claim when it is filed with FINRA. If your claim does **NOT** disclose or specify a monetary claim, the filing fee is $1,250.

Find the amount of your dispute on the chart, then find the applicable claim filing fee.

Filing Fees for Claims Filed by Customers, Associated Persons and Other Non-Members

| Amount of Claim (exclusive of interest and expenses) | Filing Fee |
|---|---|
| $.01 to $1,000 | $50 |
| $1,000.01 to $2,500 | $75 |
| $2,500.01 to $5,000 | $175 |
| $5,000.01 to $10,000 | $325 |
| $10,000.01 to $25,000 | $425 |
| $25,000.01 to $50,000 | $600 |
| $50,000.01 to $100,000 | $975 |
| $100,000.01 to $500,000 | $1,425 |
| $500,000.01 to $1 million | $1,575 |
| Over $ 1 million | $1,800 |
| Non-Monetary/Not Specified | $1,250 |

Once you have determined the correct filing fee, submit it with your Statement of Claim. For example, if you are a **customer or associated person** claimant and the amount of your claim is $40,000, the claim filing fee is $600. Mail the check with your Statement of Claim, Claim Information Sheet and properly executed Submission Agreement.

EXHIBIT C   Page 39

## Firm Claimant

**TO DETERMINE THE CORRECT FEE, USE THE <u>"AMOUNT IN DISPUTE"</u> FIGURE ON LINE 3, PAGE 18.**

If you are a *FIRM CLAIMANT* use this table (Rule 12900 of the *Customer Code* or Rule 13900 of the *Industry Code*) to determine the filing fee that **MUST** accompany a Statement of Claim when it is filed with FINRA. If your claim does **NOT** disclose or specify a monetary claim, the filing fee is $1,500.

Find the amount of your dispute on the chart, then find the applicable claim filing fee.

**Member Claimant**

| Amount of Claim (exclusive of interest and expenses) | Filing Fee |
| --- | --- |
| $.01 to $1,000 | $225 |
| $1,000.01 to $2,500 | $350 |
| $2,500.01 to $5,000 | $525 |
| $5,000.01 to $10,000 | $750 |
| $10,000.01 to $25,000 | $1,050 |
| $25,000.01 to $50,000 | $1,450 |
| $50,000.01 to $100,000 | $1,750 |
| $100,000.01 to $500,000 | $2,125 |
| $500,000.01 to $1,000,000 | $2,450 |
| $1,000,000.01 to $5,000,000 | $3,200 |
| Over $5,000,000 | $3,700 |
| Non-Monetary/Not Specified | $1,500 |

Once you have determined the correct filing fee, you should calculate the appropriate member surcharge outlined on page 21 and submit the total with your Statement of Claim. For example, if you are a **firm** claimant and the amount of your claim is $40,000, the claim filing fee is $1,450, and the member surcharge is $875. Therefore, you should send one check **payable to FINRA Dispute Resolution** in the amount of $2,325. Mail the check with your Statement of Claim, Claim Information Sheet and properly executed Submission Agreement.

20

EXHIBIT C   Page 40

## Member Surcharge & Process Fees:

Rules 12901 and 12903 of the *Customer Code*, and Rules 13901 and 13903 of the *Industry Code* require firms to pay a *non-refundable* surcharge and *non-refundable* process fees if the firm or person associated with the firm is a claimant or respondent in an arbitration at this forum. FINRA will send invoices for process fees to firms at appropriate stages of the arbitration process.

**TO DETERMINE THE CORRECT SURCHARGE, USE THE "<u>AMOUNT IN DISPUTE</u>" FIGURE ON LINE 3, PAGE 18.**

If you are a FIRM CLAIMANT, use this table (Rules 12901 or 13901) to determine the appropriate member surcharge that MUST accompany your Statement of Claim when it is filed with FINRA. If your claim does NOT disclose or specify a monetary claim, the non-refundable surcharge is $1,500.

