Thanks for providing a platform for these issues, I am looking forward to hearing an unbiased opinion regarding this situation. Please allow me to give you an overview of these events, I will provide details and answer any questions at your request.

I believe that Wells Fargo enticed me to join Wells Fargo Investments with promises that they never fulfilled and touted the benefits of receiving a performance bonus over the first 18 months and 15 million dollars in client accounts.

During and after periods of what I considered severe illness, during which I was denied short term disability benefits which I was led to believe I qualified for, I was assigned sales quotas which I was not subject to originally, and not informed that I would be subject to at my time of hiring. They were also unfair in that they excluded 50% of "licensed banker" reffered accounts. This situation, favoritism, and what I percieved as the firms reckless attitude toward client protection resulted in emotional distress and my request to be allowed to resign. I was told that the promissory note balance would be due in full if I were to resign or be terminated.

During the tenure of my 3rd sales manager, after being told that I was going to be assigned an additional branch the following month, and that it was "business as usual" until then, I was abruptly terminated for two minor infractions, infractions that are routinely and ordinarily are not cause for termination. My U-5 shows "violation of company policy" and discriptions of these infractions which is misleading, and has resulted in my repeatedly being refused employment after very positive initial interviews. They have effectively ended my thirty year career, and left me with no means of similar constructive employment.

Through the course of these events I believe that Wells Fargo Investments, and their representatives, violated State labor and employment laws, and are quilty of creating a situation of detrimental reliance, promissory estoppel, and Intentional and negligent infliction of emotional distress.

I will be reffering to California's " Division of Labor Standards Enforcement Policies and Interpretations" Manual which I have provided excerpts from. The entire document can be viewed at www.dir.ca.gov/DSLE/dsle.html.

Thank You

Ken Shaffer

ISSUES

Promissory Note

 Originally described as a "bonus", It was never explained, and I never understood that amounts could be demanded to be repaid based on unwarrented termination, or that conditions would be placed on my employment, sales revenues quotas, which were not a condition at the time of my hiring or when the promissory note amount was awarded. Additionally, the demand for lump sum payment violates contract law in that it constitutes a penalty for an employee's termination, especially in light of my precarious financial condition. These conditions result in the Promissory note being "unconscionable" and "one sided". Civil Code s 1670.5 states that unconscionable contracts or provisions therein which are one sided may be found invalid. (32.2.4)*

 Page two of the promissory note agreement states " this note shall be interpreted, enforced, and governed by the laws of the state of California. California State Labor Law states that "balloon payment demands for loans made to employees made at the time of termination are not allowed even if the employee has given his or her consent to such payments" sec 11.2.5 "Deductions made for loans to employees" Barnhill v. Saunders (125 Cal.App.3d1). *

California Labor law also defines Promissory notes as "Adhesion Contracts" which are described as " "boilerplate" language drafted by one party without opportunity for negotiation". These types of contracts are "subject to greater scrutiny in interpretation and enforcement in order to modify or nullify harsh terms which defeat the reasonable expectations of the parties" sec 32.2 (Cal.App3d,345,356,133 Cal.Rptr. 775,783)*
sec 32.2.2 states that and adhesion contract which does not fall within the reasonable expectations of the weaker or "adhering" party is not enforceable against him.* The Promissory note qualifies under these provisions.

Please  see payroll document (exhibit 1), the contested amount is described as "net pay" and "net pay distribution" as part of a what is described as a bi-weekly payroll report. This is confusing and misleading, especially because the promissory note also meets the definition of a "Bonus" as defined in section 2.5.5 - an amount promised in addition to the monthly commision due as compensation paid for a specific result, in my case the achievement of  a minimum level of commision generation.

* Excerpts from the California Division of Labor Standards Enforcement Policies and Interpretations Manual

Wrongful Termination

I was terminated without notice based on two accidental and incidental violations of company policy, an inadvertant overcharge of approximately 300 dollars on two trades, and the failure to pass on an e-mail from a client who was requesting instructions as to how to transfer his account balance to his checking account.

The Wells fargo response to my counter complaint describes the first clients as "Wells Fargo's clients". This account belongs to my friends and clients for over 15 years, which I transfered to Wells fargo from my previous firm. Please see exhibit 7. This would be considered a "trade error" for anyone not being subject to discrimination. Financial Advisors are expected to make decisions regarding commision amounts regulary, many of the individual security trades which I processed were discounted, Financial Advisors are also allowed to decide when a situation qualifies for a higher commision. Finra rule IM-2440-1 regarding mark-up policy states that "the 5% policy is a guide, not a rule". I had never had an incident relating to overcharging, and the small amount involved certainly shows that this was not intentional. A one time accidental overcharging of a client is not specified as grounds for termination in any employment manual. Please see 9-29-2009 e-mail from Mary Mortensen (2) the total overcharge amount comes to 284 dollars. The account in question had a value of 132 thousand dollars. This is an accidental and trivial error.

The second, a supposed client complaint, made no mention of misstatements or erroneous disclosures on my part, or any wrong doing on my part. He wanted to know how to return his funds from the brokerage account to his bank account when his CD matured. There was no loss or potential of loss because this was a Wells Fargo principle guaranteed investment. I immediately called him when I received the second e-mail, I believe that I accidently deleted his first e-mail due to system constaints when responding to another e-mail, and our conversation rectified his misunderstanding. See record of e-mail communication, I had informed this gentleman of how to access his account balance, had other communications with him. (exhibit 3) I did not consider this a client complaint, and I did not think of forwarding an item like this when the firm was being deluged with real complaints involving client losses.In a regional sales meeting, Financial Advisors were asked to step up production by Leo Hamill in order to help mitigate 7 million dollars in judgements against the firm. Wells Fargo's own guidelines specify that a Financial Advisor should strive to have less than 3 complaints annually (exhibit 11). Even if you consider this a bonified complaint, I have 1 in over 3 years

There were no other instances of trade errors or client complaints before this time, and Financial Advisors are expected to make judgements everyday regarding commision levels and the most appropriate way to handle client concerns. I was terminated without council, and never given the option of resignation which violates standard business practice in the brokerage business. These infractions were never specified to be reasons for termination in any employment manual, and my record of no client complaints or other violations was never considered. If we interviewed 20 brokerage managers, and described this situation, I am confident that all of them would not consider these reasons for termination. Financial Advisors who accumulated multiple infractions of policy and client complaints were not terminated. My termination is a clear case of age and health consideration discrimination leading to wrongful termination, and is covered by "wrongful discharge" provisions which are an exception to "at will" employment provisions

Ms. Krug also baited me into maximizing commisions generated in the last few days of the September production month via an earlier e-mail, which warned me that production requirements were enforceable on a monthly basis after I reported that I may come in just under my required production amount for September, but had business lined up for October. This is another example of intentional infliction of emotional distress. Adjustments for Licensed Banker reffered business were also made at the end of the month, so Financial Advisors could not accurately predict their exact closing production amounts.

Additionally California Labor code states that there is an implied contract even for "At Will" employees regarding "just cause" for termination.This situation also qualifies as an "implied contract exception" because of the promissory note conditions of amoritzation over a five year period, and the requirement that I complete five years of employment in order not to be subject to penalty.
The promissory note also qualifies as a "common law " contract and section 35.5 of the California

The Division of Labor Standards Enforcement also states that "the implied covenant of good faith and fair dealing imposes upon the employer the duty not to do anything which would deprive the employee the benefit of the contract. Finally, section 35.4 of the Enforcement policies and Interpretations manual states that " The promise of a bonus becomes a unilateral contract" (Lucien v. All States Trucking) and goes on to state that " a specific bonus plan normally becomes binding as a unilateral contract when the employee begins performance, in the sense that it cannot then be revoked by the employer" *

Libel or slander on form u-5

The entries on my u-5, are deceiving and unclear because they create the impression that the client who was over charged also complained, and that this was other than an small accidental over charge, and that the amount of the accidental over charge was meaningful. These entries have resulted in my having been declined as a candidate at eight different firms, all of which were very positive regarding my candidacy before the final review of my u-5 by other approving parties. These actions violate California Labor Code section 150 regarding blacklisting.

Withholding of disability benefits

After suffering for some time with coughing, and a choking sensation which my physician discribes as larynospasm, I began having episodes of sleep apnea, awakening at night unable to breath. At this point I decided to take my Doctor's earlier recommendation and take time off for "voice rest". I related this situation to an employee benefits specialist at Wells Fargo and was told that this was a qualifing short term disability as a result of my doctor's recommendation, and e-mailed me a review of my disability benefits (exhibit 5). Later I was informed by Metropolitan Insurance that they would not be paying my disability benefits because they could not get needed information from Kaiser, and that the records they did have did not support my leave. Please see exhibit 5, "Certification of Health Care Provider for Family Leave. My Physician, Dr. Arellanes, has indicated that this was a "serious health condition" and recommended "Absence Plus Treatment". Metropolitan effectively overruled my attending physician without providing their own examination or interview. I am still bothered by respratory issues. If this condition is deemed to have effectively ended my brokerage career, my long term disability coverage offered 120k per year income untill the age of 65. The maximum disability coverage which I have been denied has a value of 1.4 million dollars.

Withholding of commisions

Witholding of commisions was executed a s part of an unfair "Licensed Banker" program which credited only 50% of revenue from an account introduced by a licensed banker for the first year. The withheld compensation was not counted toward goal achievement or compensation, and not evenly apllied in all branches. The branch which I was able to generate the larger amount of revenue from in 2008, "Micron", had no licensed bankers at that time, and was assigned two licensed bankers at the start of 2009. My goals which subjected me to termination if not met, were raised during this period. The rational for the Licensed Banker program was that the Licensed Banker would bring the Finacial Advisor more qualified prospects, and that the expense of the Licensed Banker's salary was covered by the Bank. Section 34.3 of the division of labor standards enforcement manual states that " if the element upon which the deduction from gross sales is based upon a cost which is attributable to the employer's cost of doing business, the element may not be used". * I understand that this policy has been changed now, an admission of violation. I am not sure of the total value of the witheld commisions.

Promissory Estoppel

In addition to verbal comments regarding my assignment to a new branch after three years of requests, please see attached e-mail dated Sept. 23, 2009, (exhibit 6) which tells me that I will be covering the new branch starting Nov.1st, and it is "business as usual until the end of October". Labor code S-90, sec 31.6 states that " a promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee and which does induce action or forbearance is binding if injustice can only be avoided by enforcement of the promise"* As a footnote, Christopher Obenchain, the other recipient of the e-mail has been terminated. Jim U'ren, mentioned in the e-mail, also terminated. Jan Krug, terminating manager, is now at another bank brokerage program.


