**Original Transcript**

FINRA DISPUTE RESOLUTION

In the Matter of the
Arbitration Between:

WELLS FARGO INVESTMENTS, LLC

      Claimant/Counter-Respondent

   and                            Case No. 10-00773

KENNETH C. SHAFFER

      Respondent/Counter-Claimant

**ARBITRATION**

March 18, 2011
9:00 a.m.

1221 Locust Street
St. Louis, MO

CELENA D. MOULTON, RPR, CSR



ESQUIRE
an Alexander Gallo Company

EXHIBIT X   Page 292

Toll Free: 888.486.4044
Telephone:

2700 Centennial Tower
101 Marietta Street
Atlanta GA 30303
www.esquiresolutions.com

Arbitration                                          March 18, 2011

1

# FINRA Dispute Resolution

```
In the Matter of the        )
Arbitration Between:        )
                            )
Claimant/Counter-Respondent )Case No. 10-00773
                            )
Wells Fargo Investments, LLC)
and                         )
Respondent/Counter-Claimant )
                            )
Kenneth C. Shaffer          )
```

## ARBITRATION
### Before:
Thomas D. Reese, Presiding Chairperson
Laurel Littman Gothelf, Arbitrator
Marilyn G. McClaskey, Arbitrator

APPEARANCES:

        Ronald P. Kane,
        Attorney at Law,
        for Wells Fargo;

        Kenneth C. Shaffer,
        Pro Se.

        CELENA D. MOULTON, RPR, CSR



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 293

Arbitration                                    March 18, 2011

2

1                          INDEX

2    WITNESSES:                              PAGE:

3         KENNETH SHAFFER
          Direct Examination. . . . . . . . . . . 25
4

5         KENNETH SHAFFER
          Direct Examination. . . . . . . . . . .185
6

7    MARY MORTENSEN
          Direct Examination. . . . . . . . . . .218
8         Cross Examination . . . . . . . . . . .284

9
                            EXHIBITS
10
     Claimant's Exhibits 1 through 13 . . . . . . . . 76
11        Admitted
     Claimant's Exhibits 14 through 16  . . . . . . .313
12        Admitted

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 294

Arbitration                                    March 18, 2011

3

1               EXHIBITS (continued)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 295

Arbitration                                    March 18, 2011

4

1              CHAIRMAN:  We are on the record in the

2    matter of Wells Fargo -- your official title is Wells

3    Fargo what, Investments?

4              MR. KANE:  Wells Fargo Investments, LLC.

5              CHAIRMAN:  And then the respondent is

6    Kenneth Shaffer.  Let's identify ourselves.  First of

7    all I'm Tom Reese.  To my right is Laura Gothelf, to my

8    left is Marilyn McClaskey.  And you are Mr. Kane?

9              MR. KANE:  Ryan Kane, counsel for Wells

10   Fargo.  And to my immediate left is Ms. Mary Mortensen,

11   a corporate representative for Wells Fargo.

12             ARBITRATOR:  And Mr. Shaffer is here as

13   well.  And we have tested the machine and it appears to

14   be taping appropriately.

15             MR. KANE:  May I shut the door,

16   Mr. Chairman?

17             CHAIRMAN:  Yes, please.

18             I've introduced the arbitrators in this

19   matter and ask if there are any further disclosures that

20   need to be made by any of us that have not already been

21   made?  I have no further disclosures to add.

22   Ms. McClaskey?

23             ARBITRATOR MCCLASKEY:  I have no further

24   disclosures.

25             CHAIRMAN:  Ms. Gothelf.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 296

5

```
 1              ARBITRATOR GOTHELF:  I have none.
 2              CHAIRMAN:  Okay.  Having introduced the
 3    arbitration panel and indicated disclosures already
 4    having been made, none further, do the parties accept
 5    the constitution -- not the constitution, but the
 6    arbitration panel as set forth?  Mr. Kane?
 7              MR. KANE:  Yes.
 8              CHAIRMAN:  And Mr. Shaffer?
 9              MR. SHAFFER:  Yes.
10              CHAIRMAN:  And all of the arbitrators have
11    previously taken an oath which has been submitted to
12    FINRA.  For the record, we have submitted our properly
13    executed oaths and submitted them to FINRA.  We want to
14    formally open the hearing.
15              This controversy has been submitted to this
16    panel of arbitrators for hearing.  And in accordance
17    with the code of arbitration that has been submitted in
18    accordance with your code of arbitration procedure, the
19    panel is authorized to determine each of the matters set
20    forth and the statements submitted and filed with FINRA
21    Dispute Resolution.
22              Unless directed otherwise by the law, all
23    awards rendered pursuant to the code will be final and
24    not subject to appeal.
25              It is suggested that no interruptions be
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 297

6

1   made during an individual's testimony.  That would be

2   interruptions by us or other -- or counsel or parties

3   during the examination of a particular witness.  By

4   that, I'm suggesting that we want to hear a full and

5   truthful response.  If there is some misunderstanding,

6   if there's some clarification that's necessary, that can

7   be done at the appropriate time.

8           And I should add to that at the end of

9   testimony, any of us, the arbitrators may have some

10  questions.  And I'm going to ask my colleagues to hold

11  their questioning until the testimony of that particular

12  witness is through, because often questions are cleared

13  up with further questions by counsel or by Mr. Shaffer.

14          We, as -- well, I am reading from a script

15  which goes on to say the submission of the matter to

16  arbitration will not preclude any right of the

17  association that it would otherwise be authorized to

18  adopt, administer or enforce.

19          If any matter comes to the attention of

20  this panel during and in connection with the panel's

21  participation in this proceeding, either from the record

22  or from material or communications related to the

23  proceeding, that this panel has reason to believe may

24  constitute a violation of the association's rules or the

25  federal security laws, the panel may initiate a referral



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 298

7

1    of that matter to the association for disciplinary

2    investigation.

3              I don't expect this to occur, but I wanted

4    to make it clear that if something of this sort does

5    occur, we have that right and sometimes requirement.

6              If we make any such referral, it will only

7    be initiated after this dispute has been either settled

8    or otherwise disposed of or after a final award has been

9    rendered.

10             We have been selected to serve as neutral

11   arbitrators to hear and decide this matter.  I want to

12   make it clear that we are not employees of FINRA Dispute

13   Resolution and have no direct affiliation with them

14   other than we have been appointed to serve as

15   independent arbitrators.

16             Pursuant to Canon 1 of the ABA AAA Code of

17   Ethics for commercial arbitrators, we, as neutral

18   arbitrators, have the duty of conducting these

19   proceedings with fairness and integrity.  This duty

20   extends to all parties and to this process.

21             Therefore, on behalf of the panel, I

22   respectfully request that all parties and their counsel

23   or representatives refrain from engaging in any

24   conversation or contact with the members of this panel

25   except while in this room and in the presence of all



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 299

8

1    parties, counsel or representatives; which, put another

2    way, may mean that we may not say hello to you in the

3    elevator.  We may not even say good morning out in the

4    hallway in order to make it quite clear that we're not

5    talking to either side ex parte, is the legal term,

6    alone without the presence of the other side.

7              And we -- I will be submitting an oath to

8    any witness to ask if they swear or affirm that the

9    testimony they are about to give is the truth and

10   nothing but the truth and ask for them to state their

11   name, again, for the record.

12             Are there any matters that counsel or

13   Mr. Shaffer would like to bring up before we formally

14   begin the hearing, any logistic matters.

15             MR. KANE:  Not on behalf of Wells Fargo.

16             MR. SHAFFER:  I have two questions.  One,

17   in my cover letter, I have requested that I do receive

18   an explanation of the decision in this matter and I

19   understand there's a fee for that.  I haven't paid the

20   fee yet and I'm assuming there is a deadline for that.

21   But I'm assuming since the decision hasn't been rendered

22   yet, I can pay a fee and have the decision rationalized

23   or explained to me.

24             CHAIRMAN:  Okay.  There was something to

25   that effect in this script that I read.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 300

9

1        Mr. Kane, are you familiar with the timing

2    on that request?

3        MR. KANE:  I was just looking for it in the

4    chart.  Let me see here.

5        CHAIRMAN:  Perhaps you, too, would like a

6    reason decision.

7        MR. KANE:  Normally we do not.  And I just

8    don't recall if the rule requires -- I think the rule

9    requires all parties to agree to an explanation.  I need

10   to check on that.  I think all the parties need to agree

11   to that.  We do not agree.  I need to check and make

12   sure that's the case.  I don't want to say it without --

13       CHAIRMAN:  Why don't we do this,

14   Mr. Shaffer, at a break, we'll look for it.  Mr. Kane

15   has the rules in front of him, which I do not.  We'll

16   get that answer back to you.

17       MR. SHAFFER:  Second question, on the

18   discovery materials on the witness list were delivered

19   to my home address one day after the deadline.  So I am

20   just wondering if that affects Mr. Kane's presentation

21   or the witnesses he has here, again, on December 23rd,

22   when the deadline was the 22nd.

23       MR. KANE:  The rule is the deadline is when

24   filed.  We mailed them on the 22nd by Fed Ex.  So we are

25   in compliance with the rule.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 301

1          CHAIRMAN:  If that is the case, you would

2     testify under oath that it was sent, mailed

3     December 22nd.

4          MR. KANE:  I'll double-check to make sure.

5     But, yes, I would.

6          CHAIRMAN:  All right.  If that is the rule,

7     then it sounds like there has been compliance.

8          What we will do is run this arbitration

9     much like one would run a bench trial, which is another

10    way of saying that first the evidence would be for the

11    -- coming from the claimant, Wells Fargo Investment.

12         And by evidence, I mean the introduction of

13    any papers, documents.  And number two, the testimony

14    from any of their witnesses.

15         You, Mr. Shaffer, of course, would have the

16    opportunity to cross-examination any witness who is

17    presented.  And then after the claimants have presented

18    their case and they rest, then you have the opportunity

19    to present your case.

20         That would include any witnesses that you

21    have, any documents that you would like to submit which

22    have not already been submitted by Wells Fargo, and

23    they, of course, would have the opportunity to --

24    Mr. Kane would have the opportunity to cross-examine any

25    of your witnesses.



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 302

1           Each side before we take testimony is

2    permitted an opening statement; that is a statement by

3    Mr. Kane and then followed by you as to what you expect

4    the testimony will show, what the evidence will be and

5    what it -- what it will amount to.  After each side has

6    presented the evidence and their witnesses and each side

7    has rested, then each side has the opportunity of making

8    a closing statement.  And at that time, we would ask

9    that Mr. Kane, representing the plaintiffs, set forth

10   the damages they seek and an itemization of that.

11           If neither side or either side chooses not

12   to make an opening statement, that's fine.  There's no

13   demerits for that.  It's how each of you choose to

14   present your case.

15           We would ask for a closing statement

16   because if not at that time already made clear the

17   damages being requested and from your standpoint, the

18   result that you request needs to be made clear to the

19   panel.

20           Logistically, we will begin, as we did

21   somewhat late this morning at 9:30.  We have three days

22   set aside for this hearing.  We, of course, don't know

23   whether or not all three days are necessary.  It may be

24   that they're not.

25           And we will break sometime around the noon



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 303

12

1   hour for a noon recess that will depend on when

2   witnesses are here, when it's convenient for all of us

3   to take a break.  It's not going to be necessarily a set

4   time.  We'll also take a break mid-morning and

5   mid-afternoon.

6              And we will finish the day somewhere around

7   5, depending, again, on where the witnesses are, who is

8   coming and when their testimony begins.

9              We'll try not to extend the witness's

10  testimony into the next day, but try and complete it.

11  And if that means going a little later, that's what it

12  means.  We'll just work it out as is convenient for

13  everybody.

14             We want to make this preceding as

15  comfortable as we can, again, for everybody.  So if

16  there are any logistic matters that come up during the

17  course, let us know and we'll deal with them.

18             Any other questions or needed explanations

19  that you can think of?

20             MR. KANE:  Not on behalf of Wells Fargo.

21        (Thereupon, a break was taken.)

22             CHAIRMAN:  We're back on the record.  As I

23  said, each party may make an opening statement.  It

24  should be limited to what the party intends to prove and

25  should not be a presentation of the evidence nor the



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 304

13

1    merits of the case.  In other words, it should not be an

2    argument.  In other words, it will be, "The evidence

3    will show that this happened and that happened", and so

4    forth.  But not an argument as to what you believe the

5    result should be.  That would be more appropriate at the

6    time of your closing statement.

7              If there is no further questions, inquiries

8    or comments and no preliminary motions to be made, we

9    will proceed then with opening statements.

10             Mr. Kane?

11             MR. KANE:  Thank you.  I think as you had

12   the opportunity, or maybe you've already had an

13   opportunity to review the various documents, and I think

14   as you'll see from the evidence that's presented, the

15   facts of this case are really not particularly complex.

16             Wells Fargo is coming before this panel

17   today asking that you require Mr. Shaffer to do nothing

18   more than honor the written agreement that he signed

19   when he accepted a loan from Wells Fargo for $111,347

20   for which he signed a promissory note that I think

21   you'll see the terms of which are clear and unambiguous.

22             Now, the evidence will establish that

23   Mr. Shaffer did join Wells Fargo on June 15th of 2006.

24   And that prior to joining the firm, as a result of

25   conversations that Mr. Shaffer had with the then



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 305

14

1   regional sales manager of Wells Fargo, who at the time

2   was an individual by the name of John Scambray,

3   Mr. Shaffer was extended an offer of employment by Wells

4   Fargo.

5           And that offer of employment was embodied

6   in an offer letter that was submitted to Mr. Shaffer

7   before he joined the firm, which he accepted by signing

8   the letter and returning it to Wells Fargo, again, all

9   before he joined the firm.

10          Now, the offer letter that Mr. Shaffer

11  received from Wells Fargo before becoming employed there

12  outlines certain of the terms of his employment.

13          And among other things, that offer letter

14  states that for his first four months of employment with

15  Wells Fargo, Mr. Shaffer was to receive a nonrecoverable

16  draw, in essence, a salary for four months, I think it

17  was $12,000 per month, or $48,000.

18          In addition, pursuant to the terms of the

19  offer letter, it was agreed that if he joined the firm,

20  he would receive a minimum of a 40 percent payout on any

21  gross commissions he generated during his first year

22  with the firm, between June 15th of 2006 and

23  December 31st of 2007.

24          And the offer letter also indicated that

25  Mr. Shaffer would be eligible to receive a loan from



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 306

15

1    Wells Fargo if his best 12 months of gross production

2    during his first 18 months of employment met or exceeded

3    $217,500.  If that occurred, if he hit that level, he

4    was eligible to receive a loan from the firm that was

5    equal to 50 percent of that gross production.

6              Now, the evidence will establish that Wells

7    Fargo complied with all of the terms of the offer letter

8    that it had agreed upon with Mr. Shaffer in advance of

9    his employment.  Mr. Shaffer met the production level

10   referenced in the offer letter and in January of 2008,

11   he received the loan from Wells Fargo of $111,347.

12             Now, the evidence will also establish that

13   in connection with this loan, Mr. Shaffer was required

14   to, and he did, in fact, sign a promissory note that

15   spelled out the terms and conditions of the loan.

16             The promissory note that Mr. Shaffer signed

17   specifically provides, among other things, that it was a

18   five-year loan; that it would accrue interest during

19   those five years; but that at the end of each month,

20   one-sixtieth of the principle and interest of that loan

21   would be forgiven.  In other words, that's when the

22   taxable event occurred.

23             When Mr. Shaffer received the $111,000, it

24   was a loan.  So it wasn't income to him.  However, the

25   income is incurred with the forgiveness.  That's the



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 307

16

1   taxable event.  And he would be taxed on one-sixtieth of

2   that during the period of time that he was still

3   employed by the firm.

4              However, the promissory note that

5   Mr. Shaffer signed also specifically provides that if he

6   left Wells Fargo for any reason whatsoever, whether it

7   was voluntary or involuntary, if he left before the five

8   years was up, he was required to pay the entire unpaid

9   balance.

10             (Thereupon, a break was taken.)

11             CHAIRMAN:  Okay.  We're back on the record.

12  Mr. Kane, you were talking about repayment of the note.

13             MR. KANE:  Yes.  As I indicated, the

14  promissory note does provide that if Mr. Shaffer's

15  employment was terminated with Wells Fargo for any

16  reason whatsoever before the five years was up, that he

17  was required to immediately pay any unpaid balance and

18  the accrued interest on the promissory note.

19             Now the promissory note that Mr. Shaffer

20  signed also provides that if Wells Fargo had to bring an

21  action such as this to seek collection on this loan,

22  Mr. Shaffer agreed to reimburse Wells Fargo for all the

23  costs that it incurred in bringing an action such as

24  this, including its attorney's fees.

25             Now, as I mentioned, Mr. Shaffer joined



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 308

17

