1  no written client complaints.  It was an e-mail client

2  complaint.  I'm not even sure e-mail qualifies as

3  written.

4           And, again, I don't feel it's a complaint.

5  I informed this gentleman on how to access his account

6  balance and had other communications with him.

7           Exhibit 3, it would be one thing if you

8  never responded to someone and they had asked repeatedly

9  for information about their account and you just

10 basically blew them off, which happens all the time.

11          In this instance, you can see from the

12 Exhibit 3 that I've had communications with this person

13 at one time.  And, remember, this is an $8,000 account.

14 Do you know how an $8,000 account rates in the brokerage

15 business?  It's unprofitable business.  You're not going

16 to make any money on this account.  This account

17 basically would be ignored by a large percentage of

18 brokers.

19          He asked me at one time how he could get

20 his account on Quicken, which I am not even familiar

21 with, and I responded to his e-mail.  I had had that and

22 other communications with him.  I did not consider this

23 a client complaint, and I did not think of forwarding an

24 item like this when the firm was being deluged with real

25 complaints involving client losses.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 385

94

1          In a regional sales meeting, financial

2     advisers were asked to step up production by Mr. Leroy

3     Hamel in order to mitigate $700 million in judgments

4     against the firm.

5          Wells Fargo's own guidelines specify that

6     financial advisers should strive to have less than three

7     complaints annually.  That's Exhibit 11.  Even if you

8     consider this a bona fide complaint, I've had one in

9     over three years.

10          There were no other instances of trade

11     errors or client complaints before this time and

12     financial advisers are expected to make judgments every

13     day regarding commission levels and the most appropriate

14     way to handle client concerns.

15          I was terminated without counsel, never

16     given the option of resignation, which when interviewing

17     with brokerage firm managers, they said, "Ken, if they

18     felt this way about you, why didn't they just let you

19     resign?"  I was never given that option.

20          And these infractions were never specified

21     to be reasons for termination in any Wells Fargo

22     employment manual.  My record of no client complaints or

23     other violations was never considered.

24          If we interviewed 20 brokerage managers and

25     described the situation, I am confident that all of them



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 386

1    would say they would not consider these reasons for

2    termination.   Financial advisers who accumulated

3    multiple infractions of policy and client complaints

4    were not terminated and are still working at Wells

5    Fargo.

6              My termination is a clear case of age and

7    health consideration discrimination leading to wrongful

8    termination and is covered by wrongful discharge

9    provisions which are an exception to at-will employment

10   provisions.   Again, that's one of my major points.

11             The wrongful termination is covered by

12   wrongful discharge provisions which are an exception to

13   at-will employment provisions.

14             Mistruths also baited me into maximizing

15   commissions generated in the last few days of the

16   September production month via an earlier e-mail which

17   warned me that production requirements were enforceable

18   on a monthly basis after I reported that I may come in

19   just under the required production amount for September,

20   but had business lined up for October.   This is another

21   example of an intentional infliction of emotional

22   distress.

23             Adjustments for licensed banker referred

24   business were also made at the end of the month so

25   financial advisers could not accurately predict their



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 387

96

1    exact closing production amounts.

2            Additionally, California labor law states

3    that there is an implied contract even for at-will

4    employees regarding just cause for termination.  The

5    situation also qualifies as an implied contract

6    exception because of the promissory note conditions of

7    amortization over a five-year period, the requirement

8    that I complete five years of employment in order not to

9    be subject to penalty.

10           The promissory note also qualifies as

11   common law contract in Section 35.5 of the California

12   Division of Labor Standards.  Enforcement also states

13   that the implied covenant of good-faith and fair dealing

14   imposes upon the employer the duty not to do anything

15   which would deprive the employee the benefit of the

16   contract.  That is the promissory note.

17           Section 35.4, the enforcement policies of

18   the interpretation manual states that the promise of the

19   bonus becomes a unilateral contract in a case called

20   Lucien versus All State Trucking; and goes on to state

21   that a specific bonus plan normally becomes binding as a

22   unilateral contract when the employee begins performance

23   in the sense that it cannot be revoked by the employer.

24           And what I am seeing there is that my

25   status as an at-will employee stopped at the time Wells



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 388

1    Fargo asked me to sign the promissory note according to

2    California labor law and contract law.  And that, you'll

3    be happy to know, is the last of my comments on that

4    topic.

5                CHAIRMAN:  Very good.  You know, let's --

6    do you have other topics that you plan to present?

7                MR. SHAFFER:  Yes, a number of them.

8                CHAIRMAN:  And they're included in these 25

9    or so pages that's received in the binder of documents;

10   is that --

11               MR. SHAFFER:  Exactly.  And the text of my

12   comments is only the first six pages or so.

13               CHAIRMAN:  I'll ask Mr. Kane what he wants

14   to do.  Do you want to counter or examine Mr. Shaffer as

15   we go through the topics topic-by-topic or do you want

16   to --

17               MR. KANE:  I think he should finish it.  I

18   think he should do it as we were testifying.  I really

19   do object to us just reading this.  I think we should

20   get to the documents.  This would all be closing

21   arguments after he presented substantive evidence.  This

22   is not substantive evidence that he's --

23               CHAIRMAN:  Mr. Shaffer is still under oath.

24   When he talks about the California law says this and

25   that, I'm inclined to agree with you.  When he talks



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 389

Arbitration                                      March 18, 2011

98

1    about the relationship with this 15-year client, that

2    obviously --

3              MR. KANE:  No, I don't have a problem with

4    that.  But what's coming is all legal, promissory

5    estoppel, fiduciary duty, infliction of emotional

6    distress.  All of that is a legal argument.

7              CHAIRMAN:  I agree with that.  Can you tell

8    us what happened to you, which things were done which

9    would later be the basis for the argument that such and

10   such is promissory estoppel?  Does that make any sense

11   to you?

12             MR. SHAFFER:  We can refer -- you know,

13   Mr. Kane's comments that this was all just legal talk or

14   something, I referenced exhibits here which we can

15   review one by one if you want to.  But some of the items

16   have already been brought up.  And I thought that you

17   would prefer me not to address the individual exhibit.

18   But I certainly can do that.

19             ARBITRATOR:  It helps if you mention an

20   exhibit like you just did, to go back and say what page

21   it is.  Then we become distracted from what you're

22   saying.

23             CHAIRMAN:  So with regard to the libel or

24   slander on Form U5, what is that all about?  Not the

25   law, but what are you talking about?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 390

Arbitration                                      March 18, 2011

99

1          MR. SHAFFER:  Well, the entries are

2   deceiving and unclear because they create the impression

3   that, one, the client who was overcharged also

4   complained, and that this was other than a small

5   accidental overcharge.  I mean, there's no --

6          CHAIRMAN:  So your U5 is based on what you

7   regard were circumstances of an accident.  And you've

8   already explained your relationship with the particular

9   clients who were involved.

10         MR. SHAFFER:  Which I know really doesn't

11  matter.  That's just my pride in my relationship with

12  these people, that I wouldn't intentionally overcharge

13  them out of $300 or jip them out of $300.  That's

14  preposterous.

15         And I have an exhibit here which I can

16  quickly find which I didn't notate there from Waddell

17  and Reed, which is a firm I interviewed with after this.

18  Here it is.  If you go back in the back of my materials,

19  you'll find a page -- you'll find some information from

20  E-Trade at page 7.  At the bottom, it says 10/5/2010 at

21  the very bottom of the page.

22         ARBITRATOR:  How far back are you?  How

23  many pages back?

24         MR. SHAFFER:  Let's say two-thirds of the

25  way back.  If you look at the bottom of the pages,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 391

1    there's a date that says 10/5/2010.

2                ARBITRATOR:  I've got it.  It says "Mass

3    Mutual" on top?

4                MR. SHAFFER:  Yes.

5                CHAIRMAN:  What are you pointing out here?

6                MR. SHAFFER:  I'm pointing out this e-mail

7    from Mr. Joanne Carlefoti (phonetic) who is a manager of

8    Reed and Waddell in Sacramento, which is a brokerage

9    firm, as you're probably aware.

10               And in it, he says, "Sorry for getting back

11   to you so late.  I was out of the office for study.

12   Yes, we are denying your application due to

13   circumstances."  And this is cut off the way I tried to

14   print the e-mail, but "from circumstances related to

15   your U5 regarding termination from Wells Fargo."

16               I tried to contact the other employers that

17   had turned me down, and it's amazing, they either

18   wouldn't return my call or they wouldn't verify that

19   this was the reason for my decline.

20               And they all told me that in-person or on

21   the phone.  But this was an e-mail that I happened to

22   get from that gentleman that says that my decline was

23   based only on entries from my Wells Fargo U5.  And

24   that's the end of it.

25               And, again, if you look at California Labor



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 392

101

1   Code Section 150 regarding black-listing, you'll see it

2   there.  And I believe that I enclosed that in the

3   materials on the labor codes.

4                   CHAIRMAN:  Is the labor code included in

5   your paper here?

6                   MR. SHAFFER:  I believe it is.  I can find

7   it if you'd like me to.

8                   ARBITRATOR:  Please find it.  It's on one

9   of the pages of the labor code that I printed and it has

10  26-1 at the bottom in June of 2002.  And excuse me,

11  that's about -- that's only one-third -- it's about

12  one-third of the way into it.  It's in the -- all the

13  labor code violations that I have listed here.

14                  MR. KANE:  I've seen a June 2002 --

15                  MR. SHAFFER:  That's it.  And it says

16  "21.1" on the other side.  Again, this is in the section

17  that has the addition of California labor standards in

18  the section division of labor standards enforcement

19  policies and interpretations.

20                  CHAIRMAN:  And how does one know what

21  section it is?

22                  MR. SHAFFER:  Thumb through there.  It's

23  also one that's (inaudible).  Anyway, you know, if -- I

24  don't think it's necessary that you necessarily find it.

25                  ARBITRATOR:  Yes, it is.  When you



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 393

102

1    reference something, we really have to look at it.

2              MR. SHAFFER:  Do you want me to help?

3              ARBITRATOR:  Yes, please.

4              MR. SHAFFER:  You're right.  That one says

5    2002, too.

6              MR. KANE:  I'll make sure I'm on the right

7    page.

8              ARBITRATOR:  Because it starts with

9    "accommodation does not include" --

10             MR. KANE:  I'm on the right page, then.

11             MR. SHAFFER:  It's close to the end of that

12   section.  So if you go to the end of that section.

13             CHAIRMAN:  What's the section, I don't see

14   it.

15             ARBITRATOR:  It's the section --

16             CHAIRMAN:  I'll just read that.

17             MR. SHAFFER:  It's right there.  It says

18   "Labor Code S1050, preventing employment by means of

19   misrepresentation.  Its illegal for an employer or any

20   agent or officer thereof to prevent the reemployment of

21   an employee who has left the employer's service either

22   by discharge or voluntary quit an employee who was

23   damaged by employer's untruthful statements or recovered

24   damages."

25             CHAIRMAN:  You've got it.  That's the one.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 394

1            And I guess the next section that you

2     wanted to talk about is disability benefits; right.

3            MR. SHAFFER:   Sure.

4            CHAIRMAN:   Unless you have more to testify

5     about with regard to the U5.

6            MR. SHAFFER:   No.  That's it.

7            So disability benefits?

8            CHAIRMAN:   Yeah.  First of all, were these

9     benefits provided by Wells Fargo or were they provided

10    by an outside insurance carrier?

11           MR. SHAFFER:   Provided by Metropolitan

12    Insurance.  Not provided by me, but were provided to me

13    by Metropolitan Insurance.

14           CHAIRMAN:   And so the question is:  What

15    did Wells Fargo do to you to prevent you from getting

16    disability?

17           MR. SHAFFER:   That's true.  And my manager

18    at the time, not my terminating manager, who has left

19    Wells Fargo after a little less than 24 months, but the

20    manager before that, Ms. Barbara Brandell, was copied on

21    the notices of decline of my disability coverage.  I

22    believe that made her feel as though I was faking this

23    illness or didn't really need to take the time off.

24           So I have doctor's records here that

25    recommend that I take the time off.  I'd like to tell



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 395

104

1    you a little bit more about the situation because I

2    believe it impacted my employment status at Wells Fargo.

3              MR. KANE:  My only comment is Wells Fargo

4    didn't have anything to do, as he and -- with denying

5    disability coverage.  That was a third-party insurance

6    carrier.  So unless it's probative of anything that

7    Wells Fargo did to cause Metropolitan to deny it, it

8    doesn't have anything to do with Wells Fargo.

9              CHAIRMAN:  Excepting that it may have

10   something to do with his continued employment with Wells

11   Fargo and we will allow him to continue with that.

12             MR. SHAFFER:  And I have found those

13   exhibits.  I don't think they will be as hard to find.

