Arbitration                                        March 18, 2011

183

1              CHAIRMAN:  Recess until 9:30 tomorrow

2      morning.

3              UNIDENTIFIED SPEAKER:  Off the record.

4          (The proceedings adjourned for the day.)

5              CHAIRMAN:  We are back on the record,

6      Wednesday, January 5th, approximately 9:40 a.m.  Before

7      we get started with further testimony, do either of

8      you -- or did either of you include in your exhibits the

9      actual U5 form?  Is that in this booklet?

10             MR. SHAFFER:  Yes.

11             CHAIRMAN:  Where is it?

12             MR. SHAFFER:  It is Exhibit 8, Tab 8.  It

13     has the October 16th letter.  And then behind it is the

14     actual U5.

15             CHAIRMAN:  Okay.  Sure enough.  Okay.

16     Thank you very much.  All right.  The status of the

17     case, as I recall, is that the claimant has rested with

18     regard to the promissory note, but still is interested

19     in providing information with regard to claimed

20     attorney's fees and to defend the counterclaim.

21             And Mr. Shaffer has rested with regard to

22     the presentation of his evidence in support of the

23     counterclaim.  So now it's now over to Mr. Kane to

24     proceed.

25             MR. KANE:  Thank you, Mr. Chairman.  And it



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 475

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

184

1    as relates to the defense of the counterclaim, I'm going

2    to call Mr. Shaffer.  I'm not going to cover things I

3    covered on the promissory note.  This is strictly going

4    to be questions relating to the counterclaim.

5              CHAIRMAN:  Fine.  Mr. Shaffer, you're still

6    under oath.

7              MR. SHAFFER:  Quick question.  I thought

8    Mr. Kane presented his response to my counterclaim and,

9    in fact, had asked for a dismissal of the counterclaim?

10             CHAIRMAN:  Right.  He made a motion to

11   dismiss the counterclaim and he made an argument in

12   support of that motion.  You made an argument to refute

13   his motion for dismissal.  The panel considered the

14   arguments and then came to the conclusion that the

15   motion would be denied.

16             Now he has an opportunity to obtain

17   testimony or other evidence in defense of your

18   counterclaim.  And that's what we're doing now.

19             MR. SHAFFER:  I'm sorry.

20             MR. KANE:  Okay.  What I'm going to do if I

21   can for ease of effort is try to go through

22   Mr. Shaffer's exhibits, and I'm going to try and take

23   them in order.  Maybe it would be easier to follow

24   rather than skip around, if I can.

25             So the first one, I tabbed them, we're



ESQUIRE

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 476

1   going past the issues and damages and past the

2   Department of Labor stuff and start with the exhibits

3   where it has exhibits.  And the first exhibit I'm going

4   to ask him about in his notebook is Exhibit 2.

5            ARBITRATOR:  Are you planning on having

6   witnesses other than Ms. Mortensen?

7            MR. KANE:  As of right now, I think it's

8   only going to be Ms. Mortensen.

9            ARBITRATOR:  Okay.

10                 KENNETH SHAFFER,

11  called as a witness on behalf of the Claimant, being

12  first duly sworn, was examined and testified as follows:

13                DIRECT EXAMINATION

14  QUESTIONS BY MR. KANE:

15       Q.   And, Mr. Shaffer, if you would, please, you

16  have that -- I'm going to refer to it as Shaffer 2.

17  This is a document that you provided yesterday in your

18  counterclaim, I guess.  So this is a document that you

19  received from Ms. Mortensen; correct?

20       A.   No.  This is a document I received in a

21  package from Kane and Fischer that arrived on

22  December 23rd.

23       Q.   No, I'm talking about the e-mail from Mary

24  Mortensen to you dated December 29th of 2009.  You

25  received that with that information from her, did you



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 477

186

1    not?

2          A.    Yes.

3          Q.    Now, keep that in front of you and go to

4    the white notebook, claimant's exhibits, and go to

5    Exhibit 10.  And if you look at the bottom of the

6    Exhibit 10, the first page and the second page of

7    Exhibit 10, at least, that coincides with your Shaffer

8    2.  Do you see that?

9          A.    Uh-huh.

10         Q.    You'll have to answer yes or no.

11         A.    Yes.

12         Q.    And so if you go back to page 1, is there a

13   reason in your presentation that you chose to not

14   include your e-mail response to Ms. Mortensen where you

15   said "I thought gouging was part of our business plan"?

16   Why did you not include the complete e-mail string in

17   your documents?

18         A.    Because I didn't think it was pertinent to

19   the question of what the reason was that I was

20   terminated for.  And I knew that that was one of the

21   items in your document list, anyway.  So why would I

22   include that?

23         Q.    Now, you testified yesterday that you told

24   your supervisor, your immediate supervisor at the time,

25   Jan Krug, that you had adjusted these commissions up to



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 478

187

1    meet revenue numbers.  Do you recall that testimony

2    yesterday?

3         A.   Right.  To assure that I met month-end

4    revenue numbers to avoid termination, not knowing that

5    this was an overcharge.

6         Q.   And you testified that you said the same

7    thing to Ms. Mortensen, that you had adjusted these

8    commissions upward in order to meet revenue numbers?

9         A.   Yes.  Because I'm honest.

10        Q.   And if you go to in Exhibit Shaffer 2, go

11   to the next page after W49, this information that was

12   supplied by the Winnegers; do you see that?

13        A.   Right.

14        Q.   Did you tell the Winnegers at the time of

15   these trades that you had placed the solicited purchases

16   where you were recommending the purchases, did you tell

17   them that you had adjusted the commissions upwards on

18   their transactions so that you could meet revenue

19   numbers?

20        A.   I told them when we discussed the trade

21   that the commission would be about $1,000, and was that

22   all right with them.  I then phoned them and told them

23   that it turns out that the commissions that I had put in

24   were higher than they should have been and that they

25   would be receiving a cancel and rebuild, which I filled



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 479

1    out and supplied immediately after request.

2          Q.    But that was after Ms. Mortensen had told

3    you that you had charged excessive commissions?

4          A.    Right.   Because I didn't know it was

5    excessive.

6          Q.    But what I'm saying is before -- when you

7    entered the trade for them, did you tell them that you

8    had adjusted the commission up so you could meet their

9    revenue numbers?

10         A.    I told them that this trailed would cost

11   about $1,000.   I explained to them -- they always know

12   what the commission charge is going to be on a trade.

13         Q.    So I take it you didn't tell them you

14   adjusted it up to meet your revenue numbers?

15         A.    In effect I did.   I told them it would be

16   $1,000.   I also called to tell them that the $1,000

17   number was too high and was going to be adjusted

18   downward.

19         Q.    If you would go to -- if you would go

20   past -- we're going to go all the way to Number 6,

21   Shaffer 6.

22         A.    Yeah.

23         Q.    And just so we're clear, this is an e-mail

24   dated December 23rd of 2009 relating to coverage of bank

25   branches; correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 480

189

1        A.   Correct.

2        Q.   And there was a delay in changing coverage

3   because this Mr. Uren had been -- had delayed his return

4   from medical leave; right?

5        A.   Correct.

6        Q.   And in the meantime, you were going to

7   continue to cover the Micron branch as well as the

8   Empire Ranch branch; is that correct?

9        A.   Right.

10       Q.   And would it be correct then -- this is

11  dated September 23rd.  It was after this date, if you go

12  back to the white notebook, Exhibit 10, Claimant's

13  Exhibit 10, that the issue regarding the excess

14  commissions was brought up.  That came up later,

15  September 29th of 2009; is that correct?

16       A.   Right.  And you might want to make a note

17  that both Mr. Uren and Mr. Obenshane represented in the

18  e-mail have been terminated.

19       Q.   Now, I want to make certain -- I'm going to

20  keep these documents out where they are in front of you.

21  But I want to make sure that I understand this licensed

22  banker program that you talked about yesterday.

23            As I understand it, if a licensed banker --

24  if a banker had a Series 7 license and referred an

25  individual to you, and as a result of that referral, you



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 481

190

1    were able to close a transaction, that a joint rep code

2    would be opened with -- combining your number and the

3    banker's number; is that fair?

4        A.    Correct.

5        Q.    And that from that combined number, you

6    received 50 percent of the net of the gross commissions?

7        A.    50 percent of the gross commissions.

8        Q.    50 percent of the gross commissions and

9    then you'd get the net of whatever that 50 percent of

10   gross came out to?

11       A.    Correct.

12       Q.    And that was not just a situation with you,

13   that was a situation that existed with other licensed

14   bankers and financial advisor when a banker would refer

15   business to them; is that fair to say?

16       A.    Licensed bankers were in some branches, but

17   not all.  Some branches have multiple licensed bankers,

18   some branches have one.

19       Q.    But where there was a licensed banker, that

20   was the practice while -- throughout your employment at

21   Wells Fargo; correct?

22       A.    Right.  But not any longer.

23       Q.    Not just for you?

24       A.    Maybe Mary could comment on that.

25       Q.    Not just for you, but for other --



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 482

Arbitration                                    March 18, 2011

191

1          A.    Right.

2          Q.    Okay.  And it would also be true, would it

3     not, that but for the referral of that person to you by

4     the banker, you would have not been able to close the

5     transaction.  This isn't something you originated, it

6     was originated by the banker; is that correct?

7          A.    No.  Referrals were 99.9 percent of the

8     time a client of the bank.  And if not for the licensed

9     banker referring the client to me, it very possibly

10    could have been referred through a regular bank

11    employee.

12         Q.    But it was referred to you by the banker?

13         A.    Right.  By the licensed banker.  If it was

14    by the banker, I would get 100 percent.

15         Q.    But the fact that the licensed banker

16    referred the client to you, you wouldn't have gotten a

17    client; right?

18         A.    Not necessarily.  Because the client was a

19    client of the branch and another banker could have found

20    the client and referred the client to me.

21         Q.    But in these situations, it would be a

22    licensed banker that referred the client that caused the

23    joint rep code and you would get the 50 percent?

24         A.    Right.

25               ARBITRATOR:  I have a question.  The



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 483

1    licensed banker had a Series 7.  Why didn't he just do

2    the --

3                MR. SHAFFER:  The financial consultant,

4    or --

5                ARBITRATOR:  Why didn't he just sell --

6                MR. SHAFFER:  He wasn't allowed to under

7    the terms of his position.  These are people that were

8    less experienced.  And I think part of the reason they

9    weren't allowed to do the sales themselves, Mary would

10   know about this -- there were some types of sales they

11   could do themselves.  I think it was market link CDs.

12               They were basically rookies in the

13   business, and the rule was they couldn't sell most

14   products themselves.  There were some mutual funds they

15   could also sell.  But on the larger cases, they referred

16   it to the more experienced person, financial consultant.

17               ARBITRATOR:  Thank you.

18   BY MR. KANE:

19        Q.   We know that in January of 2008, you had

20   hit the production level to get that loan of $111,000;

21   correct?

22        A.   Right.  Or the bonus payment.

23        Q.   Well, I'll look at the -- let's take a look

24   at exhibit --

25               CHAIRMAN:  We understand there's a



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 484

1   disagreement on the characterization.

2   BY MR. KANE:

3        Q.   Just so I'm clear, it's $111,347.  So that

4   would mean that during your best 12 months during that

5   18 months, your gross production would be $222,694,

6   because it was -- you got 50 percent of the gross

7   production during the first -- during your 18 months,

8   the best 12 months; correct?

9        A.   Uh-huh.

10       Q.   And so this would be -- I'll just round it

11  off to $222,000.  So of that $22,000, what percentage of

12  that gross production came from referrals to licensed

13  bankers that you had to split 50/50 with?

14       A.   Referrals from licensed bankers?

15            ARBITRATOR:  He meant from.

16  BY MR. KANE:

17       Q.   I'm sorry.  I did mean from.  Thank you.  I

18  apologize.

19       A.   Very, very small.

20       Q.   So if we were to quantify it, it would be a

21  negligible amount, the split where you just got

22  50 percent really was a negligible amount?

23       A.   I would say it was a small amount because

24  the licensed bankers were very good people.  They were

25  harried people; they were pressured people.  They had



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 485

194

1    their goals.