**Member Surcharge**

| Amount in Dispute (exclusive of interest and expenses) | Surcharge |
|---|---|
| Up to $2,500 | $150 |
| $2,500.01–$5,000 | $200 |
| $5,000.01–$10,000 | $325 |
| $10,000.01–$25,000 | $425 |
| $25,000.01–$30,000 | $600 |
| $30,000.01–$50,000 | $875 |
| $50,000.01–$100,000 | $1,100 |
| $100,000.01–$500,000 | $1,700 |
| $500,000.01–$1,000,000 | $2,250 |
| $1,000,000.01–$5,000,000 | $2,800 |
| $5,000,000.01–$10,000,000 | $3,350 |
| Over $10,000,000 | $3,750 |
| Non-Monetary/Not Specified | $1,500 |

## V.     HEARING INFORMATION

For claims of $25,000 or less under Rules 12800 (simplified customer/investor) and 13800 (simplified industry): *(check one)*

☐ I am requesting a hearing in this matter          ☐ I am not requesting a hearing in this matter

21

EXHIBIT C   Page 41

## Submission Agreement

**Claimant(s)**

*KENNETH   C.   SHAFFER*

**In the Matter of the Arbitration Between**

Name(s) of Claimant(s)

*KENNETH   C.   SHAFFER*

**and**

Name(s) of Respondent(s)

*WELLS FARGO INVESTMENTS, LLC*

1. The undersigned parties ("parties") hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

2. The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules.

3. The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.

4. The parties agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement. The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

*KENNETH   C.   SHAFFER*

Claimant Name (please print)

*Kenneth C. Shaffer*                                    4-27-2010

Claimant's Signature                                     Date

State capacity if other than individual (*e.g.*, executor, trustee or corporate officer)

Claimant Name (please print)

Claimant's Signature                                     Date

State capacity if other than individual (*e.g.*, executor, trustee or corporate officer)

**If needed, copy this page.**

22

EXHIBIT C   Page 42

To Whom It May Concern:

The following is a full description of the areas of dispute specified in this claim.

Wrongful Termination- I was terminated without advance notice based on two frivolous infractions of company policy, an inadvertent over charge on two stock trades of approximately 300 dollars, and a failure to pass an e-mail complaint to management, a situation which I considered a misunderstanding, not a complaint, rectified with a phone call. These infractions would not be cause for termination had I not previously complained in e-mails about the firm's reckless emphasis on revenue production, withheld compensation, favoritism, and compliance violations. A Ms. Mary Mortensen, compliance manager, who informed me of the termination, actually stated that these infractions would ordinarily not be grounds for termination.

Commissions- withholding of commissions was executed as part of an unfair "licensed banker" program which credited only 50% of revenue from an account introduced by a licensed banker for the first year. This withheld revenue was not counted toward goal achievement or compensation, and not evenly applied in all branches, The branch which I was able to generate the largest amount of revenue from in 2008, originally had no licensed bankers and was assigned two licensed bankers at the start of 2009. My goals, which subjected me to termination if not met, were raised during this period.

Promissory Note- Originally described as a "bonus plan" It was never explained, and I never understood that amounts could be demanded to be repaid based on unwarranted termination, or that conditions would be placed on my employment, sales revenue quotas, which were not a condition at the time of hiring or when the promissory note amounts were awarded. When I asked about the treatment of these promissory note amounts at the time of termination, Ms. Mortensen commented that I should know these amounts are considered "blood money"

Libel or slander on form u-5- The entries on my u-5, and termination without council including not given the opportunity to resign, which I believe violates standard business practice in the brokerage business, is another discriminatory activity by the firm, and has damaged my professional reputation resulting in five firms, originally very positive on the prospects for my employment, saying they could not hire me because of the entries on my u-5. (Exhibit A). These actions have resulted in my not being able to procure employment, this after thirty years in the brokerage business without a serious complaint or compliance violation.