* California Divison of Labor Standards Enforcement Policies and Interpretations

I find it perplexing that I was terminated for these two policy infractions when there were virtually no incidents of client complaints,  over charging, or other ethical violations or policy infractions during my time with the firm. There was a constant pressure regarding commision amounts generated and warnings and threats when my production amounts did not meet minimum expectations of 25,000 per month. Production levels were always and exclusively the concern.I found this to be an extreme conflict of interest and is another example of Wells Fargo breeching it's fiduciary responsibility.

If the records are acurate, they will reveal that I routinely asked to be assigned to a branch or branches with a larger deposit base due to the extreme presure, and that the branch in Folsom where I was assigned 3 days a week had assets and performance in the bottom 25% or Northern California Branches. A year into my employment, I was assigned another branch called "Micron" which was on a frontage road off the freeway in an economically disadvantaged area of Sacramento. The branch had an unarmed guard standing duty outside because of attacks on small business clients as they were making deposits. This branch provided the bulk of my new Wells Fargo business for 2008. In 2009 the branch was assigned two licensed bankers, which meant that most new business from the branch received a 50% credit, while my goals remained the same.

While maintaining a positive relationship with the sales manager who hired me, John Scambray, I eventually became dissatisfied as the earlier promises were not fulfilled and I was forced to attempt to meet revenue expectations with only the client base which I had transfered to Wells Fargo, and had been working with for years. I followed the firms recommendations, especially involving a myriad of monthly closed end "income fund" offerings, which were mostly unsuccessful in regard to total return or the achievement of stated objectives.
 In one meeting with John when I expressed my concern about generating a competitive level of revenue from a small asset base and again questioned the availability of the promised accounts, John suggested that with the advent of the "Private Bank" brokers who wished to participate would handle only million dollar accounts, and there would be accounts available for distribution at that point. He than suggested that he could recommend me for the title of Vice-President, the criteria for I did not meet. I believe this action was an admission of violation of labor code S-970° regarding misrepresentation.
 Mr. Scambray was reassigned to the role of Insurance coordinator before leaving Wells Fargo for another firm. His successor, Barbara Brandell, subjected me to  higher revenue production minimums and explained that I could be put on verbal, and then written warning resulting in possible termination for missing revenue goals, made no attempt to fullfill the earlier account promises, and told me that I was one of the "complainers" among the group.
 My March 9th,2009 e-mail regarding violations of securities regulations would have afforded me protection under labor code S-1102.5° had I submitted those concerns to a regrulatory agency. Jan Krug was my third sales manager, and continued pressuring revenue results even as financial markets plummeted showing little or no regard for client safety. What bothered me most, and led to the disintegration of our relationship was a demanding and demeaning attitude on the part of Ms.Brandell and Ms. Krug which I had never been exposed to in my then 27 year brokerage career. This same demeaning attitude was exemplified at the branchs towards salaried employees by managers and supervisors resulting in exceptionally low morale, which I repeatedly stated in my quarterly reviews.

Intentional and Negligent Infliction of Emotional Distress

I believe that Kane and Fischer, Wells Fargo, Jan Krug, and Mary Mortensen are guilty of both intentional and negligent infliction of emotional distress as defined by California State Labor Code. Both Ms. Krug and Ms. Mortensen are aware that these types of infractions occur occasionaly during the course of business, and have routinely counciled Financial Advisors for similar errors without terminating them. My termination was a result of Ms. Krug not feeling that I displayed the proper degree of respect for her position, and retaliation for remarks that I made regarding the firms lack of concern for client welfare, poor branch morale and the firms own misrepresentation of investment products.

Additionally Kane and Fischer are certainly aware that California labor code specifically prohibits demanding balloon payments upon termination, and the fees itemized in his recent "Summary of Amounts Due" include his fees to defend Wells Fargo against my counter complaint. This willful misconduct is an insult not only to me, but also the panalists, and should be remedied with sanctions and damage awards.

Breech of Fiduciary Responsibility

I believe that Wells Fargo breeched it's required Fiduciary Responsibility by demanding sales revenue be considered over client suitability, which is also a violation of California's "public policy doctrine" , by imposing sales quotas on Financial Advisors without regard to the Financial Advisors's account base or the asset base of the branches the were assigned to, and by relentlessly "pushing" a risky security called "Reverse Convertibles"

They also failed to provide reasonable advice to clients or Financial Advisors as the economy and the markets were on the precipice of major decline, rather, the "Mantra" was "just keep on selling". Wells Fargos chief economist, James Paulson, is on record in 2007 as stating that the problems in the real estate market would not lead to an economy wide recesion, another strategist by the name of Junkins put out a report in early September 2008 that stated that the "bottom was in" in financial stocks, this just before the major decline of October and November of that year. The decline and destruction of client accounts during this period made me very concerned for client welfare, and I felt quilty that I was not able to offer better advice. In my efforts to safeguard client investments I emphasised short term income funds which generated lower revenue amounts and led to performance reviews and threats of termination.

Reverse Convertible securities are derivatives, in effect naked "put" options, based on a particular equity security which pay high interest for relatively short periods of time, 3-12 months. They also generate very high commisions, possibly the highest of any asset class investment over time. For that reason they were a very popular investment within the program, and were highlighted in weekly conference calls. These calls including the input of a Mr. Jason Bell, Certified Financial Analyst, who would look at the chart patterns of the stocks underlying the "reverse convertibles" looking for the most stable pattern. With the market collapse of 2008, and even before, the underlying equities collapsed and the holders were assigned shares of stock worth only a fraction of their original investment. Wells fargo misrepresented the risk factors of these securities to both Financial Advisors and Clients, and did not take reasonable steps to insure that these securities did not comprise a large portion of client's portfolios.

In a discussion with another complaince manager, Ms. Cindy Matheson, I related a conversation which I had with an inherited client (from another departed Financial Advisor). She had both her personal account and a beneficiary IRA positioned in Reverse Convertibles with 100% of her funds, and had experienced substantial losses. I asked Ms. Mathis how this could be allowed, and she replied that Reverse Convertible securities were considered "fixed Income securities" and therefore could make up 100% of a portfolio. Catagorizing a risky derivitive as a fixed income security is another of Wells Fargo's breech of Fiduciary Responsibility. I'm sure there are many injured parties.

I also believe that this action to collect on the outstanding note is another breech of Fiduciary Responsibility. Certainly the law firm is aware that demanding repayment of these amounts is not allowed under California employment law statue, they simply feel that they are above the law, or can get around it. This is an insult to the arbitration process as well.

Damages

Mr. Chung has questioned my productivity and compensation at previous firms. On our recent conference call he suggested that I was being better compensated at Wells Fargo than I was at my previous employer. Please see attached Social Security wage statement (exhibit 8)  from my employment at brokerage firms since 1979 without interuption. My five year income average up to the time I joined Wells Fargo was over 93K, my earnings while I was at Wells Fargo averaged over 78K. My average earnings while I was at the Bank of America brokerage division was in excess of 140K. My ten year average is 91K. Effectively barred from the brokerage business after 30 years of sevice by Wells Fargo, without a serious client complaint or ethical issue, my lost income cost will be over 910,000 dollars over the next 10 years, based on my previous 10 year average, which has been effected by market turbulance and my own health issues.If you consider the additional costs of health care and other benefits, my actual damages are well over 1 million dollars.

Over the first several months of my unemployment, I realized that I would likely have to find employment in another industry, and have applied for numerous positions utilizing the skills I have. I have not been able to procure even one interview for consideration outside of my field, I have even been rejected by e-mail twice by U.S. Bank for a branch manager position- after 30 years in the Financial Services business, and over a decade of bank experience, I cannot even get a face to face meeting. I have opened an account on "Monster", records available on request. I did not hear back from any of my "Monster" applications, seven total, and I have applied for many other positions not on the "Monster" record. I think that because of the high number of job seekers, and my age, 56, I am excluded from consideration.

Also effecting my job search are lingering respritory problems that sometimes causes me to cough and clear my throat, if this condition is considered a disability I am eligible for coverage through the program outlined in Exibit 8, which would have a value of 1.2 million dollars.

Many of the infractions of California labor Law which Wells fargo has commited call for treble damage consideration as an award. This application would suggest that a damage award of approximately 3 million dollars would be appropriate. There are also issues which I have raised which have caused me pain and suffering as well as my family, for which there can be no financial recovery.

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

32.2.1   In *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820, 171 Cal.Rptr.604, 612, the Supreme Court stated that there were two judicially imposed limitations on the enforcement of adhesion contracts or provisions therein.

32.2.2   First, an adhesion contract which does not fall within the reasonable expectations of the weaker or "adhering" party is not enforceable against him.

32.2.2.1   *Example:* Insurance company refused to defend insured in civil case for willful assault due to exclusion in policy for defense of actions for damages caused intentionally or at the direction of the insured. Judgment was obtained by injured party against the insured. The insurance company is liable for cost of defense and amount of judgment rendered against insured on grounds of adhesion contract since policy deemed to require defense in suit which potentially seeks damages covered by the policy. No one

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

32.2.1    In *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820, 171 Cal.Rptr.604, 612, the Supreme Court stated that there were two judicially imposed limitations on the enforcement of adhesion contracts or provisions therein.

32.2.2    First, an adhesion contract which does not fall within the reasonable expectations of the weaker or "adhering" party is not enforceable against him.

32.2.2.1    *Example:* Insurance company refused to defend insured in civil case for willful assault due to exclusion in policy for defense of actions for damages caused intentionally or at the direction of the insured. Judgment was obtained by injured party against the insured. The insurance company is liable for cost of defense and amount of judgment rendered against insured on grounds of adhesion contract since policy deemed to require defense in suit which potentially seeks damages covered by the policy. No one could tell until the suit was over whether the liability is covered or not (e.g., the injured party may only prove negligence which is covered by the policy. *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 54 Cal.Rptr. 104.*

32.2.3    Second, a principle of equity applicable to all contracts generally - is that a contract or provision, even if consistent with the reasonable expectations of the parties will be denied enforcement, of it is unduly oppressive or "*unconscionable.*" *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 819, 171 Cal.Rptr.604.