```
 1    Wells Fargo on June 15th of 2006.  Unfortunately, the
 2    evidence in this case is going to demonstrate that
 3    Mr. Shaffer was discharged from Wells Fargo on
 4    October 1st of 2009.
 5              And in this regard, the evidence will
 6    establish that Mr. Shaffer was discharged from Wells
 7    Fargo for the very specific reasons that are set forth
 8    on the Form U5 that Wells Fargo is required to file for
 9    FINRA for any employee that leaves the firm, whether
10    voluntary or involuntarily.
11              In this regard, the U5 that was filed by
12    Wells Fargo relating to Mr. Shaffer says that he was
13    discharged for violation of company policies relating to
14    charging a customer commissions that were in excess of
15    the firm's commission schedule for equity securities and
16    for failing to report a written customer complaint.
17              And the evidence will establish that these
18    statements contained on the U5 accurately describe the
19    circumstances under which Mr. Shaffer was discharged by
20    Wells Fargo.  They are accurate, they are truthful.
21              Subsequently, Wells Fargo requested that
22    Mr. Shaffer repay the unpaid balance on the loan, which
23    at the time was approximately $75,000.  He has not done
24    so.  And this arbitration was filed.
25              And in this arbitration, Mr. Shaffer seeks
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 309

1    to avoid repayment, his repayment obligations by

2    asserting various claims against Wells Fargo, which we

3    believe the evidence will establish -- I've had the

4    opportunity to hear that his claims are not only

5    factually incorrect, they're legally without merit and

6    in no way excuse him from honoring the obligation that

7    he undertook when he accepted the loan.

8              It's pretty clear, Mr. Shaffer signed the

9    promissory note. When he did, Wells Fargo lent him the

10   money. Mr. Shaffer agreed to repay any unpaid balances,

11   even if he was fired by Wells Fargo.

12             Unfortunately, he was. But he hasn't

13   repaid the outstanding balance on that loan. And so

14   factually and legally, the document requires that he

15   repay to Wells Fargo what he owes.

16             And as a result, at the conclusion of this

17   hearing, we will ask that you require Mr. Shaffer to

18   honor the written agreement that he signed, repay the

19   unpaid principle and the accrued interest on that loan

20   that now totals -- it's a little under I think $78,000,

21   plus pay all of Wells Fargo's costs it has incurred in

22   bringing this action, including its attorney's fees,

23   because he agreed to do so under the promissory note.

24             And we will also ask that you dismiss all

25   of Mr. Shaffer's counterclaims with prejudice. Thank



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 310

1    you very much.

2              CHAIRMAN:  Thank you, Mr. Kane.

3    Mr. Shaffer, you may make an opening statement.

4              MR. SHAFFER:  Thank you.  Thanks for

5    providing a platform for these issues.  I'm looking

6    forward to hearing an unbiased opinion for this.

7              Please allow me to give you an overview of

8    these events.  I will provide details and answer any

9    questions at your request.

10             I believe Wells Fargo enticed me to join

11   Wells Fargo Investments with promises that they never

12   fulfilled and the benefits of receiving a performance

13   bonus over the first 18 months and $15 million in client

14   accounts.

15             During and after periods of which I had

16   severe illness, during which time I was denied

17   disability benefits, which I was led to believe I was

18   qualified for, I was assigned a sales bonus, which I was

19   not subject to originally, and not informed that I would

20   be subject to at the time of hiring.

21             They were also unfair in that they excluded

22   50 percent of licensed banker referred accounts.  I'll

23   explain this later of course.  This situation,

24   favoritism and what I perceived as the firm's reckless

25   attitude towards client protection resulted in emotional



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

an Alexander Gallo Company

EXHIBIT X  Page 311

1   distress and my request to be allowed to resign.  I was

2   told the promissory note balance would be due in full if

3   I were to resign or be terminated.  And I didn't have

4   the funds to do that.

5            During the tenure of my third sales

6   manager, after being told that I was going to be

7   assigned an additional branch the following month, and

8   that it was business as usual until then, I was abruptly

9   terminated for two minor infractions, infractions that

10  are routinely and ordinarily not cause for termination.

11           My U5 shows violation of company policy and

12  descriptions of these infractions, which is misleading

13  and has resulted in my repeatedly being refused

14  employment after very positive initial interviews.  They

15  have effectively ended my 30-year career in the

16  brokerage business and left me with no means of similar

17  constructive employment.

18           Through the course of these events, I

19  believe that Wells Fargo Investments and their

20  representative violated state labor and employment laws

21  and are guilty of creating a situation of a detrimental

22  alliance, promissory estoppel and intentional and

23  negligent infliction of emotional distress.

24           I have a booklet that I have copies of for

25  each of you, and one for Mr. Kane, as well, which I'll



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 312

21

1   be referring to with my exhibits.

2              It also has, especially so that I don't

3   repeat myself or ramble on or aren't effected by

4   nervousness, it has notes to what I'm saying.  I'm

5   willing to take an oath that this is the absolute truth.

6   I have four copies altogether if I need to provide one

7   for Mr. Kane.  But I have a copy for the panelists.

8              CHAIRMAN:  What is contained in this

9   document?

10             MR. SHAFFER:  My whole presentation and the

11  exhibits that I'd like to review, all contained in my

12  disclosure.

13             CHAIRMAN:  The first thing that needs to be

14  done is to show that to Mr. Kane to permit him to go

15  through it to see, number one, whether he has, in fact,

16  received the documents before; and number two, if there

17  are any matters in this booklet, which I'll refer to as

18  a booklet, that he finds objectionable and would make an

19  objection.

20             MR. SHAFFER:  What it is is my comments.

21             CHAIRMAN:  Oh comments?

22             MR. SHAFFER:  That's all it is.

23             CHAIRMAN:  Is this, then, in the form of a

24  narrative presentation, "I did this, she did that", so

25  forth and so on?



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 313

1      MR. SHAFFER: Yes.

2      CHAIRMAN: So would it be in lieu of your

3  testimony or would this be repetition of your testimony.

4      MR. SHAFFER: It's in addition to my

5  testimony. It's an aid to my testimony. And I figured

6  it would be good for the arbitrators to have a copy of

7  exactly what I said so they could look into it, along

8  with my witness list so they can verify anything that I

9  said.

10      CHAIRMAN: The first thing -- well,

11  Mr. Kane, what comments do you have?

12      MR. KANE: I'll be happy to look at it. To

13  the extent that they're documents that we exchanged, in

14  all likelihood, I won't have an objection of the things

15  that we exchanged. To the extent that it's a narrative

16  explanation of things, I think the best evidence would

17  be the testimony of the individual. But I'd have to

18  look at it.

19      CHAIRMAN: Right. And I think, Mr. Kane,

20  you would understand that that testimony may be in the

21  form, even though oral, may be in the form of a

22  narrative.

23      MR. KANE: Yes.

24      CHAIRMAN: Which, this being an arbitration

25  under the circumstances I think would be appropriate to



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 314

23

1    receive.

2              MR. KANE:  It may well be.  I'd have to

3    look at it first.  Likewise, what I have is a notebook

4    that has documents we exchanged.  There's no narratives

5    in it.  There are documents that we exchanged.  I will

6    give it to Mr. Shaffer at the appropriate time.

7              CHAIRMAN:  I would like you to do that at

8    the appropriate time so that we may have agreement on

9    the documents that will be presented in evidence.  You

10   have an opportunity, of course, to object to any of the

11   documents that Mr. Kane wants to propose we take as

12   evidence.  And we'll do that at the appropriate time.

13             Any further opening comments, Mr. Shaffer?

14             MR. SHAFFER:  That's it.

15             CHAIRMAN:  Okay.  I think what we should

16   do, first, is to introduce Arbitrator's Exhibit Number

17   1, which consists of the following:  It is, first of

18   all, a certificate of out-of-state attorney, and I'm not

19   sure why I sound so hoarse, but bear with me, if you

20   will, which may or may not be appropriate as part of

21   Exhibit 1.  But there it is.

22             The submission and agreement signed by the

23   claimant on behalf of the claimant, the statement of

24   claim and arbitration, a letter from Mr. Shaffer which

25   was sent by him to FINRA, and I should add several



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 315

24

1   letters which I believe have been submitted to Wells

2   Fargo, and then Wells Fargo Investments' response to

3   Mr. Shaffer's claims or counterclaims that were part of

4   or included in the letters and exhibits that Mr. Shaffer

5   submitted to FINRA.