14   Even if Wells Fargo is providing the disability

15   coverage, if it's highlighted in my Wells Fargo benefits

16   information, I think they need to take some

17   responsibility for providing those benefits.  I mean,

18   because one of my exhibits is that I did have short-term

19   disability coverage and long-term disability.  But let

20   me go on.  I'll save that for later.

21             After suffering for a long time with

22   coughing and a choking condition which my physician

23   describes as laryngeal spasm, which I can tell you more

24   about if you'd like, I began having episodes of sleep

25   apnea, a waking at night unable to breathe.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 396

1    At that point, I decided to take my

2  doctor's earlier recommendation and take time off for

3  voice rest, as she put it.  I related the situation to

4  an employee benefits specialist at Wells Fargo and .was

5  told that this was a qualifying short-term disability as

6  a result of my doctor's recommendation.

7    And that person e-mailed me a review of my

8  disability benefits, which is Exhibit 5 on the exhibits,

9  if you'd like to look at them.  So, again, I'm assuming

10  that I have these disability benefits.  And I took the

11  time off.

12    And later, I was informed by Metropolitan

13  Insurance that they would not be paying my disability

14  benefits which were I thought generous and substantial,

15  because they could not get the needed information from

16  Kaiser, my physician, my -- what is it, primary care

17  provider, and the records they did get did not support

18  my leave.

19    So Exhibit 5 outlines my disability

20  benefits under the Wells Fargo plan.  It doesn't talk

21  about who is providing it.  In fact, it says right here

22  on Exhibit A under the exhibits section, which is in

23  about the first -- after the first third of it, I'm

24  sorry these aren't labeled better, but this whole

25  presentation -- anyway, it's under Section 5, it says,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 397

106

1    "Wells Fargo provides short-term disability protection

2    at no cost to you if you cannot work for more than seven

3    consecutive calendar days."

4              It doesn't say Metropolitan provides these

5    benefits or that Metropolitan provides them through

6    Wells Fargo.  It says that Wells Fargo provides these

7    benefits.

8              And if you look at the very next page,

9    you'll see my Kaiser's physician statement that says

10   that I will be unable to attend work from September 22nd

11   to November 1st.

12             CHAIRMAN:  Okay.  Hold off just a second

13   while we -- and this previous page with the 5 at the top

14   is what, it's a document that you were provided by Wells

15   Fargo?

16             MR. SHAFFER:  Right.  When I told them that

17   my doctor suggested I take time off for this.  And,

18   again, this was more of an annoyance and inconvenience

19   before I started with the episodes of sleep apnea.  And

20   when that happened, I don't know if you've ever

21   experienced sleep apnea or not, but I decided that I

22   needed to do what was important to do.

23             I related that situation, and then I was

24   given information on the first part of Exhibit 5 which

25   shows my disability benefits.  My doctor provided this



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 398

107

1   visit verification form which says I'm unable to attend

2   work from November 22nd to December 1st.

3          And Metropolitan says that the records they

4   received did not support my leave.

5          CHAIRMAN:  Again, we're interested in

6   knowing what Wells Fargo had to do with the denial of

7   your disability benefits or whether the denial of

8   disability benefits had some influence on your

9   employment with Wells Fargo.  Are either one of those --

10         MR. SHAFFER:  Well, I think Wells Fargo is

11  responsible for providing disability benefits.  Again,

12  on Exhibit 5, it says Wells Fargo is providing these

13  benefits.  It doesn't say Metropolitan.

14         And two, I think that when the records came

15  back from metropolitan, which is also attached here, and

16  said that I was not found to be -- in fact, it's at the

17  very, very back at the booklet, there's a letter from

18  Metropolitan.  And it says they are denying my claim for

19  short-term disability benefits.

20         And all of this was copied to my manager at

21  the present time, which I think made her believe that I

22  was trying to do this as some kind of scam or take this

23  time off.  But they --

24         CHAIRMAN:  And what evidence is there of

25  that?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 399

1          MR. SHAFFER:  Well, I'll be getting to that

2     in other types of situations.  I don't think you want me

3     to delve into that right now.

4          CHAIRMAN:  No.  What is the evidence that

5     any person at Wells Fargo in a senior position to you

6     thought that you were faking this to take time off?

7          MR. SHAFFER:  General treatment of me, the

8     kinds of statements she made, and --

9          CHAIRMAN:  Who made what statements?

10          MR. SHAFFER:  Ms. Brandell would never ask

11    me anything about my health.  It was like it was a

12    nonissue.  And she did say one time, "Oh, well, you look

13    better now."  But it was like with a note of there's no

14    considerations for any kind of health concerns.

15          And the thing is, I was also placed on

16    revenue quotas that I thought were unreasonable, and I

17    think that very possibly, this situation with the

18    withholding of the disability benefits affected that

19    situation.

20          My physician, Dr. Orwanas, indicated this

21    was a serious health condition on that Exhibit 5 and

22    recommended absence plus treatment.  Metropolitan

23    effectively overruled my attending physician without

24    providing their own examination or interview.  I'm still

25    bothered by respiratory issues.  This is why I wanted to



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 400

1   enclose Exhibit 5.

2              I'm still bothered by respiratory issues.

3   If this condition is deemed to have effectively ended my

4   brokerage career, my long-term disability coverage for

5   $10,000 a month, $120,000 a year until age 65, and would

6   have had a value of $1.5 million, just so you know what

7   the situation is.  And that's the last part of my

8   disability (inaudible).

9              CHAIRMAN:  Do you have any writing or can

10  you quote any statement or testimony that any person at

11  Wells Fargo thought you were faking the disability?

12             MR. SHAFFER:  No.  I don't have anything

13  like that in writing.  I do have -- here's one of my

14  exhibits in the back.  Near the very back is an e-mail

15  from Ms. Brandell on December 31st, which was the two

16  months I took off work, October and November of 2008.

17  So I'm back in December and I get an e-mail.

18             And, again, go to the very back of the

19  little booklet and then go in probably 15 or 20 pages

20  and at the bottom, it says W00007.  And it's an e-mail

21  from Barbara Brandell.  Again -- yeah, I could have done

22  a little job labeling them.  I've never been in this

23  kind of situation in 30 years.  So just go from the

24  back, go in about ten pages or so.

25             ARBITRATOR:  We have it now.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 401

110

1          MR. SHAFFER:  Do you see Ms. Brandell says,

2     "Ken, per our conversation on December 17th", that was

3     two-and-a-half weeks after I came back from sick leave,

4     "the verbal warning performance and management process

5     is resuming on January 2nd, 2009.  You must achieve

6     75 percent of your sales goal by January 31st."

7          And the reason that it was 75 percent, it

8     was not any kind of an exception for me, it was a

9     firm-wide exclusion or diminution of the sales goal

10    because the markets had crashed during that period.

11         And another reason I thought Ms. Brandell

12    possibly held it against me for being out is her

13    comments that, "Gee, I can't believe you were out of the

14    office during that period", and statements to that

15    effect.  Anyway, so achieve 75 percent of the sales goal

16    January 31st.

17         "Given that your new annual goal is

18    $310,000, you must produce $19,375 a month in January.

19    We will continually review and assess your progress.  I

20    sent you an e-mail on January 7th."  So that's not a big

21    deal.  And that's at end of my disability.

22         CHAIRMAN:  What is this handwriting on

23    this?

24         ARBITRATOR:  February 4th.

25         MR. SHAFFER:  2/4/09, must meet 80 percent,



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com.

EXHIBIT X  Page 402

111

1  February is 26,666.  See, I got this from the

2  information that the law firm sent me.  I got a box

3  again on the 23rd that had probably ten pounds of paper.

4  And this is one of the things I found.  So this is Ms.

5  Brandell's writing here.

6          CHAIRMAN:  That was the next question:

7  Whose writing is it?

8          MR. SHAFFER:  It's not mine.  I would

9  assume it's Ms. Brandell's.

10         CHAIRMAN:  Do you know whose it is?

11         MR. SHAFFER:  No, I don't know for sure.

12         CHAIRMAN:  All right.  Then you have a

13 category here of wrongful withholding -- or rather

14 withholding of commissions.

15         MR. SHAFFER:  Withholding of commissions

16 was executed as part of the unfair licensed banker

17 program, which credited only 50 percent of revenue from

18 an account introduced by a licensed banker for the first

19 year.  The withheld compensation was not counted towards

20 goal achievement or compensation and not evenly applied

21 in all branches.  Some branches had licensed bankers,

22 some branches had no licensed bankers.

23         But, again, if you had a branch with

24 licensed bankers, then any accounts referred by them,

25 you received 50 percent credit for any business you did.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 403

1    So if you met with some new people and set up a plan and

2    generated $5,000 in commissions, they would take back

3    $2,500 of that, 50 percent.  And that I pointed out in

4    quarterly meetings where I was usually derided for not

5    generating enough commissions, I said, "Hey, what about

6    the 50 percent from the licensed banker referred

7    accounts?"

8              They said, "Well, hey, you know, that part

9    of the game right here in the policy is you get

10   50 percent of any licensed banker referred account."

11   The thing is, this money just went into thin air.  It

12   wasn't considered as part of goal achievement.  So I

13   could have generated much more than my commission amount

14   per month; but, again, only 50 percent of the licensed

15   banker commissions were counted.

16             And it wasn't evenly applied at all

17   branches.  The branch at which I did my most business

18   and the branch that I was able to generate the larger

19   amount of revenue in 2008, my Micron branch, as they

20   called it, had no licensed bankers in 2008.

21             And at the start of 2009, even though it

22   was a struggling branch in a disadvantaged economic

23   area, it was assigned two licensed bankers.  And, again,

24   everyone at Wells Fargo, everyone of the branches,

25   everyone everywhere is constantly pressured to generate



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 404

113

 1    results in sales and commissions.

 2           And so they -- when you put the licensed

 3    bankers in the branch, the licensed bankers immediately

 4    go to all the other employees in the branch and ask them

 5    to filter their referrals to the financial adviser, to

 6    Ken or whoever it may be, "Please filter those through

 7    me because then I get a credit."

 8           And what happens effectively is you put two

 9    licensed bankers in the branch, and then all the

10    referrals are coming through the licensed bankers.

11           I think this was a very clever plan that

12    Wells Fargo had so that the financial advisers would in

13    effect help pay the salary of the licensed bankers,

14    which is -- and licensed bankers had a security license,

15    so they could refer qualified prospects.  But they also

16    had banking goals.  They needed to open bank accounts

17    and do loans and all kinds of things.  So this is only

18    one thing that they did.

19           And, again, the 50 percent exclusion was

20    not counted towards anything, the goal of achievement or

21    compensation and my goals which subjected me to

22    termination, if not met, were raised during this period.

23    So they put the two licensed bankers in the branch and

24    they also raised my goals.

25           The other branch I had was a brand-new



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 405

114

1   branch and generated practically nothing for me.  The

2   rationale for the licensed banker program was that the

3   licensed banker would bring the financial advisers more

4   qualified prospects and that the expense of the licensed

5   banker was covered by the bank.

6            Section 34.3 of the Division of Labor

7   Enforcement Manual, that section in the middle there

8   states, "If the element of which the deduction of gross

9   sales is based on a cost which is attributable to the

10  employer's cost of doing business, the element may not

11  be used."

12           I understand that the policy has been

13  changed now, which I think is an admission of violation.

14  So, again, California labor standards says you can't

15  deduct the commission if you're doing it as a result of

16  your cost of doing business.

17           And the argument for having the licensed

18  bankers in the branch were, "Oh, well, these guys are

19  going to generate more referrals for you and we're

20  paying them a salary."

21           In effect, if you think about it, the

22  licensed bankers didn't get paid commissions, they got a

23  quarterly bonus.  So the financial adviser was basically

24  paying the licensed bankers a quarterly bonus through

25  this procedure because they were backing out the



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 406

115

1    commission.

2              And then to subject me to termination for

3    not meeting $20,666, we're going to talk about that a

4    little bit, one time I was threatened with termination

5    by missing my sales goal by $500.  Not only is it crazy

6    and it's not general policy in the brokerage business,

7    but what it is is that money that was withheld as part

8    of this licensed banker thing.

9              And you can see why I'm using these notes

10   because I do get a little emotional about this.  I'm

11   30 years in the business with no complaints.  I've got a

12   book of clients.  You think that I would have the

13   ability to continue making a living.  And now that's

14   been removed from me.

15             I'll talk about it a little more.  I

16   applied for some other positions realizing, "Hey, I've

17   been out of the brokerage business now.  I've been away

18   from my clients now.  I heard from a recruiter, after

19   I've been out of the business for six months, "Ken, no

20   one is going to hire you now after you've been out of

21   the business for six months at a bank where there's a

22   built-in clientele."

23             And as far as my moving my existing

24   clientele that I had when I went to Wells Fargo and

25   brought to Wells Fargo, the managers I've talked to



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 407

1   said, "Ken, you'll spend more than a month -- you're not

2   going to go back and get very many of these clients."