2              The amount of qualified referrals for

3    investment purposes that came from licensed bankers was

4    extremely small.  The amount of my production during

5    that period, which was from licensed bankers was also

6    extremely small.  Because, remember, during that period,

7    my most productive branch, Micron, had no licensed

8    bankers.  It was January of the following year, 2009

9    that two licensed bankers were installed there.

10             Q.   Well, in 2000 -- I'm sorry.

11             A.   So it would be different for 2009 than

12   2008.

13             Q.   Let's take 2009.  In 2009, what would you

14   say at the time you left that your gross production was,

15   ballpark, $200,000?

16             A.   Yeah.  I'm not exactly sure.  $200,000.

17             Q.   Approximately?

18             A.   Approximately.

19             Q.   Of that $200,000 in 2009, what percentage

20   came from referrals from licensed bankers that would

21   have this impact with the 50 percent?

22             A.   What percentage.

23             Q.   Yeah.  What percentage of the gross are we

24   talking about?

25             A.   It's a relatively small percentage.  As I



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 486

Arbitration                                    March 18, 2011

```
 1   said, the licensed bankers were working hard on a number

 2   of different things.  They really tried hard but didn't

 3   generate a whole lot, especially from the branches I was

 4   servicing.  So I would say 5 percent may be.

 5            I know there was a situation in September

 6   where a woman decided to do a -- what's called an

 7   inheritance-builder insurance policy.  And the

 8   commission on that was pretty substantial, $5- or

 9   $6,000.  And I know that was the split just for the

10   month of September where I was on written warning.  And

11   that was maybe 5 percent of the total.

12            Q.   But you're not able to quantify it?

13            A.   I don't know what the numbers are.  I have

14   no access to that information.

15            Q.   Now, if you would, please, go to your

16   Number 9 in the book.  I'm just following it through.

17   It's a Social Security statement.  Now, I see on the

18   first page that it's your Social Security statement

19   dated June 1st of 2010.  Do you see that?

20            A.   On the first page?

21            Q.   Yes.  In the upper-right-hand corner.

22            A.   Yes.

23            Q.   So this would be something that would have

24   been provided to you by the Social Security department

25   that would report your earnings up through I guess 2009;
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 487

196

1    correct?

2         A.    Right.

3         Q.    Okay.  So now if we go to the second page

4    of this, you -- this isn't a complete document of the

5    Social Security statement you received, is it?

6         A.    No, it's not.  Because you had demanded --

7    the firm Kane and Fischer had demanded that I provide

8    tax records for 2004 to 2009.

9         Q.    Well, what you did here was you cut and

10   pasted the pages from your actual Social Security

11   statement to stop at 2003; isn't that correct?

12        A.    Right.  Because you had already demanded

13   information for 2004 and beyond.

14        Q.    Well, I will tell you that no 2004

15   information was provided to us.  And I've gone through

16   all of the documents.  So why didn't you just produce

17   your complete -- I mean, the complete Social Security

18   statement that you received on June 1st rather than

19   cutting and pasting it to stop at 2003?

20        A.    I didn't think about it.  I just figured I

21   had already provided 2004, why provide more information

22   of the same type.  I do have W-two statements here where

23   I can find my -- you say I did not provide 2004?

24        Q.    If you find the 2004 -- I looked last night

25   and I didn't find it in your document production.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 488

Arbitration                                            March 18, 2011

                                                                    197

1              A.   Can I see that page and I'll show you where

2       it is.   The reason was the 2004 -- part of the reason I

3       cut this off, I couldn't fit it on the page.   2004 got

4       cut off.   This is my 2004 W-2 from H & R Block Financial

5       Advisors.   The reason I brought this is the year got cut

6       off when I was putting the pieces on the copy machine.

7       And so here it is right here.

8                    MR. KANE:   May I, Mr. Chairman?

9                    CHAIRMAN:   Yes.

10      BY MR. KANE:

11             Q.   You indicated in the document production it

12      didn't have the 2004.

13             A.   If you would like me to, I will show you

14      right where it was.   It was cut off.   That's why I

15      brought this along.

16             Q.   This indicates that for 2004, your

17      production at -- well, we'll compare it to the Social

18      Security statement.   The Medicare wages are

19      $123,751.21 -- and Social Security wages are $87,900.

20      Is that -- did I accurately state that?

21             A.   I think so.   Can I ask what would be the

22      purpose of this whole thing, going back this far and

23      asking about my previous --

24                   CHAIRMAN:   We'll find out.   He's asking the

25      questions.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 489

198

1              ARBITRATOR:  He's leading up to it.

2   BY MR. KANE:

3       Q.   And I went through them.  And maybe you

4   have the 2005 W-2.  I couldn't find it last night.  But

5   what I did find that you produced was the first page of

6   your 2005 tax return.  And so I'm going to --

7       A.   It was because I couldn't find the W-2s.

8       Q.   I understand.  And you produced the tax

9   records.  So I'm going to mark this as Claimant's

10  Exhibit 17.  It's not in the notebook.

11             ARBITRATOR:  Could you repeat the numbers

12  for the H & R Block commissions?  121?

13             MR. SHAFFER:  That's not commissions,

14  that's earnings.

15             MR. KANE:  $123,751.21, and Social Security

16  wages was $87,900.

17             ARBITRATOR:  Thank you.

18             MR. KANE:  And I'm going to mark this as

19  Claimant's Exhibit 17.

20             CHAIRMAN:  And for our record, would you

21  identify what 17 is?

22             MR. KANE:  Claimant's Exhibit 17 is a

23  document produced to us by Mr. Shaffer.  It's the first

24  page of his 2005 1040.

25  BY MR. KANE:



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 490

Arbitration                                    March 18, 2011

                                                            199

1          Q.   So as you've indicated, you weren't able to

2    locate your W-2, but at least in terms of the wages that

3    are reported by you during 2005, at least line 7 shows

4    it's $56,789.  Is that all relating to H & R Block?

5          A.   Correct.

6          Q.   So between 2004 and when -- is that

7    reporting Medicare wages, the $56,000, or is that --

8    that would be what would be on your W-2, the $56,789

9    would be from the Medicare box?

10         A.   I believe so.  My wife does the taxes, so

11   I'm not sure.

12         Q.   Well, if that is the case, and we can --

13   between 2004 and 2005, your earnings at H & R Block went

14   from $123,000 to $56,788; is that correct?

15         A.   Correct.

16         Q.   And so you were employed by H & R Block

17   during the entire year of 2005, were you not?

18         A.   I was.

19         Q.   Okay.  And is that one of the reasons that

20   you didn't include --

21              ARBITRATOR:  I don't see that.  I see on

22   the --

23              MR. KANE:  Line 7.

24              ARBITRATOR:  -- record of 9, Number 9 in

25   his -- yeah.  I see that in 2003, his earnings -- his



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 491

200

1   taxed -- the tax -- I'm not sure what's the difference

2   between the Social Security earnings and the Medicare

3   earnings, but the higher number is $98,000.

4                MR. KANE:  I was referring to 2004.  If I

5   said 2003, I misspoke.  And I'm comparing 2004 with

6   2005.

7                ARBITRATOR:  And 2004 was $87,900, or

8   121 --

9                MR. KANE:  $123,751.21.

10                MR. SHAFFER:  I believe the difference is

11   Social Security earnings top out at some level; right?

12                ARBITRATOR:  Right, yeah.

13                MR. SHAFFER:  It's considered Social

14   Security.

15   BY MR. KANE:

16        Q.    So taking that, I think you're correct on

17   that.  Your income, your earnings at H & R Block went

18   from $123,000, approximately, in 2004 to $56,788 in

19   2005; correct?

20        A.    That's correct.

21        Q.    And so even though you couldn't find your

22   W-2, you decided to cut and paste this Exhibit 9 so it

23   wouldn't reflect your 2005 earnings from -- and what

24   you've presented to the panel, you determined not to

25   show them what you had earned for 2005, $56,000?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 492

Arbitration                                          March 18, 2011

                                                                201

1          A.    I already provided other information.  This
2    thing is 90 pages long.  I thought of ways to not
3    duplicate information.
4               And if what you're getting at is my income
5    dropped from 2004 to 2005, I'd say that's absolutely
6    true.  There's variables in the market, there's payout,
7    there's different variables involved.  If you look at my
8    earnings over time, there's been incredible volatility,
9    which I think is probably experienced by most
10   stockbrokers.
11         Q.    Absolutely.
12         A.    What's the point?
13               CHAIRMAN:  We understand there was a drop.
14         A.    That's part of the reason I accepted the
15   position at Wells Fargo or looked into the opportunity
16   at Wells Fargo.
17   BY MR. KANE:
18         Q.    So when you came up with your average when
19   you testified yesterday, I'm not sure if you were using
20   a ten-year average or a five-year average.  But I
21   believe you testified that based on Tab 9, that's what
22   you were going off of, that your ten-year average was --
23   of earnings was approximately $91,000.  Do you recall
24   that testimony yesterday?
25         A.    That is absolutely correct.  And my



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 493

Arbitration                                          March 18, 2011

                                                                 202

1    ten-year average went from 2009 to 1999 and included

2    this amount.  If you'd like, we can simply calculate the

3    ten-year average again right now with the information,

4    the ten-year average included this year.

5              Q.    Although it's not on Exhibit 9?

6              A.    There's no -- there's no averages there,

7    no.

8              Q.    Nor is there the 2005 figure there?

9              A.    Because I had already provided that

10   information on your demand.

11             CHAIRMAN:  All right.  We understand the

12   point that each of you is making.  Let's move on.

13   BY MR. KANE:

14             Q.    Going back to Tab 9, when you talk about

15   1993 to 1999, that was while you were at BAI; is that

16   correct?

17             A.    Bank of America Investment Services; right.

18   And that average is $140,000 a year, which I did not use

19   in my analysis.

20             Q.    And the 1999 figure of $222,252 is the

21   highest within that period of time of '93 to '99;

22   correct?

23             A.    Yes, it is.

24             Q.    And in 2000 -- so would you agree that the

25   market conditions that existed in 1999 are substantially



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 494

203

1    different than the market conditions that existed in

2    2008 while you were employed at Wells Fargo?

3         A.    Definitely.  And different than the market

4    conditions in 2005 when I had earnings of approximately

5    $60,000, which are also included in that average.

6         Q.    So these fluctuations are at least in part

7    due to fluctuations in market and economic conditions;

8    correct?

9         A.    Uh-huh.

10        Q.    You have to answer verbally.

11        A.    Yes, they are.

12        Q.    And to attempt to extrapolate those out, an

13   additional ten years as you have done here, really

14   amounts to speculation.  Because you can't -- you can't

15   analyze what the market conditions are going to be.  You

16   can't compare 2008 market conditions to 1999 market

17   conditions in attempting to establish damages because

18   it's all based on fluctuations of the market?

19        A.    Well, a ten-year average is a ten-year

20   average.  It's not based on speculation or fluctuation.

21   It's the actual results over a ten-year period.  We

22   could a take a 15-year average or 20-year average,

23   whatever you wanted to do.  I could have taken a higher

24   period of earnings which would have resulted in a higher

25   average.  I took the last ten years.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 495

204

1          Q.    So just so I'm clear, though, what

2    accounted in the difference in the reduction of your

3    income from $123,000 in 2004 to $56,000 in 2005?

4          A.    Well, you know we're going back five years

5    at that point.  And I can't tell you exactly, but I can

6    tell you that one of the reasons why I left H & R Block,

7    besides the fact that we were moving from Citrus

8    Heights, California, which is 20 minutes from my home to

9    a branch which is 45 minutes, is that I found that

10   working with the tax preparers at H & R Block, which is

11   what the financial advisers at H & R Block Financial

12   Advisers did, resulted in -- although they were great

13   people, there was a lot of very small referrals from

14   folks that didn't have a whole lot of investable assets.

15          And it even got into a situation where the

16   tax preparer would suggest that the people set up an IRA

17   to save money on taxes, and then I would come in and

18   explain different options to them and usually result in

19   a mutual fund sale.  And then a couple months later,

20   they would call and need to take the money out of the

21   account because it turns out they needed the money.

22          I recruited a friend to H & R Block and he

23   told me "H & R Block, isn't that where poor people go to

24   have their taxes prepared?"  I said no, there are

25   affluent people, but the bulk of the people that do



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 496

205

1    business at H & R Block are not high-investment type

2    availability of funds people.  And that's why I was

3    having a problem.  I was doing a lot of small tickets

4    for a lot of great people.  Many of those people

5    transferred me with to Wells Fargo when I transferred.

6              Q.   So the $56,788 in 2005 at H & R Block, what

7    was the payout, the net payout on gross commissions that

8    you were getting from H & R Block?

9              A.   That's part of the difference in earnings,

10   is that my payout was higher in the previous years as

11   part of an agreement when I came to H & R Block, as well

12   as the salary, there was a higher payout.

13             Q.   My question is:  What was your payout in

14   2005 that resulted in the $56,788?

15             A.   I don't know for sure.  It was probably in

16   the low 30 percent range.

17             Q.   Well, if you indicated you're trailing 12

18   was around $217,500 --

19                  ARBITRATOR:  Where are you getting that?

20                  MR. KANE:  He testified to that yesterday.

21   BY MR. KANE:

22             Q.   You testified that the trailing 12 months

23   of gross commissions before you joined Wells Fargo was

24   approximately $217,500.  30 percent of that would be

25   $65,250 and 25 percent of that would be $54,375.  So



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 497

                                                                      206

1    it's somewhere in the range of 25 to 30 percent; would

2    that be accurate?

3         A.    I would assume so.

4         Q.    And as part of your offer at Wells Fargo,

5    they agreed to pay you 40 percent between June 15th of

6    2006 and December 31st of 2007, didn't they?

7         A.    Yes, they did.

8         Q.    So that was much higher than what you had

9    as your payout for 2005 at H & R Block; correct?

10        A.    Yes, it was.

11        Q.    And in addition, you testified that your

12   average earnings at Wells Fargo, you testified to this,

13   it's not in a document somewhere, I think you used the

14   figure $78,000; is that correct?

15        A.    That's in one of my documents.  I believe

16   it's $78,000.

17        Q.    So that, at least in comparing an average,

18   you were there at H & R Block from all of 2007, all of

19   2008 --

20        A.    No.

21        Q.    Let me finish.  I'm not done.

22        A.    H & R Block.

23        Q.    I misspoke.  I do apologize for that.  Let

24   me back up and restart it.

25              You were at Wells Fargo approximately six



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 498

207

1    months for 2006, two years, 2007, 2008, and 10 months

2    for 2009; correct?

3          A.    Right.

4          Q.    So that's where you came up with the

5    average of the $78,000.  But at least that average was

6    more than you had made in 2005 at H & R Block, the

7    $56,788; correct?

8          A.    That would be correct.  But you're talking

9    about an average.  So why not take in the 2004 numbers

10   of $120,000 if that makes any difference.  I don't see

11   what difference it would make what I made previous to

12   Wells Fargo.

13         Q.    In addition, in 2008, you would agree that

14   in 2008, the economic conditions and market conditions

15   deteriorated during 2008 while you were at employed at

16   Wells Fargo?

17         A.    Deteriorated.  The markets crashed.  We are

18   on the brink of a financial disaster, and Wells Fargo's

19   response was to pick up the pressure to brokers and

20   demand that they forecast the amount of commissions they

21   were going to make for the month, and increase the

22   emphasis on commission revenue without any concern for

23   the products or the client.

24         Q.    So in connection with your claim for your

25   damages, you said that a million dollars and then you



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 499

208