These actions by the firm have resulted in both emotional and financial distress on my part. There are also other issues involved here, not categorized on the Claim information sheet, which I think should be taken into consideration, please see exhibit B.

EXHIBIT C   Page 43

EXHIBIT A

Firms that told me they could not hire me based on my u-5 notes from Wells Fargo, absence of t-12 (trailing 12 month commission report)

1. Stifel Nicholas (u-5,t-12)
2. Ameriprise (u-5)
3. Wedbush Morgan Securities (u-5,t-12)
4. E-Trade (u-5)
5 Chase Investment Services{u-5)

Contact names available on request.

EXHIBIT C   Page 44

Exhibit B

55 Year Old Stock Broker, called Financial Consultant at Wells Fargo, recently terminated without cause. I have no entries on my u-4, and no client complaints. I believe that a health related issue, and my identification and concern regarding compliance related issues resulted in my termination, for specific reasons which were never explained to me.

I joined the firm 3 years ago with promises of being introduced to affluent investors, receiving 15 million in affluent client accounts, never provided; I believe this created a situation of "detrimental reliance"

Six months after joining Wells I became seriously ill as a result of acid reflux, which I believe is stress related. I was unable to speak for extended periods without coughing, symptoms of sleep Apnea at night. My doctor recommended time off, I declined due to work related pressures and possibility of earning bonus for production over first 12 months. After 12 months, I had qualified for bonus, received 111K, continued Acid Reflux problems resulting in decreased production, and received verbal warning "for declining production, decided to take Dr's advice of 6-8 weeks" voice rest. I checked with the employee benefits dept., and my short term disability benefits were reviewed, when I explained the situation and my Dr's recommendation, I was led to believe this was a qualifying disability, later declined by Metropolitan.

Returned to work in December, 2008, second month back I missed my sales quota by 500 dollars, summoned to managers office on Friday afternoon for Monday morning, placed on "written warning", which at Wells means you can be terminated for missing your sales quota by any amount in any one month, an extreme conflict of interest for the broker, and undue pressure, complained in e-mail, attached.

I produced at a satisfactory level for the next several months. Two days prior to firing I received an e-mail from Mary Mortensen in compliance that I had overcharged a client by approximately 300 dollars on a stock trade, needed an e-mail explanation, told her that I didn't realize the error, the order entry system, Thompson Financial, did not inform me of the overcharge, was happy to have it reduced, and I added, in humor..that I thought it was in the firm's business plan to gouge the client anyway- it really is, the way to excel in this program is to sell the client the "high commission" product, which most of the reps are forced to do to make the quotas. Shortly after I sent the e-mail, I was ordered into the new manager's office and questioned, I truthfully told Mary Mortensen, and Jan Krug, the new manager, that I was under pressure not to miss my 25K/month quota, risking termination and that was the reason I adjusted the commission upward.

The next day I received a call from Jan Krug, telling me that Mary Mortensen had reviewed my e-mails and found an e-mail in which a customer had complained that they didn't know where their money was, actually in a separate brokerage account, total 8,000 dollars. I had previously called the client and explained that the funds were in the separate brokerage account which he agreed to set up one year earlier, and that the CD in

EXHIBIT C   Page 45

the account would mature next month, and he would receive 100% of their investment back  I didn't consider this a complaint at this point, but a misunderstanding. Jan told me during this conversation that this complaint should have been passed on to management, to be at the Roseville office in one hour, and to bring my laptop, and the keys to the file cabinets at the 2 branches I work at, which is Wells code for "your fired". I suffered stomach cramps and heart palpitations at hearing this unexpected news, and knowing I was to be terminated returned home for the day. I met Mary at my Branch the next morning and was informed that I was terminated, no council given, no opportunity to resign. I kept my laptop computer in an effort to retrieve my own client records not covered by a non-compete agreement, and my t-12, unsuccessfully, returned it the next morning.

I am sure that other "FCs" have client complaints on their record and other violations which have not been cause for termination. This discriminatory treatment and damage to my professional reputation has caused me both emotional and financial duress.