32.2.3.1    *Example:* In *Graham*, a concert promoter was required to sign (artist's) union form contract which designated union as sole arbitrator of all disputes. The court held the arbitration provision unconscionable as a matter of law since the provision did not achieve minimum levels of integrity required of a contractually structured substitute for judicial proceedings. The court found that the designation of one whose interest is closely allied with one of the parties as the arbitrator (not neutral) was to such extent illusory. In *Graham v. Scissor-Tail, Inc.,* the Supreme Court provided that among the factors which would have a profound impact on the reasonable expectations of the "adhering party" is the extent to which the contract in question may be said to be one affecting the public interest. Since the payment of wages is a matter affecting the public interest, a provision on an adhesion contract which adversely affects, impedes, or contravenes the prompt payment of wages would be suspect. (See also, Labor Code § 219 which provides that the provisions of § 200 *et seq.* cannot, in any way, be contravened or set aside by private agreement whether written, oral, or implied)

32.2.4    **Legislation Regarding Unconscionable Provisions In Contracts.** Civil Code § 1670.5 applicable to actions regarding unconscionable contracts or provisions therein which are so one-sided. If a court determines, as a matter of law, that a contract or provision therein is found to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may limit the application of the unconscionable provision as to avoid any unconscionable result. (Civil Code § 1670.5)

---

*The *Gray* case has been distinguished by many cases but is basically still good law.

EXHIBIT U  Page 173

agreement to that effect and only to the extent that the advances exceed the minimum wage and overtime requirements. (*Agnew*, *supra*, and IWC Orders; see also O.L. 1987.03.03, 1991.05.07)

34.2.1    **Reconciliation Of Draws Against Commissions.** Reconciliation of draws against commissions are to be construed according to the contract of employment but must be completed within a reasonable time depending upon the transactions involved.

34.3      **Computation Of Commissions.** Commission computation is based upon the contract between the employer and the employee. The commission may be based on either gross sales figures or net sales figures. As discussed below, certain criteria cannot be considered when reaching the "net" sales figures. If the element upon which the deduction from the gross sales is based is predicated upon a cost which is attributable to the employer's cost of doing business, the element may not be used.

34.3.1    Computation of commissions frequently relies on such criteria as the date the goods are delivered or the payment is received. Sometimes, the commission of the selling salesperson is subject to reconciliation and chargebacks if the goods are returned. If these conditions are clear and unambiguous, they may be utilized in computing the

# DIVISION OF LABOR STANDARDS ENFORCEMENT
# ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL

that the implied covenant of good faith and fair dealing imposes upon the employer the duty not to do anything which would deprive the employee of the benefit of the contract.

35.4 **The Promise Of A Bonus Becomes A Unilateral Contract.** The California courts (*Lucian v. All States Trucking supra*) have adopted the view explained by the Oregon courts in *Walker v. American Optical Corporation* (Or.1973) 509 P.2d 439, 441: that a specific bonus plan normally becomes binding as a unilateral contract when the employee begins performance, in the sense that the plan then cannot be revoked by the employer. (See discussion of unilateral contract at Section 31.2.10.1 of this Manual)

35.4.1 In *Chinn v. China Nat. Aviation Corp.* (1955) 138 Cal.App.2d 98, 291 P.2d 91 the court held that if the bonus is part of the inducement for the initial or continuing employment (see also *Sabatini v. Hensley* (1958) 161 Cal.App.2d 172, 326 P.2d 622; *Hunter v. Ryan* (1930) 109 Cal.App. 736, 293 P. 825) and where the employer, in announcing the plan, did not expressly qualify his promise to pay on any requirement of continued employment, the bonus is earned by the employee remaining in the employment of the employer.

2.5.4.1   Again, as with a piece rate plan, a commission plan may include a group of employees who share in the commissions earned. (See detailed discussion of commissions at Section 34 of this Manual)

2.5.5   **Bonus Defined.** A bonus is money promised to an employee *in addition to* the monthly salary, hourly wage, commission or piece rate usually due as compensation. The word has been defined as: "An addition to salary or wages normally paid for extraordinary work. An inducement to employees to procure efficient and faithful service." *Duffy Bros. v. Bing & Bing*, 217 App.Div.10, 215 N.Y.S. 755, 758 (1939). Bonuses may be in the form of a gratuity where there is no promise for their payment; or they may be a contractually required payment where a promise is made that a bonus will be paid in return for a specific result (*i.e.*, exceeding a minimum sales or piece quota). (See detailed discussion of Bonuses at Section 35 of this Manual)

2.5.5.1   Piece rate and commission plans may be in addition to an hourly rate or a salary rate of pay. Such plans may also be in the alternative to a salary or hourly rate. As an example, compensation plans may include salary <u>plus</u> commission or piece rate; or a base <u>or</u>

employer from interfering with an employee's political activities in any manner. The statute forbids interference with the right of an employee to engage in politics (including becoming a candidate) or adopting or not adopting any particular course or line of political action or political activity.

17.9    **State Whistleblower Statute.** Labor Code § 1102.5 protects employees who disclose information to a governmental or law enforcement agency where the employee has reasonable cause to believe that the information discloses a violation of state or federal statutes, a violation of state or federal statutes, or noncompliance with state or federal regulations.

17.9.1   **Note:** This statute encompasses the filing of a complaint with the Labor Commissioner's office (also protected under Labor Code §98.6), the filing of a complaint with OSHA (also protected under Labor Code §§ 6310, 6311), the filing of a complaint with Department of Fair Employment and Housing under Government Code Section 12940, *et seq.*, and other complaints or reports to governmental agencies about violations of law under their jurisdiction.

35.5   **Termination Of The Employment By The Employer.**   Common law contract theories will not allow one party to the contract to prevent the other party from completing the contract. If the employee is discharged before completion of all of the terms of the bonus agreement, and there is not valid cause, based on conduct of the employee, for the discharge, the employee may be entitled to recover at least a pro-rata share of the promised bonus. (O.L. 1987.06.01)

35.6   **Criteria Used To Establish Bonus.**   As discussed in Sections 17.3.3, 17.3.4 of this Manual, the courts have held that shortages or other ingredients not within the control of the employee and which are usually considered a cost of doing business may not be deducted when calculating a bonus. (*Quillian v. Lion Oil* (1979) 96 Cal.App.3d 156; 157 Cal.Rptr. 740)

35.7   **Calculation Of "Regular Rate Of Pay" Where Bonus Is Involved.**   When calculating the regular rate of pay for purposes of overtime calculation under the IWC Orders, non-discretionary bonuses must be calculated into the formula.   This is discussed in detail in the Section of this Manual dealing with calculation of regular rate of pay. (See

................ ... p................... ....... ... p........... ...p.. ........ ..............p.... ...... .. ..r....
interest, a provision on an adhesion contract which adversely affects, impedes, or contravenes the prompt payment of wages would be suspect (See also, Labor Code § 219 which provides that the provisions of § 200 *et seq.* cannot, in any way, be contravened or set aside by private agreement whether written, oral, or implied)

32.2.4   **Legislation Regarding Unconscionable Provisions In Contracts.** Civil Code § 1670.5 applicable to actions regarding unconscionable contracts or provisions therein which are so one-sided. If a court determines, as a matter of law, that a contract or provision therein is found to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may limit the application of the unconscionable provision as to avoid any unconscionable result. (Civil Code § 1670.5)

---

[1]The *Gray* case has been distinguished by many cases but is basically still good law.

32 - 2

JUNE, 2002

which is not either authorized by the employee in writing or permitted by law. Again, any employer who resorts to self-help does so at its own risk since even under the proviso contained in the IWC Orders, an objective test is applied to determine whether the loss was due to dishonesty or a willful or grossly negligent act. (O.L. 1993.02.22-2, and 1994.01.27) In the event it is determined that the employee was not guilty of a dishonest or willful act or gross negligence, the employee would be entitled to recover not only the amount of wages withheld, but any waiting time penalties due.

11.2.5   **Deductions For Loans Made To Employees.**   In *Barnhill v. Saunders* (1981) 125 Cal.App.3d 1, the court concluded that deductions may be made by the employer, with the written consent of the employee, for payments on loans made by the employer to the employee; but "balloon payments" made at the time of termination are not allowed even if the employee has given his or her consent to such payments.

11.2.6   The conclusion reached by the *Barnhill* court allowing deductions from the wages of employees to repay loans made by the employer to the employee is open to question in view of the provisions of Labor Code § 300. That statute provides that no assign-ment of future wages may be made unless wages have already been earned except that

accommodation does not impose an undue hardship on the employer."

26.2.1    The employer must make reasonable efforts to safeguard the privacy of the employee as to the fact that he or she has a problem with illiteracy (Labor Code § 1042)and an employee may not be discharged based solely on the revelation of a problem with literacy so long as the employee satisfactorily performs his or her work.

26.2.2    Note that an employer is not obligated to pay for the time an employee is off to enroll or participate in an adult literacy education program. (Labor Code § 1043)

26.3     **Labor Code § 1050, Preventing Re-employment By Means Of Misrepresentation:** It is illegal for an employer (or any person, agent or officer thereof) to prevent the re-employment of an employee who has left the employer's service either by discharge or voluntary quit. An employee who is damaged by an employer's untruthful statements may recover treble damages. (Labor Code § 1054)

JUNE, 2002

26 - 1

32.1.5   Where ambiguous, extrinsic (external of the contract) evidence may be used to show the meaning of the term "compensation for services." (*Ranier Credit v. Western Reliance* (1985) 171 Cal.App.3d 255; 217 Cal.Rptr. 291)

32.1.6   In cases of ambiguity not resolved under the rules of interpretation, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. (Civil Code § 1654) The rule applies with particular force in the case of a contract of adhesion. (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 819)

32.2   **Contract Interpretation: Adhesion Contracts, Unconscionability. Contracts of** adhesion are contracts which are drafted by one party usually reduced to a standardized form which uses "boilerplate" language and is presented to the other party *without any real opportunity for negotiation.* Such contracts are not automatically void, voidable, or unconscionable, but are subject to greater scrutiny in interpretation and enforcement in order to modify or nullify harsh terms which defeat the reasonable expectations of the parties. (See, *Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 356, 133 Cal.Rptr. 775, 783)

32.2.3    Second, a principle of equity applicable to all contracts generally – is that a contract or provision, even if consistent with the reasonable expectations of the parties will be denied enforcement, of it is unduly oppressive or "*unconscionable.*" *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 819, 171 Cal.Rptr.604.