6            And Ms. McClaskey is going to be receiving

7   the exhibits as produced by the parties with the first

8   Exhibit Number 1.

9            How do you want to go about presenting your

10  further exhibits?  Will they be presented in connection

11  with the testimony of a witness?

12           MR. KANE:  Yes.

13           CHAIRMAN:  I assume the same thing for you,

14  Mr. Shaffer, when it's your turn to testify, you would

15  be submitting your testimony orally and copies of the

16  exhibits?  And the panel will discuss whether or not to

17  receive your written testimony in addition to receiving

18  your oral testimony.

19           Typically, testimony is given orally and

20  not repeated in writing except to the extent that they

21  are documents, of course, to which you refer.

22           MR. SHAFFER:  Documents either from the law

23  firm's discovery package to me or documents that I

24  declared to them earlier?

25           CHAIRMAN:  Right.  Okay.  Shall we proceed



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 316

Arbitration                                          March 18, 2011

25

1    then with the first witness?  Okay.  Mr. Kane?

2              MR. KANE:  And my first witness will be

3    Mr. Shaffer.

4              CHAIRMAN:  Okay.  Counsel has the right to

5    examine you or the other party as part of his

6    presentation of witnesses if he calls you.  So I'm going

7    to swear you in.

8              (The witness was sworn in.)

9              MR. KANE:  If I might, I'll pass out the

10   book.  What I'll be doing is I'll be going through the

11   documents and asking Mr. Shaffer to identify them and

12   then seeking to introduce them at that time.

13             CHAIRMAN:  Very good.  Yes.

14             For the record, Mr. Kane is obtaining

15   copies of documents which he plans to introduce and he's

16   going to be giving Mr. Shaffer a copy, as well as

17   members of the panel.

18                       KEN SHAFFER,

19   called as a witness on behalf of the Plaintiff, being

20   first duly sworn, was examined and testified as follows:

21                       EXAMINATION

22   QUESTIONS BY MR. KANE:

23        Q.   As I indicated, my name is Ronnie Kane and

24   I'm here representing Wells Fargo.  Prior to today, you

25   and I have never met; correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 317

26

1          A.    Correct.

2          Q.    Prior to today, you and I have never spoken

3     to one another?

4          A.    No.

5          Q.    Could you just tell the panel your current

6     residential address, please?

7          A.    1515 Garlinda Drive, El Dorado Hills,

8     California.  That home is currently for sale.  My

9     address may be changing in the near future.

10         Q.    I just want to briefly go through your

11    employment background.  And rather than guess at dates,

12    if you would please, would you just go to the Tab 1,

13    Complainant's Exhibit 1 which -- in the white notebook.

14              And if you would, Mr. Shaffer, go to the

15    page in the lower-right-hand corner.  There will be some

16    Bates stamp numbers.  If you would go to the Bates stamp

17    numbers 139, 140 and 141, are those your signatures on

18    the document?

19         A.    Yeah.  139 and 141, not 140.

20         Q.    Okay.  I'm sorry.  Yeah, William Cannon is

21    the signatory on behalf of Wells Fargo.  But on 139

22    where it says "Ken Shaffer", that's yours, and 141,

23    where it says "Ken Shaffer", that's your signature as

24    well?

25         A.    Uh-huh.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 318

Arbitration                                        March 18, 2011

27

1          Q.   You have to answer verbally.  You can't say

2     "uh-huh".

3          A.   Yes.

4          Q.   Everybody does it.  But the uh-huh's don't

5     get picked up sometimes.

6               If you go to page 143, that starts out with

7     the employment background -- let me know when you get

8     there, Mr. Shaffer.

9          A.   I see that.

10         Q.   Was August of 1981 with Payne Weber the

11    first time you became employed in the securities

12    industry?

13         A.   No.  It was the --

14         Q.   Where were you employed -- prior to 1981,

15    what firms had you been employed with?

16         A.   I joined the firm of Drexel, Burnham,

17    Lambert in 1979 when I was 24 years old, going on 25.

18         Q.   How long were you with Drexel Burnham?

19         A.   It says 1982, so I'd say two years.

20         Q.   And you were with Payne Weber from August

21    of '81 to November of '82?

22         A.   Uh-huh.

23         Q.   Yes?

24         A.   Right.

25         Q.   And for what reason did you leave Payne


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 319

Arbitration                                      March 18, 2011

28

1    Weber at that time, if you recall?

2           A.    Truthfully?

3           Q.    If you recall.

4           A.    Well, this is a little embarrassing.  I

5    befriended a secretary -- excuse me -- and I'm going to

6    talk a little bit about respiratory problems that I've

7    been experiencing.  Sometimes I'm going to have to

8    excuse myself and hopefully -- I hope every day that I

9    don't have this every day.  I'm not going to fake a

10   cough and not going to embarrass the panelists or anyone

11   else.

12          At Payne Weber, I befriended a secretary in

13   the San Francisco office and we began dating.  We became

14   engaged.  We later called off our engagement.  And

15   several days later the manager at the Payne Weber office

16   told me I was terminated.  Kind of funny when I look

17   back at it.  At the time, it didn't seem funny at all.

18          Q.    And then you joined --

19          A.    And not for any client complaint, not for

20   any client interaction.  He said he asked me for a

21   report of a client of mine who purchased some options

22   and I hadn't given them to him, so he wanted me out of

23   there.

24          Q.    And you joined Prudential, at the time it

25   was Prudential?



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 320

29

1          A.    Prudential Securities.  And stayed there

2    for eight years with a great review.

3          Q.    What type of business did you have by the

4    time you left Prudential?  Was it a typical retail

5    securities business?

6          A.    It was a general retail securities

7    business.  And as you can see by my U4 records, I had no

8    client complaints, no issues, no problems.

9                I resigned from Prudential to move out of

10   the area and take a position with Bank of America

11   through a contact I had who was with the Prudential base

12   who joined the Bank of America program and called me

13   about the opportunity.

14         Q.    If you go to the page prior, it has a Bates

15   stamp in the lower-right-hand corner of 143.  Before you

16   went to Bank of America, did you have some interim

17   positions that are indicated here?  This one indicates

18   October '90 to June of '91 with Associated Planners?

19         A.    Yes.

20         Q.    And what was Associated Planners?

21         A.    Associated Planners is a platform for

22   independent brokers.  For the record, I don't see how

23   something that happened 20-some-odd years ago matters.

24         Q.    Well, I'm just getting your background.

25               And then you went to Olvie (phonetic)



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 321

Arbitration                                      March 18, 2011

30

1    Discount Corporation?

2         A.   Correct.

3         Q.   And why did you leave them in December of

4    '92?

5         A.   Actually, that -- I left Olvie to join the

6    Bank of America company.

7         Q.   And then you went from Bank of America to

8    Morgan Stanley Dean Witter in July of '99?

9         A.   Right.  After what is it, eight years in

10   Bank of America, I joined the ex Bank of America reps at

11   Morgan Stanley shortly after the manager that I worked

12   with at Bank of America was terminated himself.

13        Q.   Did you receive any inducements to join

14   Morgan Stanley?

15        A.   I believe so.

16        Q.   Did you receive a loan, upfront loan to

17   join Morgan Stanley?

18        A.   Yes, I did.

19        Q.   And you had to sign a promissory note for

20   that?

21        A.   Yes, I did.

22        Q.   And how much was that loan for?

23        A.   I'm not sure of the exact amount.

24        Q.   Approximately?

25        A.   Approximately $180,000.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 322

Arbitration                                          March 18, 2011

                                                                31

1          Q.    And then you left Morgan Stanley in March

2    of '03 and joined H & R Block Financial Advisers;

3    correct?

4          A.    Yes, I did.

5          Q.    And did you receive any inducement to join

6    H & R Block Financial Advisers?

7          A.    I believe I did, yes.

8          Q.    You also received an upfront loan from

9    them?

10         A.    No.   There was no loans.

11         Q.    What kind of inducement?

12         A.    I received a salary over the first 12

13   months, and a bonus based on asset accumulation after

14   one year, I believe.

15               And the questions about whether I signed

16   some kind of a promissory note with H & R Block, I was

17   never asked to.

18         Q.    Okay.   And then it was -- at the time you

19   left H & R Block Financial Advisers, what kind of --

20   what type of business were you doing at H & R Block

21   Financial Advisers?

22         A.    Still general investment advising and

23   financial planning.

24         Q.    And at the time you left them in June of

25   '06, do you recall approximately the assets under



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 323

Arbitration                                    March 18, 2011

32

1    management that you had, ballpark?

2          A.    Yes, I do.   Because I talked to John

3    Scambray about that and about my concern with that.

4    That's the reason I had come to Wells Fargo and inquired

5    about the position that was available.   I had about

6    $15 million in assets, which as everyone knows who

7    appears in the brokerage business, is not a lot.

8          Q.    And your trailing 12 months of gross

9    commissions at H & R Block, was that around $217,500?

10          A.    Yeah, probably.

11          Q.    Just approximately?

12          A.    Approximately, yeah.

13          Q.    And you -- as indicated on your U4, the

14    first page of your U4, Mr. Shaffer --

15          A.    The very first page.

16          Q.    Yeah, the very first page.   June 15th of

17    2006, as indicated under your name, June 15th, 2006 was

18    your first date of your employment at Wells Fargo?

19          A.    Correct.

20          Q.    And prior to joining Wells Fargo, you had

21    received an offer letter from the firm, had you not?

22          A.    I believe so.

23          Q.    And if you would, please, take a look at

24    Claimant's Exhibit 2, the Tab 2.   Why don't you look at

25    all the pages, and then when you're done, let me know



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 324

Arbitration                                          March 18, 2011

33

1    and then I'll ask you a question.

2              A.    Okay.

3              Q.    And is that your signature on the very last

4    page that has the stamp number W97?

5              A.    Yes, it is.

6              Q.    And the page prior to that that has the

7    W96, do you recognize that as being Mr. Scambray's

8    signature?

9              A.    I wouldn't recognize Mr. Scambray's

10   signature.  But yeah, I see he is --

11             Q.    And at the time, he was regional sales

12   manager in the area for Wells Fargo?

13             A.    Uh-huh.

14             Q.    Yes?

15             A.    Yes, he was.

16             Q.    If you go all the way back to the first

17   page, when you received and accepted this, you

18   understood, did you not, that Wells Fargo was agreeing

19   to pay you this $12,000 nonrecoverable draw, I think

20   that's from June of '06 to October of '06, four months;

21   correct?

22             A.    Uh-huh.

23             Q.    Yes?

24             A.    Yes.

25             Q.    And you also, going to the transition



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 325

Arbitration                                    March 18, 2011

34

1    compensation payout portion, you understood that they

2    also agreed to pay you the 40 percent minimum retail

3    payout through December 31st of '06, correct; as well?

4         A.    Yes.

5         Q.    And then after that, you would go to a

6    normal compensation grid; correct?

7         A.    Correct.

8         Q.    And then if you go to the second page, I'm

9    going to go to the additional incentive portions.  You

10   understood then when you accepted this that if your best

11   contiguous rolling 12 months of gross commissions during

12   your first 18 months of employment through December of

13   '07 met or exceeded 217,500, that you were eligible for

14   the taxable loan in the amount of 50 percent of your

15   gross commission.  You understood that; correct?

16        A.    Correct.

17        Q.    And you understood that the loan would be

18   secured by a five-year promissory note calling for the

19   loan to be forgiven and taxed in equal monthly

20   installments over a five-year period.  You understood

21   that when you accepted the offer?

22        A.    I understood that it was the criteria for

23   the agreement.  In all actuality, all brokers think of

24   these types of promissory notes as a bonus.