3   I've talked to a number of those clients.  A lot of them

4   have found other sources for the guidance and advice

5   that they relied on me on.  It's been very upsetting for

6   them, but they had to find someone else.

7            I've been out of the business a year now.

8   And that's, again, why I have the written notes, because

9   I will stop rambling at this point and go on to the next

10  point if you'd like me to.

11           CHAIRMAN:  Go ahead.  And, again, we want

12  your testimony and not necessarily -- and not your

13  argument.  You can do that in your closing argument.

14           MR. SHAFFER:  Okay.  So on the subject of

15  promissory estoppel, in addition to verbal comments on

16  my assignment of a new branch after three years of

17  requests -- that's my Exhibit 6.  If you'll go back to

18  my exhibits, Exhibit 6 -- and the exhibits are kind of

19  in the middle.  And so if you pull it apart almost in

20  the middle, almost towards the front, you'll see --

21           ARBITRATOR:  What's on the bottom of the

22  page?

23           MR. SHAFFER:  There's nothing on the bottom

24  of the page.  Oh, there's a 1.  And this is from my

25  third sales manager while I was there, Jan Krug, who is



ESQUIRE
*an Alexander Gallo Company*

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 408

117

1   no longer with the firm.  And I was wondering if maybe

2   Mary would like to comment on why that situation is the

3   fact, because I've heard some reasons for that.

4              And in this e-mail dated September 23rd,

5   approximately a week before my termination, she says,

6   "Hi, Ken and Chris."  Ken is to me and Chris is to

7   another broker who actually has been terminated, Chris

8   Obenjane.  "Just received word that Jim Uren, who is

9   slated to assume coverage of the Micron store, will

10  delay his return from medical LOA per his doctor's

11  orders until November 1st, 2009."

12             Now, Jim Uren, after returning from a hip

13  surgery, has been terminated from the Wells Fargo

14  program.  So the two other people referenced in this

15  e-mail have been terminated.  And I can go more into Jim

16  Uren's situation if you'd like.  We're not here to

17  address this, but it's truly sad.

18             "Because of that", she says, "we will delay

19  the store coverage changes until he returns.  I do

20  apologize for the confusion, so it's business as usual

21  until the end of October."

22             And, again, it's not just business as usual

23  until the end of October because at the -- I'm supposed

24  to assume coverage of a new branch, which I had been

25  complaining in quarterly reviews regularly that the



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 409

1    branches I had would not support the production

2    requirements that they were giving me.  So I asked to be

3    assigned to another branch.

4              And, finally, Ms. Krug acquiesced and

5    assigned me to a new branch.  And here's an e-mail that

6    says "it's business as usual until I start the new

7    branch at the end of October."  And that fits the

8    definition of promissory estoppel.

9              Labor Code S90 Section 30.16 says, "The

10   promise which the promisor should reasonably expect to

11   induce action or forbearance on the part of the

12   promisee", me, "and which does induce action or

13   forbearance is binding", which it did, because I assumed

14   I was starting a new branch.

15             If I knew I was going to be terminated, I

16   would have made copies of my broker files and got a copy

17   of my T12 and so on.  And certainly I would have

18   resigned if I knew they were going to put these comments

19   on my U5 which prohibits me from employment.

20             But it does induce action or forbearance is

21   binding if the injustice can only be avoided by

22   enforcement of the promise.  And then, again, everyone

23   in this e-mail is not at Wells Fargo.  I'm not sure what

24   Jan's situation was.

25             And right after that Exhibit Number 6,



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 410

1    you'll notice a little thing there, it's in all this

2    information or this description of this situation at

3    Wells Fargo, you can -- you get the feeling that I have

4    a bad attitude; right?  I think we can all agree on

5    that.

6              And I would just like to point out that my

7    bad attitude was caused by the lack of follow-through on

8    promises made to me, the demeaning approach that Wells

9    Fargo takes to employee management, constant pressure

10   and threats of termination for missing sales goals.

11             In spite of my problems with Ms. Brandell

12   and Ms. Krug, no persons I worked with in the branches

13   could say I was anything but friendly and supportive.  I

14   befriended many of my banker partners and met several on

15   social occasions.

16             Many employees of theirs, including all

17   three of the licensed bankers I have worked with, have

18   complained to me about the pressure to maximize sales

19   and the demeaning nature of their interaction with their

20   managers.  Several asked me if I could identify an

21   opportunity for employment away from Wells Fargo.

22             MR. KANE:  I haven't been objecting, but I

23   have to object to this.  This has nothing to do with his

24   complaint.  It relates to unnamed other individuals.  It

25   just doesn't relate to this controversy.  I haven't



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 411

120

1    objected so he could tell his story, but this is going

2    so far afield that I must object.

3              MR. SHAFFER:  The only reason I brought it

4    up is because I think it was part of my reason for my

5    termination.

6              CHAIRMAN:  Your bad attitude?

7              MR. SHAFFER:  Their perception of my bad

8    attitude.

9              CHAIRMAN:  I think your point has been made

10   and I'm going to sustain the objection.

11             MR. SHAFFER:  One of the other things I

12   would like to suggest is that Wells Fargo and Kane and

13   Fischer and Jan Krug and Mary Mortensen are guilty of

14   intentional and negligent infliction of emotional

15   distress.

16             MR. KANE:  First of all, let me object to

17   that.  Nowhere in any of his claims has he raised this

18   issue as it relates to Ms. Mortensen individually or Ms.

19   Krug individually or my law firm individually.  Let me

20   have a moment to make sure I'm going correct.

21             Nor is it included anywhere in his original

22   counterclaim or answer.  I'm looking at it now just to

23   make sure I was correct on that.  I'm looking at the

24   counterclaim.

25             CHAIRMAN:  Which is in the form of several



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 412

121

1  letters.

2           MR. KANE:   There are several letters.   The

3  one I have, there's an answer and then there's a

4  counterclaim.   This is the answer and this is the

5  counterclaim.   It's the same for both the answer and the

6  counterclaim.

7           I'll be happy to hand it to -- he filled

8  out the form on the counterclaim.   I can hand it to the

9  panel.   These are the areas that are referenced in

10 counterclaim:   Wrongful termination, commission

11 withholding, promissory note as a bonus, libel, slander.

12 In his answer, he did have the promissory estoppel.

13          CHAIRMAN:   Is this his letter which has a

14 receipt date of April 14th?

15          MR. KANE:   That's the answer.   The

16 counterclaim has -- it was filed after that.   And it has

17 a date of -- his signature is dated April 27th of 2010.

18 It is followed by a "to whom it may concern" letter that

19 starts the following -- is a full description of the

20 areas of dispute specified in this claim.

21          CHAIRMAN:   There's something January 11,

22 2010, to Mr. Raymer.   Is that --

23          MR. KANE:   No, I don't know what that is.

24 We responded to the counterclaim on May 24th of 2010.

25 What I'm referring to is this, Chairman.   This is the



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 413

122

 1    FINRA counterclaim.  The first page is the check where

 2    he filed his counterclaim, then it's followed by the

 3    form.  And then at the end is -- the form is April 27th

 4    of 2010.  Then it's followed by the "to whom it may

 5    concern".

 6                    CHAIRMAN:  Curiously, we did not receive

 7    this.

 8                    ARBITRATOR:  No, we didn't receive this.

 9                    MR. KANE:  And it starts with the "to whom

10    it may concern" after that.

11                    CHAIRMAN:  No, we haven't seen this.

12                    ARBITRATOR:  No, we haven't.

13                    MR. KANE:  I'm sure what you saw is the

14    answer, his original answer that has that receipt date.

15    But subsequent to the answer, the question was was this

16    answer a counterclaim, had he filed the counterclaim

17    filing fee.  Subsequently, Mr. Shaffer did file the

18    counterclaim filing fee and did file this document as

19    his counterclaim.

20                    CHAIRMAN:  That's why I saw your response

21    to Shaffer's counterclaim with some surprise.

22                    ARBITRATOR:  Yeah, I was trying to figure

23    that one out, too.  Apparently, they were having some

24    shifts in personnel at FINRA and the case got shifted

25    from one --



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 414

123

1          CHAIRMAN:  We don't know what happened.

2   But in any event, we hadn't seen this.  So your point

3   that Mr. Shaffer has not raised in his counterclaim or

4   any papers connected to or attached there the claim of

5   emotional distress.

6          MR. KANE:  That's correct.  We'll get to

7   the next one.  Under the rules, if he's going to do

8   that, he would have had to seek by motion leave to amend

9   his counterclaim.  There's a FINRA rule on that.  Let me

10  get it for you.  It's Rule 13309(b).  "After a panel has

11  been appointed, a party may only amend a pleading if the

12  panel grants a motion to amend in accordance with the

13  rules."

14          And, of course, we have ten days to respond

15  to any motion to amend the pleadings.  My point in

16  raising this now is this matter has been pending for a

17  long time.  I don't need to be surprised at the hearing

18  with these allegations that have never been raised and

19  are being raised for the first time.

20          Same thing with the breach of fiduciary

21  responsibility.  That's never been raised before in any

22  of his pleadings.  I object to that.  It's not fair to

23  me, but more importantly, it's not fair to my client to

24  have these things raised the day we start a hearing.

25          CHAIRMAN:  I understand.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 415

Arbitration                                    March 18, 2011

124

1          MR. SHAFFER:  And I'm sorry if I didn't
2     follow the procedure.  I came upon these terms and
3     definitions when I was researching this situation.  And,
4     you know, I think this is general employment law stuff.
5     It's not really anything that needs to be prereleased,
6     is it?
7          MR. KANE:  With all due respect to
8     Mr. Shaffer, this is not general employment law stuff.
9     This is important stuff that I've never seen before and
10    shouldn't be surprised with.
11         CHAIRMAN:  Okay.  Give me or give us just a
12    few minutes.
13         ARBITRATOR:  Do you want to take a break
14    and we can talk?
15         MR. KANE:  We can leave the room if you'd
16    like.
17         ARBITRATOR:  Off the record, please.
18       (A discussion was held off the record.)
19         CHAIRMAN:  Okay.  Mr. Kane has objected to
20    any further testimony or commentary with regard to a
21    claim of intentional and negligent infliction of
22    emotional distress.  And he's also objected to any
23    further testimony on the quote, "breach of fiduciary
24    responsibility", closed quote.
25         The panel will sustain the rulings, sustain



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 416

1  the objections.  Did you want to discuss that further?

2  Let's go outside.  Off the record.

3          (A discussion was held off the record.)

4          CHAIRMAN:  The panel has had a discussion

5  with regard to the two objections that Mr. Kane has

6  made, one with regard to the panel receiving any further

7  testimony on the crime of intentional negligent

8  infliction of emotional distress; and, secondly, the

9  breach of fiduciary responsibility.

10          Mr. Shaffer, the panel is going to sustain

11  the objections on the grounds that neither of these were

12  mentioned in the counterclaim.  And, furthermore, the

13  gravitas of these would require Wells Fargo to present

14  testimony to defend themselves with these claims, and

15  not having notice of them, has not been able to do so.

16          MR. SHAFFER:  I understand that, Mr. Reese.

17          CHAIRMAN:  Thank you.

18          MR. SHAFFER:  The reason I bring those up

19  is that you had mentioned that these proceedings could

20  initiate a referral regarding violation of policies.

21  And I just wanted to bring these up to clear the air.

22          CHAIRMAN:  I understand.  But we would have

23  had to have evidence and had a full hearing, which we

24  have not.

25          MR. SHAFFER:  If we can continue, I have



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 417

1    more information on my claim of wrongful termination.

2              CHAIRMAN:  Go ahead.

3              MR. SHAFFER:  Again, I do understand the

4    situation -- remember, there was no problem that we ever

5    discussed with client complaints or breaches of policy,

6    anything like that.  It was always about commission

7    levels, sales performance warnings.

8              And I was subject to verbal production

9    warnings, verbal, not written.  Verbal production

10   warnings means you have to meet that level of production

11   without concern of where you get it from.  Just come up

12   with this production number or you could be put on

13   written warning.

14             Written warning means if you don't obtain

15   that given production number, then you can be

16   terminated.  I was subject to verbal production warnings

17   prior to my disability leave in October and November of

18   2008.  A rational person would assume that this was

19   because I was not selling commission generating

20   products, right, if the broker is not generating the

21   proper amount of commissions because he or she is lazy

22   and they're not selling the product?

23             Well, I would like to draw your attention

24   to Exhibit Number 4 within the section there for

25   exhibits, and let me give you a minute to take a look at



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 418

127

1    that.  It's labeled Number 4 under the exhibit.

2                ARBITRATOR:   Is it Bates stamped on the

3    bottom W00042?