```
 1    said at least $3 million, in using the figures that you
 2    did, you didn't take into account changes in market
 3    conditions during any of these years that you've used
 4    for this average; is that correct?
 5           A.    Absolutely not correct.  Because a ten-year
 6    average includes periods of market volatility, good
 7    markets and bad markets.  And the -- what I suggested is
 8    a ten-year average is absolutely my ten-year average.
 9    That encompasses a period of good markets and bad
10    markets.
11           Q.    Well, at BAI, what kind of territory did
12    you cover?  What areas did you cover?
13           A.    I had five branches at Bank of America.
14    And I -- yeah, five branches.
15           Q.    And when you left Bank of America, you went
16    from Bank of America to Morgan Stanley; is that correct?
17           A.    Correct.
18           Q.    And you didn't duplicate any of your
19    earnings at least for your 2000 -- I'm going to
20    Exhibit 9, at Morgan Stanley in 2000, it's $133,000,
21    2001, $101,000 and then 91 and 98.  And all of that is
22    while you were with Morgan Stanley; correct?
23           A.    Correct.
24           Q.    So your earnings went down when you
25    switched from Bank of America investments where you had
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 500

209

1    these five branches to Morgan Stanley; is that correct?

2          A.    Sure did.

3          Q.    And then you went from Morgan Stanley to

4    the H & R Block where your earnings -- we have already

5    covered that.  What branch did you work out of for

6    Morgan Stanley?

7          A.    Folsom.

8          Q.    Did you have any other bank branches, or

9    other -- I'm sorry -- did they have any bank branches

10   that you covered like you did when you were with Bank of

11   America investments?

12         A.    No.  The Morgan Stanley model is the

13   typical brokerage model.  You're in an office and you

14   bring your own clients, find your own clients.

15         Q.    So it was in part referrals from five bank

16   branches that accounted for a lot of your production

17   from 1993 to 1999 while you were at Bank of America

18   Investments?

19         A.    Yes.  You know, that was perhaps the best

20   period in earnings for my brokerage career.  And

21   obviously, in 20/20 hindsight, I should have stayed at

22   Bank of America.

23         Q.    1998 and 1999 were some of the best years

24   in the market, were they not?