Regards,

Ken Shaffer

EXHIBIT C   Page 46

 **EDD** Employment Development Department State of California

### Claim for Disability Insurance Benefits – Doctor's Certificate

copy

TYPE or PRINT with BLACK INK.

| 34. PATIENT'S FILE NUMBER | 35. PATIENT'S SOCIAL SECURITY NO. | 36. PATIENT'S LAST NAME |
|---|---|---|
| 000001850482 | ▮▮▮▮▮▮ | SHAFFER |

| 37. DOCTOR'S NAME AS SHOWN ON LICENSE | 38. DOCTOR'S TELEPHONE NUMBER 916/817-5200 | 39. DOCTOR'S STATE LICENSE NO. A66839 |
|---|---|---|
| ROSE ARELLANES MD | | |

**40. DOCTOR'S ADDRESS** – NUMBER AND STREET, CITY, STATE, COUNTRY (IF NOT USA), ZIP CODE. POST OFFICE BOX NUMBER IS NOT ACCEPTED AS THE SOLE ADDRESS

Medical Secretaries
2155 Iron Point Road, Folsom, CA 95630

**41. THIS PATIENT HAS BEEN UNDER MY CARE AND TREATMENT FOR THIS MEDICAL PROBLEM**

FROM 12/28/2006 TO 9/10/2008 AT INTERVALS OF ☐ DAILY ☐ WEEKLY ☐ MONTHLY ☒ AS NEEDED

**42. AT ANY TIME DURING YOUR ATTENDANCE FOR THIS MEDICAL PROBLEM, HAS THE PATIENT BEEN INCAPABLE OF PERFORMING HIS/HER REGULAR OR CUSTOMARY WORK?**
☐ NO – SKIP TO THE DOCTOR'S CERTIFICATION SECTION
☒ YES – ENTER DATE DISABILITY BEGAN: 9/22/2008

**43. DATE YOU RELEASED OR ANTICIPATE RELEASING PATIENT TO RETURN TO HIS/HER REGULAR / CUSTOMARY WORK** ("UNKNOWN," "INDEFINITE," ETC., NOT ACCEPTED.)
11/2/2008

**44. ICD9 DISEASE CODE, PRIMARY** (REQUIRED UNLESS DIAGNOSIS NOT YET OBTAINED)
478.75 LARYNGEAL SPASM

**45. ICD9 DISEASE CODE(S), SECONDARY**
308.9 530.81

**46. DIAGNOSIS (REQUIRED)** – IF NO DIAGNOSIS HAS BEEN DETERMINED, ENTER OBJECTIVE FINDINGS OR A DETAILED STATEMENT OF SYMPTOMS
54 YEAR OLD MALE WITH A HISTORY OF CHRONIC THROAT PROBLEMS. HAVING COUGHING AND CHOKING EPISODES AS WELL AS REFULX PROBLEMS. STRESSED AS HIS THROAT IS EFFECTING HIS WORK, FEELS A LOT OF STRESS AND UNSUPPORTED AS IT IS DIFFICULT FOR HIM TO TALK ALL DAY. OFF WORK FOR VOICE REST GIVEN CURRENT LARYNGOSPASM. TRIAL OF ZOLOFT TO SEE IF CAN HELP DEAL WITH ANXIETY OF HIS MEDICAL CONDITION AND WORK.

**47. FINDINGS** – STATE NATURE, SEVERITY, AND EXTENT OF THE INCAPACITATING DISEASE OR INJURY. INCLUDE ANY OTHER DISABLING CONDITIONS

**48. TYPE OF TREATMENT / MEDICATION RENDERED TO PATIENT**
MEDICATION, REFERRED TO BMC AND WILL BE EVALUATION BY HEENT AGAIN.