32.2.3.1    *Example.* In *Graham*, a concert promoter was required to sign (artist's) union form contract which designated union as sole arbitrator of all disputes. The court held the arbitration provision unconscionable as a matter of law since the provision did not achieve minimum levels of integrity required of a contractually structured substitute for judicial proceedings. The court found that the designation of one whose interest is closely allied with one of the parties as the arbitrator (not neutral) was to such extent illusory. In *Graham v. Scissor-Tail, Inc.,* the Supreme Court provided that among the factors which would have a profound impact on the reasonable expectations of the "adhering party" is the extent to which the contract in question may be said to be one affecting the public interest. Since the payment of wages is a matter affecting the public interest, a provision on an adhesion contract which adversely affects, impedes, or contravenes the prompt payment of wages would be suspect. (See also. Labor Code

# Exhibits



**B03 WELLS FARGO INVESTMENTS, LLC**
999 THIRD AVENUE
SEATTLE WA  98104

| Pay Group: | BW1-BIWEEKLY PAYROLL | Check #: | 4968405 |
|---|---|---|---|
| Pay Begin Date: | 01/01/2008 | | |
| Pay End Date: | 01/31/2008 | Check Date: | 01/09/2008 |

**KENNETH CRAIG SHAFFER**
5315 GARLENDA DR
EL DORADO HILLS CA  95762

| Employee ID: | 00000716429 |
|---|---|
| AU#/CC#: | ▮▮▮▮ |
| Location: | 0000003557 |
| Job Title: | WMG FINANCIAL CONSULTANT 2 |
| Pay Rate: | $36,053.29 Annual |

| TAX DATA: | Federal | CA State |
|---|---|---|
| Marital Status: | Married | Married |
| Allowances: | 6 | 6 |
| Addl. Amt.: | | |

### HOURS AND EARNINGS

| Description | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| Forgivable Promissory Note | | | 111,347.00 | | 111,347.00 |
| Regular Pay | | | 0.00 | | 1,386.67 |
| PCS Sales Incentive Plan | | | 0.00 | | 1,539.07 |
| **Total:** | | | 111,347.00 | | 114,272.74 |

### TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 0.00 | 210.43 |
| Fed MED/EE | 0.00 | 40.68 |
| Fed OASDI/EE | 0.00 | 173.93 |
| CA Withholdng | 0.00 | 55.69 |
| CA OASDI/EE | 0.00 | 22.44 |
| **Total:** | 0.00 | 503.17 |

### BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Kaiser Northern CA | 0.00 | 94.62 |
| WF Dental Plan - Standard | 0.00 | 17.74 |
| Vision Service Plan | 0.00 | 8.00 |
| Wells Fargo 401K Plan | 0.00 | 87.77 |
| **Total:** | 0.00 | 208.13 |

### AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Community Support/United Way | 0.00 | 10.00 |
| Spouse/Partner GULP | 0.00 | 1.60 |
| GULP Optional Life | 0.00 | 22.49 |
| AD/D | 0.00 | 1.93 |
| Long-Term Disability | 0.00 | 12.44 |
| **Total:** | 0.00 | 48.46 |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 111,347.00 | 0.00 | 0.00 | 0.00 | 111,347.00 |
| YTD: | 114,272.74 | 2,717.61 | 503.17 | 256.59 | 113,512.98 |

### NET PAY DISTRIBUTION

| Check #000000004968405 | 111,347.00 |
|---|---|
| **Total:** | 111,347.00 |

(2)

**From:** Mortensen, Mary
**Sent:** Tuesday, September 29, 2009 3:08 PM
**To:** Shaffer, Kenneth C.
**Cc:** Mortensen, Mary
**Subject:** Trade Review - Excess Commissions
**Importance:** High

Ken:

Pls advise why you entered a flat $ commission amount, in excess of what normal comp would be??

| Firm: Main Firm | | | Region: California Region | | | | |
|---|---|---|---|---|---|---|---|
| Branch: EJ Roseville | | | Broker: EJ4D SHAFFER KENNETH | | | | |

| Client: WINEGER FAMILY LIVING TRUST U/A DTD 03/21/1994 JOHN G WINEGER & DOROTHY I | | | | | | | No Discreti |
|---|---|---|---|---|---|---|---|
| Account: ▮▮▮▮ | | | | | | View Profile | Medium |

| 9/29/2009 | Commission Excess Equities | 9/28/2009 TDEnt: 09/28/2009 14:02:11 | EXG | EATON VANCE TAX MANAGED GLBL DIVERSIFIED EQUITY INCOME FUND | $7,373.76 | $132,447.74 | |

**Extended Data**

| Trans Date | | Type | Product Type | Quantity | Share Price | Commission | Compared Value | Net |
|---|---|---|---|---|---|---|---|---|
| 9/28/2009 | Solicited | Purchase | Closed-End Fund | 600.00 | $12.290 | $495.00 | $368.69 | $7, |

| Firm: Main Firm | | | Region: California Region | | | | |
|---|---|---|---|---|---|---|---|
| Branch: EJ Roseville | | | Broker: EJ4D SHAFFER KENNETH | | | | |

| Client: WINEGER FAMILY LIVING TRUST U/A DTD 03/21/1994 JOHN G WINEGER & DOROTHY I | | | | | | | No Discreti |
|---|---|---|---|---|---|---|---|
| Account: 84295371 | | | | | | View Profile | Medium |

| 9/29/2009 | Commission Excess Equities | 9/28/2009 TDEnt: 09/28/2009 14:09:17 | JGT | NUVEEN MULTI-CURRENCY SHORT-TERM GOVERNMENT INCOME FUND | $6,731.56 | $132,447.74 | |

W000048

(2)

| | | Type | Product Type | Quantity | Share Price | Commission | Compared Value | Ne |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

**Extended Data**

| Trans Date | | Type | Product Type | Quantity | Share Price | Commission | Compared Value | Ne |
|---|---|---|---|---|---|---|---|---|
| 9/28/2009 | Solicited | Purchase | Closed End Fund | 400.00 | $16.829 | $495.00 | $336.58 | $7. |

Mary E. Mortensen
Vice President
Branch Administration Manager
Wells Fargo Investments

Office: 916-788-4508
Fax:   916-788-4782

**Investment and Insurance Products:**

- **Are Not insured by the FDIC or any other federal government agency**
- **Are Not deposits of or guaranteed by the Bank or any Bank affiliate**
- **May Lose Value**

**Wells Fargo Investments, LLC (member SIPC), is a non-bank affiliate of Wells Fargo & Company.**

The Information in this email is confidential. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance to it, is prohibited and may be unlawful. Trade Orders cannot be accepted by e-mail.

W000049

(2)

▮▮▮▮▮▮▮▮▮▮

WINEGER FAMILY LIVING TRUST

(530) 622-6063

To Whom It May Concern:

John and I have worked with Ken for over fifteen years now, and have always been happy with his guidance and concern. A long time friend as well as financial advisor, we have transferred our accounts in order to continue working with him. We have the utmost confidence in his ability and concern for our welfare.

Regards,

Dorothy Wineger

John Wineger

Fax from : 2062923145                                    10-01-89 11:04    Pg : 1
                                                                          Page 1 of 4

FROM: kenneth.c.shaffer@wellsfargo.com o         (3)      Configuration at time of
TO:                                                       processing: ☒ ☒ | |
SUBJECT: RE: New Accounts                                Message Sent: Sep 14 2009
                                        BRYAN A  → Drtn 6        11:20:39 AM
                                                         Processed on: Sep 14 2009
                                                                11:57:32 AM
                                                          Expiration: Sep 13 2014
                                                                11:20:39 AM

Hi      · I left a message for you at the contact number I have for you. Your market linked CDs mature on Oct 7th, and will
return 100% of your principle. You can sell them now if you need the money right away, for approx. 996/1000, the 4 dollar per
1000 is equal to .4% in less than a month, or about 4.8% annualized interest, so it's better to let them mature on Oct 7th. I have
already made a note to move the proceeds back to your bank account on the 8th.


*Ken Shaffer*
Financial Consultant
Wells Fargo Investments

M-W-F- 916 984-1179    Customer Service- 866-281-7436
T-Th- -916 364-3571
*Investment and Insurance Products*

   • **Are Not Insured by the FDIC or any other federal government agency.**
   • **Are Not deposits of or guaranteed by the Bank or any Bank affiliate**
   • **May Lose Value**

*Wells Fargo Investments, LLC (member SIPC) is a non-bank affiliate of Wells Fargo & Company*
*The information in this email is confidential. It is intended solely for the addressee. Access in this email by anyone else is unauthorized. If you are not the intended*
*recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance to it, is prohibited and may be unlawful. Trade Orders cannot be*
*accepted by e-mail.*

_____

From:
Sent: Friday, September 11, 2009 8:29 PM
To: Shaffer, Kenneth C.
Subject: Fw: New Accounts
Importance: High


Ken, Can you give me a contact to find out how to get my money back into my account since you
have not responded. If I don't hear back this time, My attorney will contact you next! I'm
pissed you got me into this and don't respond to my emails!!!

----- Original Message -----

From:
                                                          *written complaint*
To: Kenneth.C.Shaffer@wellsfargo.com

Sent: Monday, September 07, 2009 8:41 PM


about:blank                                                          10/1/2009

W000050

EXHIBIT U  Page 190

Fax From : 2062923145                                    18-01-89 11:84    Pg:  2
                                                                       Page 2 of 4

Subject: Re: New Accounts                        (3)

Hi Ken, it has been 18 months and the account produced nothing. When will my money be put back
into my account?


Thanks




----- Original Message -----

From: Kenneth.C.Shaffer@wellsfargo.com

To

Sent: Tuesday, March 18, 2008 4:54 PM

Subject: RE: New Accounts


Not sure about that, do you have to add it to your Quicken accounts?


*Ken Shaffer*
Financial Consultant
Wells Fargo Investments

M-W-F- 916 984-1179
T-Th -916 364-3671
*Investment and Insurance Products*

   • *Are Not Insured by the FDIC or any other federal government agency.*
   • *Are Not deposits of or guaranteed by the Bank or any Bank affiliate*
   • *May Lose Value*

*Wells Fargo Investments, LLC (member SIPC) is a non-bank affiliate of Wells Fargo & Company*
*The information in this email is confidential. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended*
*recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance to it, is prohibited and may be unlawful. Trade Orders cannot be*
*accepted by e-mail*

_____

From:
Sent: Tuesday, March 18, 2008 4:30 PM
To: Shaffer, Kenneth C.
Subject: Re: New Accounts



Hi Ken,                                  W000051

about:blank                                                    10/1/2009



EXHIBIT U  Page 191

Fax from : 2062923145                    (3)          10-01-09 11:04   Pg: 3

Thanks, I have it setup online at WewllsFargo but can't seem to get it to show in Quicken,
Any idea's?