25        Q.    It doesn't refer to it as a bonus, does it?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 326

35

1          A.    No, it does not.  But later I will show
2     that contract law considers it a bonus.
3          Q.    And it says here the loan would be secured
4     by a five-year promissory note calling for the loan to
5     be forgiven over the five-year period; correct?
6          A.    That's what it says.
7          Q.    That's what it said when you signed it;
8     correct?
9          A.    Uh-huh.
10         Q.    Yes?
11         A.    Yes.
12         Q.    And it also said that if for any reason
13    your employment with the firm terminates before the end
14    of the term of the loan, it would be your responsibility
15    to repay the outstanding amount due under the promissory
16    note.  You understood that as well, did you not?
17         A.    Standard boilerplate.
18         Q.    That's what it says and what you're
19    signing; correct?
20         A.    That's what it says, right.
21         Q.    And if you would go, please, to the page
22    that has the Bates stamp in the lower-right-hand corner
23    W96, and I'm going to direct your attention to the
24    second paragraph where it states -- and I'll ask you:
25    Did you understand that, as stated here, your employment



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 327

36

1   at Wells Fargo had no specified term or length?  Both

2   you and Wells Fargo had the right to terminate your

3   employment at any time with or without advance notice

4   and with or without cause.  You understood that when you

5   signed this document, did you not?

6          A.   I understood that's what they were telling

7   me.

8          Q.   Okay.  Is there anything about that

9   language you don't understand?

10         A.   Well, yeah.  In hindsight, because I didn't

11  have the right to terminate our agreement after I signed

12  the promissory note without a significant penalty.

13  So --

14         Q.   Well, you had a right to terminate.  But

15  the consequence was you had to pay the outstanding

16  balance on the loan?

17         A.   Right.

18         Q.   And then if you'll go to the fourth full

19  paragraph over the second sentence that starts, "No

20  guarantees or promises of any kind, other than those

21  contained herein, have been made concerning leads,

22  referrals, book of business, clients, store or other

23  assignments, commissions, annual compensation or any

24  other terms of your employment."

25              You understood that when you signed this



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 328

37

1   document, did you not?

2        A.   I understand that's in the document.   I

3   also assumed that Mr. Scambray's promise of giving me

4   $15 million in assets was in addition to that and not

5   covered by the agreement.

6        Q.   Well, does it go on to say, "Except as

7   explicitly set forth above, no employee of Wells Fargo

8   is authorized to change or modify the terms of this

9   letter except in writing and signed by an executive

10  vice-president"?

11       A.   I see that.

12       Q.   Well, is there anything about this

13  language, that "no guarantee or promises" that you don't

14  understand?

15       A.   No.   This document specifies that.

16       Q.   And going to the next page where you signed

17  it, you said, "By signing and returning a copy of this

18  letter, I accept and agree to all of the terms and

19  conditions of this offer of employment."   And that's

20  what you did, did you not?

21       A.   That's my signature.   That's what I did.

22       Q.   And if you would, Mr. Shaffer, please, go

23  to the next tab, Claimant's Exhibit 3.   And I don't want

24  to mislead you, so I'm going to tell you that the only

25  difference -- other than the handwriting here, the only



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 329

38

1    differences I noticed, if you go to the last page, you
2    signed it on another copy of the offer letter on
3    June 9th of '06.  But why don't you take a moment to
4    look at it and I'll ask you a question when you're done.
5    The prior one had your signature dated June 7th and this
6    is just one date.  Other than that, my looking at it,
7    the terms are identical?
8         A.    Uh-huh.
9         Q.    Do you have a recollection as to how it
10   came to be that you signed a second one?  Did you
11   misplace the first one, if you have a recollection?  And
12   if you don't, that's fine.
13        A.    I have no real recollection.  My
14   recollection is that John told me that I had -- that I
15   needed to sign this document, that I needed to stop by
16   and sign it.
17        Q.    And that is your signature on the last page
18   of Claimant's Exhibit 3?
19        A.    It is.
20        Q.    Okay.  And if you would, please, take a
21   look at Tab 4, Claimant's Exhibit 4.  Take a look at all
22   the pages.  And when you've finished looking at it, I'll
23   ask you a question.
24        A.    Yes.
25        Q.    Is that your signature that appears on the



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 330

Arbitration                                        March 18, 2011

                                                              39

1    last page of this document?

2              A.    It is.

3              Q.    Dated June 9th of 2006?

4              A.    Right.

5              Q.    And if you would go to the page prior to

6    that, in the column, or the paragraph, rather,

7    "Employment At-Will", when you signed this, you

8    understood as indicated there that your employment is

9    at-will and nothing in the document changed or altered

10   that status; and that you were free to resign at any

11   time for any reason.  And, similarly, the firm was free

12   to end the relationship at any time for any reason.

13              You understood that, did you not, when you

14   signed this?

15             A.    That's what it says.  There's an assumption

16   of just cause in any employer, employee relationship.

17             Q.    Well, what is there about the language that

18   says, "Similarly, the firm is free to end the employment

19   relationship at any time for any reason with or without

20   cause", is there anything about that language that you

21   don't understand?

22             A.    No.  I don't -- you rationally expect that

23   a firm would be fair and not terminate you without

24   cause.

25             Q.    And if you would, please, you did -- in



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 331

Arbitration                                    March 18, 2011

                                                            40

1    fact, the offer letter that indicated that you were
2    eligible to receive that loan, you did, in fact, receive
3    that loan, did you not?
4         A.   Yes, I did.
5         Q.   And if you would, please, go to Tab 5,
6    Claimant's Exhibit --
7         A.   Can I clarify?  I received the amount in
8    question.  I never really thought of it as a loan.  I
9    thought it was just a reason I would have to stay with
10   the firm for five years.
11        Q.   Well, let's look at Exhibit 5, if you
12   would, please.  Take a look at all the pages and after
13   you've finished looking at it, let me know and I'll ask
14   you a question.
15        A.   I've seen this before.
16        Q.   And if you'd take a look at the last page,
17   is that your signature on the last page of Claimant's
18   Exhibit 5?
19        A.   Yes, it is.
20        Q.   And if you'd just go to the very first
21   page, it says "in consideration of a loan".  Is there
22   anything about that language you don't understand?
23        A.   No.  I understand the language might be --
24   but you must also understand that in the brokerage
25   community, these types of arrangements are considered



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 332

Arbitration                                          March 18, 2011

41

1     bonuses.  And this was a bonus I earned based on my
2     achieving the production standards that were set out for
3     me.  Yeah, I see it says "consideration of loan".
4              Q.   Well, and the offer letter that you signed
5     referred to it as a loan for which you would have to
6     sign a promissory note as well, did it not?
7              A.   Uh-huh.
8              Q.   Yes?
9              A.   Yes.
10             Q.   Nowhere in the offer letter or in this
11    promissory note does it refer to it as a bonus, does it?
12             A.   No.
13             Q.   And, in fact, when you received the loan,
14    you didn't report income of $111,347, did you?
15             A.   No, I did not.  But part of what I will be
16    discussing is that Wells Fargo gave me documents that
17    listed this amount as income, not a loan.
18             Q.   The income -- I'll go through the document
19    in a minute.  But when you received the $111,347 in
20    2008 -- that's when you received it; correct?
21             A.   Uh-huh.
22             Q.   Yes?
23             A.   Right.
24             Q.   You didn't report as income on your tax
25    return $111,347, did you?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 333

Arbitration                                          March 18, 2011
                                                            42

1        A.   No, I did not.

2        Q.   Because it was a loan.  If it was a bonus,

3   you would have reported the $111,347 as income?

4        A.   I considered it a bonus, and most brokers

5   consider it a bonus that they don't have to pay tax on.

6   That is one of the ways that it is described to you in

7   interviews, this is money that you receive that you do

8   not have to pay tax on upfront.

9        Q.   Okay.  And you also understood, did you

10  not, that you were going to be charged interest on this

11  loan as indicated here of 3.58 percent; correct?

12       A.   If I didn't stay with the firm for a

13  five-year period, which I very much intended on doing.

14       Q.   Well, this says it's going to accrue on any

15  unpaid balances of 3.58 percent.  Do you see that?

16       A.   And that would be forgiven.

17       Q.   Understood.  I'll go there.  In the third

18  paragraph, Item 1, you understood, did you not, that the

19  entire balance under the note would be immediately due

20  and payable if your employment with Wells Fargo was

21  terminated for any reason whatsoever, including, but not

22  limited to, involuntary termination.

23            You understood that when you signed this

24  promissory note; correct?

25       A.   I understand that that was in the wording



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 334

Arbitration                                    March 18, 2011

43

1    of the promissory note.  I didn't think that any company
2    that held a public trust would, in fact, terminate
3    someone for any reason whatsoever, including reasons
4    that weren't rational.
5            Q.   If you would, please, go to the last
6    paragraph of this last page.  You understood when you
7    signed this promissory note that the principle and
8    interest due on this note would be forgiven and taxed in
9    sixty equal monthly increments commencing on the first
10   day of the month following dispersement of the loan
11   proceeds continuing thereafter.  You understood that;
12   correct?
13           A.   Yes.  That's what it says.
14           Q.   And that's the tax that you were -- and
15   when that was forgiven, you were taxed on the forgiven
16   amount?
17           A.   Right.
18           Q.   Okay.  And then if you would, please, go to
19   the second page of this promissory note.  I'm going to
20   go to the third full paragraph.  When you signed this
21   promissory note, you understood, did you not, that in
22   the event that any action or lawsuit was required to be
23   brought for the collection of the note, you agreed to
24   pay reasonable attorney's fees and costs, including all
25   fees and costs involved in the collection.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 335

Arbitration                                    March 18, 2011

44

1          You understood that when you signed this

2   promissory note; correct?

3          A.   Yes.

4          Q.   Okay.  And you also indicate -- you also

5   understood in the -- it's the fifth paragraph down, that

6   you executed the note without reliance on any oral

7   representations.  You understood that when you signed

8   this note, did you not?

9          A.   I'd have known that.  But, obviously, I did

10  rely on all representations.  But I'm not seeing that.

11  That's in the fifth paragraph on the second page.

12         Q.   Yes.  "The undersigned executes this note

13  without reliance on any oral representations."

14         A.   Yeah.

15         Q.   And the paragraph below that, you

16  understood, did you not, that, again, you were employed

17  on an at-will basis, and that didn't constitute an

18  agreement to employ you for any specified period of

19  time, and your employment could be terminated at any

20  time with or without notice or cause?

21         A.   That's what it says.

22         CHAIRMAN:  Would this be a good time to

23  take a morning break?