4                MR. SHAFFER:   No.  00042 is the page before

5    that.  Turn to the next page.  That is something I would

6    like to review, but not now.  The exhibit I'd like to

7    have you take a look at is right after.  So everyone

8    found that?  It's a long listing of names.

9                MR. KANE:   It's after 42?

10               MR. SHAFFER:   Yeah.

11               MR. KANE:   I've got it.

12               MR. SHAFFER:   Okay.  So I was -- received a

13   written warning for production, which is also part of

14   Exhibit 4.  You can see that on March 9th of 2009,

15   again, that's three months after my return from

16   disability leave, I was informed that I'm on a formal

17   warning for unsatisfactory production.

18               And if you look at Exhibit 4, Exhibit 4 is

19   a year-to-date -- excuse me -- and, you know, I was

20   subject to verbal warnings prior to my disability leave.

21   Exhibit 4 is a listing of market link CD and market link

22   note production for 2008 through October.

23               And you'll see -- if you look down this

24   list, there's three pages here.  It lists every broker

25   in the Sacramento district's production in these types



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 419

128

1   of investments offered by Wells Fargo.  And you can see

2   my name is up there near the top.  It's about, what is

3   it nine or ten from the top, I came into $3 million in

4   generated commissions of $58,000 for these market link

5   CDs and market link notes.

6          So I'm one of the top performing sales

7   people at $3 million in sales, but, again, I'm going on

8   written warning and threat of termination.

9          Anyway, the problem is that although this

10  is good for the client because it gives them a principle

11  guarantee and the opportunity to participate in equity,

12  commodity, real estate and gold indices without an

13  upfront load or sales charge, market link CDs only

14  generate a one percent sales charge.  So I generated

15  $68,000 selling this Wells Fargo originated product --

16  I'm sorry, that's $58,000.  But that's at approximately

17  a one percent commission fee because the client doesn't

18  pay a commission and they get a principle guarantee.

19  Just think, if it would have been three percent, that

20  would have been a lot better for Wells Fargo's purposes.

21  For me, it didn't matter.  Because these vehicles were

22  perfect for the clients in a period of extreme

23  volatility for the market but not good enough for Wells

24  Fargo because they generated lower commissions

25  initially, which is a violation of standard business



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 420

129

1    practice and security regulations.

2           And the same situation exists with regard

3    to my sales of Wells Fargo Advantage Mutual Funds.   I

4    have no performance records on those, but I'm sure

5    you'll show my sales performance were above average, but

6    many of the sales I made were C class shares resulting

7    in a one percent commission credit.

8           So even though I'm -- in fact in one

9    instance, which we can review in the future, I was put

10   under warning again in August of 2009.  And in that

11   particular month, I had generated a million dollars in

12   sales in Wells Fargo mutual funds C shares.

13          And, in fact, if you go to the same --

14   generated a million dollars in Wells Fargo mutual funds

15   shares for the month.  One sale was for $500,000 for my

16   own client that I had brought to the firm.  Those

17   purchases of C shares in the Wells Fargo mutual fund

18   group got no sales credit for the producing

19   representative.

20          So in other words, out of $1 million, some

21   of it was subject to only a one percent fee.  And

22   $500,000 of it, I got no sales commission credit for.  I

23   explained this situation to Mrs. Krug and she suggested

24   that I switch to another fund family which did not have

25   this policy, which I did not; because, one, I consider



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 421

130

1    it unethical; and two, I couldn't find -- this was a

2    short-term municipal bond fund.  And I couldn't find any

3    other fund that had a yield as good as the Wells Fargo

4    funds.

5              So here I am supporting Wells Fargo funds

6    not even getting credit for a half-million-dollar sale,

7    which would be considered a substantial sale, no sales

8    credit at all.  And that was one case in August of 2009

9    when I was put on a, you know, termination notice.

10             But in this other case, and the one we're

11   looking at, there I am at $3 million in sales in these

12   particular Wells Fargo issued securities, yet it's not

13   good enough.  Because I was getting verbal warnings at

14   that point.  And then the formal warning in March of

15   2009, which if we could go on from that point.

16             What I'm suggesting is that Wells Fargo

17   didn't have any consideration for the benefits of the

18   client and they really didn't care if I was bringing in

19   a million dollars to a Wells Fargo product, which is

20   more profitable to them than bringing it to an outside

21   product or Wells Fargo mutual funds.  They don't care.

22   All they care about is the amount of revenue involved.

23   And they pressured not only brokers but people in the

24   banks unrelentlessly to generate revenue.

25             If we could continue on on this same idea,



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 422

1  if you look at Exhibit 4 after that listing of market

2  link CD sales, you'll see that on March 9th of 2009, I

3  am on formal warning for unsatisfactory production

4  because I didn't reach 20,666, and you'll see there I

5  refused to sign.  Because I asked Ms. Brandell at that

6  point, I said, "Well, if I'm fired, what about the

7  promissory note thing?"  And she said, "Oh, well, you

8  would be responsible for that."  And so I said, "Well,

9  that's crazy."

10         And again, I missed the February goal by

11  $500, which we're going to review on the next page.  So

12  at the beginning of March, I'm put on formal warning for

13  unsatisfactory production based on my February sales

14  numbers.

15         And if you look at Exhibit 4, the next one,

16  for February, I'm listed at number eight among all the

17  brokers.  And this actually is only the branch-based

18  brokers at Wells Fargo.  There were other brokers in the

19  hub that didn't need to have the new people, new

20  accounts and new money coming to them by being in a

21  branch, so they're not included in this listing.

22         It says right here at the top, "store-based

23  brokerage, 2009".  And there I am at number eight.  I

24  came in at $20,159.  Well, if you look at Ms. Brandell's

25  e-mail, because I didn't make it to $20,666, so for the



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 423

1    sum of $500, I'm being terminated with -- I mean I'm

2    being threatened with termination, which as you can

3    imagine when your welfare -- the welfare of your family

4    is on the line, it can tend to make you a little cranky.

5              So then if you go to the next page on

6    Exhibit 4, you'll also see another listing.  And this is

7    a store-based broker's total compensation through

8    February 28th.  And there I am in 14.  It says -- excuse

9    me.  This is -- this is not total compensation.  This is

10   a listing of commissions generated.  There I am at

11   number 14 for the whole year of -- up to February 28th.

12             So what I don't understand is how you can

13   threaten someone who was number eight for the month and

14   number 14 for the year out of 29 people with termination

15   based on sales production when they sold $3 million in a

16   product that only generated approximately a 1-percent

17   sales commission.  It just shows that they don't care

18   about anything but revenue generation.

19             And it puts the broker in an incredibly

20   unconscionable situation where you have to sell the

21   higher-commission products to people, which to me is

22   just like a basic violation of the whole covenant of the

23   brokerage industry, trying to do what's best for people.

24             I have one more example of this type of

25   treatment and discrimination.  And it's on -- it's on a



ESQUIRE
an Alexander Gallo Company

EXHIBIT X   Page 424

133

1   page closer to the end.  And at the top, it says "Wells

2   Fargo I bonus".  If we could move on to that at this

3   point, at the bottom, this is one of the things that I

4   received from the Kane and Fischer package.  It says

5   0009.

6             MR. KANE:  Is that what we looked at,

7   Exhibit Number 4?

8             MR. SHAFFER:  Yeah.  Right near the end of

9   the booklet, if you go in maybe 20 pages.  You'll see

10  something that says "Wells Fargo I bonus" on the top.

11            ARBITRATOR:  It says 6/1/2009 at the

12  bottom, Bates W009 at the bottom.

13            CHAIRMAN:  This is the medical stuff.  It's

14  after the medical stuff.

15            MR. SHAFFER:  Yeah.  It's right near the

16  back of the -- if you take a chunk of paper a quarter of

17  an inch thick or eighth of an inch thick.

18            ARBITRATOR:  We're just going to share.

19            MR. SHAFFER:  Let's go ahead and take a

20  look at this.  Now, this is after Ms. Brandell is

21  transferred to the Santa Rosa area and Ms. Jan Krug was

22  then my manager.  This was an e-mail that, again, I got

23  from the information that came from the package that

24  Kane and Fischer sent me.  It deals with a performance

25  warning situation.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 425

134

1          As you can read -- I don't know why it says

2     "Wells Fargo I bonus" at the top.  It's almost like Jan

3     or these people are getting a bonus for terminating

4     employees.  But these are coaching notes.  That's a

5     little humor.  I don't believe they would put in writing

6     that they got a bonus for terminating employees.

7          MR. KANE:  I have to object to this.

8     There's nothing in here about his being terminated.  He

9     wasn't terminated for lack of production.  This is June

10    of 2009.  He wasn't terminated for this.

11         CHAIRMAN:  This refers to a written

12    performance warning.  And I think that is a subject

13    which we are dealing with, namely his termination, and

14    whether it was wrongful or not.

15         MR. KANE:  Well, the point is his

16    termination wasn't -- this is June of '09.  He wasn't

17    terminated in June of '09 and he wasn't terminated for

18    lack of production, and his U5 doesn't indicate that he

19    was terminated for lack of production.

20         CHAIRMAN:  And the U5 may not be the total

21    reason for his termination.  I think he is permitted to

22    present evidence which surrounded his termination for

23    whatever reason he was terminated.  Go ahead,

24    Mr. Shaffer.

25         MR. SHAFFER:  Thank you, Mr. Reece.  I feel



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 426

Arbitration                                         March 18, 2011

135

1    that my termination was not based on these incidental

2    and accidental items.  It was based on the constant

3    go-around and the bad relationship that was developed

4    from this.

5            Take a look at this.  "Ken was put on

6    written performance warning on 3/9/09 for three months.

7    His minimum metric for revenue was set at $20,666.  Ken

8    exceeded this minimum each of the three months in the

9    period with an average of $26,065.  Careful monitoring

10   will continue to take place to help, and coaching Ken

11   and even exceeding this new minimum.  Ken should set his

12   pace at $30,000 a month to remain competitive in this

13   model as a WFI FC.  Formal written warning status will

14   be discontinued as of June 30th of 2009."

15           What she's saying there is my sales goals

16   were raised from $20,666 to $30,000 a month, almost a

17   50-percent increase.  I think this shows an intention to

18   terminate me for that reason.  When she couldn't, out of

19   whatever motivation she might have, she decided to use

20   these other items as an excuse.

21           Now, the other point I'd like to make in

22   that regard, and this is a reflection on Ms. Krug, if

23   you look at the notes, the page just before that shows

24   some notes about a meeting that I had with Ms. Krug, I

25   guess, dated July 29th.  And it says on 6/1/09, minimum



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 427

136

1    set at $30,000 a month.  So again, there's verification

2    that my goal was raised from $20,666 to $30,000 a month.

3              And additionally I have another note from

4    Ms. Krug that you have to go back a few pages for.  And

5    it's a handwritten page.  It's dated 8/28/09.  It says

6    "review of Ken Shaffer, review with Ken Shaffer".  Can

7    you find that?  It's about --

8              CHAIRMAN:  Yes.

9              ARBITRATOR:  Review of Ken Shaffer, 8/28.

10    It's several pages toward the front.

11             MR. SHAFFER:  What you'll notice, I think

12    this gives us a good insight into the untenable

13    situation at Wells Fargo.  It says "to date, $10,500,

14    not showing $20,000 revenue will hit."  She goes down

15    and makes some more notes and says that, "My licensed

16    banker feels like" -- where does it say -- down at the

17    very bottom of the notes, you'll notice that Ms. -- this

18    is Ms. Krug's notes.  It says "work his book by deciding

19    which clients deserve a deeper drill."

20             Now, I don't know if you folks have

21    experience with the brokerage industry, but again, which

22    clients deserve a deeper drill?  This is one of the

23    reasons why my relationship with Ms. Krug became rocky.

24    I mean, statements like that.

25             And the other case where I was put on



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 428

137

1  performance review and had done the

2  half-a-million-dollars mutual fund trade as part of my

3  million dollars in Wells Fargo Advantage Mutual Funds,

4  she explained it like this, if I could show you this:

5  She said, "So you thought you were going to get this

6  much, but you got this much."

7          And I'm sitting there in a performance

8  review being threatened with termination by people who

9  have motivations like this.  I mean, it's crazy.  I just

10 thought it was crazy.  And, again, I did lose it to some

11 extent.  You can see by my e-mails, I never threatened

12 anyone, although it crossed my mind.  I remained civil

13 the whole time.  And, again, it was just a repeated

14 process of craziness.

15          If you will please turn -- this is my last

16 page on this, the previous page to the one we just

17 looked at, handwritten notes, "performance review of Ken

18 Shaffer".  Look down at the bottom.  It says, "What

19 we'll book, $198,000 in client's bank account plus

20 $100,000 maturing market link CD.  Reinvested in

21 short-term government fund approximately $200 million.

22 $6,500 if successful close."