25         A.    Yes, they were.



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 501

210

```
 1          Q.    And in connection with these figures that
 2    you came up with, in any way -- and the earnings that
 3    you're comparing, prior earnings with the average of
 4    $78,000 from Wells Fargo, did you take into account in
 5    your figures the fact that you received $111,347 from
 6    Wells Fargo as a loan when you joined the firm?  Did you
 7    take that into account in any of the figures you
 8    provided the panel yesterday?
 9          A.    In the average income figures?
10          Q.    No.  In 2008, you received a loan of
11    $111,347.
12          A.    Uh-huh.
13          Q.    Did you take that into account, that 111,
14    in connection with your any of your figures?
15          A.    No.
16          Q.    Okay.  You received the proceeds of that
17    loan, did you not?
18          A.    Yes, I did.  And my Exhibit 1 shows that
19    that was listed as net pay.
20          Q.    I understand?
21          A.    By Wells Fargo.
22          Q.    Now, if you would, please, I'm going to
23    take you back to the back of your book, Met Life.  It
24    will be all the way -- it will be the first Met Life
25    document, October 23rd of 2008.  Let me know when
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 502

Arbitration                                        March 18, 2011

211

1    everybody gets there.
2              CHAIRMAN:  I've got it.  It's about a
3    quarter inch.
4              MR. KANE:  And there's several, but this
5    one is the October 23rd, 2008.
6              ARBITRATOR:  What's at the bottom.
7              MR. KANE:  It doesn't have anything at the
8    bottom, unfortunately.
9              ARBITRATOR:  I've got it.
10             CHAIRMAN:  Okay.
11   BY MR. KANE:
12             Q.   Thank you.  And before I get to that, I'm
13   glad everybody is there.  Are you there Mr. Shaffer?
14             A.   It's dated November 25th?
15             Q.   October 23rd, 2008.  I think it's the first
16   one.  Before I ask, keep that out in front of you.  But
17   before I ask you the question, you're aware, are you
18   not, that the Bank of America Investments' model has
19   changed since you left Bank of America.  There are no
20   more referrals from bank branches.
21             A.   No, I'm not.
22             Q.   You're not aware that Bank of America
23   acquired Merrill Lynch and it's now operating as Merrill
24   Lynch?
25             A.   I think I might have heard that.  But I had



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 503

212

1  not heard about not referring customers to banks and

2  branches.

3       Q.   Just so we're clear, Met Life was the

4  insurance carrier that handled the short-term and the

5  long-term disability at Wells Fargo; correct?

6       A.   I assume so.

7       Q.   And just so we're clear, as it relates to

8  this, this letter, as it indicates here, was regarding

9  your request to Met Life for a short-term disability

10 claim.  And it was Met Life that says, "Your claim is

11 being denied as the information provided does not

12 support an inability to work starting on September 22nd

13 of 2008."

14           In this letter -- that was the

15 determination made by Metropolitan Life Insurance

16 Company; is that correct?

17      A.   Correct.

18      Q.   Okay.  And if you will go to the next

19 page -- oh, let's go to the fourth paragraph down.

20 Their conclusion was based on the medical documentation

21 on file, that there is no medical support, no medical to

22 support your inability to work starting on

23 September 22nd, 2008.

24           There is no indication that you are having

25 impairments of a severity or frequency to preclude



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 504

Arbitration                                        March 18, 2011

                                                              213

1    working full-time, therefore the short-term disability

2    benefits are denied.

3              That was a determination made by

4    Metropolitan Life Insurance; correct?

5         A.   Correct.  And I sent a letter to Wells

6    Fargo Employee Benefits Department asking for their help

7    with this issue and never heard anything back.

8         Q.   And they also conclude that based on the

9    lack of clinical findings to support your inability to

10   work full-time, your short-term claim was denied;

11   correct?

12        A.   Right.

13        Q.   And you appealed that, did you not?

14        A.   I appealed that because the information I

15   have and I provided here recommended that I take time

16   off by two different physicians.

17        Q.   Okay.  Let's go to the next Met Life letter

18   that's dated November 25th of 2008.  Let me know when

19   you get there.

20        A.   You'll notice when we get there, there's a

21   medical certification form signed by a physician,

22   Dr. Lawson, that says it is necessary for the employee

23   to be absent from work for treatment.  And the box is

24   marked yes.  That's what I didn't understand and asked

25   for clarification of.  And I never received any kind of



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 505

a response.

Q. Well, you received a response from Met Life on November 25th of 2008, did you not?

A. Right. But I tried to take this to Wells Fargo away from Met Life and ask for their help on this issue.

Q. And on this November 25th, 2008, letter that you received from Metropolitan Life, they told you that they completed their review of the denial of your claim and for the reason -- let me finish my question, if you would, please.

And for the reasons that they state forth, they upheld their decision to deny benefits upon the appeal review that they did, correct, in their letter?

A. Correct.

Q. And if you go to the next page of the November 25th letter, they even advised you in this first full paragraph, "In an effort to provide you with a thorough and fair review, we had our entire claim file reviewed by an independent physician consultant board certified in internal medicine." That's what they told you; correct?

A. Correct.

Q. And the consultant that they hired reviewed all of the information from your family practitioners

Arbitration                                    March 18, 2011

215

1    that you were referring to; correct?

2              A.    Correct, I guess.   I don't know.

3              Q.    That's what the letters says, anyway?

4              A.    That's what the letter says.

5              Q.    And they said that the consultant concluded

6    that the medical information did not support any

7    functional limitations beyond September 22nd and

8    reaffirmed the denial of your claim; correct?

9              A.    Which I could not understand.   Because I

10   had not only Dr. Lawson's statement that I needed to

11   take time off work, but another of my doctors that I

12   could find is Dr. Orwanis's original recommendation to

13   take time off work.   I found all that dumbfounding.

14             Q.    In any event, all of those determinations

15   were made by Metropolitan Life Insurance Company, not

16   Wells Fargo; correct?

17             A.    Well, right at the bottom of the page, it

18   says "Wells Fargo Company", which is where I directed it

19   to.   And on the first page of this document --

20             Q.    Mr. Shaffer, listen to my question.   All of

21   these letters of denial is from Metropolitan Life

22   Insurance, not from Wells Fargo; is my statement

23   correct?

24             A.    I'm not sure.   It says "Metropolitan Life"

25   on the top, but then it says "short-term disability,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 507

216

1   Wells Fargo and Company".  I was getting the disability

2   benefits through Wells Fargo.  And I didn't think I was

3   responsible for forcing my Kaiser physicians -- and I

4   would say that Kaiser is administratively challenged.  I

5   didn't think it was my job to force the Kaiser

6   physicians to provide the information to them in a

7   timely basis.

8              They he even commented that they provided

9   information and did not hear back from the Kaiser

10  physicians.  It says on the first paragraph on the

11  page --

12             ARBITRATOR:  Excuse me.  I think I need to

13  intervene a little bit here.  Wells Fargo is not in the

14  insurance business.  They hired Met Life to do all of

15  their disability insurance.  Everything goes through

16  them.

17             MR. SHAFFER:  I understand.

18             ARBITRATOR:  So they can only go by what

19  Met Life says.

20             MR. SHAFFER:  Again, I wrote a letter to

21  this address at the bottom here and asked for their help

22  in getting these records from my Kaiser physician.

23             MR. KANE:  Mr. Chairman, at this time, I'd

24  like to move Claimant's Exhibit 17 into evidence.

25             CHAIRMAN:  Any objection, Mr. Shaffer?



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 508

217

1          MR. SHAFFER:  Can I make one final comment
2   regarding this last issue?
3          MR. KANE:  Wait.  I don't have any
4   questions pending.
5          CHAIRMAN:  Right.  So the question is:  Do
6   you have any objection to moving into evidence your 1040
7   for the year 2005, this document?
8          MR. SHAFFER:  No.  It's just that I'd like
9   to make one final comment in regard to this whole issue.
10         (Claimant's Exhibit 17 was marked for
11   identification.)
12         CHAIRMAN:  I'm going to -- what business
13   are you talking about?
14         MR. SHAFFER:  I just want to make one final
15   comment.
16         CHAIRMAN:  With regard to what.
17         MR. SHAFFER:  With regard to Met Life and
18   the disability payment.
19         CHAIRMAN:  All right, proceed.
20         MR. SHAFFER:  You'll notice that there are
21   no e-mails or letters of complaint or anything.  After
22   this decision was made, I dropped it and I went back to
23   work and I did the best job I could.
24         CHAIRMAN:  Okay.  Thank you.
25         MR. KANE:  Mr. Chairman, I may be done with



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 509

1   my examination of Mr. Shaffer.  But could we perhaps

2   take our morning break now.  It's a little earlier than

3   we would, but I could consult with my client.

4            CHAIRMAN:  Absolutely.

5            UNIDENTIFIED SPEAKER:  Off the record.

6        (Thereupon, a break was taken.)

7            CHAIRMAN:  All right.  You may proceed,

8   Mr. Kane.

9            MR. KANE:  Thank you, Mr. Chairman.  I

10  don't have any further questions of Mr. Shaffer.

11           CHAIRMAN:  Next witness?

12           MR. KANE:  Ms. Mortensen.  I don't think

13  she's been sworn.

14        (Witness sworn.)

15           CHAIRMAN:  And state your full name,

16  please.

17           WITNESS:  Mary Mortensen.  It's

18  M-o-r-t-e-n-s-e-n.

19                MARY MORTENSEN,

20  called as a witness on behalf of the Claimant, being

21  first duly sworn, was examined and testified as follows:

22                DIRECT EXAMINATION

23  QUESTIONS BY MR. KANE:

24       Q.  Ms. Mortensen, why don't we start -- what

25  is your current position with Wells Fargo?  Tell the



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 510

Arbitration                                    March 18, 2011

219

1    panel.

2         A.    My current title is called branch

3    administration manager.

4         Q.    And what office is that out of?

5         A.    I'm located in the Roseville office.   My

6    region covers Sacramento and Roseville.

7         Q.    Why don't we start with you just giving the

8    panel a brief description of your background in the

9    securities industry?  And speak up so we can --

10        A.    I started in the business in 1979.   I was

11   in high school.  And with Merrill Lynch working changing

12   the numbers, you know, doing the quotes on the

13   whiteboard, and moved up into cashiering, wire operator

14   position.

15             I then moved with Merrill here to San

16   Francisco when they opened up their first regional

17   operations center.

18        Q.    When was that?

19        A.    It was about 1981, I believe, and quickly

20   went into a lead supervisor role in the margins

21   department and securities received department.  I did

22   that for a couple of years.  And then Merrill sent me to

23   New York working with their audit program.

24        Q.    Are we talking '82 or '83?

25        A.    About '83, I believe.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 511

220

1        Q.   And what did you do in working with Merrill

2   Lynch's audit program?

3        A.   I was responsible for doing their internal

4   examinations nationally.  At that time, Merrill's audit

5   program was a national program, and I flew 48 weeks out

6   of the year just traveling to all the different branches

7   performing their internal examination.

8        Q.   Okay.  How long were you in that position?

9        A.   Just a couple of years.  Merrill only

10  allowed you to do it for a couple of years due to

11  burnout.

12       Q.   What was your next position?

13       A.   I left Merrill because I wanted to come

14  back to Sacramento, and there wasn't a position

15  available.  I came back and actually left the business

16  for about a couple -- probably less than a year.  I did

17  401k administration.

18            Then shortly after that, I joined A.G.

19  Edwards as a sales associate.

20       Q.   When was that, approximately?

21       A.   I'm thinking --

22       Q.   Ballpark?

23       A.   Like '85, '86.

24       Q.   Okay.  And how long were you with A.G.

25  Edwards as a sales associate?



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 512

221

1          A.    Maybe just a little over a year.   Then I

2    was hired by Bateman Eichler Hill Richards as an

3    operations manager in their Sacramento office.

4          Q.    Okay.   And how long were you with Bateman

5    Eichler?

6          A.    I was with Bateman Eichler given all the

7    name changes that they had gone through, Dekemper and

8    Everen, up until I think '91.   And I actually received

9    my 7 licenses while I was with Bateman in 1987.

10         Q.    And what did you do for Bateman Eichler

11   until 1991?

12         A.    I was responsible for working doing all the

13   HR management with the sales associates, all the

14   operations personnel, handling -- handling the

15   operations issues that were escalated that needed help

16   with, helping the branch manager gather documents for

17   customer complaints of that nature.

18         Q.    And after you left Bateman Eichler in 1991,

19   where did you go next?

20         A.    I went to Morgan Stanley.   And I went there

21   working as the admin to the branch manager.   And my

22   function was really to continue working with all the

23   sales assistants.   I helped him in his monthly reporting

24   for active account reports, just various things.   And I

25   was also responsible for work with all the trainees.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 513

Arbitration                                          March 18, 2011

222

1            So from the beginning of performing

2    those -- those old tests that they had to take and then

3    helping them through their testing until they actually

4    went to New York for their sales training.

5            Q.   And how long were you in that position with

6    Morgan Stanley after 1991?

7            A.   A couple of years.  And I decided that if I

8    could train brokers, that I could probably be one.  So I

9    went to Payne Weber as an investment executive.

10           Q.   About 1993?

11           A.   It was about 1993.

12           ARBITRATOR:  Are you saying you got a

13   Series 8.

14           A.   No, no.  It was still my 7.  I had my 7 and

15   my 63.  Then I became a broker, financial adviser at

16   Payne Weber.

17   BY MR. KANE:

18           Q.   So a financial adviser conducting a general

19   retail securities business?

20           A.   Correct.

21           Q.   Not in any supervisory role at Payne Weber?

22           A.   Correct.

23           Q.   How long were you a financial adviser at

24   Payne Weber where you didn't have any supervisory --

25           A.   Just a few years.  I quickly learned that



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 514

223

1  there's right-brained and left-brain type of people,
2  people who are more adept to sales and people more adept
3  to administration.  I was definitely an administrator,
4  not a salesperson.
5        Q.    Where did you go after Payne Weber?
6        A.    For a very short stint, I think I was still
7  holding onto the fact that I might be able to do sales.
8  I went in as a junior partner for only about six months
9  with Edward Jones.
10            And at that time, I started going through
11  some personal -- I was going through a divorce and it
12  was just too hard to stay focused.  And I needed a
13  steady income.
14        Q.    So when did you first --
15            MR. KANE:   I'm sorry.  Do you have a
16  question.
17            ARBITRATOR:   I wondered when you joined
18  Payne Weber.   What year was that?
19            WITNESS:   I think it was in 1992 or '93.
20            ARBITRATOR:   And then Edward Jones.
21        A.    Then Edward Jones for just a real short
22  period of time.  Then I went over to Great Western, and
23  that was the first time that I kind of went into what I
24  would consider a bank program.
25  BY MR. KANE:



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 515

Arbitration                                    March 18, 2011

224

1        Q.    So kind of describe -- approximately, I

2    know we're dusting cobwebs off, but approximately what

3    year was that?

4        A.    I think it was around 1995, '94, '95.

5        Q.    And what position did you go into at Great

6    Western?

7        A.    That was what you called an RSA position,

8    or regional support administrator.  And it's basically

9    helping, again, the regional manager with compliance

10   functions.  I got my 24 license there.  And reviewing

11   some of the switches and increased trade approvals and

12   things like that.

13       Q.    And you said Great Western was the first

14   time you went into a bank mode.  Kind of briefly

15   describe what you meant by that when you made that

16   statement.

17       A.    Most of my -- actually all of my prior

18   experiences have been with what I consider a wire house

19   model, which would be your standard Morgan Stanley,

20   Merrill Lynch, Payne Weber where you have to actually go

21   out and identify your own clients and build your own

22   book.  The bank program, you have financial advisers

23   actually sitting in the branches where you received

24   referrals.

25       Q.    But you could also -- you would also be



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 516

Arbitration                                              March 18, 2011

1    developing your own?

2         A.   You could absolutely still be developing

3    your own book.  At that point, I couldn't understand why

4    everybody didn't do that.  Because here you're getting

5    some free referrals.  And I remember when I was with

6    Payne Weber, that was back in the days when you were

7    smiling and dialing.  And, you know, 250 calls a day, 50

8    contacts a day.  It was crazy.

9              And so here, you build relations with the

10   bank personnel, with the bankers there, and you would

11   receive referrals that they would provide to you.

12             MR. SHAFFER:  Can I object?

13             CHAIRMAN:  To his question?

14             MR. SHAFFER:  To this whole -- I don't

15   understand how any of this has any pertinency to the

16   items we're discussing.

17             CHAIRMAN:  That's really not up to you to

18   decide.  We'll decide whether the testimony is relevant

19   and what weight we will give to it.  Mr. Kane may ask

20   questions.

21   BY MR. KANE:

22        Q.   And, I'm sorry, we were -- have you already

23   described what you did at Great Western?

24        A.   Yes.

25        Q.   So how long were you in that position at



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 517

226

1    Great Western?

2          A.    A couple of years.   And Great Western was

3    subsequently bought out by Washington Mutual and my

4    position was going to be eliminated.   And at that time,

5    I was approached by Wells Fargo to join them.

6          Q.    And what year are we talking about?

7          A.    1997.

8          Q.    And in 1997, did you join Wells Fargo?

9          A.    I did.

10         Q.    Okay.   And where were you located in '97

11   when you joined Wells Fargo?

12         A.    We were in Sacramento in the Sacramento

13   area, a smaller office.   Wells Fargo was really just

14   starting there, really developing their program.

15         Q.    And in 1997, when you joined Wells Fargo,

16   what was your position at that time?

17         A.    As an operations manager.

18         Q.    Let's just take 1999 -- so we'll start with

19   '97 and we'll just kind of go forward.   What were your

20   duties as an operations manager in that Sacramento

21   office?

22         A.    To work with all the financial advisers

23   relative to their, you know, escalated operations issues

24   that they may have.   I worked with the regional sales

25   manager in pulling together documents and for customer



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 518

Arbitration                                    March 18, 2011

227

1   complaints.  I did a pre-review of the accurate account

2   reports and trade blotters.

3           Q.   And how long were you in that position as

4   operations manager?

5           A.   For I'd say about three years.  And then

6   Wells Fargo developed this new program or this new

7   position call the branch administration manager program.

8   And they did that in an effort to try and facilitate

9   support to the regional sales managers so that they had

10  the opportunity to train and coach their financial

11  advisers.

12          And there would be someone who was more

13  geared towards what I would consider compliance.  And so

14  at that time, I did all the pre -- all the trade

15  reviews, the approvals of the switch letter letters,

16  approval of the annuity transactions.  And I also

17  supervised, of course, sales associates.

18          Q.   So that started -- and that was a title

19  called branch administrative manager; correct?

20          A.   Correct.

21          Q.   And there's no dispute, Mr. Shaffer worked

22  for Wells Fargo from June 15th of 2006 to October 1st of

23  2009.  During that time period, from 2006 until

24  October 1st of 2009, did you always have the position of

25  branch administrative manager that you just described?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 519

Arbitration                                    March 18, 2011

228

1          A.    Yes, I did.

2          Q.    Did your duties change at any point between

3    2000 and October of 2009?

4          A.    No.

5          Q.    Let's take the period when Mr. Shaffer was

6    employed, June of 2006 to October of '09.  In June of

7    2006, were you the branch administrative manager that

8    had -- would have responsibility relating to

9    Mr. Shaffer?

10         A.    Yes, I was.

11         Q.    Okay.  What office did you work out of?

12         A.    The Roseville office.

13         Q.    The Roseville office.  And how long had you

14   worked out of the Roseville office?

15         A.    We moved into the Roseville office in 2001,

16   I believe.

17         Q.    And when you started in June of 2006, what

18   area did you cover as the branch administrative manager?

19         A.    I covered the Roseville -- what I would

20   consider east of Sacramento.  So from Carmichael on up

21   through Folsom, which would have been Ken Shaffer's

22   branches.

23         Q.    And did that stay the same through the

24   period of time he was employed through October 1st of

25   '09?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 520

229

1          A.    Yes.

2          Q.    And during that period of time,

3    approximately how many registered representatives were

4    you the branch administrative officer for performing

5    duties you described?

6          A.    I'm going to guess.  It was probably maybe

7    43.

8          Q.    It fluctuated?

9          A.    It fluctuated constantly.

10         Q.    But in the area of 40?

11         A.    Yeah.

12         Q.    And you were located in the Roseville

13   office, what -- where was Mr. Shaffer located during

14   this period of time?

15         A.    Mr. Shaffer was in the Folsom office.

16         Q.    And did he have more than one office or

17   branch?

18         A.    He ended up with Carmichael as well.

19         Q.    Let's make sure we understand.  When we've

20   heard Folsom, we've heard it called the Empire Branch?

21         A.    The Empire.

22         Q.    What is that?

23         A.    We call them stores.  So if you ever hear

24   me referring to a store, it's just like normal stuff

25   coming out of my mouth.  It was one of our store



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 521

230