**49. IF PATIENT WAS HOSPITALIZED, PROVIDE DATES OF ENTRY AND DISCHARGE**
_/_/_ TO _/_/_

**50. DATE AND TYPE OF SURGERY / PROCEDURE PERFORMED OR TO BE PERFORMED**
_/_/_

**ICD9 PROCEDURE CODE(S)**

**51. IF PATIENT IS NOW PREGNANT OR HAS BEEN PREGNANT, WHAT DATE DID PREGNANCY TERMINATE OR WHAT DATE DO YOU EXPECT DELIVERY?**
_/_/_

**52. IF PREGNANCY IS / WAS ABNORMAL, STATE THE ABNORMAL AND INVOLUNTARY COMPLICATION CAUSING MATERNAL DISABILITY**

**53. BASED ON YOUR EXAMINATION OF PATIENT, IS THIS DISABILITY THE RESULT OF "OCCUPATION," EITHER AS AN "INDUSTRIAL ACCIDENT" OR AS AN "OCCUPATIONAL DISEASE"?** (INCLUDE SITUATIONS WHERE PATIENT'S OCCUPATION HAS AGGRAVATED PRE-EXISTING CONDITIONS.)
☐ YES ☒ NO

**54. ARE YOU COMPLETING THIS FORM FOR THE SOLE PURPOSE OF REFERRAL / RECOMMENDATION TO AN ALCOHOLIC RECOVERY HOME OR DRUG-FREE RESIDENTIAL FACILITY AS INDICATED BY THE PATIENT IN QUESTION 23?**
☐ YES ☒ NO

**55. WOULD DISCLOSURE OF THIS INFORMATION TO YOUR PATIENT BE MEDICALLY OR PSYCHOLOGICALLY DETRIMENTAL?**
☐ YES ☒ NO

**Doctor's Certification and Signature (REQUIRED):** Having considered the patient's regular or customary work, I certify under penalty of perjury that, based on my examination, this Doctor's Certificate truly describes the patient's disability (if any) and the estimated duration thereof.

I further certify that I am a _____ FAMILY PRACTICE _____ licensed to practice in the State of _CA._
(TYPE OF DOCTOR) (SPECIALTY, IF ANY)

Rome Mattos, Auth Signer for ROSE ARELLANES MD

► *Rose Arellanes MD /rm* ► 10/1/2008
(ORIGINAL SIGNATURE OF ATTENDING DOCTOR – RUBBER STAMP IS NOT ACCEPTABLE) DATE SIGNED

Under sections 2116 and 2122 of the California Unemployment Insurance Code, it is a violation for any individual who, with intent to defraud, falsely certifies the medical condition of any person in order to obtain disability insurance benefits, whether for the maker or for any other person, and is punishable by imprisonment and/or a fine not exceeding $20,000. Section 1143 requires additional administrative penalties.

DE 2501 Rev. 76 (9-05) (DI Branch) page 3

EXHIBIT C Page 47

Wells Fargo Leave management:

Attached you will find the family leave form which I was requested to submit because Metropolitan declined to pay disability benefits. There reasoning, as explained to me, was that Kaiser's medical records do not "support" disability pay. One of Kaiser's medical records is a recommendation to take time off after dealing with a severe case of acid reflux for more than a year.

I am affected by gagging and coughing, hoarseness, symptoms of laryngitis, and esophageal spasms. I have been referred to an ENT specialist, who thinks that my symptoms warrant seeing a Gastro-intestinal specialist. I have tried to work through this for over a year because of my commission only pay status and minimal disability benefits.

Recently, my choking and coughing episodes have worsened, and I have become depressed over this situation and decided to take my doctors advice. I was instructed to call the benefits department, and explained my situation and my doctor's recommendation, and was explained my disability benefits by a representative. At no time was it mentioned that a doctor's recommendation was not suitable for a short term medical leave. At this point I have been prescribed Zoloft for depression, and another medication for panic attacks, I have spoken with a therapist at Kaiser, and another at Metropolitan, Ann Marie, who told me that these symptoms, medical and physical, fill the requirement for disability pay, and that she would contact me the following week- I never heard from her, and upon contacting my case manager, Nancy Weird, I was informed that my request has been denied. I wonder if our high level management team would receive the same kind of treatment if they were sick?