Thanks


----- Original Message -----

From: Kenneth.C.Shaffer@wellsfargo.com

To:

Sent: Tuesday, March 18, 2008 9:50 AM

Subject: RE: New Accounts


Hi,    - When you sign on, go to the "account services" tab, choose "add accounts"- you should see your new brokerage
account listed, select the account and go to the "account summary" screen- call or e-mail with any questions.


*Ken Shaffer*
Financial Consultant
Wells Fargo Investments

M-W-F- 916 984-1179
T-Th -916 364-3571
*Investment and Insurance Products*

- *Are Not insured by the FDIC or any other federal government agency.*
- *Are Not deposits of or guaranteed by the Bank or any Bank affiliate*
- *May Lose Value*

*Wells Fargo Investments, LLC (member SIPC) is a non-bank affiliate of Wells Fargo & Company*
*This information in this email is confidential. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance to it, is prohibited and may be unlawful. Trade Orders cannot be accepted by e-mail*

-------------------------------------------------------

From
Sent: Monday, March 17, 2008 9:48 PM
To: Shaffer, Kenneth C.
Subject: New Accounts


Hi Ken,

about:blank                          W000052                    10/1/2009



I met with you and Yuri on Tuesday the 4th and decided to open a couple accounts from money in my savings. Are these accounts going to show up on my monthly statement? I also use Quicken and do see the 8,000.00 transfer out of savings but do not see it anywhere. Is this something I will be able to see in the future?


Thanks

W000053

about:blank

10/1/2009

Sales Performance Warnings

I was subject to verbal production warnings prior to my disability leave in October and November of 2008. A rational person would assume that this is because I was not selling commision generating products. Please see Market Linked Certificate of Deposit (MLCD) and Market Linked Note (MLN) production. (exhibit 4) I am one of the top performing sales people at 3 million plus in sales. The problem is that although this product is good for the client because it gives them a principle guarantee, and the opportunity to participate in equity, commodity, Real Estate,  and Gold indices without a "load" or upfont sales charge, MLCDs only generate an approximate 1% sales charge. These vehicles were perfect for the client in the period of extreme volatility for the markets, not good enough for Wells Fargo because they generated lower commisions initially, a violation of standard business practice and securities regulations.

The same situation exists in regard to my sales of "Wells Fargo Advantage" Mutual Funds.  I have no performance records, I'm sure that they would show that my sales performance was far above average, but many of the sales I made were "C" class shares, resulting in a 1% commision credit. These shares were the only class of shares that I considered appropriate and ethical for short term income funds generating less annual interest than the "A" share sales charge. On one occasion, during another discussion regarding sales performance, I had generated over 1 million dollars in sales in the Wells Fargo Mutual fund group for the month, in short term Govt. and Municiple funds. One of the sales that I made was for 500,000,  for my own client, which I brought to Wells Fargo, I received no sales commision on the sale because of the fund's policy of offering 500K purchases with no sales charge. When I explained this situation to Ms. Krug, she suggested that I switch the order to another fund family which did not have this policy, I did not because I considered it unethical.

I was placed on written warning on March 9th, 2009, (exhibit 4)  for missing my sales goal for Feburary by 500 dollars even though I had exceeded my goal in January by more than that amount. Monthly sales quotas for Financial Advisors are an extreme conflict of interest, is not industry policy, and is another example of Wells Fargo's breach of fiduciary responsibility.

*E-MAIL I SENT TO MY*
*MANAGER'S MANAGER* (4)

## Shaffer, Kenneth C.

| | |
|---|---|
| From: | Shaffer, Kenneth C. |
| Sent: | Monday, March 09, 2009 4:31 PM |
| To: | Webster, Mark D. (PCS); Hamill, Leo P. |
| Subject: | Fair and reasonable? |

Hi Mark- I have been issued a "formal written warning" for unsatisfactory production from Barbara. My monthly goal is 20,666 (80%). For February, I had total production of 20,100, missing the mark by 500 dollars. My year to date is 41,439, an average of 20,719.50 per month, and higher than the original requirement. I am now being threatened with termination, at a time when, prior to this meeting, I felt like I was gaining momentum- For March, I have booked my 1st Transamerica Inheritance Builder Sale, received my first "Inforce Policy review", and booked business in fixed annuities. I feel my branch relations are excellent, and I have no customer complaints. I was 14th out of 29 reps for the month of February, and am 8th in % to goal.

Complicating the situation is the fact that I have an outstanding promissory note- Barbara has informed me that the unamortized amount would be due back to Wells, a financially disastrous situation. I cannot believe that the Ms. Brandell is subjecting not only myself, but other FCs to this type of mental duress at a time of financial crisis. Do you think this is fair and reasonable?

I think one of the sources of this discriminatory behavior is that I took 8 weeks off last year, Oct. and Nov., for a health problem that I am still being treated for- I currently take 8 pills a day! I was denied short term disability from Metropolitan Insurance with the explanation the my medical records did not support disability payments- even though I would assume the recommendation to take time off was part of my records. They effectively over ruled my Doctor- amazing. This situation affected my productivity before I left, and I had 2 months of 0 production. Barbara states that the condition of written warning is based on last year's production as well. I was on track to achieve my annual goal last year until July. I believe my treatment is partially based on verifiable illness.

Since I am now in a "sudden death" situation, I must also tell you as well that, after 30 Years of no entries on my u-4, I am very concerned with complaints and law suits arising from reckless behavior on the part of the firm- the push on "reverse convertibles", resulting in the unexplained disappearance of one of their strongest converts, Suggestion that health questions regarding insurance be less than fully truthful, and the misrepresentation of income from Insurance policies.

I am hoping that I can be on more than a "month to month" plan, which is only reasonable since it could compromise my ability to suggest the best course of action for my clients. I am available to verify and discuss any of these items at your request, and will continue to provide the very best support for clients and team members.

*Ken Shaffer*
Financial Consultant
Wells Fargo Investments

M-W-F- 916 984-1179
T-Th -916 364-3571
*Investment and Insurance Products*
*Are Not insured by the FDIC or any other federal government agency.*
*Are Not deposits of or guaranteed by the Bank or any Bank affiliate*
*May Lose Value*

Wells Fargo Investments, LLC (member SIPC) is a non-bank affiliate of Wells Fargo & Company.

The Information in this email is confidential. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance to it, is prohibited and may be unlawful. Trade Orders cannot be accepted by e-mail.



Wells Fargo Investments, LLC
Compliance Manual

C   N⁻I⁻L⁻N⁻IAL

Chapter 2 General WFI Policies

## 2.1   STANDARDS OF CONDUCT

The securities industry holds its members to the highest standards of business ethics and conduct. The major objective of its rules, regulations and policies is to promote just and equitable principles of trade. All Associated Persons, Registered Representatives and employees of WFI, including all individuals dually employed by WFI and any of its affiliated companies, must conduct their dealings in a manner consistent with high standards of conduct and personal integrity and avoid even the appearance of impropriety.

Additionally, WFC has established a Code of Ethics and Business Conduct that all Associated Persons, Registered Representatives and employees of WFI must abide by when conducting business. If there is a discrepancy between WFC and WFI policies and procedures the more restrictive requirements must be followed. The WFC Code of Ethics and Business Conduct is available on the Wells Fargo intranet site at: http://oregon.homestead.wellsfargo.com/Personnel/handbook/ethics/index.html.

### General Code of Conduct - Prohibited Business Practices

The following is a non-exclusive list of prohibited business practices. Supervisory Principals and BOMs must take reasonable steps to ensure that employees are aware of these prohibitions and do not engage in prohibited practices.



- Misrepresentation of material facts, including ambiguous statements, silence, concealment or the failure to act where a duty to act exists. Misrepresentation includes false statements made regarding services or products offered by WFI or WFC, the qualifications of any person offering services, or the method of compensation for services. Misrepresentation is not excused by characterizing a statement as an "opinion." Areas of concern include but are not limited to statements about potential yields, price forecasts, product risks, value, and projected returns. Such statements should only be made if there is a firm basis for them.

- Misuse of any confidential, nonpublic information, concerning ownership of, or transactions in, securities acquired by WFI or an affiliate while acting in a fiduciary or other agency capacity for any customer, issuer, or broker/dealer (e.g., as paying agent, transfer agent, registrar, indenture trustee, clearing agent, safekeeping agent or correspondent).

- Act on rumors as the basis for soliciting transactions with or for customers. This prohibition applies to circulating, in any manner, rumors of a sensational character that might be expected to affect market conditions in any security on any exchange. This includes rumors relating to the economy or an individual industry or company. Discussion of unsubstantiated information disseminated by public media is not prohibited when the source and unsubstantiated nature of the information is disclosed.

- Pay or rebate, directly or indirectly, to any person, firm or organization, compensation for business sought or procured by WFI. No concessions or commissions can be paid to any unregistered person or entity. Certain business arrangements (e.g., soft dollar payments) may only be effected with prior written approval from WFI senior management and the Compliance Department.