24         MR. KANE:  It would be.

25         CHAIRMAN:  So let's resume in ten minutes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 336

Arbitration                                    March 18, 2011

45

```
1              UNIDENTIFIED SPEAKER:  Off the record.
2          (Thereupon, a break was taken.)
3              CHAIRMAN:  We are on the record.  You may
4      proceed, Mr. Kane.
5              MR. KANE:  Thank you.
6      BY MR. KANE:
7          Q.   If you would, please, Mr. Shaffer, take a
8      look at Exhibit 6, Claimant's Exhibit 6 in the notebook.
9      Take a look at it and let me know when you're finished
10     with it and I'll ask my question.
11         A.   I've seen this.  Mr. Chumney probably
12     mailed this to me several times.
13         Q.   And you -- do you recall receiving this
14     while you were at Wells Fargo, as well, that would show
15     how the one-sixtieth would be taxed and paid, you know,
16     forgiven over time?
17         A.   I don't have a recollection of receiving
18     this from Wells Fargo.  But I certainly believe that I
19     did.
20         Q.   Okay.  I understand.  And, likewise, you
21     did, in fact, if you take a look at exhibit --
22     Claimant's Exhibit 7, receive the loan proceeds of
23     $111,347.  Do you see that?
24         A.   Yes, I did.  And this document, if you'll
25     notice, lists this amount as a net pay distribution.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 337

46

1    And the top part of this particular document is listed

2    as a biweekly payroll report, I would assume.  And it

3    lists the current total gross at the bottom, $111,347

4    and net pay of $111,347, which is one of the confusing

5    issues here, and I think pertinent to whether this is,

6    in fact, a loan or not.

7            Q.    Well, you did get --

8            A.    It's certainly confusing.

9            Q.    And you see the net pay distribution of

10   $111,347 there, do you not?

11           A.    Paid, yes.

12           Q.    And there was no taxes taken out of that.

13   The only taxes would relate to the regular pay that was

14   the draw, $138,667.  And anything under the incentive

15   plan.  Do you see that?

16           A.    I see that.  And at the top in the middle

17   box down, it says "pay rate $36,053 annual".  That may

18   be the recoverable draw and is not correctly referred to

19   as a salary.

20           Q.    All right.  And if you would, please, as it

21   relates to your employment with Wells Fargo, you, in

22   fact, were discharged from the firm on October 1st of

23   2009, were you not?

24           A.    Yes, I was.

25           Q.    And if you would, please, take a look at



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 338

Arbitration                                    March 18, 2011
                                                          47

1    Exhibit 8, Claimant's Exhibit 8.  Read all of it.  And
2    then when you're finished, I'll ask you a question.
3           A.   I've seen this many times, too.  Yes, I'm
4    ready.
5           Q.   And you received a copy of this letter from
6    Wells Fargo shortly after the October 16th date on the
7    letter?
8           A.   After I called Ms. D'Orio and told her that
9    I did not understand why I was terminated.  Yeah, I did
10   receive this shortly after.
11          Q.   And that was sometime in October of 2009?
12          A.   Right.
13          Q.   And if you would go to the page that has
14   121 at the bottom, it indicates there under IM 3, "book
15   termination".  Let me know when you get to that portion
16   of the document.
17               UNIDENTIFIED SPEAKER:  Would you restate
18   where you're looking?
19               MR. KANE:  Sure.  It's the page that's
20   Bates stamped 121, and it has the 3, and it says
21   "termination".
22          A.   I see that.
23   BY MR. KANE:
24          Q.   And you see your reason for termination,
25   discharged.  Do you see that?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 339

Arbitration                                      March 18, 2011

48

1          A.    Right.  At the very bottom.

2          Q.    Okay.  And then if you go to the next page

3    where it asks for explanation, and it says, "violation

4    of company policies, representative lacked justification

5    for charging equity securities markup that exceeded the

6    firm's full-service equity schedule.  And representative

7    received a written customer complaint and did not

8    forward to supervisory principal."

9          That's what was reflected on the U5 that

10   Wells Fargo submitted to FINRA?

11         A.    I see that.  Its erroneous and deceiving.

12         Q.    Well, let's take a look if you would,

13   please, as it relates to Item 1, the charging the

14   commissions that exceeded the full service equity

15   schedule, that relates to two trades that you were

16   questioned about by Ms. Mortensen; isn't that correct?

17         A.    Right.

18         Q.    And if you would go to Tab 10, and I'd like

19   you to take a look at the second page that has the Bates

20   Stamp Number W20, did you -- actually, it would start on

21   the page W19 at the bottom.  It's the string e-mail.

22         It says -- e-mail from Ms. Mortensen to you

23   dated December 29, 2009 at 3:08.  Did you receive a copy

24   of this e-mail from Ms. Mortensen at that time?

25         A.    Yeah.  I got the e-mail requesting



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 340

1    clarification of the trade.

2            Q.    Okay.  And as it relates -- so when you

3    received this e-mail that's on page 20, did you

4    understand what this was referring to, this e-mail where

5    she says --

6            A.    The actual e-mail didn't have this excerpt

7    of the trades.  But I -- we had already talked about it.

8    I knew what the trades were and which account it was,

9    yeah.

10           Q.    It says, "Please advise why you entered a

11   flat dollar commission in excess of what the normal comp

12   would be."  And then it has in this box the two trades.

13           Is it your testimony that this wasn't

14   contained in the e-mail that you received from her?

15           A.    It might have been.  I don't -- I don't

16   think the e-mail system is capable of printing something

17   like this, is it?  But, yeah, and it may have been.  And

18   it doesn't matter.  Because I understood what trades we

19   were discussing, whose account it was and so forth.

20           Q.    And just so it's clear, did you

21   understand -- let's take this first trade on

22   September 29th.  It was a purchase you solicited of this

23   closed-end fund where you charged the client a flat

24   commission of $495 versus what the firm's equity

25   commission schedule indicated should have been charged



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 341

50

1   of $368.69.  You understood that?

2          A.   Right.  A difference of $120.

3          Q.   But you understood that that's what this

4   was referring to?

5          A.   I understood.

6          Q.   And as it relates to the second trade, this

7   was a solicited purchase by you of a closed-end fund,

8   where, again, you charged the client a flat commission

9   of $495, versus what the firm's commission schedule

10  reflected should have been charged, and that is the

11  $336.58; is that correct?

12         A.   Uh-huh.  A difference of $175.

13         Q.   But you understood that that's what this is

14  referring to?

15         A.   Right.

16         Q.   And you responded to Ms. Mortensen, did you

17  not?

18         A.   I did.

19         Q.   And before we get to that, you understood

20  that she was the branch administrative manager at the

21  time when you received this from her; correct?

22         A.   I did.  And the reason that my e-mail is as

23  informal as it is and as casual as it is is because --

24  and, certainly, we can ask Ms. Mortensen to comment on

25  this.  But prior to this time, Mary Mortensen and I had



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 342

1    had a very friendly relationship.  And there was no

2    instances of client complaints or policy violations on

3    my part that we had to discuss.  We had a very friendly

4    relationship.

5              And, in fact, part of the reason I

6    responded this way in this e-mail is that Ms. Mortensen

7    would, in our conversations, would refer to me as honey,

8    sweetie, other endearing terms.  I'm not saying that she

9    had a romantic interest in me personally.  I assume

10   that's the way she talks to all the brokers.

11             But she would refer to me with endearing

12   terms that made me think we were on a very friendly type

13   level as far as our relationship goes.

14        Q.   She told you, did she not, that these

15   trades had been flagged as part of her routine functions

16   that -- indicating that you had charged a client in

17   excess of what the firm's commission schedule indicated

18   should be charged a client.  She indicated that?

19        A.   She indicated that.

20        Q.   Okay.

21        A.   This was an accidental situation on my

22   part.

23        Q.   Okay.  Well, let's go to your response, if

24   you would, please.  And that's on page 19 where you say,

25   "Was I not supposed to do that?  We can change if we



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 343

52

1   want.  These are good clients, recently 50 percent,

2   72 percent profit on trades.  I estimated the cost at

3   $1,000.  I thought gouging was part of our business

4   plan."

5           So is it your testimony that because of

6   these terms of endearment, you thought it would be

7   appropriate for you to tell her that you thought gouging

8   a client was part of the business plan?  You thought

9   that was an appropriate --

10       A.   I --

11       Q.   -- comment to make?

12       A.   I felt that in a period of extreme

13   frustration, that I would make that statement to, again,

14   display my displeasure at the firm's attitude of

15   generating commissions without a consideration of the

16   benefit to the client.

17       Q.   Just so we're clear, you're on Tab 10, the

18   page 19 e-mail in the middle, Ken Shaffer, sent

19   September 29, 3:27, to Ms. Mortensen regarding review of

20   excess commissions; correct?

21       A.   Uh-huh.

22       Q.   Yes.

23       A.   And I had a reason for saying that.  And I

24   will address that in my presentation.

25       Q.   Now, you understood that part of her role



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 344

53

1  was a compliance role at the firm, Ms. Mortensen's role;

2  correct?

3       A.    Correct.  I understood that was her role.

4  But the compliance department at Wells Fargo did not

5  fulfill the duties of a compliance department.

6       Q.    Okay.  Let's, if you would, please, go to

7  the page that has the Bates stamped number in the

8  lower-right-hand corner.

9       A.    You don't want to talk about the rest of

10 the e-mail?

11      Q.    I'm going to ask you some questions, if you

12 would please go to the page that has --

13           CHAIRMAN:  I'm sorry.  What did you say,

14 Mr. Shaffer?

15           MR. SHAFFER:  I said did he want to review

16 the rest of the e-mail.  He brought up some portions of

17 the e-mail and that's it.

18           CHAIRMAN:  And you're referring to the

19 e-mail on page 19?

20           MR. SHAFFER:  Right.  Where I complained

21 about the monthly minimums with the threat of

22 termination if not met.

23           CHAIRMAN:  All right.  You can bring that

24 up during the course of your presentation.

25           MR. SHAFFER:  Thank you.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 345

1    CHAIRMAN:  Go ahead, Mr. Kane.

2  BY MR. KANE:

3    Q.    If you would, Mr. Shaffer, go to page W22.

4  That's the order ticket for the purchase for the

5  customer; right?

6    A.    Yeah, the same two.

7    Q.    Let's skip to 22, and let me know when

8  you're there because I'm going to ask you a question

9  about that.

10    A.    Okay.  I'm looking at it.

11    Q.    And where you see it says "CM $495".

12  That's something that you had to enter into the system,

13  was it not?

14    A.    Right.

15    Q.    And you had -- you intentionally entered

16  the $495 into the system?

17    A.    I did that.  And financial advisers were

18  allowed to adjust commissions.  It's an industry

19  standard that commissions may be adjusted based on the

20  time spent with the client.  And, truthfully, if brokers

21  would respond truthfully, commissions are also adjusted

22  based on the success of the trade.  If you make $10,000

23  on the trade, the commission might be $385.  And if

24  you're losing money on the trade, it might be $39.95.

25  And brokers adjust trade amounts.  You're allowed to do



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 346

1    that within the trade entry system that we were using.

2              I don't understand why it didn't inform me

3    that the principle amount I was working with didn't

4    support that level of commission charged.

5         Q.   Take a look at page -- well, first of all,

6    when you put a trade in, when you enter a trade, you

7    don't know whether the trade is going to be profitable

8    or unprofitable; right?

9         A.   No.

10        Q.   So how could you base a commission on

11   profitability that you don't even know if it exists yet?

12        A.   That's why if you go out to my e-mail to

13   Mary, again, assuming that we were on the same friendly

14   basis we were always on, that these clients returned a

15   50 and 72 percent profit on trades.  And that was the

16   reason I adjusted the commission upward; which, again,

17   is allowed of financial advisors.

18             We also talk about discount and premium

19   business.  It depends on the amount of time you spend

20   with the clients and what kind of services you offer.

21   Also, when you're placing a bond trade, you put the

22   commission in that you think is appropriate.

23             On the bond trading platform, if you put a

24   commission in that's higher than the allowed amount,

25   then it tells you the commission is too high.  And I



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 347

56

1  would assume it would have done that on the equity side,
2  too.
3          Q.   Okay.  Take a look at --
4          A.   Again, so I overcharged the commission
5  accidentally by $300 on two trades.
6          Q.   Well, not accidentally.  You overrode the
7  system and put in $495 versus the $169.47 it should have
8  been; correct?
9          A.   Yes.
10         Q.   That was no accident?
11         A.   No.  I put the amount in, having no idea
12  that it would be over the maximum amount.
13         Q.   Well, take a look at Exhibit W -- at page
14  W23 in Exhibit 10.  You understand -- this would be
15  something that you would see on the screen when you
16  would enter a trade that would calculate the commission
17  that should be charged to the client.  And as we see
18  here, it should have been $169.47.
19              That's something that you would see on the
20  screen when you entered the trade; correct?
21         A.   No.  No.  And you can check with Mary on
22  this.  You could go to the commission calculator screen,
23  I believe, and calculate a commission.  But when you
24  were placing a trade, this screen does not come up.
25              And, again, I had no idea that the amount



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 348

57

1    of commission was not supported by the principle amount

2    of the trade.

3            Q.    Isn't this the commission calculator?

4            A.    This may be the commission calculator.

5    It's not the order entry screen.  I never saw this.  By

6    the way, it says "maximum commission of 460" here.

7            Q.    At the time you entered this order, did you

8    know that you were charging commissions that were in

9    excess of what the schedule called for?

10           A.    Absolutely not.

11           Q.    So you didn't see the commission calculator

12   that says it should have been $169.47?

13           A.    I didn't go to the commission calculator

14   screen.  Mary would know how that works.  I know there

15   is a commission calculator screen.  I didn't go to that.

16   I went to the order entry screen, entered the trades for

17   the client, assuming that I was doing the best job I

18   could for them, and I had no idea that I was

19   overcharging the client.

20                 This is interesting, too, because in this

21   Number 23, it shows the maximum commission of $460.  I

22   thought we said the actual commission was less than

23   that.

24           Q.    You saw the actual commission charge to be

25   $169.47?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 349

Arbitration                                    March 18, 2011

58

1      A.   Yeah.   Why does it say up in the shaded
2  area, it says "max commission 460".
3      Q.   Okay.
4      A.   Why does it say that?   I don't know.
5      Q.   Would you go to page 25?
6      A.   Okay.
7      Q.   This is the second trade that we were
8  talking about; correct?
9      A.   Right.
10     Q.   And, again, you entered the $495 into the
11 system?
12     A.   I did.
13     Q.   Had you not entered that into the system,
14 it would have -- the commission would have been
15 calculated according to the commission calculator;
16 right?
17     A.   Right, which is what I did probably
18 90 percent of the time.   Another 90 percent of the time,
19 I reduced the commission to a lower amount which was
20 necessary based on relationships that I had.   And in
21 this instance, and I would suggest one percent of the
22 time, I adjusted the commission upward.
23     Q.   And so you overrode the system in order to
24 adjust the system upward?
25     A.   It's not a matter of overriding the system.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 350

Arbitration                                    March 18, 2011

59

1   You just put the commission in.  I did that before.  And

2   every other broker I'm sure has adjusted commissions

3   upward.

4        Q.    My point is had you not entered the 495,

5   the commission would have been automatically calculated

6   pursuant to the firm's commission equity schedule?

7        A.    Right.  And it was an ability of the

8   financial adviser to adjust the commission upward if

9   they wanted to, which is why this is the way we do it.

10            Again, why the system didn't tell me that

11  principle amount of the trade didn't support the

12  commission amount, I don't understand.  Because on the

13  bond trading desk, it would have.  And I assumed it

14  would.

15            I also assumed that this error was too

16  small and inconsequential to erase a 30-year record in

17  the brokerage business.

18       Q.    Would you go back to Exhibit 8, please,

19  Claimant's Exhibit A?  And it's page 122.  I want to go

20  to the second column of the U5 where it says,

21  "Representative received a written customer complaint

22  and did not forward to supervisory principal."

23            Go to Exhibit 9, please, Tab 9.  Take a

24  look at those pages.  And when you're done looking at

25  those pages, I'll ask you a question.



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 351

1    A.    Yeah.   I've seen this before.

2    Q.    Okay.  Let's go to the bottom of page 50

3 and the top of page 51.  Did you receive this e-mail

4 from Mr. Doug Johnson on September 11th of 2009 where he

5 indicated, "Give me a contact to find out how to get my

6 money back into my account since you have not responded.

7 If I don't hear back this time, my attorney will contact

8 you next.  I'm pissed.  You got me into this and don't

9 respond to my e-mails."

10    Did you receive -- without the written

11 notations there, I don't know that -- did you receive

12 this e-mail from this client?

13    A.    I received this e-mail and I called the

14 client immediately.

15    Q.    And did you bring this e-mail where he's

16 threatening to go to his attorney to the attention of

17 any of your supervisors at the time you received it?

18    A.    No, I did not.  Because I did not consider

19 it a complaint.  This client with the $8,000 total

20 investment in a principle-protected investment had --

21 did not say that I was guilty of any lack of disclosure

22 or misrepresentation.  He wants to find out how to get

23 his money back in his account.  It's an administrative

24 issue.

25    Q.    Well, he said, "My attorney will contact



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 352

61

1    you next.  I'm pissed you got me into this."  He said

2    that as well, didn't he?

3         A.   He sure did.  And he is market link CD,

4    which was issued and guaranteed by Wells Fargo, paid

5    back his $8,000 total investment shortly after this

6    conversation.  And I, in fact, helped him and made the

7    notes of the entries to get the money back into his

8    checking account.

9              I didn't consider this a complaint against

10   me because he didn't mention any representation on my --

11   misrepresentation on my part or any, you know, lack of

12   total disclosure on my part.

13             And at the same time, I knew the firm was

14   basically deluged with complaints regarding market rate

15   securities and reverse convertible bonds, which I'm

16   going to address in my presentation, and had millions of

17   dollars of lawsuits.  And I didn't think this was

18   something that I should bother anyone with.

19             This guy wanted to know how to get his

20   fully-protected principle back into his checking

21   account.  And the other reason why he was irritated

22   about this is there's a system limitation, which Mary

23   can comment on, within our e-mail system.  I would

24   receive say 20 to 50 e-mails a day.  A number of those

25   were from the municipal bond department, maybe five to



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 353

62

1   six a day.

2          My particular system limitation, when I

3   tried to respond to somebody's -- or reply back to

4   someone's e-mail, say someone is going to stage an

5   after-hours calling event and they want all the FCs,

6   financial consultants, to get back right away to confirm

7   their participation, when I'm trying to reply to that

8   e-mail, my system will tell me that my -- I don't have

9   the room on my system, I have to delete e-mails.

10         I think what I did on Mr. Johnson's e-mail

11  dated December 11th was accidently delete --

12         Q.   September?

13         A.   September.  No, it was the one before that

14  I believe I accidentally deleted.  And then when I got

15  the one that says, "My attorney will contact you next",

16  I'm sure his attorney would be thrilled to take a case

17  of an $8,000 principle-protected investment that lost

18  him no money.  You know, this guy is a little bit crazy,

19  don't you think?

20         And I immediately called and cleared

21  everything up.  He also told me that he went into the

22  branch and tried to get help with this and find out

23  exactly how to get his money back into his checking

24  account, and he told me that no one at the branch was

25  helpful.  And I think that affected his attitude in this



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 354

63