23          All Wells Fargo cares about is the revenue.

24 They don't care what you have to do to get it.  Because

25 if you do have a client complaint, they'll just fire



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 429

Arbitration                                    March 18, 2011

138

1   you. There's -- it's undue pressure. It's just a

2   ridiculous situation. All she cares about is the

3   revenue that's generated. There's no concern with how

4   many new accounts I opened, how many market link CDs I

5   sold, how many millions of dollars went into Wells Fargo

6   Advantage Mutual Funds, again C shares which paid one

7   percent, which I think were a better deal for the

8   client.

9              In summarizing this whole situation,

10  please, just bear me with me one more second and I'd

11  like to turn to Exhibit 7 among the exhibits.

12             CHAIRMAN: Which is in what direction?

13             MR. SHAFFER: Exhibit 7 is almost in the

14  middle, a little bit closer to the beginning. It's

15  forward from where we were.

16             ARBITRATOR: What does it say at the bottom

17  of the page?

18             CHAIRMAN: Nothing. This is what it looks

19  like.

20             MR. SHAFFER: There's nothing on the

21  bottom. It's a page where a large portion of the names

22  are all darkened.

23             CHAIRMAN: That's four and there's five.

24             ARBITRATOR: I've got it.

25             MR. SHAFFER: Then if you'll notice, if



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 430

139

1    you'll turn to the page before and see my little

2    commentary, what's wrong this a picture?  This is a

3    listing of financial advisors from 2009.  And some of

4    these might have been terminated.  It's a listing of

5    financial advisors from 2008.  The darkened names are

6    those financial advisors who are no longer with the

7    firm.  22 of the financial adviser, or 62 percent, have

8    either resigned or been terminated.

9                CHAIRMAN:  As of when?

10                MR. SHAFFER:  As of now, if you look back

11   at this list.  Again, and this -- this list was in 2009.

12   So all the darkened people, and you'll notice my name

13   there, have either been terminated or resigned.  And,

14   again, it makes you wonder what's going on with this

15   thing.

16                Like I said, also gone is Ms. Jan Krug,

17   less than 24 months with the firm.  Perhaps she was

18   terminated for overterminating, perhaps because she has

19   a caustic personality, treated financial advisors in a

20   demeaning manner, or had what one currently-employed

21   sales assistant named Trudy Mitchell described as 14

22   broker complaints.

23                And maybe Ms. Mortensen could tell us more

24   about why Ms. Krug is not with the firm anymore.  But I

25   think this provides an insight into the life and



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 431

140

1   pressures of Wells Fargo employees.  They treat their

2   employees as human capital, and the turnover rate at

3   both the brokers division and the bank demonstrate this.

4          So part of my theory here is that I was

5   terminated because I would not generate the -- I could

6   not generate with the branches I had the amount of

7   commissions that they were demanding from me.  And they

8   had no consideration for what was best for the client or

9   what your sales levels were or what your new account

10  levels were.  It was all about show me the money,

11  generate the revenue.

12         And, oh, by the way, you know, if you get a

13  client complaint, then you're going to be brought in

14  here and be grilled about it and then we just fire you.

15  You can see 60 percent of the brokers are gone.

16         CHAIRMAN:  Anything else, Mr. Shaffer?

17         MR. SHAFFER:  I pause for a while, not rest

18  my case, but certainly pause.

19         CHAIRMAN:  Are you going to present further

20  evidence?  Do you have any further testimony to give us?

21         MR. SHAFFER:  As a matter of fact, I do.

22  Since we're on Exhibit 7, if you flip two pages back,

23  there's -- by the way, just go one page back, that's May

24  production levels.  And I'm at number 15 out of 42 at

25  that point because -- that's Exhibit 8.  Now, this



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 432

1    included the HUD-based brokers as well.  That's why

2    there's 42 brokers.  I'm number 15 for production in

3    May, but then again, year-to-date, 28 out of 42.

4              And then if you turn to the next page, in

5    September, my production level was $22,835.  And, again,

6    part of what I think is going on here is that, you know,

7    she would have liked to have terminated me because of

8    the attitude that I thought I was being taken advantage

9    of and Wells Fargo clients were being taken advantage of

10   and for not meeting the production minimums.  But she

11   couldn't do that, so she comes up with the other stuff.

12             And, again, maybe you can tell me, why is

13   Jan not with the firm anymore?

14             CHAIRMAN:  So far as I know, Ms. Mortensen

15   has not yet been presented as a witness.  You may call

16   her if you want to, or Mr. Kane may call her if he wants

17   to.

18             MR. SHAFFER:  I -- one of my other items

19   was that I would like to present an e-mail from a

20   witness on my witness list.  And it serves as kind of

21   a --

22             MR. KANE:  Just so you know, I would have

23   an objection to that.  If he has a person on his witness

24   list, he should call the witness and not present an

25   e-mail if I'm not going to be cross-examine the author



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 433

142

1    of the e-mail.

2                ARBITRATOR:  Would it be possible to call

3    her?

4                MR. SHAFFER:  It's a him.  It just refers

5    to a statement Mary made about Jan Krug, and I thought

6    it was pertinent.  And it also gives you an indication

7    of the kind of environment that the financial advisors

8    were living in there.

9                CHAIRMAN:  Mr. Kane, are you going to have

10   any witnesses by phone?

11               MR. KANE:  I don't know yet.  I'll know

12   better once Mr. Shaffer finishes his case.  I suspect

13   not, but I don't know for sure.

14               CHAIRMAN:  It is true that if you call a

15   witness, the other side should have the opportunity to

16   cross-examine them.  And that's why we do sometimes --

17   well, more than sometimes, permit telephone testimony

18   even though we missed the body language which is

19   sometimes useful.  But an e-mail doesn't really permit

20   that cross-examination.

21               MR. SHAFFER:  Yeah.  And that's the reason

22   I put this gentleman on my witness list because it would

23   certainly be possible to call them and verify that they

24   made this statement.  It's basically just a statement

25   about a comment Mary made regarding Ms. Krug.  I think



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 434

143

1   it's pertinent to all the items being discussed.

2              CHAIRMAN:  And you're not inclined to call

3   Mary as a witness; is that it?

4              MR. KANE:  He didn't list her as a witness.

5              CHAIRMAN:  Actually, we did not receive his

6   witness list, or I didn't.

7              MR. KANE:  It was attached to the

8   counterclaim.

9              CHAIRMAN:  Okay.  So I'm afraid that we

10  can't submit that.

11             MR. SHAFFER:  The other thing I would like

12  to raise, Mr. Reece, is if Mary is a witness, wouldn't

13  something that gave us an insight into her character or

14  motivation be within my rights?

15             CHAIRMAN:  Who is "her"?

16             MR. SHAFFER:  Ms. Mortensen.

17             ARBITRATOR:  If she's called as a witness,

18  then you may cross-examine her.

19             MR. SHAFFER:  Could I then present an

20  e-mail stating her --

21             ARBITRATOR:  Is she on your witness list?

22             MR. SHAFFER:  I meant the person who --

23             ARBITRATOR:  Ms. Mortensen?

24             ARBITRATOR:  No, but if she has been

25  brought here to be a witness and she is called as a



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 435

144

1    witness by the claimant, then he has a right to

2    cross-examine her.

3              CHAIRMAN:  And depending on what she says,

4    your e-mail may be admitted or may not be admitted.  But

5    if it is admitted, it would be admitted as an

6    impeachment.

7              MR. SHAFFER:  I just think that's a real

8    nice character reference.  So we'll save that for later.

9    Can I go on to one other point you wanted to make?

10             CHAIRMAN:  Before you do, I would like

11   to -- and I'm violating my own admonition not to

12   interrupt.  You first took us to this Wells Fargo I

13   bonus note that Jan Krug is said to have created.  Do

14   you want to look at that?

15             MR. SHAFFER:  If I can find it.

16             ARBITRATOR:  It says "009" at the bottom.

17             MR. SHAFFER:  Well, let's assume I'm

18   looking at it.

19             CHAIRMAN:  Well, the last sentence of this

20   I was wondering about.  "Formal written warning status

21   will be discontinued as of June 1, 2009."  Did you

22   receive any further formal written warning after June of

23   2009?

24             MR. SHAFFER:  Yes, I did, both August and

25   September.  And I have those e-mails somewhere.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 436

145

1   Remember, August was the month I was put on written

2   warning -- well, I was put on written warning at the end

3   of August for September, which was the reason I was

4   trying to make sure that I made their imposed minimums.

5           And the reason I was put in written warning

6   in August was for missing my sales goal that happened to

7   be the same month when I brought in a million dollars in

8   new money to the Wells Fargo mutual fund family.

9           Again, all of it -- it's C shares.  And the

10  C shares in one fund, if the one fund was over $500,000,

11  generate no commission at all.  So half a million at one

12  percent, it's all money that goes to the firm and

13  benefits the firm.  And there's an ongoing benefit, as

14  well.  But they don't look at it that way.  They look at

15  it as what have you done for me this month.

16          CHAIRMAN:  Now, with regard to the sentence

17  that I read, which was the last sentence of this e-mail,

18  has anyone told you or have you learned from any source

19  what the meaning of that statement is or the reason for

20  it or the policy or practice with regard to formal

21  written warnings?

22          ARBITRATOR:  The statement that no formal

23  warnings --

24          CHAIRMAN:  Formal warnings will be

25  discontinued as of June 1, 2009, what does that mean?



EShQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 437

146

1          MR. SHAFFER:  That's because I was on

2     formal written warning and I achieved the minimum levels

3     of commissions, again, I feel ethically, or else I won't

4     do it.

5          ARBITRATOR:  So in your mind, this didn't

6     mean that you would not receive a written warning again?

7          MR. SHAFFER:  No.  It meant I was off

8     written warning at the time.  Was that the one where she

9     said, "By the way, your minimums are $30,000 a month

10    instead of $20,000."

11         CHAIRMAN:  Thank you.  You wanted to go on

12    to another area.  Where was that?

13         MR. SHAFFER:  I did.  Exhibit 11, which is

14    almost -- it's exactly in the middle.  And at the

15    bottom, you'll see -- this is also something I received

16    from the Kane and Fischer package.  You've got -- it

17    says "W0115" at the bottom, Exhibit Number 11.  Have you

18    got that?

19         Well, again, now, this says "key business

20    objectives and target, feedbacks and coaching".  And you

21    can see that one, if you go down to the lower part, it

22    says "compliance and trade errors, number two".  Let's

23    start with the first part.  I'm sorry.  I'm jumping

24    around.

25         So under number two, "Complaints and Trade



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 438

147

1    Errors", the first item, maintain a satisfactory client

2    rating of less than three sales practices, complaints

3    annually.  So I had -- if you consider the complaint

4    that I don't think it's a true complaint and didn't

5    forward, if you consider that a complaint, that's one

6    complaint I had.

7                And if you look down below, it says

8    "ongoing year-end and dates complete".  It says "number

9    one, no issues".  So I had no issues with complaints or

10   trade errors at that point.  And right here, it says

11   "Maintain a satisfactory complaint rating of less than

12   three sales practices complaints annually."

13               It's in their own employee manual and they

14   fired me for one, again, that I don't believe was a real

15   complaint or wasn't a verifiable complaint.  So that's

16   still in line with the wrongful termination, I believe.

17               I also have another -- I feel the

18   situation, the other situation with the supposed

19   overcharging of my client, the Winnegers, I would refer

20   to as a trade error.

21               And I also have -- and I'd have to find it,

22   but trade errors are not a reason for termination.  It

23   says that trade errors will come out of your payment

24   unless you, you know, ask for it to be reconsidered.

25   So, again, that's the end of my wrongful termination



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 439

148

1    issues.

2              CHAIRMAN:   Okay.   Does that, then, cover

3    your cross-complaint?

4              MR. SHAFFER:   Oh, I could explain some

5    more.   No, I think --

6              CHAIRMAN:   By my recollection, you have

7    covered promissory note, wrongful termination, the U5

8    withholding of disability benefits, and withholding of

9    commissions.   In addition, promissory estoppel, the next

10   two items were not -- were not noticed and were not

11   permitted.

12             MR. SHAFFER:   Then that would be it on

13   those items.

14             CHAIRMAN:   So are you in a position to rest

15   your case?   In other words, "I rest" meaning I have no

16   further evidence to produce.

17             MR. SHAFFER:   If I wanted to talk about

18   damages in this situation --

19             CHAIRMAN:   That would be part of your

20   closing.   Well, wait a minute.   You need to present

21   evidence of what damages you have suffered as a result

22   of these allegations, for example, the wrongful

23   termination would be an example, the promissory note

24   that is claimant -- and this is your response to that

25   claim.   The U5 libel and slander claim, and I suppose



ESQUIRE
an Alexander Gallo company

EXHIBIT X  Page 440

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Arbitration                                    March 18, 2011

149

1    you can talk about withholding commissions and

2    withholding disability benefits under the subject -- or

3    in the subject of damages.