```
 1    locations, which means it was an actual bank branch
 2    located in the Folsom area.
 3         Q.   And at some point, he also handled the
 4    Micron branch?
 5         A.   He did.
 6         Q.   Where was that located?
 7         A.   That was located out in the -- closer to
 8    the downtown Sacramento area.  And it was (inaudible).
 9         Q.   Do I understand correctly that of the 40 or
10    so financial advisers, they all worked out of different
11    bank branches?
12         A.   They did.
13         Q.   Now, we heard yesterday Mr. Shaffer
14    referred to some handwritten notes.  It's not an exhibit
15    number, but it's this far in from the end.
16              ARBITRATOR:  Of his?
17              MR. KANE:  Of his documents.  It's
18    August 28th, 2009 handwritten notes.  We'll wait until
19    everybody gets there.
20              ARBITRATOR:  August 14th.
21              MR. KANE:  August 28th.  Its the one behind
22    August 14th.  It's right behind it.
23              CHAIRMAN:  Is it before?
24              MR. KANE:  It's closer to the end.
25              CHAIRMAN:  It looks like -- is it after the
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 522

231

```
 1    Met Life stuff?
 2                MR. KANE:  It's before the Met -- it's
 3    before all the Met Life stuff.  It's right before all
 4    the Met Life stuff.
 5                CHAIRMAN:  Okay.
 6                MR. KANE:  By a couple pages.
 7                ARBITRATOR:  8/28?
 8                MR. KANE:  Yes.
 9                CHAIRMAN:  Got it.
10    BY MR. KANE:
11          Q.    There was a -- Mr. Shaffer made reference
12    to an entry at the bottom of this page that said -- and
13    I think he said these were Ms. Krug's handwriting.  Just
14    for the panel, who was Ms. Krug at this period of time
15    in August of '09?
16          A.    She was the regional sales manager.
17          Q.    Okay.  And he indicates here that the notes
18    say "work his book by deciding which clients deserve a
19    quote, deeper drill".  And then it says "5 to 10
20    clients".  And he didn't know what deeper drill -- he
21    wasn't sure what deeper drill meant.  Have you heard
22    that referenced before?
23          A.    Yes.
24          Q.    And tell the panel what this reference is
25    in regards to?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 523

232

1      A.   One of the things about working with the
2  private bank is that you have the availability of some
3  of the -- some of the things that the private bank has.
4  Which means that when a deeper drill -- and deeper die
5  drilling means that you do more cross-referrals.
6           So find a client who has the ability who
7  can benefit from some of the advantages of the private
8  bank, either by working with a private banker, that he
9  deposits -- you know, if there is loan needs, insurance
10 needs, whatever those are.  But really diving deeper
11 into the book to see how we can benefit the clients in
12 order to bring benefit to the clients.
13      Q.   As part of your function as the branch
14 administrative manager, do you have occasion to review
15 any exception reports that are generated on the firm's
16 system?
17      A.   That used to be a big part of my job, was
18 the review of the broker audit reports.
19      Q.   Okay.  So let's make sure we're in the same
20 time period.  Let's take the time period of 2009 up
21 until October of 2009.  That's when Mr. Shaffer was no
22 longer with the firm.  Was that part of your function in
23 2009?
24      A.   It was.
25           CHAIRMAN:  To do what?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 524

233

1    BY MR. KANE:

2         Q.   Good question.  Why don't you tell the

3    panel what that entailed?

4         A.   So the first thing I did every morning when

5    I came in was to look at the trade blotter.

6              CHAIRMAN:  What's that?

7              WITNESS:  The trade blotter is the trade

8    sections placed the day prior.  So that was driven off

9    of a system that we had called broker audit.  It was a

10   third-party system that we had purchased to do our

11   supervisory reviews of the trading activity of the prior

12   day.

13             So the first thing I would do, obviously,

14   would to come in and take -- and look at all the trades

15   that had taken place and review those trades for

16   suitability issues, for anything that might stick out.

17             CHAIRMAN:  For what area?

18             WITNESS:  For the Sacramento Roseville

19   area.

20             CHAIRMAN:  For all the trades?

21             WITNESS:  All the trades.  I have to step

22   back.  I have to be honest with you, there was a period

23   where -- I don't remember the period.  The position was

24   too overwhelming.  We had also hired another branch

25   manager, administration manager.  So you'll hear me



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 525

234

1    refer that I was working in the Roseville office.

2             This other branch administration manager

3    was responsible for the Sacramento office.  So

4    therefore, my responsibility kind of split and I was --

5    at that point, I was dealing with about 23 financial

6    advisers so that we could really do more focused review

7    of some of the trade activity that had taken place.

8    BY MR. KANE:

9        Q.   Now, you referred to something called

10   broker audits.  Why don't you describe for the panel

11   what a broker audit was.  And let's take the time period

12   at issue here, September, October of '09.

13       A.   Again, so broker audit was the trade

14   blotter.  There were two pieces to broker audits.  The

15   first was the entire trade blotter.  The second piece

16   was what was we call the exception blotter.  The

17   exception blotter would highlight things that we needed

18   to really look at.  So those would be potential switches

19   and potential large trays, you know, and of course in

20   this case, the excess commissions.

21            So this is all noted on this exception

22   report that I would pull up in the morning to, one,

23   identify whether or not I had pre-approved a switch

24   letter.

25            CHAIRMAN:  What's a switch?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 526

235

1          A.    Where a financial adviser moves a client's

2    position from one package product into another package

3    product generating a commission.

4    BY MR. KANE:

5          Q.    Like mutual funds?

6          A.    Like mutual funds.  It's typically mutual

7    funds.  When I say "packaged product", it's also

8    required for unit investment trusts.  It's also required

9    for annuity transactions.

10         Q.    Okay.  Now, before we get into this,

11   describe how -- in September, October of '09, how the

12   order entry system worked at Wells Fargo.  In other

13   words, what -- if a broker solicits a customer to

14   purchase or they intervene, tell the panel what the

15   process was.

16         A.    Well, we, again, purchased a -- or we use a

17   third-party system called Thompson 1.  Thompson 1

18   provided us with all the market data.  It had a market

19   data sheet.

20               It also had all the account information so

21   you could go into your account workbook, your rec

22   workbook, and then there was an order entry tab in that

23   as well-driven down between mutual funds and equity

24   transactions.

25               And then we had a separate -- we had a



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 527

236

1    separate function for bond desk, which is more of our

2    fixed income trades.

3            Q.    Let's take an equity.

4            A.    An equity would be off the Thompson 1, and

5    if you wanted to buy or sell a position, you would go

6    into the order entry screen on the Thompson 1 system to

7    place those trades.

8            Q.    And was there -- when the broker placed the

9    trade, how was the -- on the Thompson system, how was

10   the commissions determined in the normal course of

11   business?

12           A.    Well, it's a third-party system.  Wells

13   Fargo provides the third-party company our commission

14   schedule.  It's all downloaded in there.  So when a

15   financial adviser placed a trade, the commissions would

16   populate with whatever our standard commission schedule

17   was.

18           Q.    And could the broker deviate from -- could

19   he override the system?

20           A.    You have the ability to override the

21   system.  However, in the overriding of a system,

22   particularly if you do an upward movement, it

23   requires -- there was a soft edit to it.

24           Q.    I'm sorry.  What?

25           A.    What I call a soft edit, where it might



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 528

237

1   say, "Okay. Hold on. Just FYI, this is happening." If
2   you're doing a large trade, it would say, "Hold on.
3   You're placing a trade for this. Are you sure you want
4   to continue?" And you can -- all you had to do is hit
5   enter and it would go in and verify the trade screen.
6           Q.   Okay. So in connection with your position
7   as the branch administrator, did a situation arise from
8   the broker audit exception screen that related to
9   Mr. Shaffer?
10          A.   Yes.
11          Q.   Okay. What I'd like you to do, you should
12  have that white notebook over there in front of you.
13  And I'm going to ask you -- before I get to the
14  notebook, when the broker audit exception screen popped
15  up, did you have -- what was your practice? When that
16  showed a trade that met any of the criteria that you
17  mentioned, what, if anything, did you do?
18          A.   Well, I always cut and pasted that page, so
19  I would copy and paste that page onto an e-mail and send
20  it out to the financial consultant to ask for a reason
21  why. So if it was a large, you know -- if it was
22  something that I didn't receive approval on, I would
23  send them an e-mail saying, "Where is the approval? Did
24  we miss it?"
25          In Ken's case, I sent him an e-mail saying,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 529

238

1   "What happened here?  Why did you charge more than what

2   the allowable commission was?"

3         Q.   Okay.  Now, if you would, please, go to the

4   white notebook and I'd like you to go to Tab 10.  And go

5   to the bottom -- what I'm going to ask you to look at is

6   the bottom of the first page, which is your e-mail to

7   Mr. Shaffer dated September 29th at 3:08 p.m. and the

8   top -- and the second page.  So tell the panel what this

9   document is as it relates to what you've explained to

10  us.

11        A.   Well, this is an e-mail that I sent to Ken

12  saying that I was doing a trade review on a trade that

13  he had done the prior day.  And the trade review was

14  excess commissions.  And I asked him to let me know why

15  he had entered a flat dollar commission amount in excess

16  of what the normal commission would be.

17        Q.   So let's go through --

18             ARBITRATOR:  I'm sorry.  I'm not seeing

19  that wording.

20             MR. KANE:  It's W20, the page W20.

21             ARBITRATOR:  No.  What she was just --

22             WITNESS:  If you look at the top of the

23  line --

24             ARBITRATOR:  That says, "Kelly, I thought I

25  would share this with you."



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 530

239

1    BY MR. KANE:

2         Q.   No.   It's to Ken.   "Please advise why you

3    entered a flat commission amount in addition to the

4    normal."   Let's go to the first box, the Eden Vance.

5    Walk us through what you're showing and what it is

6    you're seeing on the screen and what it's indicating to

7    you?

8         A.   Well, it's telling me that he solicited a

9    closed-end fund, which was the Eden Vance Tax-Managed

10   Global Diversified Equity Income Fund.   It tells me what

11   price he purchased it at and what commissions he charged

12   on it.

13        Q.   So just as we're going across on it, it

14   says "commission $495".   What does that represent?

15        A.   That represents the commission that he had

16   entered into the system.

17        Q.   When it says "compared value, $368.69",

18   what does that reference?

19        A.   Can I tell you, I'm not quite sure.

20   Because when I look at the commission amount, that's

21   what I would look at.   The compared value typically

22   offer some sort of commission schedule.   But it wasn't

23   anything that I would look at.

24             I would look at here a commission in excess

25   of equities.   It clearly flags it.   The system pulls off



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 531

240

1   of the commission schedule what they think the

2   comparative value would be, what that's derived from, I

3   couldn't say.  But that's how it notifies me that there

4   was commission in excess.

5              ARBITRATOR:  Just for clarifications, you

6   had mentioned that the Thompson 1 had an opportunity for

7   the bank to enter the commissions into the Thompson 1.

8              WITNESS:  So what that is, it's not the

9   bank -- well, Wells Fargo Investments provides a

10  commission schedule through the technology group to

11  Thompson 1, and that's what is used when we go through

12  the order entry system.  Because if you can imagine,

13  Thompson 1, many different firms use Thompson 1.  And

14  many different firms have different commission

15  schedules.

16             ARBITRATOR:  But you did mention that this

17  compared value was derived from a commission schedule.

18             WITNESS:  I believe that it was derived

19  from a commission schedule, but I'm not certain.

20             ARBITRATOR:  So you're not certain that

21  this was the commission that was entered by Wells Fargo

22  into the Thompson 1?

23             MR. KANE:  Answer the question.  I'll

24  clarify with the document.

25             WITNESS:  The reason why I'm not sure is



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 532

Arbitration
<span style="float:right">March 18, 2011</span>

241

1    because at the time that I flagged this in, there's

2    another system on Thompson 1 that is what we call a

3    commission calculator.  So that's a system that many of

4    the sales assistants and financial advisers will use if

5    they're speaking with a client.