Wells Fargo needs to contact Metropolitan and tell them that Wells Fargo employees should not be subjected to treatment like this, and if they cannot rectify this situation, should stop working with Metropolitan, and pay my disability benefits themselves. My signing this family leave form does not constitute an agreement by me to not receive disability benefits.

Regards,

EXHIBIT C   Page 48

**PROMISSORY ESTOPPEL**

Shaffer, Kenneth C.

| | |
|---|---|
| From: | Krug, Jan M. |
| Sent: | Wednesday, September 23, 2009 1:32 PM  -- *1 WEEK BEFORE MY TERMINATION* |
| To: | Shaffer, Kenneth C.; Obenchain, Christopher T. |
| Subject: | Micron and Douglas/Auburn-Folsom Stores |

Hi Ken and Chris:  I have just received word that Jim U'Ren whom we had slated to assume coverage of the Micron store will delay his return from medical LOA per his doctor's orders until Nov. 1, 2009.  Because of that, we will delay the store coverage changes until he returns.  I do apologize for the confusion.  So, it's business as usual until the end of October!  Thanks

*Jan M. Krug*

Wells Fargo Investments
Vice President
Regional Sales Manager
Private Client Services
1512 Eureka Road Suite 300
Roseville, CA 95661
(916) 788-4532

1

EXHIBIT C   Page 49

*E-MAIL I SENT 3/09/2009*

**Shaffer, Kenneth C.**

| | |
|---|---|
| **From:** | Shaffer, Kenneth C. |
| **Sent:** | Monday, March 09, 2009 4:31 PM |
| **To:** | Webster, Mark D. (PCS); Hamill, Leo P. |
| **Subject:** | Fair and reasonable? |

Hi Mark- I have been issued a "formal written warning" for unsatisfactory production from Barbara. My monthly goal is 20,666 (80%). For February, I had total production of 20,100, missing the mark by 500 dollars. My year to date is 41,439, an average of 20,719.50 per month, and higher than the original requirement. I am now being threatened with termination, at a time when, prior to this meeting, I felt like I was gaining momentum- For March, I have booked my 1st Transamerica Inheritance Builder Sale, received my first "Inforce Policy review", and booked business in fixed annuities. I feel my branch relations are excellent, and I have no customer complaints. I was 14th out of 29 reps for the month of February, and am 8th in % to goal.

Complicating the situation is the fact that I have an outstanding promissory note- Barbara has informed me that the unamortized amount would be due back to Wells, a financially disastrous situation. I cannot believe that the Ms. Brandell is subjecting not only myself, but other FCs to this type of mental duress at a time of financial crisis. Do you think this is fair and reasonable?

I think one of the sources of this discriminatory behavior is that I took 8 weeks off last year, Oct. and Nov., for a health problem that I am still being treated for- I currently take 8 pills a day! I was denied short term disability from Metropolitan Insurance with the explanation the my medical records did not support disability payments- even though I would assume the recommendation to take time off was part of my records. They effectively over ruled my Doctor- amazing. This situation affected my productivity before I left, and I had 2 months of 0 production. Barbara states that the condition of written warning is based on last year's production as well. I was on track to achieve my annual goal last year until July. I believe my treatment is partially based on verifiable illness.

Since I am now in a "sudden death" situation, I must also tell you as well that, after 30 Years of no entries on my u-4, I am very concerned with complaints and law suits arising from reckless behavior on the part of the firm- the push on "reverse convertibles", resulting in the unexplained disappearance of one of their strongest converts, Suggestion that health questions regarding insurance be less than fully truthful, and the misrepresentation of income from Insurance policies.

I am hoping that I can be on more than a "month to month" plan, which is only reasonable since it could compromise my ability to suggest the best course of action for my clients. I am available to verify and discuss any of these items at your request, and will continue to provide the very best support for clients and team members.