 (4)

**MLCD & MLN Production**
YTD 2008 (through October)

| Office | RM | Notional | Commission |
|---|---|---|---|
| **Sacramento/Roseville** | | **$111,767,000** | **$2,188,799** |
| | ELLIOTT/MASON | $8,643,000 | $222,473 |
| | WALLEN LINDY | $7,260,000 | $134,591 |
| | U'REN JAMES | $5,705,000 | $109,660 |
| | LOMMEN DAVID | $5,306,000 | $91,678 |
| | JAFFEE JASON | $5,155,000 | $90,034 |
| | LAPKASS PAUL | $4,749,000 | $84,008 |
| | AWABDEH YOIL | $4,247,000 | $81,122 |
| | RICHMOND WILLIAM | $4,084,000 | $89,431 |
| | HARRIS THERESE | $3,765,000 | $73,411 |
| | DO STEVEN | $3,448,000 | $60,921 |
| | HENG/CARLSEN/ALLEN | $3,350,000 | $60,350 |
| | SHAFFER KENNETH | $3,194,000 | $58,649 |
| | TANGEN KRISTIN | $3,052,000 | $62,864 |
| | MACFARLANE DOUGLAS | $2,889,000 | $64,083 |
| | JIMENEZ JUAN | $2,580,000 | $51,116 |
| | WALLEN/KUSONRUKSA | $2,274,000 | $41,853 |
| | PETERS KENNETH | $2,099,000 | $38,123 |
| | GASKINS/HAWKES | $2,098,000 | $36,412 |
| | VETTER DANIEL | $2,043,000 | $35,392 |
| | HEUANSAVATH SENG | $1,915,000 | $32,400 |
| | ROHRER MITCHELL | $1,765,000 | $38,231 |
| | ROHRER MITCH | $1,693,000 | $39,370 |
| | HAMPTON MICHAEL | $1,654,000 | $28,694 |
| | EMITTE DOUG | $1,633,000 | $31,425 |
| | HOWARD GEOFF | $1,218,000 | $24,515 |
| | RICHMOND/PETERSON | $1,021,000 | $19,540 |
| | ELLIOTT/MASON/YEH | $971,000 | $21,441 |
| | WALKER KEITH | $961,000 | $26,251 |
| | EVANS CLAY | $835,000 | $14,613 |
| | VETTER/SALVADOR | $781,000 | $12,743 |
| | SAGE DAN | $743,000 | $14,003 |
| | ANDERSON/MONROE/HILLIKER | $687,000 | $11,976 |
| | HEUANSAVATH/DEEP | $661,000 | $11,295 |
| | GASKINS/HAWKES/RAMIREZ | $610,000 | $10,551 |
| | HOWARD/PETERS | $602,000 | $11,376 |
| | WALLEN/BIRCH | $595,000 | $11,355 |
| | MACFARLANE/BROWN | $594,000 | $17,820 |
| | ZANOLLI GREGORY | $581,000 | $13,881 |
| | ANDERSON/SINGH | $567,000 | $10,205 |
| | JAFFEE/DEEP | $544,000 | $9,521 |
| | MASON/ELLIOT | $531,000 | $14,693 |
| | HOWARD/RAMAMURTHY | $493,000 | $12,021 |
| | HEUANSAVATH/JOHNSON | $479,000 | $8,058 |
| | HENG/CARLSEN/ALLEN/BUI | $473,000 | $8,278 |
| | HENG/CARLSEN/ALLEN/ASCALON | $447,000 | $8,340 |
| | HAWKES MICHAEL | $434,000 | $8,048 |

*Prod 2008*

(4)

| | | |
|---|---|---|
| HAWKES/MILLIGAN | $430,000 | $8,125 |
| AWABDEH/VAN DER WENDE | $420,000 | $7,350 |
| HAMPTON/HUYNH | $405,000 | $6,663 |
| HENG/CARLSEN/ALLEN/MILLIGAN | $402,000 | $6,813 |
| LOPEZ/RAMIREZ | $399,000 | $6,983 |
| MASON/ELLIOTT/WOOD | $395,000 | $7,413 |
| HERSHISER MIA | $385,000 | $7,500 |
| HAMPTON/LAU | $372,000 | $6,661 |
| SHAFFER/KIRK -50% ≈ 1800+ | $370,000 | $7,100 |
| ELLIOTT/MASON/TREVINO | $354,000 | $7,508 |
| MANESS JAMES | $354,000 | $7,110 |
| ANDERSON GREGORY | $350,000 | $6,363 |
| OBENCHAIN CHRISTOPHER | $350,000 | $5,875 |
| ZAMBOANGA/JACOBSON | $307,000 | $5,448 |
| ELLIOTT/MASON/WILLIAMS | $304,000 | $7,021 |
| HAWKES/GASKINS | $292,000 | $5,133 |
| GASKINS/HAWKES/ROYLES | $277,000 | $4,535 |
| GASKINS/HAWKES/MILLIGAN | $275,000 | $4,863 |
| MANESS/SHAFFER -50% | $274,000 | $4,795 |
| TZIKAS EMMANUEL | $274,000 | $6,296 |
| GASKINS/HAWKES/NGUYEN | $229,000 | $4,008 |
| ZAMBOANGA JOHN | $225,000 | $3,838 |
| GODT CURTIS | $212,000 | $3,498 |
| MASON/ELLIOTT/MILLIGAN | $212,000 | $5,110 |
| EMITTE DOUGLAS | $200,000 | $3,000 |
| PETERS/PERKINS | $200,000 | $3,500 |
| TZIKAS/ELIAS | $190,000 | $3,800 |
| HENG/CARLSEN/ALLEN/BROWN | $185,000 | $3,125 |
| DO/ELIAS | $172,000 | $3,011 |
| JIMENEZ/PEREZ | $170,000 | $3,036 |
| LOPEZ MIGUEL | $166,000 | $2,905 |
| HOWARD/WILLIAMS | $160,000 | $3,051 |
| KUCHAR/APURADO | $159,000 | $2,783 |
| BENNETTE DAVID | $150,000 | $2,625 |
| VANDELL THOMAS | $147,000 | $2,573 |
| HOWARD/PETERS/WILLIAMS | $141,000 | $3,333 |
| HENG/CARLSEN/ALLEN/MILLER | $124,000 | $2,170 |
| JIMENEZ/HUYNH | $121,000 | $2,218 |
| BUCHANAN ROBERT | $107,000 | $1,873 |
| MASON RYAN | $107,000 | $2,810 |
| KUCHAR/WILLIAMS | $106,000 | $2,120 |
| BAILEY ROBERT | $104,000 | $1,820 |
| CYPHER CLAUDIA | $100,000 | $3,000 |
| EVANS/HAFF | $100,000 | $1,750 |
| HENG/CARLSEN/ALLEN/PERKINS | $100,000 | $2,375 |
| MACFARLANE/LAWRENCE | $100,000 | $3,000 |
| TANGEN/ANDERSON | $100,000 | $1,750 |
| WALLEN/LAU | $100,000 | $1,750 |
| WALKER/STOWE | $95,000 | $2,350 |
| TZIKAS/KAUR | $90,000 | $1,575 |
| GASKINS/HAWKES/MILLER | $79,000 | $1,408 |
| MASON/ELLIOTT/GALLO | $70,000 | $2,100 |

4

| | | |
|---|---|---|
| HOWARD/PETERS/YEH | $67,000 | $1,173 |
| HAFF  JOHN | $62,000 | $1,085 |
| AWABDEH/RICHMOND | $59,000 | $1,033 |
| CHEN  ALFRED | $52,000 | $910 |
| BENNETTE/RAMIREZ | $50,000 | $875 |
| GASKINS/HAWKES/PEREZ | $50,000 | $875 |
| MACFARLANE/O'REGAN/GONZALEZ | $50,000 | $875 |
| DO/PHAN | $44,000 | $770 |
| HENG/CARLSEN/ALLENAPURADO | $44,000 | $795 |
| TZIKAS/PHAN | $40,000 | $800 |
| EMITTE/ANDO | $30,000 | $525 |
| EVANS/HUFF | $30,000 | $525 |
| JAFFEE/RAMIREZ | $30,000 | $450 |
| HARRIS/MILNER | $28,000 | $490 |
| LOPEZ/NGUYEN | $28,000 | $490 |
| HENG/CARLSEN/ALLEN/DEWHURST | $25,000 | $375 |
| MACFARLANE/MONROE/HILLIKER | $23,000 | $345 |
| HAWKES/BUI | $20,000 | $600 |
| HEUANSAVATH/GOFF | $20,000 | $350 |
| MACFARLANE/DEWHURST | $20,000 | $600 |
| LOMMEN/JOHNSON | $15,000 | $263 |
| TANGEN/CYPHER | $10,000 | $300 |
| MACFARLANE/ZAMBOANGA | $9,000 | $270 |
| ANDERSON/MURPHY | $8,000 | $140 |
| HOWARD/TANGEN | $8,000 | $160 |
| ZAMBOANGA/SHIVERS | $6,000 | $105 |





Private Client Services
1512 Eureka Road, Suite 300
Roseville, CA 95661-3069

**To:**     **Kenneth Shaffer**, Financial Consultant          **Date: 3/9/2009**

**From:**   **Barbara Brandell**, Regional Sales Manager

**Subject:**   **Formal Written Warning for Unsatisfactory Production**

**Ken**, this notice is to inform you that you are being placed on Formal Warning for unsatisfactory production. You have been unable to achieve the required production level of 80% of your monthly goal which is $20,666.

**Ken**, you must meet 80% of your monthly production goal ($20,666) each of the following months of March, April and May.

Following successful achievement of your monthly goal, your performance will be reevaluated. If you should fail to meet your goal, you will be subject to further disciplinary action, up to and/or including termination.

I am confident you will be able to improve this situation. As always, I am available to assist you in any way I can.

Should you wish to discuss this with someone else, please contact **Christine Blomley**, our Human Resources Manager, at **(415) 222-1143**. For any non-job related problems affecting your performance, contact Employee Assistance Consulting (EAC) at 888-327-0027

Please sign below to indicate that you have received this Informal Written Warning memo.