```
1    e-mail.
2           Q.    Mr. Shaffer, you annually were required to
3    review the compliance manual of the firm and certify
4    that you had reviewed the compliance manual?
5           A.    Right.
6           Q.    And if you take a look at Tab 12 -- and you
7    do that on the computer, would you not?
8           A.    Right.
9           Q.    And if you take a look at Tab 12, does this
10   cons -- the two pages where you're certifying that you
11   had reviewed the compliance manual, are these your
12   certifications for the years indicated?
13          A.    Uh-huh.
14          Q.    Is that yes?
15          A.    Yes, I guess so.  I don't see 2009 there.
16          Q.    If you go to --
17          A.    Yeah, I'm --
18          Q.    Okay.  And then it goes to Tab 11.  Do you
19   understand that Tab 11, that this is the portion of the
20   compliance manual that indicates what's -- what a
21   financial adviser is to do when the person gets a
22   written or verbal complaint?
23          A.    Correct.
24          Q.    Correct.  And that FINRA defines a
25   complaint as any written statement of a customer or
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 355

64

```
 1   person acting on behalf of a customer alleging a

 2   grievance involving the activities of those persons

 3   under the control of the member in connection with

 4   the --

 5        A.    There you go.

 6        Q.    -- execution or the disposition of funds?

 7        A.    Right.

 8        Q.    As a matter of policy, WFI deems a

 9   complaint to include any verbal or written statement

10   from a client alleging a grievance involving the

11   activities of WFI, a WFI registered rep or employee, or

12   any investment or insured made available through WFI.

13              And I guess it's your testimony that when

14   he says, "My attorney will contact you, I'm pissed" --

15              I apologize.  I thought I had turned my

16   phone off.  I'm sorry.

17              I take it that you didn't view that as a

18   grievance when he said, "My attorney will contact you.

19   I'm pissed you even got me into this."

20        A.    No.  Because it says alleging a grievance

21   involving the activities of a WFI-registered

22   representative.  He wasn't complaining about any

23   activities.  He was complaining that he didn't know how

24   to get his money from the brokerage account back to the

25   checking account.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 356

1          Q.    He said, "I'm pissed that you got me into
2    this", the investment; correct?
3          A.    Yeah.   He does say that.
4          Q.    Okay.
5          A.    The other question in my mind was whether
6    an e-mail complaint actually qualifies as a so-called
7    written complaint.   And when I called him and I said,
8    "okay" -- I told him, "Here's your account number.
9    Here's what I'm going to do.   I'm going to make a note
10   to get the money back into your checking account."
11              I told him, "Your market link CD will be
12   maturing shortly and you will be receiving 100 percent
13   of your principle back."   At that point, I did not
14   consider this a complaint anymore.   He was completely
15   satisfied with my verbal explanation.
16              And, again, at a time when a firm is
17   receiving lawsuits about all kinds of what I would call
18   unscrupulous activity, I figured the least I could do is
19   not send on some e-mail from some guy who wants to know
20   where his $8,000 is, which, again, was completely
21   principle-protected.   There was no risk to him at any
22   time.
23          Q.    Now, you had a conversation with
24   Ms. Mortensen about both the trade commission issue, as
25   well as the customer complaint issue that we've



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 357

66

1   discussed, did you not?

2          A.   I believe I did.

3          Q.   Okay.  And during that conversation, you

4   were advised that your position with Wells Fargo had

5   been terminated; correct?

6          A.   Well --

7          Q.   Why don't you tell the panel everything you

8   recall.  So when was that conversation?  Was that

9   conversation on October 1st of 2006?

10         A.   I believe so, October 1st or October 2nd.

11         Q.   Okay.  And where was the conversation held?

12         A.   It was held in my former branch of Wells

13  Fargo in --

14         Q.   Which branch was that?

15         A.   That is the branch in Folsom, California on

16  Blue Ravine Road, Empire Ranch.

17         Q.   Empire Ranch.  Let me ask the question and

18  you can expand.

19              Just why don't you tell the panel, was

20  anybody else present for this conversation other than

21  you and Ms. Mortensen?

22         A.   No.

23         Q.   Why don't you tell the panel everything you

24  recall Ms. Mortensen saying to you and everything you

25  said to her?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 358

Arbitration                                    March 18, 2011

67

1        A.    Well, I don't recall every word.

2        Q.    What do you recall?

3        A.    But the idea of our conversation was that I

4   was being terminated for these infractions.  And Mary

5   said that she was -- again, it was based on a

6   relationship of friendship, and I believe she told me

7   that she was kind of rooting for me in the meeting with

8   Jan.

9              But then I said I adjusted the commission

10  upward in order to not be terminated for missing my

11  September sales commission goal.  She told me that she

12  thought, "Oh", to herself, "why would you say that?"

13  And I said that because it was the truth.

14             And, again, as we will see, you can tell

15  from my e-mails, I was getting tired of this constant

16  sales pressure with no concern for other metrics of

17  performance or the concern for clients.

18             So yeah, in our conversation, she said,

19  "Oh, you know, I can't believe you said that",

20  basically.  "I was rooting for you there with Jan.  You

21  shouldn't have said that you did it so that you would

22  meet the sales commission amount or not be fired."

23             And I believe she also told me that this is

24  usually not the kind of thing that you get fired for,

25  but you've gone and done it.  And I was warned before



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 359

68

1  not to put any concerns in e-mail form because of

2  regulatory concerns.

3           Mary told me that she was going to a -- I

4  don't know if it's FINRA arbitration or some kind of

5  legal proceedings because of something that someone said

6  in an e-mail.  I was told not to put any complaints in

7  e-mail form.  Again, I had cooked my own goose in this

8  situation because of sending the e-mails and then the

9  way I responded to the questions about the $300

10 overcharging amount.

11          She also says that the issue came up -- and

12 to tell you the truth, because of the reckless behavior

13 of Wells Fargo, I would have been happy to leave and

14 gain suitable employment with another firm.  And so I

15 wouldn't have had a problem with being terminated,

16 although I did not realize that the notes on my U5 would

17 preclude me from gaining other employment.

18          And the question I asked about, because of

19 that almost relief not to be part of this program

20 anymore, is about the promissory note.  And that is when

21 Mary told me that I should understand that these

22 promissory note amounts are blood money.  And that was

23 her exact term.  And I realize I'm under oath here and I

24 just -- I mentioned that because it gives you an insight

25 into the functioning of this dysfunctional firm.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 360

Arbitration                                    March 18, 2011

69

1          Q.   Have you -- let me go back here.

2               You indicated in your conversation with

3    Ms. Mortensen on October 1st or 2nd that you had

4    adjusted the commission upward to meet your goal.  Did I

5    get that correct?

6          A.   Yes.  But particularly because I didn't

7    know for sure where I would come in at the end of the

8    month because there was adjustments made to business I

9    had done during the month.

10              There could be charge-backs from annuities

11   if someone surrendered their policy or there was an

12   adjustment for the 50 percent of the revenue which was

13   not recognized under the Wells Fargo plan, so you never

14   really knew where you were going to come in.

15              And as we will review, I already had been

16   informed that I could be terminated for not making my

17   minimum commission amount.  As it turns out, I came out

18   well above it.

19         Q.   And just so I'm clear, you told Mary that

20   one of the -- Ms. Mortensen that one of the reasons you

21   adjusted the commissions up to the $495 versus the $269

22   or the $136 --

23         A.   It was $300 total.

24         Q.   Whatever amount.

25         A.   Yeah.  I told her I adjusted it up, and it



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 361

Arbitration

70

1   was the end of the month and I'm trying to make sure I

2   didn't get fired because of all these threats.  Because

3   over my time at Wells Fargo, there was no concern about

4   client complaints or violation of company policy.  It

5   was always, "Hey, you're not generating enough

6   commissions."

7        Q.   I believe you also told her that before the

8   termination, you had said the same thing to another

9   supervisor, correct, that you had adjusted those

10  commissions upwards to meet the revenue goal; was that

11  correct?

12       A.   I said that with Jan Krug, my immediate

13  manager.

14       Q.   And that was before you were advised of the

15  decision to terminate you?

16       A.   Right.  That was when I was asked for my

17  explanation.

18       Q.   So the -- so I guess you had earlier said

19  that you hadn't done this intentionally, you know,

20  adjusted the commissions up.  But based on what you told

21  Ms. Mortensen, you did do it intentionally, at least

22  under your testimony, to meet revenue goals?

23       A.   I adjusted it up intentionally.  And I had

24  no idea that it would exceed the maximum markup policy.

25  And, again, this is a regular business procedure, a



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 362

71

1    regular activity in the course of business.

2                 And if there was some way we could look at

3    the records, I'm sure we'd see that brokers adjust

4    commissions up and down regularly.  And if you look at

5    my record, I adjusted commissions downward much more

6    often than I adjusted them upward.

7         Q.   Anything that you haven't testified to as

8    to what you said to Ms. Mortensen or what she said to

9    you during this conversation?

10        A.   Nothing that I can remember.  Oh, I would

11   like to mention that in something I received in your

12   discovery packet, Ms. Mortensen says that I stated that

13   "You will never see one red dime of the promissory

14   note."

15                I deny ever making a statement like that.

16   For one thing, I don't know what "red dime" means.  I

17   don't think there's really a saying called red dime.  I

18   never said that.

19        Q.   Do you recall anything else, testifying

20   here now, other than what you've testified to, of what

21   you said to Ms. Mortensen or what she said to you during

22   this conversation?

23        A.   There might have been other items that --

24        Q.   As you sit here now, do you recall

25   anything?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 363

72

1          A.    Nothing more that I recall.

2          Q.    And after this conversation, you then were

3    no longer employed by the firm.  And you received a

4    letter asking that you repay the outstanding balance on

5    the promissory note, did you not?

6          A.    Right.  And, also, during that

7    conversation, I asked if I would be able to receive

8    information pertaining to my clients that I brought to

9    Wells Fargo, which was the bulk of my client base.  And

10   it was not covered by the noncompete agreement that I

11   had signed in relationship to Wells Fargo clients.

12          And I also asked about the availability of

13   a T12, which if you're familiar with that, it's a

14   broker's records of commissions.  Which as it turns out,

15   I didn't realize it at the time, but if you're a broker

16   and you're looking for a job and you don't have a T12,

17   you're pretty much out of luck.  Or at least that's been

18   my experience.

19          Q.    So is it your testimony that you've

20   recalled this now, and these are other things you

21   discussed with Ms. Mortensen at this conversation

22   October 1st or October 2nd?

23          A.    Right.  She told me that I would not be

24   provided a T12 because she knew that was the case

25   because another financial advisor was termed out, as she



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 364

Arbitration                                    March 18, 2011

                                                              73

1   put it, and had requested a T12 and that it was

2   considered proprietary information.  And that was the

3   reason she told me that I would not receive a T12.

4        Q.    Now, you had received all of your payroll

5   records during the period of time that you were employed

6   by the firm, did you not?

7        A.    You know, actually not.  Because you had to

8   go online to actually get the payroll records.

9        Q.    You had access to it?

10       A.    I had access to payroll records.

11       Q.    So if you chose, you could go online and

12  look at --

13       A.    Right.

14       Q.    And each month, you did get a commission

15  production summary, did you not?

16       A.    Right.

17       Q.    That had your rolling six months of

18  commissions.  And it kept going forward, did it not?

19       A.    Something like that.

20       Q.    And that was provided to you each month.

21  So you had that available to you?

22       A.    It was at least available.  But, again, you

23  could never know where you were going to land for the

24  month because of adjustments that might be made at the

25  end of the month.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 365

74