4                MR. SHAFFER:  I'd like to do that.  And let

5    me find -- while I talk about damages, hold on a second.

6    Does anyone need to take a break, by chance?

7                CHAIRMAN:  Yeah.  Let's -- although we've

8    had a break, but if you would like one to find where you

9    want to go, that's certainly appropriate.

10               MR. SHAFFER:  I'd like one.

11               CHAIRMAN:  Okay.  Let's take five minutes.

12   Off the record.

13               (Thereupon, a break was taken.)

14               CHAIRMAN:  Okay.  Mr. Shaffer, you were

15   going to present testimony regarding damages.

16               MR. SHAFFER:  Please.  And if this

17   information is my booklet, but the exhibit that I'll be

18   referring to is Number 9, and it's a Social Security

19   wage statement.  I thought you might need that to verify

20   what my full wages were beyond the period that Mr. Chung

21   had --

22               ARBITRATOR:  Why don't you wait until we

23   get to that page?

24               MR. SHAFFER:  Exhibit 9 is a Social

25   Security wage statement.  It shows my wages actually



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 441

150

1   back to high school days.  Those are exclusively and

2   only from my brokerage firm activities.  As I mentioned,

3   I joined Drexel, Burnham, Lambert when I was 24.  This

4   was the only career I've ever had.  Referring to Exhibit

5   Number 9 --

6            ARBITRATOR:  What year was that?

7            MR. SHAFFER:  Those are for all years up to

8   2003.  Hopefully it wasn't a whole year, because I only

9   made $6,880.  Then I jumped to 16 and 35.  That was good

10  money in '83.

11           Throughout this whole period, I tried to do

12  the best thing for the client.  And I always felt

13  disappointed if I got put in a situation where I wasn't

14  doing the best thing for the client.

15           But Mr. Chung had asked about my

16  productivity at previous firms.  If you recall in their

17  discovery requests, he asked me how much I had made

18  under management at previous firms and so on.

19           And if you'll look at Exhibit 8, from my

20  employment at brokerage firms since 1979 without

21  interruption, you'll see my income, my five-year income

22  average up to the time I joined Wells Fargo was slightly

23  over $93,000 a year.  My earnings while I was at Wells

24  Fargo averaged $78,000 a year.

25           And, you know, I just took the basic



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 442

151

1    numbers and didn't take it beyond the first couple of

2    places.  So all of these numbers are.

3                    CHAIRMAN:  Are you referring to a chart?

4                    MR. SHAFFER:  Yeah.  It's just Social

5    Security wages in case you wanted to verify that.

6                    MR. KANE:  It only goes to 2003.

7                    MR. SHAFFER:  Mr. Chung had demanded that I

8    provide that information beyond that point, so that is

9    in my package that I provided from 2004 and 2005.

10                    MR. KANE:  I'm asking if there's a document

11   in here we should be looking at.

12                    CHAIRMAN:  Did you have a copy of that

13   which you provided Mr. Chung?

14                    MR. SHAFFER:  I may have.

15                    CHAIRMAN:  Because this only goes up to

16   2003 and I don't see any chart of average earnings.

17                    MR. SHAFFER:  Right.

18                    CHAIRMAN:  Although you've testified to

19   what that average is.

20                    MR. SHAFFER:  I have part of that

21   information that I provided to Mr. Chung about my

22   earlier earnings.  Why don't I tell you what I earned

23   and we'll see if it matters.

24                    ARBITRATOR:  We're not seeing anything past

25   2003, so that's why we're asking.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 443

152

1              MR. SHAFFER:  Like I said, I already

2      provided this -- I may have a copy of the information I

3      provided.  But I provided all that to Kane and Fischer

4      as part of their demand that they were going to -- we

5      had the conference call regarding my cooperation with --

6              CHAIRMAN:  Do you have it at home, or --

7              MR. KANE:  It's not at --

8              MR. SHAFFER:  My home is two hours away.

9              ARBITRATOR:  Can your wife fax it to us,

10     please?

11             MR. SHAFFER:  Can you check that out?  I

12     provided the information to them.

13             MR. KANE:  I'm not saying he didn't provide

14     the information.  It's just not in my book.

15             MR. SHAFFER:  I got certain years right

16     here.  I've got my Wells Fargo W-2s here for 2007, '8

17     and '9.

18             CHAIRMAN:  What are those numbers?  If you

19     want, you can testify from that.  Well, you testified

20     what the Wells Fargo earnings for '7, '8 and '9 were.

21             MR. SHAFFER:  Do you want the exact

22     figures?

23             CHAIRMAN:  Yes.

24             MR. SHAFFER:  Okay.  For 2009, $67,074

25     Social Security wages 397 -- so 68 or 69.  And for 2008



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 444

153

1  was $69,994 and 2007 was $77,900.

2            CHAIRMAN:   $77,900.

3            MR. SHAFFER:  Yeah.  Some amount.  But my

4  average earnings while I was at Wells Fargo was $78,000

5  okay.  My average earnings while at the Bank of America

6  brokerage division was in excess of $140,000.  That's

7  the information on the Social Security statement.

8            ARBITRATOR:  What years were they?

9            MR. SHAFFER:  That's why I also attached --

10           ARBITRATOR:  Because that should be in this

11  record here.

12           MR. SHAFFER:  Oh, wait.  And here is my

13  response to Kane and Fischer --

14           ARBITRATOR:  For example, in 1999, your

15  taxed Medicare earnings was $222,000.

16           MR. SHAFFER:  Right.

17           ARBITRATOR:  And in '98, 159, and in '97,

18  97.

19           MR. SHAFFER:  Right.  That was my average

20  during the period I was at Bank of America.  And I think

21  I attached a FINRA -- let me find it in the very back.

22  I have a FINRA record of my employment.

23           ARBITRATOR:  Do you recall what years you

24  were at Bank of America?

25           MR. SHAFFER:  Yeah.  It was '90 -- in fact,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 445

154

1    I thought Mr. Kane had gone over that earlier.  He had

2    the records.

3                   ARBITRATOR:  He did.  But it's --

4                   MR. SHAFFER:  In fact, if I could find

5    those, it was in '92 to '99, I believe.

6                   ARBITRATOR:  You left in 2000.

7                   MR. SHAFFER:  I left in '99.  I thought I

8    copied that FINRA record of my brokerage employers.  But

9    wait a minute.  Where is the information that Mr. Kane

10   presented this morning?  Because it had a whole

11   timeline.

12                  It's in the binder.  Yeah.  Let me look at

13   this real quick and I can tell you exactly where I was

14   and what dates.  And, again, I already provided the

15   information about my income from 2004 based on the

16   questions that they had asked.

17                  ARBITRATOR:  Do you know what tab it was?

18                  CHAIRMAN:  I think he said it was Tab 1.

19                  MR. KANE:  Exhibit Tab 1 would be your U4.

20                  MR. SHAFFER:  Remember you were asking me

21   about my --

22                  MR. KANE:  With 132?

23                  MR. SHAFFER:  W132 at the end.  I was at

24   Wells Fargo Investments -- excuse me -- Bank of America.

25                  ARBITRATOR:  From '93 to '99.



# ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 446

155

1          MR. SHAFFER:  Exactly, 1993 to 1999.  And

2  my average income, see, that's all reflected in those

3  Social Security wages.  My average income during that

4  period was $142,000 a year.

5          So my average while I was at Bank of

6  America, which I know it doesn't make any difference,

7  I'm just setting the stage here, was in excess of

8  $140,000.  My ten-year average the last ten years is

9  $91,000.

10          I have been effectively barred from the

11 brokerage business after 30 years of service by Wells

12 Fargo without a serious client complaint or ethical

13 issue.  My lost income costs will be over $910,000 over

14 the next ten years based on my previous ten-year

15 average, which had been affected by market turbulence

16 and my own health issues.  If you consider the

17 additional cost of healthcare and other benefits, my

18 actual damages are over $1 million.

19          Over the first several months of my

20 unemployment, I realized I would likely have to find

21 employment in another industry and have applied for

22 numerous positions utilizing the skills that I have.  I

23 have not been able to procure even one interview for

24 consideration outside my field.

25          I have even been rejected by e-mail twice



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 447

1  by US Bank when I applied for a branch manager, a bank

2  manager position, which at one point I would have said

3  "I'm not going to do that. I make twice as much as a

4  branch manager." But, again, when I'm barred from the

5  business I have experience in, I thought, "Well, I could

6  be a great bank manager. I've been selling financial

7  products for 30 years."

8             I got two rejections by e-mail for US Bank

9  branches in my own area where I live so my -- I think I

10  might have some connections in the community or

11  something. After 30 years in the financial services

12  business and over a decade of bank experience, I cannot

13  even get a face-to-face meeting.

14             I've opened an account on Monster, records

15  available on request. I've attached the records at the

16  end of this information, but it doesn't matter. And I

17  have been rejected by e-mail or never even heard back.

18  I think because of the high number of job seekers and my

19  age of 56, I'm excluded from consideration.

20             And for a long time, my resume said "I

21  would like to apply my 30 years of experience in the

22  brokerage business to this new and exciting

23  opportunity." And I realized, well, as soon as I say

24  30 years of experience, they know they're dealing with a

25  50-year old. Maybe that's why I never get called back.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 448

157

1          Also affecting my job search are laboring

2    respiratory problems that cause me to cough and clear my

3    throat.  Today has been an excellent day.  I hope that

4    it continues.

5          If that throat condition was considered a

6    disability from the brokerage business -- and, again, I

7    don't think you have to have a total disability in the

8    brokerage business to be out of business, because

9    whereas a $300,000 or $400,000 producer has a job, a

10   $200,000 producer doesn't have a job in this market

11   anymore.

12         So if something affects your productivity

13   by 50 percent, I think you're out of business.  So if

14   you consider my respiratory problems a long-term

15   disability, the coverage for the program available

16   outlined in Exhibit 8, the short-term and long-term

17   disability would have had a value of $1.2 million.

18         Many of the infractions of California labor

19   law which Wells Fargo has committed call for treble

20   damage considerations and an award.  This application

21   would suggest that a damage award of approximately

22   $3 million would be appropriate.  I know my damages I

23   had listed at $1 million and paid the fee.  Basically,

24   that's all I could afford at the time.  But that was a

25   suitable amount of damages.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 449

158

1          At this point, though, I've got a lot more

2     information and better information.  And it turns out

3     that I am effectively barred from the brokerage

4     business, especially in the capacity I was employed at.

5     And so if you take that $91,000 10-year average and

6     consider it over the next ten years, that's $900,000 in

7     benefits, not including healthcare benefits or other

8     benefits.

9          So I would think that the application that

10    calls treble damages as many of these infractions would

11    suggest an award damage of approximately $3 million.

12    There are also issues which have caused me pain and

13    suffering as well my family for which there can be no

14    financial recovery.  And if I had a million dollars, I

15    would gladly pay it not to see my wife go through this

16    now for the last year.

17          And, again, especially in as much as

18    California employment law prohibits demanding amounts

19    from a promissory note upon termination, I just don't

20    understand why Kane and Fischer, Mr. Kane and Mr. Chung

21    are pushing this whole issue.  And I'd also like to make

22    a note that my complaint is a counter-complaint.

23          CHAIRMAN:  Any other testimony,

24    Mr. Shaffer?

25          MR. SHAFFER:  Well, I have some other



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 450

159

1  stuff.  Again, you know, you tell me if you've heard

2  enough.

3          The other thing I'd like to draw your

4  attention to regarding my health situation is extensive

5  medical notes.  In fact, on the conference call, one of

6  the ladies suggested I get my medical records and I did,

7  indeed.  And I copied most of them.

8          I didn't copy the ones about my cholesterol

9  readings or something I had removed from my eye.  But

10 you can review those notes on repeated visits I had to

11 the doctor, and basically, I have had a respiratory

12 problem which has affected my productivity, although

13 again, I think it's pretty good in light of all the

14 variables involved.

15         And again, they made absolutely no type of

16 adjustment or any kind of consideration for that fact.

17 And the Americans with Disabilities Act does suggest

18 that your employer should make some kind of concession

19 or adjustment for a health problem.

20         MR. KANE:  I've tried not to object, but he

21 has not raised any of this in his counterclaim,

22 Americans with Disabilities Act, any of that.  I've been

23 trying not to object, but I have to object.  If it's not

24 in the counterclaim, I'm not able to defend against it,

25 and I object to eliciting testimony.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 451

Arbitration                                    March 18, 2011

160

1           CHAIRMAN:  Are you talking about the ADA?

2           MR. KANE:  That's right.  It's not in

3    there.  And if he tried raise such a claim, we didn't

4    consent to it.  In the FINRA code, in our response, Rule

5    13201 in the FINRA code says, "A claim of any type of

6    discrimination is not required to be arbitrated under

7    the code, only if the parties have agreed to arbitrate

8    it."  We simply don't agree to arbitrate that, so it's

9    not before the panel.