6              That client will say, "How much is this

7    going to cost me?"  They can go into the commission

8    calculator saying this is the approximate dollar amount

9    that it will cost you.  It will pull from what our

10   commission schedule is and show that commission dollar

11   amount.  So when I ran the commission calculator against

12   the trades for Ken, it was a different amount than this.

13             CHAIRMAN:   Than this.

14        A.    Than the compared value.  So I go off of

15   what the commission calculator states because I know

16   that to be our commission schedule.

17   BY MR. KANE:

18        Q.    So to clarify that, go to the document that

19   has the number W23.  It's for the -- let's not do that

20   one.  Let's do the one for the Eden.  So let's go to the

21   document that has the page number W26.

22             So to kind of clarify, tell the panel what

23   this document is and how you use it in connection with

24   your review of this trade?

25        A.    So with this, I took -- I was trying to



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 533

242

1    determine what the commissions would -- should have been

2    off of our commission schedule.  So that's kind of a

3    free form.  I was able to put in that the quantity was

4    600 shares, that it was traded at $12.29.  It gave me

5    the principle amount and then it pulled our commission

6    schedule of $197.74 along with our postage and handling

7    fee, which was standard, to give you a net amount of

8    $7,576.76.

9            ARBITRATOR:  My question is the maximum

10   grade area above that, what does that represent?

11           WITNESS:  I couldn't tell you.  I had

12   spoken with someone in our IT department trying to

13   figure that out.  They said it was some sort of a system

14   glitch, that we weren't ever to look at that number,

15   that the low number was what was our actual commission

16   schedule was.

17           ARBITRATOR:  I can guess what it is.

18   Because zero is the minimum and 690 is the maximum, so

19   the problem is a system function that you can't put in

20   more than the 690.

21           WITNESS:  Yeah.  I don't know.

22   BY MR. KANE:

23       Q.  But just so we're clear, there's no doubt

24   in your mind that pursuant to the commission schedule at

25   Wells Fargo, the commission was supposed to be the



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 534

Arbitration                                      March 18, 2011

243

1    $197.74?

2              A.    Correct.

3                    MR. SHAFFER:  Objection.

4                    CHAIRMAN:  To what?

5                    MR. SHAFFER:  To the statement that

6    Mr. Kane just made.  Because obviously, it says $460 is

7    the maximum commission.

8                    ARBITRATOR:  $690, you mean?

9                    MR. SHAFFER:  I'm sorry.  I'm looking at

10   the first one.  It says $690 is the maximum commission.

11   I don't know that we can ascertain --

12                   ARBITRATOR:  We have ascertained what that

13   is.  That's a system issue that Wells Fargo cannot issue

14   a commission higher than $690.

15                   MR. SHAFFER:  But you realize it is

16   possible to charge a commission much higher than $690.

17   If you had --

18                   ARBITRATOR:  But this system doesn't

19   operate that way?

20                   MR. SHAFFER:  Yes.  This system would allow

21   any FC to enter an order saying Mr. Kane had 300 shares

22   of 3 Com stock, the commission might be very well be

23   $1,500.

24                   ARBITRATOR:  Clearly there's issues here.

25   Because we've got an issue with the compared value.  How



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 535

244

1    is an FC going to know which of these he is to use?

2          A.    If you just enter the trade without putting

3    any flat dollar commission, if you just put in "I am

4    buying 600 shares out the market", and the market was at

5    $12.29, when you go in to place the trade, it gives

6    you -- it gives you a pre-look at the order form.

7                ARBITRATOR:    Sure.

8          A.    It gives you an idea of what that

9    commission is.

10   BY MR. KANE:

11         Q.    Would that then show the 194.74?

12         A.    At that point, that would also allow the FC

13   to say, "You know what, I'm not comfortable charging

14   that amount.    I want to charge less."    They could at

15   that point discount the trade if they wanted to discount

16   the trade.

17         Q.    What if the FC wanted to make an upward

18   adjustment?

19         A.    I would say that I have never seen FCs make

20   upward adjustments, primarily because FCs have a really

21   hard time discussing what their worth is.    Many FCs have

22   a problem talking about how they get paid.    And it's

23   almost embarrassing at some points, you know.

24                It's my experience working with financial

25   advisers, the toughest conversations that they ever have



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 536

245

1  with their clients is what commissions they're charging

2  and what they earn on the specific transaction.

3          CHAIRMAN:  Excuse me.  Are you saying this

4  is the only time you've ever seen an upward commission?

5      A.   Yes.

6  BY MR. KANE:

7      Q.   You've seen discounts?

8      A.   I've seen discounts right and left.  I've

9  never seen this.

10          ARBITRATOR:  Well, the discounts are not in

11  the best interest of the company.

12      A.   You know, it depends.  And I won't say

13  that.  Because if it brings value to a client, if it

14  means that you're developing and deepening a

15  relationship by discounting a trade because you believe

16  that you're going to get more business later on, then --

17          ARBITRATOR:  I understand.

18          WITNESS:  Then that would make sense.

19          MR. SHAFFER:  I have a question as well.

20          CHAIRMAN:  You'll have an community.

21          MR. SHAFFER:  I want Ms. Mortensen to

22  answer all of your questions.  So if you have any

23  questions, please ask them.

24  BY MR. KANE:

25      Q.   So the one for Eden Vance, go to Number 23,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 537

246

1    which would be for the -- let's go all the way back to

2    20 and talk about the second trade that shows up there,

3    the V.  Again, this is showing a solicitation of the

4    purchase and a flat commission of $495.  And we see that

5    compared value there as well.

6              So that was included in what you sent to

7    Mr. -- to Mr. Shaffer; correct?

8         A.   I did not send this commission calculator

9    to him.

10        Q.   No.  I'm talking about Number 20 at the

11   bottom.

12        A.   Yes.

13        Q.   And that's also included in your e-mail?

14        A.   Yes.

15        Q.   And no matter what the compared value is,

16   we know that it's less than the flat fee of $495?

17        A.   Correct.

18        Q.   And then if you go to Tab -- page 23, what

19   does this show?

20        A.   This shows that the -- that our commission

21   schedule would have reflected a commission of $169.47.

22        Q.   When Mr. Shaffer entered the trade, would

23   this pop-up where he would know that the commission was

24   under the schedule where it was $169.47?

25        A.   Yes.  If he entered it without -- because



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 538

247

1    he populated it with a flat dollar, it would have not

2    showed.  If he would have just left it alone again, it

3    would have showed.

4                  ARBITRATOR:  My question to you is:  If --

5    this is the e-mail that you sent him with the compared

6    value?

7                  WITNESS:  Yes.

8                  ARBITRATOR:  If he had entered the compared

9    value of $368.69 in the first instance, $336.58 in the

10   Nuvane (phonetic) instance, would it have triggered

11   your --

12                 WITNESS:  I don't know.

13                 ARBITRATOR:  Because this is the one you

14   sent to him.

15                 WITNESS:  This is the one.  I sent it to

16   him because the system triggered it.  I work off of the

17   tools and resources that are provided to me.  This

18   obviously populated for a reason.

19   BY MR. KANE:

20        Q.   We keep saying "populated".  Just so

21   we're -- what do you mean by that?  Showed up?

22        A.   Well, yeah.  It's not where I had to dive

23   into it or try and find it within the trade blotter.  It

24   was on my exception blotter that when I'm -- when I do

25   our exception approves, I'm required to place notes in



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 539

248

1   the system as to either how I resolve the problem or

2   what happened, some sort of a note so that there would

3   be a trail for whatever reason to ensure that those

4   exceptions had been answered the way that the firm

5   required me to do so.

6        Q.    Let's go to the actual order, unless you

7   have a question.

8              ARBITRATOR:  But, again, what you saw that

9   triggered your concern was what you e-mailed him here?

10             WITNESS:  Correct.

11  BY MR. KANE:

12       Q.    And after you e-mailed him, is that when

13  you went to the commission calculator, you know, take

14  Number -- page 23, or where does that enter into the

15  process?

16       A.    That's when I pulled and I -- at the point

17  that I started what I consider my investigative work as

18  to why, at that point, I pulled up the commission

19  calculator so that I would have an idea of what had been

20  charged versus what should have been charged.

21       Q.    Now let's go to -- so we're clear, on page

22  22, W22 and we'll do the same thing for W25.  But let's

23  start with W22, page number 22 in the lower-right-hand

24  corner.  It's on --

25             ARBITRATOR:  I just want to ask one more



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 540

Arbitration                                    March 18, 2011

249

1    question.  I'm sorry to do this.  What year did Ken join

2    the firm?

3                   MR. KANE:  '06, June 15th of '06.

4                   ARBITRATOR:  That's fine.

5                   MR. KANE:  Are you at page W22,

6    Ms. Mortensen?

7         A.    Yes.

8    BY MR. KANE:

9         Q.    Tell the panel what this document

10   represents.

11        A.    I have the ability to go into what I call

12   the dark side.  It's off of another system, what we call

13   data host, and pull up what the actual transaction

14   looked like and how it was actually entered.

15        Q.    How the broker entered the trade?

16        A.    How the broker entered the trade.

17        Q.    What did this show you?

18        A.    Again, it tells me that he was buying 400

19   shares of the JGT of the new E multi-currency.  And then

20   if you look right above the description where it says

21   "CM", that stands for commissions.

22        Q.    CM, so the 495?

23        A.    Yeah.  So that's how I was able to

24   ascertain that there was truly a flat dollar amount that

25   was placed versus a percentage.  If you look directly to



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 541

250

1    the right where it says "P/C", if he would have

2    discounted the trade with a certain percentage, then

3    that percentage of the discount would be there.

4         Q.   Now, is the CM, where it has $495 on the

5    order ticket, does that typically have a number there?

6         A.   No.

7         Q.   Why not?

8         A.   Because typically the financial advisers

9    just charge the normal commission schedule and therefore

10   it would be blank.

11             ARBITRATOR:  It would be automatic.

12        A.   It would be automatic, correct.

13   BY MR. KANE:

14        Q.   So did you reach any determination or

15   conclusions as to whether he overrode the system in

16   order to put the $495 there?

17        A.   I could clearly tell that he overrode the

18   system and placed a flat-dollar amount.

19             MR. SHAFFER:  Objection.

20             CHAIRMAN:  Objection to the question?  What

21   is your objection?

22             MR. SHAFFER:  Her statement.

23             CHAIRMAN:  No.  You have an opportunity to

24   ask questions later and to make an argument.

25   BY MR. KANE:



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 542

Arbitration                                      March 18, 2011

251

1        Q.    And would you go to the page that has the

2   W25?  That's the same for the second trade.  You have

3   this one, the Eden Vance trade, W25.  And, again, is

4   this the order ticket for the second trade we're talking

5   about?

6        A.    It is.

7        Q.    And, again, your answers would be the same,

8   that normally that CM would not have the $495 there, it

9   would be blank?

10       A.    Correct.

11       Q.    And this is another indication that he

12   overrode the system?

13       A.    Correct.

14       Q.    And then if you go back to page 23, what --

15   whose handwriting is that at the bottom?

16       A.    Mine.

17       Q.    Okay.  And tell the panel what those

18   numbers represent.

19       A.    Well, I was trying to figure out what the

20   client should have been charged for both trades and how

21   much he was overcharged.  So I took both trades and I

22   totalled those two together.  And then I took the dollar

23   amount of what he had actually charged, less the -- what

24   he should have been charged.  And that was the total

25   dollar amount that I thought that he was overcharged.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 543

252

1      Q.   So the numbers in the middle are the

2  commission -- the $169.47 and $197.74 that should have

3  been charged and the bottom is the $990, what he did

4  charge?

5      A.   Right.

6      Q.   And then if you go to the next page, 24,

7  tell the panel what this represents.

8      A.   I requested Ken to submit me a trade

9  correction form so that we could get the commission

10 adjusted to where the client should have been charged.

11 And so he filled out -- part of this is his handwriting

12 and the other piece is my handwriting.

13     Q.   Where it says BAM note --

14     A.   Even at the top where it says "COMM should

15 be $79.94", that's my handwriting.  And then the note