*Ken Shaffer*
Financial Consultant
Wells Fargo Investments

M-W-F- 916 984-1179
T-Th -916 364-3571
*Investment and Insurance Products*
*Are Not insured by the FDIC or any other federal government agency.*
*Are Not deposits of or guaranteed by the Bank or any Bank affiliate*
*May Lose Value*

*Wells Fargo Investments, LLC (member SIPC) is a non-bank affiliate of Wells Fargo & Company.*

*The Information in this email is confidential. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance to it, is prohibited and may be unlawful. Trade Orders cannot be accepted by e-mail.*

1

EXHIBIT C   Page 50

MY RESPONSE TO DEMAND LETTER

Dear Mr. Lindsay:

Recieved your letter regarding the promisory note balance. Unfortunately, at this time I have no job, and approximately twenty thousand dollars to my name. My burn rate is approximately 5K per month, meaning in 4 months, I will be withdrawing from a small IRA in order to survive. My home, formerly my most valuable asset, is now worth substantially less than I paid for it, resulting in minimal equity. I am very likely a candidate for bankruptcy proceedings, if I could afford the legal expense.

I have been unable to secure other employment of any type, and specifically as a Financial Advisor, because I was given no advance notice of my termination and have no client or production records. I believe that Wells Fargo has breached my rights under California's "right to work" statutes, and is guilty of other employee rights violations.

The termination which results in this request for the return of the promisory note amounts is completely unwarranted, and in fact, I was told by the Branch Administrative Manager, Mary Mortensen, that the events sited would not be grounds for termination if it were not for my criticism of the firm. Prior to my termination on October 1st, I had no reason to believe I would be terminated, and in fact, recieved an e-mail from my immediate supervisor, Jan Krug, approximately one week before my termination that it was "business as usual" until November, when I was to start working at a new branch. I believe that this created a situation of promissory estoppel.

When I asked Wells Fargo for a trailing 12 month production record, I was denied. This record is mandatory information for most hiring firms, I believe that this is a violation of California "right to work" laws.

I recieved a call from a representative of the State unemployment office who told me that Wells fargo had reported to them that I had purposely intended to be fired, resulting in no unemployment payments and possible waiver of COBRA benefits. This is completely false, and in fact, I have been warned that termination could trigger a demand to return earlier bonus amounts, resulting in mental duress and undue pressure to make sure that I would not be terminated.

Additionally, when I was hired I was promised 15 million dollars in affluent client accounts, and the opportunity to meet regularly with affluent investors creating a situation of detrimental reliance. I was assigned to a new branch of Wells Fargo with a tiny asset base, and struggeled to produce a minimal income from the client base which I brought to the firm. This stress resulted in illness which my doctor recommended time off to recover from. Through the Wells fargo employee benefits department, I was led to believe that this was a qualifying short term disability, later denied by Metropolitan Insurance Co. My medical records at this time included a recommendation to take time off for voice rest due to persistant laryngospasm and sleep apnea symtoms, as well as treatment for depression. Metropolitan told me that it was difficult to obtain the required information from my Kaiser Physician, and that the records they recieved did not support a valid claim.

These events, and blatant favoritism towards Financial Consultants hired by managers who benefit from their success ( the manager who hired me has been terminated), pressure to meet minimum production goals while having revenues witheld through a punitive FC/ Licensed banker sharing arrangement, and

EXHIBIT C   Page 51

lack of adequate compensation for time spent in manadatory, non revenue producing activities have resulted in extreme hardship, frustration, and depression.

I have been told that these outstanding promissory note amounts are considered by Wells Fargo to be "blood money" by Mary Mortensen, Branch Administrative Manager, and now fear for my own and my family's safety. No one ever explained the ramifications of the promisory note to me originally, especially in regard to future production quotas that were never discussed or in effect at the time, or the possibility of arbitrary termination.


Ken Shaffer

EXHIBIT C   Page 52