_Refused to Sign_                    _3/9/09_
**Kenneth Shaffer**, Financial Consultant          Date

Presented by:

_Barbara Brandell_                    _3/9/09_
**Barbara Brandell**, Regional Sales Manager          Date

cc:     Personnel File
        Mark Webster
        Christine Blomley

---

**Investment and Insurance Products:**
▸ Are NOT insured by the FDIC or any     ▸ Are NOT deposits of or guaranteed     ▸ May Lose Value
   other federal government agency           by the Bank or any Bank affiliate

---

Financial consultants are registered representatives of Wells Fargo Investments, LLC (member NYSE/SIPC), a non-bank affiliate

Formal Warning Kenneth Shaffer 3-9-09

(4)

## Sacramento/Roseville Store Based Brokerage 2009
## ICOMP % to Goal Rank

February End of Month

| Sales Professional | Location | February 28th Actual | YTD Actual | Monthly Goal | % to Monthly Goal | Annual Goal |
|---|---|---|---|---|---|---|
| Todd Kuchar | Gold River & Folsom West | $48,404 | $66,590 | $19,167 | 253% | $230,000 |
| Blair Buchanan | Placerville & Cameron Park | $25,275 | $56,681 | $21,250 | 119% | $255,000 |
| Greg Anderson | El Dorado Hills | $21,006 | $31,514 | $19,167 | 110% | $230,000 |
| Bill Richmond | Cool, Newcastle, Camilla City | $39,902 | $68,298 | $37,500 | 106% | $450,000 |
| Jim U'Ren | Yuba City | $25,121 | $39,143 | $27,500 | 91% | $330,000 |
| Simon Heuansavath | N. Stockton & Tracy | $34,754 | $52,606 | $40,000 | 87% | $480,000 |
| Joel Awabdeh | Carmichael | $28,289 | $68,768 | $34,583 | 82% | $415,000 |
| Ken Shaffer | Empire Ranch & Micron | $20,159 | $41,439 | $25,833 | 78% | $310,000 |
| Doug MacFarlane | Roseville-Douglas | $49,689 | $120,350 | $65,000 | 76% | $780,000 |
| Michael Hawkes | Elk Grove | $28,222 | $73,984 | $37,500 | 75% | $450,000 |
| Geoff Howard | Roseville-Creekside & W. Roseville | $16,441 | $32,575 | $22,917 | 72% | $275,000 |
| Mike Hampton | N. Natomas & W. Sac | $27,853 | $75,816 | $44,167 | 63% | $530,000 |
| Juan Jimenez | S. Natomas & 30th & Capital | $17,371 | $44,012 | $30,833 | 56% | $370,000 |
| Dan Sage | Lincoln & Rocklin | $13,325 | $164,041 | $23,750 | 56% | $285,000 |
| Jason Jaffee | Stockton-College Square | $41,195 | $108,049 | $75,000 | 55% | $900,000 |
| Lindy Wallen | Greenhaven | $28,078 | $67,253 | $51,250 | 55% | $615,000 |
| Ryan Mason | Campus Commons & Crossroads | $20,412 | $46,086 | $39,583 | 52% | $475,000 |
| Justin Elliott | Country Club & Mad. Aub. | $20,082 | $46,749 | $39,583 | 51% | $475,000 |
| Mia Hershiser | 400 Capitol Mall | $18,348 | $45,574 | $38,750 | 47% | $465,000 |
| Alan Morgenstern | Sac Sunrise | $14,030 | $25,649 | $30,417 | 46% | $365,000 |
| Dave Lommen | Sonora & Manteca | $15,987 | $23,000 | $35,417 | 45% | $425,000 |
| Teri Harris | Auburn & N. Auburn | $11,117 | $23,228 | $25,000 | 44% | $300,000 |
| Keith Walker | Grass Valley & Glenbrook | $15,368 | $55,040 | $34,583 | 44% | $415,000 |
| Mike Tzikas | J Street, Fruitridge & N. Florin | $12,814 | $42,408 | $29,167 | 44% | $350,000 |
| Chris Obenchain | Downtown Aub, Roseville-Harding | $10,303 | $28,907 | $25,000 | 41% | $300,000 |
| David Bennette | Stockton Main | $12,763 | $43,955 | $34,625 | 37% | $415,500 |
| Jim Maness | Jackson & San Andreas | $12,429 | $36,413 | $35,417 | 35% | $425,000 |
| Dan Vetter | Folsom | $10,046 | $44,963 | $43,750 | 23% | $525,000 |
| Jason Gaskins | Lodi | $11,492 | $53,450 | $61,833 | 19% | $742,000 |



## Sacramento/Roseville Store Based Brokerage 2009
## ICOMP $ Stack Rank
## February 28th, 2009

| Sales Professional | Location | February 28th Actual | YTD Actual | Annual Goal |
|---|---|---|---|---|
| Doug MacFarlane | Roseville-Douglas | $49,689 | $120,350  2 | $780,000 |
| Todd Kuchar | Gold River & Folsom West | $48,404 | $66,590  9 | $230,000 |
| Jason Jaffee | Stockton-College Square | $41,195 | $108,049  3 | $900,000 |
| Bill Richmond | Cool, Newcastle, Camilla City | $39,902 | $68,298  17 | $450,000 |
| Simon Heuansavath | N. Stockton & Tracy | $34,754 | $52,606  12 | $480,000 |
| Joel Awabdeh | Carmichael | $28,289 | $68,768  10 | $415,000 |
| Michael Hawkes | Elk Grove | $28,222 | $73,984  5 | $450,000 |
| Lindy Wallen | Greenhaven | $28,078 | $67,253  8 | $615,000 |
| Mike Hampton | N. Natomas & W. Sac | $27,853 | $75,816  4 | $530,000 |
| Blair Buchanan | Placerville & Cameron Park | $25,275 | $56,681  40 | $255,000 |
| Jim U'Ren | Yuba City | $25,121 | $39,143  21 | $330,000 |
| Greg Anderson | El Dorado Hills | $21,006 | $31,514  24 | $230,000 |
| Ryan Mason | Campus Commons & Crossroads | $20,412 | $46,086  14 | $475,000 |
| Ken Shaffer | Empire Ranch & Micron | $20,159 | $41,439  20 | $310,000 |
| Justin Elliott | Country Club & Mad. Aub. | $20,082 | $46,749  13 | $475,000 |
| Mia Hershiser | 400 Capitol Mall | $18,348 | $45,574  15 | $465,000 |
| Juan Jimenez | S. Natomas & 30th & Capital | $17,371 | $44,012  17 | $370,000 |
| Geoff Howard | Roseville-Creekside & W. Roseville | $16,441 | $32,575  23 | $275,000 |
| Dave Lommen | Sonora & Manteca | $15,987 | $23,000  27 | $425,000 |
| Keith Walker | Grass Valley & Glenbrook | $15,368 | $55,040  11 | $415,000 |
| Alan Morgenstern | Sac Sunrise | $14,030 | $25,649  26 | $365,000 |
| Dan Sage | Lincoln & Rocklin | $13,325 | $164,041  1 | $285,000 |
| Mike Tzikas | J Street, Fruitridge & N. Florin | $12,814 | $42,408  19 | $350,000 |
| David Bennette | Stockton Main | $12,763 | $43,955  18 | $415,500 |
| Jim Maness | Jackson & San Andreas | $12,429 | $36,413  22 | $425,000 |
| Jason Gaskins | Lodi | $11,492 | $53,450  10 | $742,000 |
| Teri Harris | Auburn & N. Auburn | $11,117 | $23,228  26 | $300,000 |
| Chris Obenchain | Downtown Aub, Roseville-Harding | $10,303 | $28,907  25 | $300,000 |
| Dan Vetter | Folsom | $10,046 | $44,963  16 | $525,000 |



## Disability Plans

Wells Fargo offers both short-term and long-term income protection for you in the event you become ill or injured and cannot work. These plans are designed to maintain a certain level of income from all sources.

### Short Term Disability

Wells Fargo provides short-term disability protection at no cost to you if you cannot work for more than seven consecutive calendar days due to your own health condition. When your claim is approved, you may be eligible for:

$3,615  per week for up to 3 weeks, followed by

$2,350  per week for up to 18 additional weeks.

### Long Term Disability (LTD)

If, after 22 weeks, you are still unable to work due to your own health condition and your claim is approved, you may be eligible for:

$10,182  monthly up to age 65.

You may also receive a benefit from your account balances in the Cash Balance Plan and/or the 401(k) Plan. You may, however, leave the money in the Plans to continue to grow.

### Plan Highlights

- Benefits from the Short Term and Long Term Disability Plans may be reduced by benefits you may receive from
  - o  Social Security
  - o  Workers' Compensation
  - o  State Disability Insurance
  - o  Any other wage replacement income.
- PTO days must be used during the Short Term Disability waiting period.
- For additional information on how your benefits are calculated, refer to *Teamworks*.

**Did You Know?**
Today's 20-year old worker has a 3-in-10 chance of becoming disabled before reaching retirement. More than half of these disabilities are related to health conditions, not work. **

**Source: Social Security Administration*

**Next Steps**
Nearly half of all mortgage foreclosures are due to disability, while less than 5% are due to death. Long Term Disability coverage can help you protect your assets.

EXHIBIT U    Page 203

Visit Verification Form

(5)

**KAISER PERMANENTE.**
MEDICINE STATION 2 2155 Iron Point Road Folsom, CA 95630-8707 Dept: 916-817-5200 Main: 916-817-5000

# Kaiser Permanente Visit Verification Form

Patient Name: Kenneth C Shaffer

Date Of Visit/Advice: 9/10/08
Date of Illness:

Kenneth C Shaffer was seen in this office

Kenneth C Shaffer has been ill and unable to attend work from 9/22/2008 through 11/1/2008

**Off work/school/physical education comments:**
Will complete disability form for patient for voice rest given current laryngospasm,

Generated by ROSE ELEANOR ARELLANES MD on 9/10/08
Authorized by ROSE ELEANOR ARELLANES MD

http://kaiserpermanente.org

Shaffer, Kenneth C.

$(6)$

| | |
|---|---|
| From: | Krug, Jan M. |
| Sent: | Wednesday, September 23, 2009 1:32 PM |
| To: | Shaffer, Kenneth C.; Obenchain, Christopher T. |
| Subject: | Micron and Douglas/Auburn-Folsom Stores |

Hi Ken and Chris: I have just received word that Jim U'Ren whom we had slated to assume coverage of the Micron store will delay his return from medical LOA per his doctor's orders until Nov. 1, 2009. Because of that, we will delay the store coverage changes until he returns. I do apologize for the confusion. So, it's business as usual until the end of October! Thanks

*Jan M. Krug*

Wells Fargo Investments
Vice President
Regional Sales Manager
Private Client Services
1512 Eureka Road Suite 300
Roseville, CA 95661
(916) 788-4532

1

My Bad Attitude

My bad attitude was caused by the lack of follow through on promises made to me, the demeaning approach that Wells Fargo takes to employee management, and constant presure and threats of termination for missing sales goals. In spite of my problems with Ms. Brandell, or Ms. Krug, no person whom I worked with in the branches could honestly say that I was anything but friendly and supportive. I befriended many of my banker partners and met several on social occasions. Many of these employees, including all three of the licensed bankers I worked with have complained to me about pressure to maximize sales and the demeaning nature of their interaction with their managers. Several have asked me if I could identify an opportunity for their employment away from Wells Fargo.

I have heard employees gather in outrage on a regular basis, female employees crying in the break room, and men with familys walked out of the branch after complaining about working conditions in the branch. That, and the tumultuous nature of the financial markets, Wells bad advice, and severe illness led to the controlled "meltdown" evidenced in my e-mails and behavior.

I have never been a part of an organization where turnover was so high, with brokers routinely diappearing without mention, sales goals which did not consider factors such as sales volume and new accounts, and the general unhappiness of employees. Wells Fargo is a modern day " Sweat Shop"

What's wrong with this picture?