```
 1          Q.   If you would, please, go to Complainant's
 2   Exhibit 13.  Is this a copy of a letter you received
 3   from my office asking that you repay the outstanding
 4   balance on the --
 5          A.   Correct.
 6          Q.   Okay.  And then, also, if you would,
 7   please, go to Exhibit 16, Tab 16, and I'm going to ask
 8   you to keep your hand on 16.  But go back to Exhibit 16,
 9   that amortization schedule.
10          A.   Uh-huh.
11          Q.   And do you see that the item on the left,
12   the payment numbers 21, going to Number 21, that as of
13   that date, October 1st of 2009, the new balance on the
14   note -- it's the third -- --
15          A.   Yeah, $74,617.
16          Q.   And that's indicated here on Exhibit 16.
17   And that was the unpaid balance at the time of
18   termination; correct?
19          A.   According to the terms of the note, yes.
20          Q.   And do you have any reason to dispute the
21   mathematical calculation of the interest that's there?
22   I'm not asking you to agree that you owe the money.  But
23   do you have any reason to dispute the mathematical
24   calculation of the interest rate?
25          A.   No.  But I do have a question about the
```



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 366

75

1    attorney's fees.

2         Q.    I'm not asking you any questions about that

3    right now.

4              MR. KANE:   Mr. Chairman, as it relates to

5    our promissory note case, what I'd like to do now is

6    move into evidence exhibits that I've identified

7    within -- not ones that I haven't.  And there's an index

8    in the front of the binder.  And so it would be Exhibits

9    1 through 13, I believe.

10             MR. SHAFFER:  Before we move on, do I get

11   to ask those questions regarding attorney's fees on this

12   document that I just presented?  My question is --

13             CHAIRMAN:  Well, who would you ask?

14             MR. SHAFFER:  Actually, I would refer a

15   question to the panel.

16             CHAIRMAN:  Who put together Exhibit 16?

17             MR. KANE:  16.  That would be put together

18   under my supervision.  I'm not introducing 16 yet.  The

19   reason for that, Mr. Chairman, is because I'm not

20   putting in my fees yet.  I'll do that at the conclusion

21   of the hearing.  So I'm only asking to move into

22   evidence 1 through 13.

23             MR. SHAFFER:  But you asked me to review

24   16.

25             MR. KANE:  I only reviewed the unpaid



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 367

Arbitration                                    March 18, 2011

76

1    balance.
2            CHAIRMAN:  When 16 is offered for evidence,
3    we would like to hear from you as to your view of what
4    16 says.
5            MR. SHAFFER:  And I can question him?
6            CHAIRMAN:  Right.  So as I understand it,
7    Mr. Kane is asking to put into exhibits Number 1 through
8    13 as identified by the tabs in this notebook.
9            MR. SHAFFER:  But he just brought up 16.
10   That's why I was asking.
11           CHAIRMAN:  He did.  Do I understand what
12   you're moving?
13           MR. KANE:  Just 1 through 13.  I'm not
14   offering Exhibit 16 just because it's not complete yet.
15           CHAIRMAN:  Mr. Shaffer, any objections to
16   Exhibits 1 through 13?
17           MR. SHAFFER:  No.
18           CHAIRMAN:  Okay.  They will be put into
19   evidence.
20       (Exhibits 1 through 13 were admitted into
21   evidence.)
22           MR. KANE:  As it relates to our case in
23   chief on the promissory note, Mr. Chairman, I have no
24   further questions of the witness at this time.
25           CHAIRMAN:  Okay.  You will have an



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 368

77

1 opportunity, Mr. Shaffer, to provide your testimony

2 either in rebuttal to what you've said, or in addition

3 to what you've said or on other subjects.  So now we're

4 back to Mr. Kane and your next witness.

5           MR. KANE:  Or he could do it now if he

6 wanted to respond to what I've asked.  Would that be

7 also an option?

8           CHAIRMAN:  What is your preference,

9 Mr. Shaffer, to present your case?

10          MR. SHAFFER:  Yes.  I'd like to respond to

11 the issues Mr. Kane has brought up for right now,

12 depending on when you'd like to take a break for lunch.

13          CHAIRMAN:  We'll probably do that.  How

14 long do you anticipate you will require?

15          MR. SHAFFER:  I need ten minutes.  Maybe

16 that would be a good thing to do before the lunch break.

17          CHAIRMAN:  Sure.  We may break at noon, we

18 may break after.  Who knows.

19          So if Mr. Kane has no objection to your

20 responding and while it's fresh on your mind, why don't

21 you?

22          MR. SHAFFER:  Sure.  And as Mr. Kane had a

23 notebook here --

24          CHAIRMAN:  Mr. Shaffer, before.

25          ARBITRATOR:  Attorneys, I'm not familiar



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 369

Arbitration                                    March 18, 2011

78

1    with this T12.  Could you explain what it is, please?

2                    MR. SHAFFER:  A T12 is a record of the

3    commissions that a broker has generated over the last

4    12 months.  T stands for trailing, I believe.  It would

5    break up the broker's production between mutual funds,

6    individual stock trades, bond trades, whatever they do.

7                    ARBITRATOR:  I understand now.

8                    MR. SHAFFER:  Brokerage firms want to know

9    what kind of book you have, what kind of commissions you

10   generated.

11                   CHAIRMAN:  So is it a list of commissions

12   generated by a broker?

13                   MR. SHAFFER:  Yes.

14                   CHAIRMAN:  Covering a period of --

15                   MR. SHAFFER:  Covering the last 12-month

16   period.

17                   CHAIRMAN:  Of the sale of any product?

18                   MR. SHAFFER:  Of all products and total

19   commission.  Obviously, if I walk into your brokerage

20   firm, you're going to say, "What kind of commissions do

21   you generate, Ken?"

22                   CHAIRMAN:  And these are the gross

23   commissions?

24                   MR. SHAFFER:  These are the gross

25   commissions.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 370

Arbitration                                    March 18, 2011

79

1          CHAIRMAN:  Not those -- which commissions

2    are divided between the house and the financial

3    representative?

4          MR. SHAFFER:  The gross commissions go to

5    the house and then the financial representative's payout

6    determines how much of the gross commission they're

7    getting in a paycheck.

8          ARBITRATOR:  So he was getting 40 percent.

9          MR. SHAFFER:  It's a required document to

10   obtain employment in many brokerage firms.

11          Now, just as Mr. Kane had distributed these

12   binders, I have some binders with documents that I'd

13   like to refer to.  Again, these also have notes for me.

14   Again, I realize I'm under an oath of truthfulness here,

15   and everything in this I would say under oath is

16   absolutely truthful.

17          CHAIRMAN:  Okay.  Now, are you going to

18   refer to this booklet now in your testimony?

19          MR. SHAFFER:  Just as Mr. Kane did to his.

20          CHAIRMAN:  All right.  Specify exactly what

21   you're going to refer to so Mr. Kane has an opportunity

22   to accept it.

23          MR. SHAFFER:  I'm on the second page of

24   this document, and it's titled "Issues".

25          CHAIRMAN:  And you're going to testify in



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 371

1    response to what Mr. Kane asked you about?

2            MR. SHAFFER:  Only in response to the

3    promissory note.

4            CHAIRMAN:  Okay.  And this is your writing

5    that you put together.

6            MR. SHAFFER:  This is my writing.  I have

7    had no --

8            CHAIRMAN:  And are you going to read it as

9    your testimony?

10           MR. SHAFFER:  Kind of.  I'm going to use it

11   as notes like Mr. Kane did.  Yeah, basically, I'm going

12   to read it from notes like Mr. Kane did.

13           CHAIRMAN:  What are your thoughts,

14   Mr. Kane?

15           MR. KANE:  This is not what I did, just so

16   we're clear.  The -- I don't know if it's a brief or

17   what, but the first 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

18   12, 13, 14, 15, 16, 17, 18, 19 --

19           MR. SHAFFER:  It's about 90 pages long.

20           MR. KANE:  The first 24 or 25 pages have

21   nothing to do with documents or exhibits.  It's like a

22   brief, and I object to it.  If he wants to testify, he

23   can.  As far as the exhibits, they start at about the

24   25th page.

25           ARBITRATOR:  Is that the page that says



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE

EXHIBIT X  Page 372

Arbitration                                           March 18, 2011

                                                                 81

1    "2002 update of the DL"?

2                MR. KANE:  No.  It's a page that has

3    exhibits.  There's about 25 pages in it.

4                CHAIRMAN:  You were going to say?

5                MR. KANE:  And it starts with this Number

6    1, payroll records.  I'm going to look quickly.  I

7    suspect I don't have any objections to any of this.

8                CHAIRMAN:  Let me clarify.  As I understand

9    it, Mr. Shaffer, you want to talk about the promissory

10   note only; is that right?

11               MR. SHAFFER:  Exactly, at this point.

12               CHAIRMAN:  And that is what is identified

13   on the first page of this booklet.

14               MR. SHAFFER:  Right.

15               CHAIRMAN:  In other words, you don't intend

16   to refer to the wrongful termination and other items

17   that are indicated in this booklet.

18               MR. SHAFFER:  Just addressing the

19   promissory note.

20               CHAIRMAN:  All right.  You may testify as

21   to the promissory note which is -- was quizzed by

22   Mr. Kane.

23               MR. SHAFFER:  Thank you.

24               CHAIRMAN:  Go ahead.

25               MR. SHAFFER:  Originally described as a



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 373

1    bonus, it was never explained and I never understood

2    that amounts could be demanded to be repaid based on a

3    termination or that conditions would be placed on my

4    employment, sales revenue bonus which were not a

5    condition at the time of my hiring or when the

6    promissory note amount was awarded.

7              Additionally, the demand for lump-sum

8    payment violates contract law in that it constitutes a

9    penalty for an employee's termination, especially in

10   light of my precarious financial condition.  These

11   conditions result in the promissory note being

12   unconscionable and one-sided.

13             Civil Code S1670.5 states that

14   unconscionable contracts or provisions which are

15   one-sided may be found invalid.

16             My second and most important point I

17   believe is that page 2 of the promissory note agreement

18   states, "This note shall be interpreted, enforced and

19   governed by the laws of the State of California."

20             California State Labor Code states that

21   "balloon payment demands for loans made to employees at

22   the time of termination were not allowed even if the

23   employee has given his consent to such payments."

24   That's from Section 11.2.5 of this particular code.  And

25   it was in a case that was decided, the Barnhill versus



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 374

83

1    Sanders, which I have copied information from.

2             By the way, all of this information

3    pertaining to California employment law can be found at

4    the site, excerpts as you see at the bottom, excerpts

5    from the California Division of Labor Standards and

6    Enforcement Policies and Interpretations Manual I've

7    made here.  And on my cover page, there is a website

8    address to these particular labor codes.

9             Again, the labor code says that balloon

10   payment demands for loans made to employees made at the

11   time of termination are not allowed even if the employee

12   has given his or her consent to such payments.

13            And to go on, California labor law also

14   defines promissory notes as adhesion contracts which

15   are, despite this boilerplate language, drafted by one

16   party without opportunity for negotiation which is a

17   situation that is certainly fulfilled.

18            These types of contracts are subject to