10          CHAIRMAN:  That's sustained as to the ADA.

11          MR. SHAFFER:  I understand.  I do have one

12   other issue that's part of what I think we're talking

13   about here --

14          CHAIRMAN:  Go ahead.

15          MR. SHAFFER:  -- regarding what a previous

16   employer can tell a new employer.  Is that something

17   that we can discuss?  I have reason to believe that

18   Ms. Mortensen made derogatory comments to someone I was

19   interviewing with for another bank position.

20          CHAIRMAN:  You can give testimony to what

21   you've said or what has been said to you.

22          MR. SHAFFER:  Okay.  Please let me do that.

23          MR. KANE:  I'm going to object.  His only

24   libel and defamation claim relates to the U5.  We asked

25   him to state the basis, any other basis.  This is the



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 452

161

1   first time I've heard of that, and I don't think he

2   should be allowed to do it.

3            CHAIRMAN:  You're proposing to state

4   something that was said to a potential employer by you

5   think Ms. Mortensen?

6            MR. SHAFFER:  Right.  Which is employment

7   law or regulation -- is called A1050.  I don't know what

8   she said.

9            MR. KANE:  My position is, one, that he's

10  adding to his defamation claim now and that he's doing

11  it during the day of the hearing.  That's not

12  appropriate.  That's number one.

13           Number two, we asked in discovery for

14  everything that related to his claims of defamation and

15  slander.  It's not in any of his answers to discovery.

16           MR. SHAFFER:  I was not aware of it.

17           MR. KANE:  So I'm being blindsided at the

18  last second.

19           Third, it's apparently someone who I don't

20  know who is not here, so I'm not going to have the

21  ability to cross-examine about what was said to him.

22  And that's not just hearsay, because I know the formal

23  rules of hearsay don't apply.  I'm not going to have an

24  opportunity to cross-examine the person.

25           He didn't identify it in discovery.  He



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 453

162

1    didn't identify the person in his 20-day exchange.  And

2    for all of these reasons, we've given -- I have given

3    him a lot of latitude and this is going too far.

4              CHAIRMAN:  Yeah.  And I think it was

5    demonstrated during this conference call that anything

6    that was not provided to the other side could very well

7    not be admitted in evidence.  And I think this does fall

8    into that category.  So the objection is sustained.

9              MR. SHAFFER:  The other thing I'd like to

10   bring up if I could is I received a lawsuit -- a

11   settlement of a lawsuit against Wells Fargo for

12   underpayment.

13             CHAIRMAN:  That's irrelevant.

14             MR. KANE:  I'm going to object to that as

15   well.

16             MR. SHAFFER:  Which I did not respond to

17   because of this issue.  I didn't want to sign off my

18   rights on something.

19             CHAIRMAN:  I'm sorry.  You received what?

20             MR. SHAFFER:  Settlement of a lawsuit

21   against Wells Fargo.

22             CHAIRMAN:  And you were invited to be a

23   participant?

24             MR. SHAFFER:  I am a participant.

25             CHAIRMAN:  You are?



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 454

Arbitration                                    March 18, 2011

                                                          163

1              MR. SHAFFER:  But it's this whole thing

2       that goes around the brokerage business about not

3       getting breaks or lunch breaks or rest breaks.

4              MR. KANE:  None of that has anything to do

5       with this.

6              MR. SHAFFER:  I wanted to say I did not

7       participate in that because I did not want to release

8       Wells Fargo from liability.

9              CHAIRMAN:  Now, I notice that you have

10      introduced a number of pages of labor law, or submitted.

11             MR. KANE:  I object to those as well.

12      Because, again, he hasn't listed those.  That wasn't

13      part of his counterclaim.

14             MR. SHAFFER:  Yes, I did.  I listed the

15      provisions.  These are all --

16             MR. KANE:  I'm looking at the counterclaim,

17      Mr. Chairman.  And perhaps I could be --

18             MR. SHAFFER:  I listed the California --

19      remember, we talked about that on the conference call.

20      You suggested that I list the items of California labor

21      law that I wanted to bring up, and I did.

22             And how in the world could anyone argue

23      against bringing up California labor law in a labor-type

24      situation?  That's just basic, isn't it?

25             MR. KANE:  You have to plead what you're



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 455

164

1    claiming was violated and that wasn't in his answer and

2    wasn't in his counterclaim.

3            CHAIRMAN:  I'm going to overrule the

4    objection, because he did refer to labor laws, and he

5    has in his testimony.  And I think it's fairly common

6    when an attorney, or he's pro se, when a law violation

7    is being proposed as part of a position, that copies of

8    that law be provided to the panel.  And I take that to

9    be what he is doing.

10            MR. KANE:  Understood.

11            MR. SHAFFER:  Thank you.

12            CHAIRMAN:  So Mr. Shaffer, I guess back to

13   my previous question, do you have any further testimony?

14   You provided damages.  You've provided the several

15   subject issues that you identified with the exception of

16   two, which were not permitted.  Anything else, sir?

17            MR. SHAFFER:  Do you think it's appropriate

18   that I should suggest something which I view as the

19   firm's example of overcharging.  And the reason why we

20   bring that up is your earlier comment that items

21   discussed here could possibly initiate a referral for

22   violation.

23            Would you like me to talk about something

24   that I think Wells Fargo does that's illegal.

25            MR. KANE:  Mr. Chairman, that's not what



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 456

165

1    the purpose of this arbitration is about.

2              CHAIRMAN:   Right.   We're here to consider

3    the claim of Wells Fargo which principally is the

4    promissory note and the terms within.   And your

5    counterclaim for wrongful termination, U5 and the other

6    several other issues.   We're not here to discuss

7    policies of Wells Fargo as they relate to items not

8    included in the claim or counterclaim.

9              MR. SHAFFER:   But the only other problem I

10   have on that is would you like me to suggest a reason

11   why I was given the payroll document that showed my

12   promissory note as pay rather than a loan?

13             CHAIRMAN:   If you have testimony that is --

14   that goes to the character of the documents that you

15   signed.

16             MR. SHAFFER:   No.   This is just -- I think

17   the reason they listed it as pay is because then they .

18   can fraudulently deduct it as a taxable event for them.

19             CHAIRMAN:   You have pointed out the word

20   "pay", and also it has been pointed out that that's been

21   characterized as a note and a loan and not a payment or

22   a bonus.   I think the panel understands that those

23   phrases and words have been introduced in connection

24   with those documents.

25             MR. SHAFFER:   And if it matters, the loan



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 457

166

1  amount, supposed loan amount has been categorized as pay

2  in Wells Fargo's own documents.

3           CHAIRMAN:  That you can argue.

4           MR. SHAFFER:  You're aware of that.  It has

5  and, again, if you want to bring that up or --

6           CHAIRMAN:  You've testified to that.  And

7  you can argue it when we do the argument, which we'll be

8  doing tomorrow, not incidentally, I think.

9           MR. KANE:  I think so.

10           CHAIRMAN:  So anything else, Mr. Shaffer,

11  that you want to offer in evidence?  And, again,

12  understand that is not argument.

13           MR. SHAFFER:  Pertaining to the subject

14  matter; right?  No, I think that about does it.

15           CHAIRMAN:  And by that, do I interpret you

16  to rest, which is a magic legal term.

17           MR. SHAFFER:  I do.

18           CHAIRMAN:  Now, Mr. Shaffer -- or rather

19  Mr. Kane wanted to introduce -- or has the opportunity

20  to present evidence that would be contrary to your

21  counterclaim.

22           MR. KANE:  And I guess before I do that, at

23  this point in time, under the FINRA -- the new FINRA

24  rules, 13504 regarding motions to dismiss, this is the

25  only time that we have an opportunity to present such a



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 458

1    motion to dismiss.

2                And I would like to do that at this time on

3    the basis that all of the things that Mr. Shaffer has

4    presented do not either factually or legally present the

5    claims for wrongful termination, for withholding of

6    commissions or libel, slander and the promissory note as

7    a bonus.  And the legal argument is --

8                CHAIRMAN:  Let me clarify.  You are making

9    a motion to dismiss certain issues?

10               MR. KANE:  All of his counterclaim.  His

11   entire counterclaim.  His first basis was that the

12   promissory note was a bonus.  And then his argument

13   under the California labor code regarding the lump-sum

14   payments, which he misstated.

15               Clearly, he accepted the terms of this

16   loan, where it is indicated that it was a promissory

17   note.  That's established in our Exhibit Number 5.  But

18   even more importantly, prior to that time, he signed two

19   offer letters where it indicated that what he was going

20   to receive was not a bonus, it was going to be a loan.

21   And clearly, it was -- is stated in there.

22               In addition, despite all of the things that

23   Mr. Shaffer has indicated, the California Labor Code

24   under Section 1625, basis for contract law is simply

25   undeniable, that the execution of a contract in writing,



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 459

168

1   whether the law requires it to be written or not,

2   supercedes all negotiations or stipulations concerning

3   that matter.

4          That pertains to his argument, very -- not

5   very strongly argued that somehow misrepresentations

6   were made to him ahead of time regarding the I guess

7   $15 million in assets.

8          Also we saw in the offer letters that he

9   received, he specifically acknowledged in two that he

10  signed that no representations had been made to him

11  about books of business, assets, et cetera.  He clearly

12  signed those two offer letters.  And that was repeated

13  again in the promissory note that he signed, which

14  indicated that he was not relying on any oral

15  representations, or more importantly, under California

16  law.  And we cite this at page 6, the note that he

17  signed.

18          CHAIRMAN:  Page 6?

19          MR. KANE:  Page 6 of the response to

20  counterclaim.

21          CHAIRMAN:  Go ahead.

22          MR. KANE:  At the bottom, that under

23  California law, and we specified the Shamlin case,

24  parties may contract for anything that is not illegal or

25  against public policy.  And that's clear.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 460

169

1          And we cited California law at page 7 that

2     indicates that parties should adhere to the terms of

3     their contract.  When a person with the capacity of

4     reading and understanding an instrument signs it, he's,

5     in the absence of fraud and imposition, bound by its

6     contents and is estopped from saying the provisions are

7     contrary to his or her intention.

8          So as it relates to the arguments under

9     promissory note, we believe that it's clear that nothing

10    is misrepresented about the terms of these loans.  More

11    importantly, as indicated in California law, there is

12    very specific requirements to meet what would be, if he

13    was fraudulently induced to join these.  And we set

14    forth the elements at page 8, that some false

15    misrepresentation was made, none of the falsity,

16    reliance and resulting damage.

17         Clearly, he can't say he had any

18    justifiable reliance on any of this was because he was

19    told that it was going to be a loan, not a bonus.  He

20    was told that he was not relying on any promises,

21    whatever.

22         Moreover, he accepted the loan after

23    18 months after he already joined the firm.  The loan --

24    he started in '06 and received the loan in January of

25    '08.  So that's long after these supposed



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 461

170

1    representations were made.

2              As it relates to the wrongful termination

3    claim, very clearly spelled out in the documents as to

4    the reason that he was terminated and the documents

5    clearly show that it was only after a flag came where he

6    was indicated as having charged excess commissions over

7    the schedule.

8              This is in Exhibit 10, that he was called

9    on the carpet for it, to explain this.  And the

10   explanation that he gives is one that should cause the

11   hair on the neck of any compliance officer to raise.  "I

12   thought gouging was part of our business plan."

13             If you, as a compliance officer, see that

14   the person has charged excessive commissions and then

15   get an e-mail explanation that says "I thought gouging

16   was part of our business plan".  Contemporaneous with

17   this Exhibit 9, which is clearly a complaint, "My

18   attorney will contact you next, I'm pissed you got me

19   into this", if that's not a grievance of a person, I

20   don't know what more a customer could say.  He admits

21   that he didn't report that.  He admits that he knew what

22   the compliance manual said about his reporting that.

23   And it's those two items that certainly were appropriate

24   for dismissal.

25             But keep in mind, he was an at-will



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 462

171

1    employee.  He could be dismissed for any reason.  He

2    could be dismissed for low production.  He could be

3    dismissed for any reason whatsoever.  But, clearly,

4    there was an appropriate basis under which he was, in

5    fact, terminated.  So clearly, there's nothing wrongful

6    about this termination.

7              As it relates to the defamation, under

8    California law, U5s are absolutely privileged.  We set

9    that forth at page 15 of our response to counterclaim.

10   California law extends an absolute privilege against

11   defamation claims arising out of statements contained in

12   a Form 5, because a Form 5 is a communication made in

13   anticipation of the bringing of an action or other

14   official proceeding.

15             And it's Fontani versus Wells Fargo that

16   says U5s are protected from liability under the

17   California Civil Code Section 47C.  We placed that in

18   our document response to the counterclaim.  I just want

19   to make sure.