16 before, what I put in before.

17     Q.   Tell the panel what that says there.

18     A.   "FC inputted trade in excess of commission.

19 Firm guidelines at $197, FC put $495.  Trade to be

20 reduced 10/1 of '09."

21     Q.   And does that also pertain to the second

22 trade?  Let me make sure I have that.  Page 24.  Did I

23 do 24?  I'm sorry.  I apologize.  Go back to 21.  I

24 misspoke.  And is this the same report that you just

25 described for the other --



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 544

Arbitration                                        March 18, 2011

253

1          A.    It is.

2          Q.    And why don't you just tell us what your

3    handwriting is, what it says?

4          A.    My handwriting says, "The comm should be

5    $169.47", my signature, date and then "reduced

6    commission to flat $169.47 in BAM note.   FC inputted

7    trade in excess of commissions from guidelines at

8    $169.47.   FC put $495, trade to be reduced 10/1/09",

9    with my initials.

10         Q.    Now let's go back to 20, the next page.

11   And I understand that what we just read came after your

12   e-mail to Mr. Shaffer, because that's a September 29th

13   e-mail.   Did you get a response from Mr. Shaffer to your

14   September 29 e-mail?

15         A.    I did.

16         Q.    And could you go to the first page of

17   Claimant's Exhibit 10, the very first page of -- I'm

18   sorry -- Tab 10, the first page.   And let's talk about

19   the middle e-mail from Mr. Shaffer to you.   Take a look

20   at that and then I'll ask you a question.

21               Did you receive this e-mail from

22   Mr. Shaffer responding to your inquiry about these two

23   trades?

24         A.    I did.

25         Q.    When you got this -- when you received this



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 545

254

1    e-mail, what was your reaction to it?

2         A.    I was shocked.

3         Q.    Why?

4         A.    Well, one of the things that I've always

5    spoken with the FCs about is memorializing things in an

6    e-mail format.  And for him to memorialize that it

7    was -- that he thought that gouging was part of our

8    business plan, I didn't believe that he did that.

9              And second, I almost felt that it was

10   disrespectful to me and to the firm that he would be so

11   flippant about his response to me.

12        Q.    And after you received this e-mail, what

13   did you do next?

14        A.    Well, I immediately took it to my regional

15   sales manager as, you know, per my guidelines, because

16   she is his supervisory principal, and I brought it to

17   her attention.

18        Q.    Who is that?

19        A.    Jan Krug.

20             CHAIRMAN:  You said something about

21   guidelines?

22        A.    Well, what I'm talking about is as a branch

23   administration manager, at the end of the day, the

24   person who's ultimately responsible for the supervision

25   of the office is the regional sales manager.  And it is



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 546

255

1    the person that Ken Shaffer directly reported to.

2                So Ken wasn't a direct report to me, he was

3    a direct report to the sales manager.  And therefore, it

4    was, you know, part of my responsibility to ensure that

5    I was properly communicating concerns that were taking

6    place with her direct reports.

7         Q.   And so that was the Jan Krug that's

8    indicated there?

9         A.   Correct.

10        Q.   I'm sorry.  Indicated in that top e-mail.

11   Let's take a look at that top e-mail.  It was from you

12   to a Kelly Marks with a ccs to, you know, yourself,

13   Mr. Mark Webster, et cetera.  First of all, who is Kelly

14   Marks?

15        A.   Kelly Marks is one of the senior managers

16   in our compliance department here in San Francisco.  She

17   is responsible for regulatory inquiries.  She is

18   responsible for customer complaints and she's

19   responsible for the registration group.

20        Q.   Why don't you send the e-mail to her?

21        A.   I was requested to do so by -- I believe it

22   was Jan Krug.  Directly after I received this e-mail,

23   not only did I take it to Jan Krug, but I also took it

24   to another one of our senior managers.  And I believe it

25   was Leo Hamel at the time.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 547

256

1          Q.    And just for the record, what was

2    Mr. Hamel's position at the time?

3          A.    Regional manager.

4          Q.    And what was his role?  What were his

5    duties?

6          A.    His role was more as a -- he's a manager of

7    what we call the private banks.  So it's the umbrella

8    that Wells Fargo Investments falls under.  So he was

9    responsible for all the activity that took place in that

10   office between the investment group, of the private bank

11   group, our estate planning group.  He was responsible

12   for that.

13         Q.    You also copied I think Mark Webster on

14   this?

15         A.    Right.

16         Q.    Why did you copy him on the e-mails?

17         A.    Mark Webster had recently been promoted to

18   a new position called -- now it's called the Senior

19   Director of Brokerage, which means that he is

20   responsible for all of Wells Fargo Investments in

21   Northern California.

22              And, therefore, the regional sales managers

23   all report directly in to him.  And I was requested to

24   copy in Mr. Webster, as well as Ms. Marks.

25              CHAIRMAN:  Who advised you to do that?



EXHIBIT X  Page 548

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

257

1              WITNESS:  Jan Krug.

2              CHAIRMAN:  Go ahead.

3        A.    And to let them know of the situation that

4    I had uncovered.  And but more -- it wasn't so much even

5    the situation.  It was really the e-mail that he sent

6    and that he had memorialized in response to the fact

7    that it was in Wells Fargo's business plan to gouge

8    customers.

9    BY MR. KANE:

10       Q.    And while this was going on, did another

11   issue come up in connection with Mr. Shaffer?

12       A.    Well, Kelly -- it's my understanding that

13   Kelly Marks had notified other people within our

14   compliance group, one of them by the name of Brian

15   Aldridge.  And Brian Aldridge is my compliance analyst.

16   So --

17       Q.    What does he do?

18       A.    He is responsible for my internal

19   examinations.  He literally comes in and does my

20   internal examinations.  He's responsible for our monthly

21   surveillance, enhanced surveillance to make sure I'm

22   doing my job.

23             In addition, he's also a resource for me

24   should I have any questions regarding compliance,

25   someone that I could readily reach out to that I had a



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 549

258

1   relationship with that could help me find my way.

2        Q.   So what was Mr. Aldridge's involvement

3   here?

4        A.   Well, Mr. Aldridge, after he was -- after

5   this was brought to his attention, did an additional

6   review on what we call our Assenter system.

7        Q.   Describe for the panel what is an Assenter

8   system?

9        A.   Assenter is an e-mail system that allows us

10  to capture and to review e-mails that are in and out of

11  Wells Fargo, but not internally.  And this is a way for

12  us to meet with FINRA guidelines of reviewing incoming

13  and outgoing correspondence via the e-mail systems.

14       Q.   So in connection with Mr. Aldridge's review

15  through a center of these e-mails, did he bring an

16  e-mail to your attention regarding Mr. Shaffer, or a

17  series of e-mails regarding Mr. Shaffer?

18       A.   He did.

19       Q.   And if you would, take a look please in the

20  white notebook, it would be Tab 9.  And just look at all

21  those pages and then I'll ask you a question.

22            MR. SHAFFER:  Can I ask a question?

23            CHAIRMAN:  When it's your turn.

24  BY MR. KANE:

25       Q.   Have you had an opportunity to review



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 550

Arbitration                                    March 18, 2011

259

1    Exhibit 9?

2         A.    Yes.

3         Q.    Just tell the panel what Exhibit 9

4    represents.

5         A.    Exhibit 9 represents a fax that we received

6    from Brian Aldridge.  And I can tell because it's his

7    fax number.

8              CHAIRMAN:  You said the stocks you

9    received?

10             MR. KANE:  A fax.

11   BY MR. KANE:

12        Q.    I'm sorry.  So we're clear, the fax header

13   at the top indicates that Mr. Aldridge faxed you this

14   string of e-mails.

15        A.    Right.  And it also has his writing, which

16   is the Brian A to Dan G and the written complaint down

17   on the bottom.

18        Q.    That's Mr. Aldridge's handwriting?

19        A.    Correct.

20        Q.    So what are these e-mails?

21        A.    These e-mails are e-mails that he pulled

22   from our Assenter system in which he did a review.  And

23   he identified this e-mail and asked if we were aware of

24   this written complaint that had come in through the

25   e-mail system.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 551

260

1        Q.    And had you been aware of it?

2        A.    No, I had not.

3        Q.    Had Mr. Shaffer brought this e-mail of Doug

4    Johnson this we down here of September 11, '09 to any

5    manager's or supervisor's attention at Wells Fargo?

6        A.    No, he did not.

7        Q.    You've heard Mr. Shaffer's testimony that

8    he didn't believe for whatever reason that this was not

9    a written complaint.  It's Brian Aldridge writing that

10   says "written complaint" where it says "my attorney will

11   contact you next.  I'm pissed you got me into this."

12       A.    Correct.

13       Q.    When you saw this e-mail, did you view this

14   to be a complaint that needed to be reported to

15   management that Mr. Shaffer failed to report?

16       A.    Yes, I did.

17       Q.    Why did you come to that conclusion?

18       A.    Anytime that you mention that my attorney

19   will contact you, any word of the -- any word of

20   attorney, I think at that point, you need to engage us

21   because there's definitely an issue and the client is

22   definitely complaining.  Someone who isn't complaining

23   won't throw around the word attorney.

24       Q.    In addition, he said "I'm pissed you got me

25   into this"?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 552

261

1        A.    Exactly.

2        Q.    So take a look at Exhibit 11, Tab 11.   Is

3   that the portion of Wells Fargo's compliance manual that

4   deals with customer complaints and the reporting of

5   customer complaints?

6        A.    It is.

7        Q.    Did Mr. Shaffer follow that procedure in

8   connection with the written complaint that we just

9   talked about?

10        A.    He did not.

11        Q.    Now let's go back to Exhibit 10 for a

12   minute.  I'm sorry 9.  I apologize.  9.  In connection

13   with your conversations with Mr. Aldridge regarding this

14   e-mail, did you ever discuss with him Mr. Shaffer's

15   production levels, whether they were high, low or

16   indifferent.  Was that a subject matter that ever came

17   up?

18        A.    No.

19        Q.    In connection with Exhibit 10, when you

20   were -- had discussions with any of the individuals that

21   are copied on this e-mail on Exhibit 10, did you ever

22   have any discussions with any of those individuals of

23   what Mr. Shaffer's production was?

24        A.    No.  Outside of the fact that I did state

25   that at that point he was on written performance



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 553

262

1   warning.  But production -- just for clarification, if I

2   could, production wasn't anything that I paid a lot of

3   attention to.   I tried not to pay attention to

4   production.

5           Because in my view, I don't want there to

6   be anything colored as far as what types of trading

7   they're doing or for them to differentiate between

8   someone who is a high, high producer or low producer.  I

9   want to look at this trade and not have this other

10  information be part of my thought process.

11          So even today, if you were to ask me what

12  production level any of my financial advisers were at, I

13  wouldn't be able to tell you.

14          Q.   So we've got Exhibit 10 with the trade

15  issue and we've got Exhibit 9 with the e-mail issue.

16  After you have that information in your possession, what

17  happens next?

18          A.   Well, it's a -- when Kelly Marks received

19  the e-mail, part of a standard practice that we do is

20  we -- she will determine whether or not this is

21  something that warrants what we call a conference call

22  to that extent where we involve various parties from the

23  firm to discuss the issue to determine the risk that as

24  a firm we have and whether or not we need to mitigate

25  that risk.  So Kelly Marks requested that we have that



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 554

263

1    conference call.  And there were various people

2    firm-wide on that call.

3            Q.    So just so we're clear, let's sure we have

4    an approximate time for this conference call?

5            A.    If I recall, that call was around 1:00 or

6    2:00 in the afternoon.

7            Q.    On September 29th?

8            A.    No, on October 1st.

9            Q.    So sometime on the afternoon of

10   October 1st, who are the participants of the conference

11   call?  Just identify them for the panel and what their

12   positions were with the firm.

13           A.    To the best of my recollection, it was

14   myself, it was Jan Krug, it was Kelly Marks, Brian

15   Aldridge.

16           Q.    And Kelly Marks' position again?

17           A.    I'm sorry.  She was the compliance manager.

18   Brian Aldridge.  I believe Susan Muser was on that call.

19           Q.    Who is she?

20           A.    She is Brian Aldridge's manager.

21           Q.    Okay.  L. G. D'Orio, who is that?

22           A.    He is the registrations manager.

23           Q.    What does he do?

24           A.    He's in charge of registrations and

25   licensing.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 555

264