Please see exhibit 7. This is a listing of Financial Advisors from 2009. The darkened names are those Financial Advisors who are no longer with the firm. 22 of the 35 Advisors, or 62% have either resigned or been terminated. Also gone is Ms. Jan Krug, after less than 24 months with the firm. Perhaps she was terminated for over terminating, perhaps because she had a caustic personality, treated Finacial Advisors in a demeaning manner, or had what on currently employed Sales Assitant named Trudy Mitchell decsribed as 14 broker complaints.

I think this provides an insight into the life and pressures of Wells Fargo Employees. They treat their employees as human capital, and the turn over rate at the Brokerage division and the Bank illustate this.



| Dan Sage | N. Auburn, Glenbrook | Annuity |
|---|---|---|
| Jason Jaffee | N. Stockton | Annuity |
| Joel Awabdeh | Carmichael | Annuity |
| David Bennette | Stockton Main | Annuity |
| Todd Kuchar | Gold River | Annuity |
| Simon Heuansavath | 30th & Cap, N. Stockton, Tracy | Annuity |
| Alan Morgenstern | Auburn, Roseville | Ivy Funds |
| Lindy Wallen | Greenhaven | UITs |
| Dan Vetter | Folsom | Wrap |
| Bill Richmond | Cool/Newcastle | All |
| Mia Hershiser | 400 Capitol Mall | All |
| Teri Harris | Roseville-Woodcreek, Auburn | All |
| Greg Anderson | El Dorado Hills | All |
| Justin Elliott | Country Club, Mad. Aub. | |
| Ryan Meyer | Campus Commons, Crossroads | |
| Doug MacFarlane | Roseville-Douglas | |
| Mike Hampton | N. Natomas, W. Sac. | |
| Dave Lommen | Sonora, Manteca | |
| Curtis Grove | NDB | |
| Michael Hawkes | Elk Grove | |
| Keith Walker | Grass Valley, Penn Valley | |
| David Emilian | Fair Oaks | |
| Bill Zachariah | | |
| Mike Zine | | |
| Juan Jimenez | | |
| Jim Harris | | |
| Karl Gruber | | |
| Greg Snyder | | |
| Jim Benson | | |
| Ryan Hall | | |
| Clay Ayers | Roseville | |
| John Zimmerman | Roseville | |
| Chris Obenchain | Roseville-Town Center | |
| Bill Barton | | |
| Jason Gaskins | Lodi | |



| | Sacramento Region<br>Week Ending Stack Rank<br>May 22nd 2009 | | |
|---|---|---|---|
| **MTD Rank** | **Sales Professional** | **YTD Rank** | **Sales Professional** |
| 1 | Jim Monroe | 1 | Jim Monroe |
| 2 | Dan Sage | 2 | Greg Zanolli |
| 3 | Kelly Huff | 3 | Kelly Huff |
| 4 | Mitch Rohrer | 4 | Mitch Rohrer |
| 5 | Jason Jaffee | 5 | Doug MacFarlane |
| 6 | Jason Gaskins | 6 | Dan Sage |
| 7 | Matt Hilliker | 7 | Matt Hilliker |
| 8 | Greg Zanolli | 8 | Jason Jaffee |
| 9 | Mia Hershiser | 9 | Kris Tangen |
| 10 | Juan Jimenez | 10 | Joel Awabdeh |
| 11 | Jim Maness | 11 | Ken Peters |
| 12 | Keith Walker | 12 | Jason Gaskins |
| 13 | Doug MacFarlane | 13 | Michael Hawkes |
| 14 | Tom Vandell | 14 | Lindy Wallen |
| 15 | Ken Shaffer | 15 | Mike Hampton |
| 16 | Ken Peters | 16 | Tom Vandell |
| 17 | David Bennette | 17 | Mia Hershiser |
| 18 | Greg Anderson | 18 | David Bennette |
| 19 | John Haff | 19 | Todd Kuchar |
| 20 | Kris Tangen | 20 | John Haff |
| 21 | Justin Elliott | 21 | Juan Jimenez |
| 22 | Ryan Mason | 22 | Keith Walker |
| 23 | Alan Morgenstern | 23 | Bill Richmond |
| 24 | Mike Hampton | 24 | Russ Godt |
| 25 | Chris Obenchain | 25 | Simon Heuansavath |
| 26 | Teri Harris | 26 | Jim Maness |
| 27 | Todd Kuchar | 27 | Justin Elliott |
| 28 | Dave Lommen | 28 | Ken Shaffer |
| 29 | Lindy Wallen | 29 | Ryan Mason |
| 30 | Simon Heuansavath | 30 | Dan Vetter |
| 31 | Joel Awabdeh | 31 | Greg Anderson |
| 32 | Dan Vetter | 32 | Alan Morgenstern |
| 33 | Bill Richmond | 33 | Blair Buchanan |
| 34 | Russell Chaney | 34 | Mike Tzikas |
| 35 | Blair Buchanan | 35 | Dave Lommen |
| 36 | Mike Tzikas | 36 | Jim U'Ren |
| 37 | Jim U'Ren | 37 | Curtis Godt |
| 38 | Russ Godt | 38 | Chris Obenchain |
| 39 | Curtis Godt | 39 | Terri Harris |
| 40 | Michael Hawkes | 40 | Russell Chaney |
| 41 | Denis Valle | 41 | Bill Bartok |
| 42 | Bill Bartok | 42 | Denis Valle |



| Sacramento Region Brokerage Weekly Stack Rank as of September 25, 2009 | | | |
|---|---|---|---|
| Greg Zanolli | $103,061 | Jim Monroe | 1 |
| Jim Monroe | $84,263 | Greg Zanolli | 2 |
| Kelly Huff | $69,154 | Kelly Huff | 3 |
| Mitch Rohrer | $65,049 | Mitch Rohrer | 4 |
| Matt Hilliker | $43,372 | Doug MacFarlane | 5 |
| Tom Vandell | $37,795 | Matt Hilliker | 6 |
| Juan Jimenez | $31,428 | Jason Jaffee | 7 |
| Jason Jaffee | $30,796 | Dan Sage | 8 |
| Doug MacFarlane | $29,902 | Joel Awabdeh | 9 |
| Todd Kuchar | $27,705 | Kris Tangen | 10 |
| John Haff | $27,308 | Ken Peters | 11 |
| David Bennette | $25,410 | Jason Gaskins | 12 |
| Jim Maness | $24,811 | Lindy Wallen | 13 |
| Ken Peters | $24,454 | Michael Hawkes | 14 |
| Jason Gaskins | $23,857 | John Haff | 15 |
| Ken Shaffer | $22,835 | Tom Vandell | 16 |
| Kris Tangen | $22,670 | Michael Hampton | 17 |
| Russell Godt | $21,225 | Mia Hershiser | 18 |
| Keith Walker | $20,885 | Justin Elliott | 19 |
| Mia Hershiser | $20,850 | Ryan Mason | 20 |
| Joel Awabdeh | $20,407 | David Bennette | 21 |
| Dan Sage | $20,139 | Juan Jimenez | 22 |
| Alan Morgenstern | $18,671 | Todd Kuchar | 23 |
| Ryan Mason | $17,956 | Keith Walker | 24 |
| Justin Elliott | $17,941 | Simon Heuansavath | 25 |
| Blair Buchanan | $16,833 | Russell Godt | 26 |
| Michael Hawkes | $16,279 | Bill Richmond | 27 |
| Michael Hampton | $15,663 | Jim Maness | 28 |
| Mike Tzikas | $12,625 | Alan Morgenstern | 29 |
| Teri Harris | $11,743 | Dan Vetter | 30 |
| Russell Chaney | $11,670 | Ken Shaffer | 31 |
| Lindy Wallen | $11,133 | Mike Tzikas | 32 |
| Bill Richmond | $8,575 | Blair Buchanan | 33 |
| Chris Obenchain | $6,231 | Greg Anderson | 34 |
| Greg Anderson | $4,821 | Teri Harris | 35 |
| Dan Vetter | $4,582 | Chris Obenchain | 36 |
| Simon Heuansavath | $821 | Russell Chaney | 37 |
| Denis Valle | $726 | Denis Valle | 38 |

### Speaking of over charging

Financial Advisors at Wells Fargo shared frustrations over many issues, one was how the Municiple bond department could offer a bond at a price which they claimed was only "marked up" by the amount of the sales commision, say 10 to 15 to 20 dollars per bond, and then Wells own pricing model would show the bond was worth far less than the supposed unmarked price on the very next statement. I beleive that the Municiple dept. is in violation of regulations regarding the pricing of Municiple bonds, adding an undisclosed mark up to benefit the department, in violation of regulation regarding FIPS, the fixed income pricing system.

### Mary Mortensen's comments regarding my termination

Ms. Mortensen claims that I said "Good, than I can file an unlawful termination claim, you know that you will never see a red dime from me" This is a complete fabrication, I never made this statement, I have never used or heard of the phrase " red dime" and do not know what this means.
Please also see Exhibit 12, an e-mail from a former Wells Fargo employee, Jim U'ren (witness list) regarding comments that Ms. Mortensen made to him regarding Ms. Krug.

I also believe that a potential employer, U.S. Bank, received information from Mary Mortensen which was defamatory, as a Mr. Marv Scofield came into our interview and made statements regarding my emotional state, continued our interview for over an hour, and would not return my phone calls or e-mails requesting an update. I learned later when relating my befuddlement regarding his comments to a friend and fellow broker that Mary Mortensen and Marv Scofield are friends.

### Other Misrepresentations

It is standard business practice in the brokerage industry that brokers are provided at least some administrative assistance, one of the rational for the firm keeping 60-70% of the commision revenue. I learned after joining Wells Fargo, and was never informed earlier, that to utilize a sale assistant part time would cost 500 dollars per month. I did not participate in this offer, handeling all paperwork and administrative activities myself.

### FINRA guidelines on subpoenas

FINRA guidelines state that " documentary evidence should be exchanged voluntarily by the parties without the use of subpoenas" I was never contacted by any party to discuss accesing the information regarding my employment applications, and certainly I will not be considered as a candidate for employment at any of these firms as aresult of this action. This is another violation of FINRA guidelines, and  of S-1050, blacklisting.

### Delivery of Witness List, Discovery Documents

I received the package on Dec 23rd, one day past the deadline. Please see Fed. Ex delivery confirmation. Received Mr. Kanes authorization to practice law in California on Dec. 29th.