19   greater scrutiny and interpretation and enforcement in

20   order to modify or nullify harsh terms which defeat the

21   reasonable expectations of the parties.  And, again,

22   I've noted the labor code which applies there.

23            Section 32.2.2 states that an adhesion

24   contract -- or there's a typo there.  I'm sorry -- and

25   many throughout this, I'm sure.  Section 32.2.2 states



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 375

84

1    that "An adhesion contract which does not fall within

2    the reasonable expectations of the weaker or adhering

3    party", which would be me, "is not enforceable against

4    him."  Promissory note qualifies under all these

5    provisions.

6              Then I bring into discussion the fact that

7    the promissory note is described as net pay and net pay

8    distribution.  That's my Exhibit 1.  But, also, Mr. Kane

9    had used that as one of his exhibits, if you'll

10   remember.

11             And I was bringing your attention to the

12   fact that the supposed loan amount is shown as net pay

13   on a wage statement.  And it's shown as net pay, net pay

14   distribution is part of what it's described as a

15   biweekly payroll report.  That's the same report

16   Mr. Kane is referring to.

17             This is confusing and misleading also

18   because the promissory note meets the definition of a

19   bonus as defined in Section 22.5.5 of this same

20   employment code, an amount promised in addition to the

21   monthly commission due as compensation paid for a

22   specific result, the result being me reaching that

23   minimum level of production.

24             And so it is described as a bonus according

25   to California employment law.  I think we're all dealing



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 376

Arbitration                                    March 18, 2011

85

1    under the rules and regulations of the California

2    employment law.  For that reason, I don't understand why

3    we're even here to discuss this item.  It's plainly not

4    demandable.

5                And because it's not and because this is a

6    violation of California employment law, I believe that

7    the law firm Kane and Fischer, not so much Mr. Kane, but

8    definitely Mr. Choo and everyone involved in this, is

9    guilty of intentional infliction of emotional distress.

10               CHAIRMAN:  Anything else about the

11   promissory note that you were asked --

12               MR. SHAFFER:  That's it about the

13   promissory note.

14               CHAIRMAN:  Mr. Kane, what is your pleasure?

15               MR. KANE:  I read that more as closing

16   argument, so anything I'm going to retort to that would

17   be closing argument.  I don't have anything to ask this

18   witness at this time.

19               CHAIRMAN:  Your next witness would be who?

20               MR. KANE:  As to the promissory note, I

21   have no witnesses to present and no additional exhibits

22   other than I want to reserve my right to, number one,

23   present a defense to the counterclaim; and number two,

24   at the conclusion of the hearing, to present the

25   attorney fee affidavit and costs.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 377

1        So as it relates to the promissory note,

2   except for these reservations, we have no additional

3   exhibits to present or witnesses to present.

4        CHAIRMAN:  In the whole proceeding?

5        MR. KANE:  As it relates to the promissory

6   note, we rest.  However, I'm reserving my right to

7   present a defense to the counterclaim and to present the

8   attorney's fees at the end of the hearing.

9        CHAIRMAN:  So you're saying that the

10  prosecution, for lack of a better term, you rest.  And

11  then the case would go to Mr. Shaffer to present his

12  case with exception of showing the attorney's fees and

13  in response to any counterclaim of his.

14       Why don't we take a noon break at this

15  point and be back here by 1, because I suspect we're

16  going to have some discussion.

17       (Thereupon, a break was taken.)

18       CHAIRMAN:  We're on the record and we had a

19  discussion earlier with regard to explained decisions,

20  and Mr. Shaffer indicated that he was interested in

21  that.  And we asked Mr. Kane for the rules and

22  regulations.  What have you found out, Mr. Kane?

23       MR. KANE:  Yes, Mr. Chairman, and I'm happy

24  to show it to Mr. Shaffer as well as the panel.  It's

25  Rule 13904G called explained decisions.  And it says



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 378

87

1  this paragraph G applies only when all parties jointly

2  request and explain decision.

3              CHAIRMAN:  And what does that paragraph

4  say?

5              MR. KANE:  Well, it starts with Exhibit F,

6  where it says, "Award may contain a rationale",

7  underline "the award".  Explained decisions, this

8  paragraph G only applies when parties request an

9  explained decision.

10             An explained decision is a fact-based award

11  stating the general reasons for the Arbitrator's

12  decision.  Conclusion of legal authorities and damage

13  calculations is not required.

14             Three, parties must make any request for an

15  explained decision no later than the time of the

16  prehearing exchange of the document, and the list under

17  13514D.  The chairperson of the panel will be

18  responsible for writing the explained decision.

19             The chairperson will receive an additional

20  honorarium of $400 for writing the explained decision as

21  required by this paragraph G.  The panel will allocate

22  the cost of the chairperson's honorarium to the parties

23  as the final award.

24             CHAIRMAN:  Okay.  So it sounds like on two

25  counts, there would not be an explained decision.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 379

88

1   Number one, not all parties have requested it; and

2   number two, it was not provided in the time period that

3   was provided.

4           MR. SHAFFER:   That's true, except

5   interpreting that language a little different way, it

6   says that that rule applies only when all parties are

7   requesting an explained decision.

8           Is there any passage that talks about the

9   situation where only one party is --

10          MR. KANE:   No.   Because --

11          CHAIRMAN:   Why don't you show him the rule?

12          MR. SHAFFER:   Because it says -- right at

13  the outset, it says, "This only applies to situations

14  where both parties are requesting an explained

15  decision."   And you are not requesting an explained

16  decision.

17          And I don't understand why that would be a

18  rule, because the decision hasn't been made yet

19  hopefully.   So why would there be a problem with me

20  getting an explained decision?

21          CHAIRMAN:   Let me also observe that this is

22  a fairly new add-on within a year.

23          MR. KANE:   I believe so.

24          CHAIRMAN:   Previously, there wasn't such an

25  option.   And previously -- there's a form that FINRA



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE

EXHIBIT X   Page 380

1   uses to prepare the final award after -- with the

2   information that the panel gives to the FINRA staff.

3   And this talks about something greatly -- in addition to

4   the form which addresses the issues as have been

5   presented in the claim and the counterclaim and the

6   answer.  So that may be why the rules are peculiar,

7   because it really breaks the mold, to some extent.

8                MR. KANE:  We do not request explained

9   decisions.  I'm not requesting one now.  If I wanted an

10  explained decision, I would have requested one in the

11  time provided in accordance with the rule, and we didn't

12  and we're not.

13               CHAIRMAN:  So I think you'll find the award

14  will probably have more explanation in -- than you may

15  have anticipated.

16               MR. SHAFFER:  Okay.

17               CHAIRMAN:  But it may not be enough for

18  you.

19               MR. SHAFFER:  My last letter on this issue

20  was possibly an exception could be made because my case

21  administrator, Bianca Phillips, has been ill or out of

22  the office.  I didn't have anyone to talk to.

23               But it doesn't make any difference really

24  because it doesn't change the decision, does it?

25               CHAIRMAN:  No.  And Joanna Lamb has been



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 381

90

1   taking Ms. Phillips' place in the meanwhile.  And she

2   seems okay.

3            All right.  So as I understand the

4   situation, the claimants have rested except for

5   introduction of evidence regarding requested attorney's

6   fees.  And as to rebuttal of any testimony or evidence

7   that is presented by Mr. Shaffer in -- by way of

8   counterclaim, which means, Mr. Shaffer, we now look to

9   you for you to present your case of counterclaim.  And

10  you may proceed.

11           MR. SHAFFER:  Thank you.  I feel that there

12  have been a number of infractions that have injured me

13  both professionally and emotionally.  The first one I'd

14  like to address would be the situation of wrongful

15  termination.

16           And as is in my notes, the notes of my

17  presentation, I was terminated without notice based on

18  two accidental and incidental violations of company

19  policy, an inadvertent overcharge of approximately $300

20  on two trades and the failure to pass on an e-mail from

21  a complaint who was inquiring on instructions as to how

22  to transfer his account balance to his checking account.

23           The Wells Fargo response to my counterclaim

24  describes these first clients as Wells Fargo clients, so

25  this is just a little bit of my personal thing.  The



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 382

1    account in question for the overcharging belongs to my

2    friends and clients for over 15 years, which I

3    transferred to Wells Fargo from my previous firm.

4              And the answer to my counterclaim, Wells

5    Fargo described this account as Wells Fargo's, that I

6    overcharged Wells Fargo's client.  I'd just like to

7    clarify.  These people are friends and clients of mine

8    for 15 years.  I transferred them to Wells Fargo from my

9    previous firm.

10             And Exhibit 7 is a letter from the

11   Winneger's that just says that they have worked with me

12   for years and they felt that I have done a great job for

13   them.  And as you know, there was no client complaint in

14   this matter.  This would be considered a trade error for

15   anyone not being subject to discrimination.

16             Financial advisors are expected to make

17   decisions regarding commission amounts regularly.  Many

18   individual security trades that I processed were

19   discounted.  Financial advisors are also allowed to

20   decide when a situation allows for a higher commission.

21             FINRA rule IM 2440-1 regarding markup

22   policies states that the 5 percent policy is a guide,

23   not a rule.  So I would suggest that this is not even a

24   FINRA violation.  I had never had an incident relating

25   to overcharging and the small amount involved certainly



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 383

1   shows that this was not intentional.

2              A one-time accidental overcharging of a

3   client is not specified as grounds for termination in

4   any employment manual from Wells Fargo.  Please see the

5   e-mail from Mary Mortensen, which we've already

6   discussed.  The total overcharge amount comes to $284.

7   The account in question has a value of $132,000, had at

8   that point.

9              I visited with the Winneger's.  The account

10  value is significantly higher now.  The account in

11  question had a value of $132,000.  This is an accidental

12  and trivial error, and I would add not subject to

13  termination.

14             The second, a supposed client complaint

15  made no mention of misstatements or eronneous

16  disclosures on my part or any wrongdoing on my part.  He

17  wanted to know how to return his funds to the bank

18  account when his CD matured.  There was no loss or

19  potential of loss because this was a Wells Fargo

20  principle guaranteed investment.  I immediately called

21  upon receiving the second e-mail.

22             I believe that I accidentally deleted his

23  first e-mail due to system constraints which I explained

24  earlier when responding to another e-mail.  And our

25  conversation rectified his misunderstanding.  There was



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 384