20             CHAIRMAN:  What exhibit is that again?

21             MR. KANE:  It would be page -- it's not an

22   exhibit, but it's pages 15 and 16 of our response to the

23   counterclaim, the Fontani versus Wells Fargo case.  It's

24   a 2004 case.

25             MR. SHAFFER:  Can we have a quick point of



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 463

172

1   of clarification?

2                ARBITRATOR:   A question?

3                CHAIRMAN:   Because you're going to be able

4   to argue against his motion.

5                MR. KANE:   As it relates to the claim of I

6   guess it's the withholding of commissions, under his own

7   testimony, what he's referring to is if there's a

8   licensed banker who had a Series 7 license that referred

9   him business, so he's not the originator of the

10  business.

11               It's a licensed banker referring him

12  business.   But for the licensed banker, he wouldn't get

13  that business, that he had to split the commissions with

14  that licensed banker 50/50 I think he said for one year.

15  There's nothing wrong, there's nothing illegal about

16  that.   There's no legal basis.   It's done all the time.

17               As it relates to his claim of damages, as

18  we indicated, damages can't be based on speculation.

19  For him to compare his earnings, what he did in 1992 to

20  1999 and say therefore I've been damaged because my

21  average was whatever it was, it is not an appropriate

22  measure of damages.   Market conditions, everything

23  factors into that, and this is not the appropriate way

24  to prove damages.

25               More importantly, damages never come into



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 464

1  play here unless Wells Fargo did something wrong.  We

2  don't even get to the issue of damages unless Wells

3  Fargo did something wrong.  What I've indicated here

4  based on his claim, Wells Fargo did nothing wrong.  It

5  did not wrongfully terminate him.  It did not withhold

6  commissions.  It did not wrongfully describe this

7  promissory note as a bonus plan.  And it did not libel

8  or slander him on the U5.

9          Not only is the U5 privileged, the

10 statements that are contained there are completely

11 accurate.  The documents show that they were completely

12 accurate.  That happened.

13         He admitted that he adjusted the

14 commissions upward and that they should have been a

15 lower amount.  He admitted he did not report that

16 customer complaint.  He says it's not a complaint.  But

17 he did not report it to his supervisor as required.  So

18 the statements that are contained on the 5 are

19 completely accurate.

20         His counterclaim must be dismissed.  Wells

21 Fargo shouldn't be placed to the burden of presenting

22 any evidence against charges that are not supported

23 factually or legally.  The counterclaim should be

24 dismissed now.  Wells Fargo should present its

25 attorney's fees and ask for an award on the promissory



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 465

174

1    note at the conclusion of the hearing.

2              CHAIRMAN:  Okay.  Mr. Shaffer, you can

3    argue against the motion to dismiss your counterclaim.

4              MR. SHAFFER:  Well, I have several reasons

5    to be observed about those statements.  The first one is

6    that, you know, that the counterclaim evidence that

7    Mr. Kane was reading was from Mr. Chung.  That's

8    Mr. Chung's work.  I'm wondering if that's even

9    applicable since Mr. Chung is not here.

10             CHAIRMAN:  It's appropriate.

11             MR. SHAFFER:  Okay.  Well, the thing is

12   Mr. Kane suggested that I had misquoted the code that

13   says that you cannot demand repayment of a promissory

14   note when you terminate the employee.  And I did not

15   misquote it.  And it's in my presentation material.  I

16   can find it if you'd like.  But we've already gone over

17   that.  But I quoted it exactly as stated.

18             It simply says that you cannot demand

19   repayment of a promissory note if you terminate the

20   employee even if they have already signed an agreement

21   agreeing to that.

22             CHAIRMAN:  And you were referring to what?

23             MR. SHAFFER:  I'm referring to his argument

24   that --

25             CHAIRMAN:  Are you referring to California



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 466

175

1   law?

2               MR. SHAFFER:  Yeah.

3               CHAIRMAN:  And where is that?

4               MR. SHAFFER:  Let me find it, because it's

5   here.  The other thing is Mr. Kane referred to me as an

6   at-will employee that can be fired for any reason.  And,

7   also, the employment code shows that once I had entered

8   that contract of adhesion as it's defined, that I no

9   longer was an at-will employee.  I ceased to be an

10  at-will employee at that point.  And he mentions that.

11              CHAIRMAN:  And where do you get that

12  argument?

13              MR. SHAFFER:  That is --

14              CHAIRMAN:  What's the basis for that

15  argument?

16              MR. SHAFFER:  The basis is in my original

17  presentation material.

18              ARBITRATOR:  It's on the first page of the

19  issues, I think.

20              CHAIRMAN:  Under "Promissory Note".

21              MR. SHAFFER:  Yeah, that would be in the

22  promissory note.  And, again, let's review the -- was it

23  Section 11.2.5, real quickly, as far as misquoting that.

24  And these are -- I tried to put these in order of the

25  numbers.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 467

176

1          ARBITRATOR:  The third paragraph under

2   "Issues, Promissory Note", is where he quoted the

3   adhesion.

4          CHAIRMAN:  But did you provide a copy of

5   that law?

6          MR. SHAFFER:  Yes, I did.  And it's Section

7   11.2.  Darn it.  When you flip through the copies of the

8   statutes or whatever you would refer to them to, it's

9   Number 11.2.5.  And it's within that section -- the one

10  after it has a June 2002 --

11         ARBITRATOR:  Division of Labor Standards

12  Enforcement.

13         CHAIRMAN:  I didn't see 11.2.

14         ARBITRATOR:  I didn't see that, either.  I

15  see the section.

16         MR. SHAFFER:  I can show you mine if you'd

17  like to.  It's -- let's see.  The one before it is -- it

18  says it's 32.2.4.  And the one after it is 26.

19         ARBITRATOR:  11.2.5?

20         MR. SHAFFER:  Yeah, that's, what, probably

21  ten pages total there?

22         ARBITRATOR:  Yeah, I see it.

23         MR. SHAFFER:  Okay.

24         CHAIRMAN:  Okay.  Go ahead.

25         MR. SHAFFER:  It simply says "I don't



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 468

1    understand why Mr. Kane would say I misquoted it."   It

2    says the court -- the deductions made by the employer

3    with the written consent of an employer made for loans

4    by the employer.  But balloon payments made at the time

5    of termination are not allowed even if the employee has

6    given his or her consent to such payments.  It's right

7    there.  That's when I should have asked for a dismissal

8    of the promissory note demand.

9           The other thing on the previous page --

10   excuse me, it's two pages earlier, and it -- more than

11   that.  Again, if you read Section 2.5.5, bonus defined,

12   you'll see that that promissory amount or loan amount,

13   supposedly, does qualify as a bonus.

14          And then on the page before that, 35.4, the

15   promise of a bonus becomes a unilateral contract.  It

16   says a specific bonus plan normally becomes binding as a

17   unilateral contract when the employee begins

18   performance, which in my case was obtaining the minimum

19   sales level in a sense that the plan then cannot be

20   revoked by the employer.

21          So my legal slant on this is that when I

22   signed the promissory note agreement, I was no longer an

23   at-will employee.  And even as an at-will employee,

24   there still is the assumption of justifiable cause of

25   termination.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 469

178

1            And in Wells Fargo's own manual states,

2    which we reviewed earlier, that you can have three

3    sales -- or you should strive to have no more than three

4    complaints per year.  And, again, I was terminated at

5    the very first one.

6            Again, because I complained about what I

7    think is just -- if you look at the demographics of

8    Wells Fargo, it amounts to elder abuse, if you look at

9    the age of the folks involved with the investment

10   division, particularly.

11           Mr. Kane's statement about the licensed

12   banker, that that was a usually situation, I'm not aware

13   of any other of the brokerage program that deletes half

14   the commission because it's referred.

15           And when Mr. Kane suggested the licensed

16   banker was going to bring business to the financial

17   consultant, the broker, he was going to earn those

18   commissions.  Remember, they didn't bring the business

19   in.  They brought the people into the door or there was

20   a call session or something where they found somebody

21   that was willing to come into the branch.

22           All they did was find the people.  They

23   didn't recommend the investment.  Their licenses weren't

24   at stake if the investment plan should go wrong and

25   result in a complaint.  They had nothing of the like.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 470

1   All they did was bring the people in the door.  This was

2   really just a kind of clever idea to divert more money

3   away from the brokers and back to the bank.  It

4   disappeared completely for some reason.

5            There was no usual situation with a

6   50 percent discount, and then being subject to revenue

7   requirements without concern for the client's well-being

8   or concern for the amount of clients or amount of

9   products sold.  And I would just move that that is not

10  an item that should be dismissed.

11           MR. KANE:  Okay.  Just a very brief reply,

12  because I think it's important.  What I argued on his

13  11.5 argument, as you'll see, it goes on to 11.2.6.

14  This is just a head note out of the labor code.  He

15  doesn't put the whole case in context.

16           But, clearly, what it says, if you read

17  what it says, it doesn't apply to this situation.  It

18  says in Barnhill the Court concluded that deductions may

19  be made by the employer with the written consent of the

20  employee for payment on loans made by the employer to

21  the employee.  But balloon payments made at the time of

22  termination are not allowed even if the employee has

23  given his or her consent.  They're talking about

24  withholding of wages at the time.

25           That's not what we're talking about here.



EXHIBIT X  Page 471

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

180

1   That's made clear if you go to the next headnote where

2   it says "Conclusion reached by the Barnhill court

3   allowing deductions from wages of employees to repay

4   loans made by the employer to the employee is open to

5   question in view of the labor code."

6          That statute provides that no assignment of

7   future wages may be made unless wages have already been

8   earned, except as an accommodation, does not impose an

9   undue hardship.  So they're talking about -- it's an

10   apples and oranges comparison.  That's not what we have

11   here.

12          As it relates to the 35.4, we're not

13   talking about a bonus here where it says, "The

14   California courts have adopted a view that a specific

15   bonus plan normally becomes binding as a unilateral

16   contract when the employee begins performance in the

17   sense that the plan becomes revoked by the employer."

18          This isn't a bonus plan here.  This is a

19   loan that was made to him.  He acknowledges that he

20   didn't take -- he didn't treat it as a bonus.  He didn't

21   deduct taxes.  There was clearly a benefit.  He got

22   $111,000 to use as he felt he had to use it.  He had the

23   use of that money to do whatever he wanted to do with

24   that money tax-free until the forgiveness benefit.  Then

25   he had the benefit of spreading out the taxes over five



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 472

181

1    years.

2              Clearly, that's not something that is an

3    adhesion contract or unconscionable.  He had the choice

4    and he wanted -- he accepted the money.  This wasn't

5    something that was forced on him.

6              And he accepted it, knowing what the terms

7    were before he even became employed.  He knew that it

8    was going to be a loan, not a bonus.  And he knew if he

9    left for any reason, he'd have to repay any unpaid

10   balance.  He knew it before he joined.  He knew it

11   18 months later when he accepted the loan.

12             I know he's trying to be a lawyer here, but

13   he's not understanding the law.  And the law is pretty

14   clear on the contract that he entered into.  And it

15   should be enforced in these counterclaims.  It should be

16   dismissed.  Wells Fargo shouldn't have to spend any more

17   money defending these frivolous counterclaims.

18             UNIDENTIFIED SPEAKER:  Off the record.

19        (A discussion was held off the record.)

20             CHAIRMAN:  As you've seen, the panel has

21   conferred and the panel denies the motion to dismiss the

22   counterclaim.

23             We're going to recess now to enable you all

24   to prepare for tomorrow and to prepare your closing

25   arguments if we get to that, which I think we will.  And



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 473

182

1  therefore, to my colleagues, I suggest that we plan to

2  be here all day, some of which may be conferring as to

3  what our award, eventual award is.

4         ARBITRATOR:  Unless you're putting on

5  witnesses tomorrow.  Are you planning on bringing

6  witnesses tomorrow?

7         MR. KANE:  Yes.  Strictly as it relates to

8  the counterclaim.  I won't go over the notes.  I'm going

9  to call Mr. Shaffer.  He will be the first witness.

10  Then I'll call Ms. Mortensen and/or Mrs. Brandell, not

11  even in that order.

12         CHAIRMAN:  So we may not even complete

13  tomorrow, just to give you all some logistic planning.

14         MR. KANE:  I hope to complete.  I may not

15  need Ms. Brandell.  I'm going to make a decision on

16  that.

17         CHAIRMAN:  That's fine.  And it's clearly

18  your decision.

19         ARBITRATOR:  And we also have Thursday

20  planned, too.  So we're not under the gun on this at

21  all.  We want to give you the fair chance for both of

22  you to put on your case.

23         CHAIRMAN:  Okay.  So we'll stand in

24  retirement -- or what is the word I'm fishing for?

25         ARBITRATOR:  Recess.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 474