```
 1        Q.   U4s, U5s?

 2        A.   U4s, U5s.  We have an HR representative on

 3   the line.

 4        Q.   Who was that?

 5        A.   It's either Christy Longley or Eva McCaya.

 6   It was one of those two.  I can't specifically remember

 7   who our HR consultant was.  But we never have a call

 8   with an HR consultant on the phone.

 9             ARBITRATOR:  The HR manager works for Wells

10   Fargo exclusively?

11        A.   Correct.  And then we also had -- Jackie

12   Sun was on that call.

13   BY MR. KANE:

14        Q.   Who is she?

15        A.   She is a lawyer representing Wells Fargo

16   Investments employee law.  So she's in charge of

17   reviewing various things that have to do with employee

18   relations.

19        Q.   So an attorney was participating in that

20   conference call?

21        A.   Yes.

22        Q.   Because an attorney was participating in

23   this call, I don't want to ask you about what took place

24   during the conference call.  But I do want to ask you,

25   after that conference call, what happened next?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 556

265

1          A.    Obviously, there was a recommendation that

2     was made.  And Jan Krug had to make a decision on the

3     viability of Mr. Shaffer's employment, at which time a

4     decision had been made to proceed with termination of

5     his employment.

6          Q.    What happened after that?

7          A.    Jan Krug called Ken Shaffer to come.

8          Q.    Were you present when she called

9     Mr. Shaffer?

10         A.    I was.

11         Q.    Why don't you just tell the panel what you

12    remember about that?

13         A.    She asked Ken to come in so that we could

14    have a discussion on what happened, and to also bring

15    his laptop with him.

16         Q.    Anything else said during this

17    conversation?

18         A.    No.

19         Q.    And did Mr. Shaffer bring in -- come in

20    that day?

21         A.    He did not.

22         Q.    As he was requested?

23         A.    He did not.

24         Q.    Had he been requested to come in that day?

25         A.    He had been requested to.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 557

266

1          MR. SHAFFER:   Ordered.

2     BY MR. KANE:

3          Q.   And so when he didn't come in that day,

4     what happened next?

5          A.   Well, of course by this time, we're pretty

6     late in the afternoon.  And Jan Krug had asked me to go

7     out to his store location the following day and to

8     proceed with the termination of Mr. Shaffer.

9          Q.   Up to now, had anybody discussed with you

10    Mr. Shaffer's production levels at all regarding --

11         A.   No.

12         Q.   Okay.  So you proceed to -- was it Empire

13    Ranch?

14         A.   Empire Ranch.

15         Q.   You went there the next day, I guess,

16    October 2nd?

17         A.   Uh-huh.

18         Q.   Tell the panel what happened.

19         A.   Well, prior to going, Jan Krug had coached

20    me.  Because this isn't something that's part of my

21    normal function.  I typically don't personally terminate

22    financial advisers.  It's a function of the regional

23    sales managers.  So she coached me in what I should

24    be -- what I should include in my conversation with him

25    and what I needed to do.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 558

Arbitration                                        March 18, 2011
                                                              267

1           ARBITRATOR:  Do you have any idea why she
2    didn't do it herself?
3           WITNESS:  I wracked my brain over that and
4    I don't.  You know, there might have been a meeting
5    going on.  She might have had a commitment the following
6    day.  I really don't recall.
7    BY MR. KANE:
8           Q.   Let me ask you a question as a follow-up to
9    that:  When you participated in this call when Ms. Krug
10   was asking him to come in that day to meet, was it your
11   understanding that if he had come in, it would have been
12   you and her?
13          A.   Absolutely.
14          Q.   So when he didn't show up, it was after
15   that that Ms. Krug asked you to go out there?
16          A.   Exactly.  So that leads me to believe that
17   there had been something that she couldn't get out of
18   her calendar that prohibited her from going that
19   following day.  And it had to be taken care of.  It had
20   to be resolved.
21          Q.   And as best you recall, tell the panel
22   everything you recall about that meeting with
23   Mr. Shaffer.  It's just you and him?
24          A.   I recall going into the office.  I recall
25   he asked me am I there to terminate him.  I said yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 559

268

1    He told me that -- he goes, "I want you to know that

2    you're not going to one red dime out of me.  I'm not

3    going to pay you anything."

4              I then tried to remind him that this was as

5    a result of the two compliance violations that we noted,

6    the failure to forward a written complaint and for

7    marking up the client's account.

8              I also recall having a conversation with

9    him at the time that really the thing that sealed the

10   deal, or however you want to say that, was the e-mail;

11   that that e-mail was disturbing, not just to me, but to

12   other people within the compliance group.

13             I then asked him for his laptop and his

14   keys, as we normally do.  He was agitated, as I'm sure

15   he would be, being terminated.  But we were in a

16   store -- we were in the middle of the bank branch and it

17   was getting loud, so I was trying the best I could to

18   try and diffuse the situation.  He asked me for a copy

19   of -- he wanted a receipt for his laptop.  And it's

20   something that I've never done before.  I've never been

21   requested to provide a receipt for Wells Fargo property.

22   And I finally just acquiesced and gave in to him.  So I

23   wrote him a handwritten receipt for the laptop.  And

24   then he proceeded to pack up his personal belongings.

25             And then I stayed there in the store to --



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 560

269

1   what I always do like an exit examination, just to make

2   sure that everything is there, Wells Fargo client files

3   are there, and anything wasn't taken that I considered

4   proprietary information.

5           I also do recall at that time that he did

6   ask me for information regarding his gross production

7   runs, which I was not inclined to give him.  Because we

8   do consider that the proprietary information.

9           The commission runs actually list out

10  client names and account numbers and things like that.

11  So it wasn't something that I was willing to give him.

12  To be perfectly honest with you, I didn't even know how

13  to access it.  That's how little I pay attention to the

14  production, is I didn't have -- personally, at that

15  point, I didn't have access to that program to be able

16  to pull it out.

17          Q.   During this conversation with Mr. Shaffer,

18  did he inquire about the promissory note?

19          A.   He did.

20          Q.   Tell the panel what you recall him saying.

21          A.   That was part of the coaching that Jan gave

22  me.  Jan made sure that I told him that in no way was

23  the promissory note going to be forgiven as a result of

24  these actions, that that contract was still in full

25  force.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 561

270

1          Q.    Did you refer to the promissory note as

2   blood money during this conversation?

3          A.    I don't recall that.

4          Q.    Is that something you'd remember?

5          A.    I hope that that's something I would

6   remember.   I truly don't remember that.

7          Q.    When he gave you the laptop and asked for

8   the receipt and you gave that to him, after he left,

9   what did you do next with the laptop?

10         A.    Well, I went back to the office and I gave

11  the laptop to my IT consultant.   And what the IT

12  consultant does is think kind of go through and they

13  will disable everything.

14             And I typically require that the hard drive

15  or their personal hard drive be saved on to my laptop so

16  that if later on there's any type of regulatory

17  inquiries or anything like that, I have access to the

18  information on his laptop.

19         Q.    Just so I'm clear, what at least we're

20  talking about here is Wells Fargo does give financial

21  advisers Wells Fargo laptops to use when they are in

22  these bank branches?

23         A.    Correct.

24         Q.    So what did your IT person conclude?

25         A.    He came back to me and told me that the



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 562

271

1   laptop that I had wasn't a Wells Fargo laptop and that

2   it was Ken Shaffer's personal laptop and that he had

3   given me the wrong laptop.

4        Q.   What did you do next?

5        A.   I was obviously really upset.  If you can

6   imagine, it was difficult enough for me to go in and do

7   the termination because that is not something that I was

8   used to.

9             But I felt that he had put me in a

10  situation where he demanded a receipt for the laptop and

11  he intentionally gave me the wrong laptop and it

12  required me to have further conversation with him was

13  really disturbing.

14       Q.   So what did you do?

15       A.   I called him up and I told him that he had

16  to return that laptop immediately.  And failure to

17  return that laptop, I would report it to the proper

18  authorities as stolen property.

19       Q.   So what happened next?  What was his

20  response to you?

21       A.   He said he would come in and meet me.

22       Q.   Okay.  So what happened next?

23       A.   I'm sorry.

24       Q.   Do you need to take a break or just take a

25  minute?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 563

272

1           A.    I'm sorry.  He then requested that I meet

2      him downstairs.  And I didn't feel comfortable and so I

3      had asked my IT person to go out there and meet us to

4      get -- to retrieve the laptop.  And we went down into

5      the lobby area.  He wasn't there.  We looked in the

6      front of the parking lot and he wasn't there.  So we

7      went to the back of the building and he was there.  He

8      was slumped down in his car.

9                  And I think one of the reasons why this is

10     so upsetting to me is that for whatever reason, I mean,

11     I've terminated a lot of people in my career.  I've

12     participated in a lot of terminations.  But there was a

13     lot going on with Ken at that time.  And I felt that Ken

14     had the ability to go postal.  I mean, he was so angry

15     with Wells Fargo.  There was so much anger there.  And I

16     was afraid.

17                 And so I remember going out to the back

18     area and he was kind of slumped down in his car.  And

19     even my IT guy said that it made him very nervous.  He

20     got out of the car and he went to the trunk of his car.

21     I didn't know what was going to happen.  I'm not trying

22     to be overly dramatic.  It was just scary for me.

23                 So he pulled out the laptop and he gave it

24     to me and we went back up to the office.  Now, in the

25     33 years that I have been in -- I have never, ever, been



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 564