273

```
 1   so scared.  I don't care what you call it, but I
 2   requested Wells Fargo to hire corporate security for
 3   that office for at least -- I think they were there for
 4   a week where they took me back and forth to my car
 5   because I was literally afraid of him at that point.
 6   And the thought of having to come here today was
 7   really -- was really hard.
 8           Q.    Take a minute.  I'm going to leave this
 9   topic.  We're almost done.  We're almost done.  Take a
10   minute.
11           It might help you to take a look at
12   Exhibit 8 in the notebook.  Grab a drink of water.  And
13   what I'm going to ask you to do, Mary, is go into the
14   U5.  Take a minute.  Take your time.  We're almost done.
15   Get the 5.  Do you see that?
16           A.    Yeah.
17           Q.    And in connection with that U5, the
18   statements that are contained there where it says -- it
19   would be page 122 at the bottom, where it says that he
20   was discharged for violation of company policies, the
21   reasons stated, are those reasons that are stated there
22   accurate statements?
23           A.    Yes.
24           CHAIRMAN:  Where on 22 are you looking?
25           MR. KANE:  122 where it says "violation of
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 565

274

1    company policies".

2            CHAIRMAN:  At the top, not the bottom.

3    BY MR. KANE:

4        Q.   Right.  Where it says "violation of company

5    policy, representative lacks justification for charging

6    the equity securities that exceeded the schedule.

7    Representative received written customer complaint and

8    did not forward it."

9            In your view, are all those all accurate

10   statements that were reported by Wells Fargo on

11   Mr. Shaffer's U5?

12       A.   Yes.

13       Q.   And then I'm going to ask you another

14   question and we're going to be done.  In Mr. Shaffer's

15   counterclaim, I won't ask the panel to go to it.  It's

16   in the counterclaim, he states here, Ms. Mary Mortensen,

17   compliance manager who informed me of the termination

18   actually stated that these infractions -- that these

19   infractions would ordinarily not be grounds for

20   termination.

21           Did you ever say that to Mr. --

22       A.   I don't recall that.  I do recall clearly

23   that inclusive of all of the information provided is

24   what brought us to the grounds.  So if you don't mind me

25   saying a little bit more, you know, as working in



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 566

275

1   compliance, and excuse me, but I almost feel like we're

2   damned if we do and damned if we don't.  So damned if we

3   do is I'm here today.  Damned if we don't is if we

4   didn't terminate him and I had this e-mail that was

5   memorialized and he continued.

6           Or if he came, you know, he did other

7   things and it was brought to FINRA's attention, at that

8   point, as a supervisory principal, that comes back on my

9   head.  And I'm responsible for it because I have this

10  note that's memorialized that, oh, it's okay because

11  Wells Fargo gouges your clients.

12          And so when you're making a determination

13  for termination, you have to look at everything.  And a

14  big piece of that is -- you know, maybe I'm being a

15  little selfish, but this is my career, too.  This is

16  something I take very seriously.  And I'm not going to

17  have something held out there in moratorium that later

18  on has the ability to come back and ruin my career.

19          MR. KANE:  I don't have any further

20  questions at this time.  It's about noon.  We can take a

21  lunch break.

22          CHAIRMAN:  Right.  We'll take a lunch

23  break.  Just a second.  And afterwards, Mr. Shaffer, you

24  will be able to ask Ms. Mortensen some questions.  Do

25  you have any other witnesses?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 567

276

1        MR. KANE:  No.  I will be complete, other

2   than my attorney fee affidavit.  I think we can do that

3   in closing arguments, would be what I think we could do.

4        CHAIRMAN:  I suggest you present it during

5   the time the evidence is in.

6        MR. KANE:  Yes.  I'm going to do that.  As

7   soon as Mr. Shaffer is done with Ms. Mortensen, I'll

8   present it at that time.

9        CHAIRMAN:  And then we'll probably close

10  the hearing.  And each of you is entitled, and, in fact,

11  we would like each of you to make a closing argument to

12  review the testimony and evidence as it has come in and

13  argue from it and indicate also the amount of damages

14  that you're seeking.

15        And I'm saying this to you as one who

16  doesn't regularly do this sort of thing to give you some

17  idea as to what's going to happen.  And I think then

18  we'll be able to complete today.

19        MR. KANE:  Yes, I believe you're correct.

20        ARBITRATOR:  I would like to ask one more

21  question before she finishes.  And that is:  Had you had

22  any previous problems of this type with him before?

23        WITNESS:  No.

24        CHAIRMAN:  What previous contacts had you

25  had with Mr. Shaffer before either of these incidents



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 568

277

1    unraveled or occurred?

2              WITNESS:  You know, there's a few things.

3    I mean, there's some things that I'm aware of.  And if

4    you're trying to figure out why I was afraid or what

5    brought that, I don't know if that's what you're leading

6    into.

7              CHAIRMAN:  No.  I'm sort of asking your

8    prior experience.

9              WITNESS:  A lot of my prior contact was the

10   trade review systems and stuff like that.  And then

11   there, you know, were -- I'd say that that was the

12   biggest piece of it.

13             ARBITRATOR:  But you had not had a trade

14   review problem with Mr. Shaffer before this.

15             WITNESS:  You know what, there's -- I can't

16   specify -- there's always a trade with almost I would

17   say every one of my financial advisers.  I've had

18   something come up where maybe I didn't have a switch

19   letter and/or I wasn't comfortable with a trade or I

20   felt that there was some sort of a product concentration

21   or something that they need to be aware of.  I'm in

22   constant communication with my FAs.  It's not like I

23   never saw Mr. Shaffer, never spoke with him.  Whenever

24   there was something, I'm in constant communication with

25   my financial advisers.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 569

278

1          MR. KANE:  But nothing that stood out like

2     what we had at the end.

3          CHAIRMAN:  Would you say you had more or

4     less contact with Mr. Shaffer than your other financial

5     advisers?

6          WITNESS:  Less.  But I think that's

7     indicative of the amount of trades he did.  Where, the

8     more trades that you review, the more opportunity that

9     I'm going to be reviewing things that I'm going to have

10    questions on.

11         If you don't do much trading, then that

12    lessens the interaction I'm going to have with you

13    because there's going to be less trades than I'm going

14    to review.

15         CHAIRMAN:  How long did you know

16    Mr. Shaffer?

17         WITNESS:  Since his hire date.

18         ARBITRATOR:  I have only one last question.

19    It's a follow-up to your comment that Mr. Shaffer was

20    having a lot of problems with the bank.

21         WITNESS:  Well, he was really, really angry

22    and there was a lot of stuff that was going back and

23    forth between his requests for medical disability.

24         At one point, I'm talking about my other

25    partner, Cindy Mathes, he had threatened suicide with



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 570

1   her.  I worked with a financial adviser who has

2   threatened suicide and they followed through with what

3   they said.  And that's something you take seriously.

4              And so as a result of that, he was

5   requested to do what we call a fitness of duty exam,

6   where they -- we had reached out to him and he wanted

7   him to contact our employee assistance group to say if

8   there was anything any way that we would be able to help

9   him.

10             We felt he needed to go through this

11  fitness of duty to see if he was in a mental state to do

12  his job.  And he declined our offer for that fitness of

13  duty.  But it was that in culmination with other things.

14  When I know someone has threatened suicide and we are

15  pushing out a fitness of duty claim, since I've been

16  with Wells Fargo, in my whole career, he's never done

17  something like that.  We kind of took all of those

18  things.

19             I was afraid of him.  It wasn't "I'm going

20  to do something to you."  It was more his state of mind.

21  You hear about stuff every day.

22             ARBITRATOR:  Sure.  The other question I

23  wonder about -- I'm sorry.  I lost my train of

24  thought -- would have had to do with the insurance, the

25  fact that he had applied for disability.  He felt he



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 571

280

1    needed time off and needed to -- Metropolitan had

2    declined him the disability.

3         And there was also a piece which I can't

4    recall exactly, but it had do with there was no

5    psychiatric or a psychological issues that they felt the

6    disability was warranted, the time off.

7         WITNESS:  I did -- I wasn't aware that he

8    had been denied.  I know he told me, but I never saw the

9    report from Met Life.  None of that ever flows to my

10   desk because he doesn't report to me.

11        ARBITRATOR:  Would Jan Krug have been aware

12   of that?

13        WITNESS:  I don't know.

14        CHAIRMAN:  I'm going to save some questions

15   until after Mr. Shaffer.  But just following up here,

16   were you part of the decision to recommend a fitness for

17   duty checkup?

18        WITNESS:  No, I was not.

19        ARBITRATOR:  I just have one question.  Who

20   was?

21        WITNESS:  Cindy Mathes and January Krug.  I

22   think I was out on vacation at that time and I came back

23   and they were talking about it.  We do a weekly admin

24   meeting where the branch managers and sales managers

25   talk once a week where we talk about issues, concerns



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 572

Arbitration                                   March 18, 2011

281

1    and things like that.  And it was brought up in that

2    meeting.  And Cindy told me about the conversation that

3    she had had and why they had requested the fitness for

4    duty examination.

5              CHAIRMAN:  Okay.  Off the record.

6         (Thereupon, a break was taken.)

7              CHAIRMAN:  Back on the record Wednesday

8    afternoon about 1:30.

9              The status now is for you, Mr. Shaffer, to

10   cross-examine Ms. Mortensen.  And since you don't do

11   this every day, I'll just point out what you will be

12   doing.  You will ask her questions and for her to

13   respond.  This is not the time for you to give your

14   opinions or your speeches.

15             You could say, for example, isn't it -- is

16   it true or false that such and such is the policy at

17   Wells Fargo, is the case.  And let her give her

18   response.  It's not up to you at this point to argue

19   with her.

20             In the closing statements, you can express

21   your views based on the evidence, not based on your

22   thoughts or thinking, but based on what somebody said or

23   what some document showed.

24             MR. SHAFFER:  Am I allowed to introduce

25   evidence at this point that I think has bearing on the



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 573

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

282

1    whole matter?

2              CHAIRMAN:  No.  You've rested.  Now, if you

3    have something that is really important, we can waive

4    that, because I don't want you to deny you your right to

5    have a full hearing.  What did you have in mind?

6              MR. SHAFFER:  Remember yesterday, I had

7    mentioned that I had an e-mail that I think served as an

8    ideal character reference for Mary, who is a witness in

9    this case against me.  I was told I would need to save

10   that until I was cross-examining Mary.  Would I have a

11   chance to do that?

12             CHAIRMAN:  Has she seen the e-mail?

13             MR. SHAFFER:  Yes, she has.  Well, it was

14   in my discovery packet.

15             CHAIRMAN:  I see.

16             MR. SHAFFER:  And the person who wrote the

17   e-mail is on my witness list.

18             MR. KANE:  I saw what's in his packet.

19   It's not a to/from Ms. Mortensen.  It relates to this

20   third party that he had on his witness list.  He wrote

21   an e-mail to Mr. Shaffer.

22             And the objection was he had him on his

23   list, he should have brought him in.  I won't have a

24   chance to cross-examine this person.  It's not in any

25   way impeachment to Ms. Mortensen.  So I still object.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 574

283

1          CHAIRMAN:  Right.  And the issue in this

2   case is not the character of Mary Mortensen.

3          MR. SHAFFER:  Well, it has become an issue

4   of my character.

5          CHAIRMAN:  No, not really.  It's what you

6   did and didn't do and what they did and didn't do.  So

7   if that's what you have in mind as additional evidence,

8   my inclination is not to allow it in, and pending the

9   testimony that you obtained from Ms. Mortensen, whether

10   it could be allowed in for impeachment purchases, and

11   that's why I can't rule it out.  But that's my

12   inclination.

13          MR. SHAFFER:  By the way, this is not

14   hearsay or something that someone said to me.  This is a

15   direct quote from Mary Mortensen.

16          CHAIRMAN:  Why don't you go ahead and ask

17   your questions.  At this point, I'm not going to allow

18   that in because I don't see a basis for it.

19          MR. SHAFFER:  Okay.

20          CHAIRMAN:  If one develops, I'll

21   reconsider.

22          MR. SHAFFER:  I haven't been sworn in today

23   and I'm not sure if Ms. Mortensen was sworn in.

24          CHAIRMAN:  Yes, she has been.  And when you

25   were sworn in yesterday, it was ongoing.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 575

Arbitration                                    March 18, 2011

                                                                284

1              MR. SHAFFER:  I believe Ms. Mortensen has

2    perjured herself a couple of times.

3              MR. KANE:  I'm going to object.  There's no

4    call for something like that.

5              CHAIRMAN:  That's exactly the sort of thing

6    that you cannot do; namely make statements, active

7    statements.  You're to ask her questions.

8              MR. SHAFFER:  Thank you.

9                        EXAMINATION

10   QUESTIONS BY MR. SHAFFER:

11        Q.   Mary, you mentioned that there is a process

12   and some kind of a computer program that you deal with

13   regularly call the broker audit or the Assenter blotter?

14        A.   Yes.

15        Q.   How often do you check that information?

16        A.   On a daily basis.

17        Q.   And how often do items come up on the

18   broker audit or the Assenter blotter?

19        A.   On a daily basis.

20             CHAIRMAN:  Well, you said "or".  That's

21   compound.  Is it the broker audit or the Assenter

22   blotter that you're asking her about?

23             MR. SHAFFER:  I don't understand the

24   difference between the two.  I thought they were kind of

25   the same.  Could you clear that up, Mary.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 576

285

1          A.    The broker audit is the trade blotter.  The

2     exception blotter is for any exceptions that are

3     identified.

4               CHAIRMAN:  Right.  So I guess the question

5     is how often do you look.  And answer as to both of

6     them.

7               WITNESS:  Daily.

8     BY MR. SHAFFER:

9          Q.    And especially in respect to the exception

10    blotter, those would be items of trade that needed your

11    additional consideration or input?

12         A.    Correct.

13         Q.    So those items come up daily.  And how

14    often are brokers fired when an item comes up on the

15    exception audit for the first offense?  I mean, when

16    this exception audit or the broker audit comes up, are

17    all the brokers on the broker audit fired for that day?

18         A.    No.

19         Q.    Well, what is the usual procedure then?

20         A.    Typically, it depends on what the issue is

21    and the severity of the issue.

22         Q.    But is it the case that brokers sometimes

23    would have several or even many items of this type and

24    not be terminated?

25         A.    Yes.



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 577

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

286

1         Q.   What would make the difference between one

2    person being terminated on the first offense and one

3    person being able to have repetitive offenses?

4              MR. KANE:   I'm going to object.  She didn't

5    testify to that.  That's not her testimony.  He's

6    mischaracterizing it.

7              CHAIRMAN:   She just testified that it's not

8    unusual for brokers to have several places on an

9    exception order.

10             MR. KANE:   That she did say.  The rest of

11   it, she didn't say.

12             CHAIRMAN:   He's asking if one appearance on

13   the broker exception is justification for termination.

14             MR. KANE:   Listen to the question.

15             ARBITRATOR:   He asked the question well.

16             WITNESS:   Can he repeat the question?

17             ARBITRATOR:   Ask the question again.

18   BY MR. SHAFFER:

19        Q.   Were brokers that had trades turn up on the

20   broker audit terminated on the first event?

21        A.   No.

22        Q.   And what were the variables that resulted

23   in a decision to terminate a broker or to let them have

24   several of these events?

25        A.   A violation of firm policy versus just a



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 578

Arbitration                                        March 18, 2011

287

1    review to determine whether or not I had pre-approved a

2    trade, and I had the necessary documents received for

3    switches, annuity trades or large trade approvals.

4              Q.   So let's say in a case where something came

5    up in the broker audit that was considered a violation

6    of company policy, was that financial adviser, financial

7    consultant terminated immediately?

8              A.   I don't recall ever having an exception

9    that showed a true violation of firm policy such as what

10   had occurred.

11             Q.   Really?  Okay.  I'm surprised at that.

12   Could you tell us, Jan Krug was the manager who

13   terminated me and who I worked with for little more than

14   a year.  Can you tell us why Jan Krug is not with Wells

15   Fargo anymore?

16             MR. KANE:  Object.

17             CHAIRMAN:  I didn't hear.

18             MR. SHAFFER:  Why is Jan not with Wells

19   Fargo anymore?

20             CHAIRMAN:  That's overruled -- I'm sorry --

21   sustained.  That's not relevant.

22   BY MR. SHAFFER:

23             Q.   Are you aware of any problems that brokers

24   had with Jan's predecessor, Jon Scambray?

25             MR. KANE:  Same objection.  This case isn't



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 579

288

1     about --

2                 CHAIRMAN:   Sustained.

3     BY MR. SHAFFER:

4          Q.   If we could go back to the trades, which

5     were reviewed in laborious detail this morning again

6     after being brought up yesterday, I've been in the

7     business 30 years, as you know.  And I was a financial

8     adviser, financial consultant at Wells Fargo.

9                 And by looking at this information, I am

10    truly unable to ascertain the actual correct amount of

11    the commission charged in this case.  If you could turn

12    to the item of -- in Mr. Kane's exhibits, Item 10, and

13    go to that 023 area where it's -- calculators on the

14    top.

15                MR. KANE:   She's there.

16    BY MR. SHAFFER:

17         Q.   And we talked about Mary's calculation of

18    the correct commissions being a total of $367.  So there

19    was an overcharge of $637, according to Mary's notes on

20    the bottom there.  But not only does -- and

21    Ms. McClaskey seemed to understand this, and I'm not

22    understanding why in the darkened area at the top, it

23    says "max commission $460" for one thing.  Could Mary

24    explain that for us?

25         A.   I couldn't before and I can't now.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 580

Arbitration                                   March 18, 2011

289

1       Q.   So you did mention that.   The other

2   confusing thing is if you go back to Item Number 26,

3   that it lists a maximum commission of $690 on that

4   particular trade.   And if the commission down below in

5   the nondarkened area is shown at $197, there's one other

6   item that shows that it's still a different amount.

7   Here it is.

8          If we could flip to Item 20 under 10, ahead

9   of that particular item, where it shows a 197, which are

10  the numbers Mary used, here's another printout that

11  shows that the compared value, which I assume is the

12  appropriate commission, is $368.

13          MR. KANE:   She's already answered the

14  question as to comparative value.   I think it's asked

15  and answered.

16          CHAIRMAN:   Not necessarily by Mr. Shaffer.

17  Overruled.   Go ahead.

18          WITNESS:   The question again?

19  BY MR. SHAFFER:

20      Q.   How do we reconcile the compared value

21  suggesting 368 was the correct amount for the trade, the

22  other items that show 460 and even as low as 169.   I

23  just don't understand what the actual recommended

24  commission was on this trade.

25      A.   The recommended commission is what would be



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 581

290

1    identified on the commission calculator in the

2    non-highlighted portion, which was the Wells Fargo

3    commission schedule that had been provided to Thompson

4    1.

5             Q.    Okay.  So the correct amount of the

6    commissions were the 197 amounts or the 368 amounts?

7    I'm confused even at this point, even with my experience

8    in the business.

9             ARBITRATOR:  That is what she's saying.

10            MR. SHAFFER:  Well, I'd just like to point

11   out that there's some discrepancy there about what the

12   proper amount was.

13   BY MR. SHAFFER:

14            Q.    And, Mary, you had mentioned that you do

15   not remember instances of brokers opting to increase the

16   commission on a trade.

17            A.    Not on an equity transaction, no.

18            Q.    See, that's surprising because --

19            MR. KANE:  I'm going to object to this

20   characterization.  She answered the question.

21            CHAIRMAN:  You can't --

22            MR. SHAFFER:  I've done it a lot of times

23   myself.  The broker is allowed to adjust the commission

24   through the system.  You don't have to override --

25            MR. KANE:  I'd just like him to ask



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 582

Arbitration                                    March 18, 2011

1   questions.  He's going to have the chance to do closing

2   arguments.

3                    CHAIRMAN:  I agree.

4                    MR. SHAFFER:  That's why I've asked the

5   question, because I've done it myself.

6   BY MR. SHAFFER:

7         Q.   Okay.  Mary, with regard to the T12

8   question, which -- with regard to the T12, did you not

9   say that this includes client names and account numbers?

10        A.   I understand the commission runs include

11  the clients' accounts numbers and names.

12        Q.   Right.  But a T12 is not a commission run.

13        A.   I wouldn't know the difference because I

14  don't pay attention to the production reports, again.

15                   CHAIRMAN:  So are you saying that the 12

16  does not include the names and addresses?

17                   WITNESS:  I will tell you my understanding

18  is anything off the commission run, we have names and

19  account numbers.  I'm not familiar with the compensation

20  reports.  That's what I know, is what I've seen.

21                   CHAIRMAN:  Does it have addresses and

22  Social Security Numbers?

23                   WITNESS:  No, it does not.

24                   CHAIRMAN:  Just name and account numbers.

25                   WITNESS:  Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 583

292

1   BY MR. SHAFFER:

2          Q.   On the commission run, the T12, does it

3   have anyone's name on that one?

4                MR. KANE:   There's no document that says

5   T12.

6                MR. SHAFFER:   It's referred to as T12,

7   which is a trailing 12.

8                CHAIRMAN:   I think that's what

9   Ms. McClaskey has said.

10               MR. SHAFFER:   I think Mary has had

11  involvement with T12s.

12               CHAIRMAN:   What is your question?

13  BY MR. SHAFFER:

14         Q.   My question was:   Does it list client names

15  and account numbers, and is that truly proprietary

16  information?   The answer is she doesn't know, I guess.

17               CHAIRMAN:   I think that's her answer.

18  BY MR. SHAFFER:

19         Q.   Okay.   See, I'm having trouble with items I

20  wanted to bring up as opposed to questions.   Let me look

21  through my notes one quick second.

22               Mary, in regard to Jan Krug's comment about

23  drilling down on some clients, and you had mentioned

24  that that refers to looking for opportunities to refer

25  that client to what's called the private bank at Wells



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 584

Arbitration                                              March 18, 2011

293

1    Fargo; correct?

2          A.    Correct.

3          Q.    Could you tell me what the minimum is for a

4    client to participate in a private bank at Wells Fargo?

5          A.    To be in -- to work with a private banker,

6    it's a million dollars relationship which includes

7    deposits and loans.  However, that doesn't mean that you

8    can't still cross-reference other opportunities within

9    that office, whether it's a wealth plan, some sort of

10   estate plan, a private mortgage.

11         ARBITRATOR:  Mary, for my own

12   clarification, do you mean that if there is a client

13   that does not have a million dollars in assets with the

14   bank, that that client is still eligible to be referred

15   to the private client area if -- if the broker can

16   identify an issue that might be resolved for that client

17   in the private banking area, even though she's not a

18   member of the private banking group?

19         WITNESS:  Yes.

20         ARBITRATOR:  Thank you.

21         MR. SHAFFER:  Okay.  And I don't know,

22   maybe you could advise me, should I even ask any

23   questions about that final meeting when Mary was

24   concerned that I may go postal.  I don't think that it's

25   really relevant in that that was after the time of my



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 585

294

1    termination, for one thing.

2              CHAIRMAN:  I thought -- are you talking

3    about a conference call?

4              MR. SHAFFER:  No.  The final meeting where

5    I returned the laptop and she came to tears and said she

6    was concerned about my going postal.

7              CHAIRMAN:  Yes.  Go ahead.

8    BY MR. SHAFFER:

9         Q.   Mary, do you remember the gentleman that

10   accompanied you downstairs?

11        A.   Yes.

12        Q.   And I recall that you mentioned that first

13   we were to meet inside the office, and then I was

14   outside the office.

15             ARBITRATOR:  Ask the question.

16   BY MR. SHAFFER:

17        Q.   My question is:  Who was with you to pick

18   up the laptop?

19        A.   David Godding.

20        Q.   And do you remember our conversation when I

21   returned the laptop?

22        A.   No.

23        Q.   Do you remember me stating in front of Dave

24   Godding, who is a current employee of Wells Fargo, I

25   believe, that as a response to you saying that I was



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 586

295

1    flipping out, I said, "Well, what about you calling the

2    promissory note blood money" in front of Mr. Godding?

3            A.    I don't recall.

4            Q.    You don't recall that?  It's certainly --

5    Mr. Godding is not on my witness list.  But he can

6    certainly verify that I made that statement.

7                 CHAIRMAN:  Go on, please.

8    BY MR. SHAFFER:

9            Q.    And then, Mary, in regard to other items

10   that came up regarding my suggestion that I may kill

11   myself, I was wondering where -- from where did you get

12   that information?  Why did you make that statement?

13           A.    It was discussed in a meeting with Cindy

14   Mathes who apparently said that conversation took place

15   with Ken Shaffer.

16           Q.    What exactly did Ms. Mathes say?

17           A.    The -- it was in relation to the fitness of

18   duty request, and that Ken had threatened suicide, that

19   he might as well kill himself, quote, unquote.

20                ARBITRATOR:  He said that to --

21                WITNESS:  To Cindy Mathes.

22   BY MR. SHAFFER:

23           Q.    Mary, do you think that that kind of

24   information would be subject to a confidentiality

25   requirement?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 587

296

1          MR. KANE:  That's a legal conclusion,

2     whether or not.

3          CHAIRMAN:  She can answer as best she can

4     whether it's a legal answer or not, whatever her

5     understanding is.

6          A.   I don't know.

7     BY MR. SHAFFER:

8          Q.   Well, were you aware that Mr. Chung from

9     Kane and Fischer contacted me several times to have me

10    sign a release?

11         MR. KANE:  I'm going to object to any

12    conversations she had with an attorney in my office.

13    That's attorney/client privilege.

14         CHAIRMAN:  Attorney/client privilege covers

15    communications.  And I think the question asked whether

16    she was aware that Mr. Chung had sought a release from

17    Mr. Shaffer.

18         MR. KANE:  Well, that assumes a fact not in

19    evidence.

20         CHAIRMAN:  And I don't know what that is

21    all about, so I'm going to sustain the objection.

22    BY MR. SHAFFER:

23         Q.   Okay.  Mary, I was wondering if you were

24    privy to the e-mail that is marked 000014 in my --

25         MR. KANE:  What tab, or what number?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 588

297

1              MR. SHAFFER:  It's -- it doesn't really

2     have a number.  It's in the very back, just probably 20

3     pages in from the back.

4              CHAIRMAN:  Before or after the Met Life?

5              MR. SHAFFER:  It's before the Met Life, I

6     believe.

7              CHAIRMAN:  And it's e-mails you're looking

8     for.

9              MR. SHAFFER:  Yeah.  It's an e-mail from --

10    with Jan's name on it.  It says "administrative leave

11    option".

12         A.   I was not aware.

13    BY MR. SHAFFER:

14         Q.   Okay.  Because I wondered what Mark's

15    comment "I thought it was going to be suggested" --

16              MR. KANE:  I'm going to object.  She said

17    she's not aware of it.

18              CHAIRMAN:  Is this the August 3rd?

19              MR. KANE:  August 12th.  It's got a W14 at

20    the bottom.

21              CHAIRMAN:  Okay.  And what is your

22    question?

23    BY MR. SHAFFER:

24         Q.   My question was if Mary was aware of this

25    e-mail.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 589

298

1           CHAIRMAN:   The one from you to Jan or the

2      one from Jan to you?

3           MR. SHAFFER:   No.   This is from Mark

4      Webster to Jan Krug, Christine Longley.

5           CHAIRMAN:   Were you, Ms. Mortensen, aware

6      of this e-mail prior to preparation for this trial?

7           WITNESS:   No, I was not.

8           CHAIRMAN:   Okay.

9      BY MR. SHAFFER:

10          Q.   Mary, you're familiar with the Wells Fargo

11     compliance manual, I'm sure; right?

12          A.   Yes.

13          Q.   Could you tell me if the compliance manual

14     states that not submitting -- first of all, does a

15     written complaint qualify as an e-mail complaint, as

16     well?

17          A.   Yes.

18          Q.   And does the Wells Fargo compliance manual

19     specify that a financial advisor, financial consultant

20     would be terminated if they -- on the first event of not

21     forwarding a client complaint.

22          A.   No.

23          Q.   And, also, on the overcharging or what I

24     refer to as a trade error of the Winneger account, does

25     the Wells Fargo compliance manual specify that the



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 590

299

1  financial adviser will be terminated for the first

2  instance of overcharging?

3       A.   No.

4            MR. SHAFFER:   Thank you.   I rest my

5  questions.

6            CHAIRMAN:   Okay.   I have a few questions,

7  Ms. Mortensen.   I'd ask you to look at Mr. Kane's Tab 8,

8  in particular, the U5.   Actually, I'm going to focus on

9  the U5 and page 2 of the U5.   And, specifically, the

10 violation of the company policies, who prepared the U5

11 in this case?

12           WITNESS:   The U5 is prepared by our

13 licensing and registration department.

14           CHAIRMAN:   Based on information they obtain

15 from where?

16           WITNESS:   Based on information obtained

17 from the conference call that we had, and in correlation

18 with our lawyers.

19           CHAIRMAN:   Okay.   Now, Number 1, violation

20 states "representative lacked justification for charging

21 equity securities markup that exceeds the -- that

22 exceeded the firm's full service equity schedule."

23           And as has been discussed here, if there

24 was an equity schedule, why wouldn't that number that is

25 the commission be automatically plugged into the trading



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 591

300

1    request?  We've discussed here the number of the

2    suggested amount and the number that Mr. Shaffer put in,

3    and then there was a comparable number, and then there

4    was a maximum number.  Doesn't that appear to give some

5    latitude to somebody to put in numbers between the max

6    and the suggested number?

7              WITNESS:  The only number that I've ever

8    worked with is based off of the commission calculator.

9    Or if you enter a trade and that commission populates,

10   that number.

11             CHAIRMAN:  Why wouldn't it always populate

12   the suggested number?

13             WITNESS:  If you override it, it won't

14   populate it.

15             CHAIRMAN:  And it's marked up.  That is a

16   violation, even though it's permissible by the system?

17             WITNESS:  That's hard to answer.

18             CHAIRMAN:  Yeah.

19             ARBITRATOR:  What is the difficulty in

20   answering that?

21             WITNESS:  The difficulty is how much you

22   mark up something and are we following the prudent

23   manual of do no harm to our clients.

24             CHAIRMAN:  Okay.  Then I believe it is in

25   one of your tabs, I think it's 10, Mr. Kane, look at Tab



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 592

301

1   10, and, particularly, Bates stamp 24.  That's a printed

2   Wells Fargo document, is it not?

3                    WITNESS:  The trade correction form, sir.

4                    CHAIRMAN:  Yes.  The trade correction form?

5                    WITNESS:  Yes, it is.

6                    CHAIRMAN:  And the purpose of that it is to

7   correct trades?

8                    WITNESS:  Yes, it is.

9                    CHAIRMAN:  And if the broker corrected the

10  commission which was pointed out to be too high,

11  wouldn't that correct the situation so there's no longer

12  a violation?

13                   WITNESS:  Yes.

14                   CHAIRMAN:  And you have this form for that

15  very purpose, do you not?

16                   WITNESS:  Yes.  But please keep in mind it

17  wasn't just that thing.  It was everything combined that

18  led to the decision.  So it didn't -- just because we

19  corrected it, which we have an obligation to do for our

20  clients, but it is more about all -- everything combined

21  when you look at the whole picture.

22                   CHAIRMAN:  Were there other instances where

23  you had to correct trades that Mr. Shaffer had placed?

24                   WITNESS:  In regards to marking up?

25                   CHAIRMAN:  Equity trades.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 593

302

1                    WITNESS:  No.

2                    CHAIRMAN:  With regard to violation 2, it

3         states that representative -- I'm back on the U5.

4         Sorry.

5                    MR. KANE:  Tab 8.

6                    CHAIRMAN:  Violation 2 is, "The

7         representative received a written customer complaint and

8         did not forward to supervisor principal."  But

9         Mr. Shaffer has testified here, and I'll be interested

10        if you know his testimony to be incorrect, that he

11        returned the money and corrected that complaint straight

12        away.

13                   WITNESS:  Correct.

14                   CHAIRMAN:  So on both of these violations,

15        they were corrected?

16                   WITNESS:  It was still a written complaint

17        that wasn't forwarded to us, that had we not been aware

18        of it, it could have escalated into a much different

19        situation.

20                   CHAIRMAN:  Except that it was corrected?

21                   WITNESS:  Correct.

22                   CHAIRMAN:  So it wasn't likely to escalate,

23        was it?

24                   WITNESS:  Because it was identified, no.

25                   ARBITRATOR:  My own recollection is that



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 594

303

1   the complaint came in on a Friday, and on Monday, it was

2   corrected.  When did you actually see the complaint so

3   that you could have had any impact on its being

4   corrected?

5              WITNESS:  I was not -- we were not aware of

6   until afterwards.

7              ARBITRATOR:  So he corrected it himself?

8              WITNESS:  Yes.

9              CHAIRMAN:  And I think you said there was a

10  gentleman in charge of combing e-mails to make sure that

11  they got taken -- well, that they were, what, noted, I

12  guess is what you were doing?  And did that gentleman

13  inquire into whether or not this complaint had been

14  corrected and fixed so that the complaint was no longer

15  in effect, so to speak?

16             WITNESS:  Yes, he did.

17             CHAIRMAN:  And so he was aware that

18  Mr. Shaffer had returned the money which was apparently

19  the subject of the complaint.

20             WITNESS:  I can't answer that.  I'm sorry.

21             CHAIRMAN:  I can understand why you

22  wouldn't know.  And so is there any set policy -- strike

23  that.  I'm not going to ask that.

24             Okay.  That's all I have.  Thank you very

25  much.  If I have generated some questions that either



**ESQUIRE**
an Alexander Gallo Company

EXHIBIT X  Page 595

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

304

1    Mr. Kane or Mr. Shaffer has, and I mean questions,

2    please go forward, and my colleagues as well.

3                  MR. KANE:  I don't have any additional

4    questions.  We can go to closing arguments whenever.

5                  ARBITRATOR:  I just want to reiterate what

6    I think I heard and get a confirmation.

7                  Several times it was asked if instances of

8    two times having a deviation from the amount of the

9    commission would have in and of itself constituted a

10   reason for dismissal.

11                 And, secondly, that one instance of a

12   complaint, whether that in itself would have, or even in

13   both instances, in the two instances that are listed

14   here for termination explanation, whether they in and of

15   themselves would have been a typical cause for

16   dismissal.

17                 WITNESS:  I will say that we did terminate

18   one other gentleman for failure to forward a written

19   complaint.

20                 ARBITRATOR:  One time?

21                 WITNESS:  One time, yes.

22                 ARBITRATOR:  Of course, the circumstances

23   may have been different in the sense that the complaint

24   was not corrected within one business day as was in this

25   case.  So are they really comparable?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 596

305

1            WITNESS:  Yeah.

2            ARBITRATOR:  But, typically, a complaint

3    can come in from a client who, for his own reasons, may

4    be very upset about something.  He needed the money

5    immediately and he wanted that money right now and he

6    was being pressed by some outside event in his life, and

7    so he took it out on the broker.

8            WITNESS:  The issue I question is were

9    proper disclosures made on that specific product and how

10   that product worked.

11           ARBITRATOR:  Do you recall any -- I don't

12   recall any input in our hearings on that line at all.

13   Do you recall anything?

14           CHAIRMAN:  I'm not sure what you're asking.

15           MR. KANE:  I'm going to address it in my

16   closing argument.

17           CHAIRMAN:  All right.  Do you participate

18   or, Ms. Mortensen, have you in the past participated in

19   determining the wording that goes on a U5 termination

20   explanation?

21           WITNESS:  No.

22           CHAIRMAN:  That's your representative

23   person that does that?

24           WITNESS:  Yes.

25           CHAIRMAN:  And as I understand it, this



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 597

306

1    language came out of or as a result of that conference

2    call.

3                    WITNESS:  Correct.

4                    CHAIRMAN:  Okay.  Any -- okay.

5                    MR. KANE:  She's excused.  She's not going

6    to leave the room.  Before we get to closing arguments,

7    I did want to exhibit -- it's in the exhibit book, my

8    fee affidavit, and kind of admit that.  And we will be

9    ready for closing arguments.

10                   If the -- Exhibit 14, if you go to

11   Claimant's Exhibit 14 -- and they tie together.  14, 15

12   and 16 go together.  Basically, I prepared this

13   affidavit before I came down previously to the hearing

14   and I'll tell the panel:  Previously, we had exchanged a

15   fee affidavit of Mr. Chung and gave that to Mr. Shaffer.

16   But we didn't complete it in discovery, in the

17   prehearing exchange.

18                   So he got a copy of not mine, but

19   Mr. Chung's -- and because I was here at the hearing, we

20   redid it for my affidavit.  My affidavit really is quite

21   clear.  It sets forth the billing rate for me and the

22   other attorneys, my rate at $225 an hour.

23                   It goes to the second page where it talks

24   about the total paralegal and attorney's fees are,  and

25   that's $29,814.  And then it goes to the cost of the



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 598

Arbitration                                    March 18, 2011

307

1    hearing, of what Wells Fargo has expended.  And of the

2    $8,862.06, $1,700 is FINRA filing fees.

3              CHAIRMAN:  Filing fees?

4              MR. KANE:  Right.  If you go to the next

5    page, it kind of summarizes all of that.  If you go to

6    Tab 15, Tab 15 is the bill history that provides the

7    detail, the backup for the $29,814.  If I go to the last

8    page, you see there's that $29,814, page 13, at the top

9    on Tab 15.

10             ARBITRATOR:  Okay.

11             MR. KANE:  So that ties to my fee

12   affidavit.  Now, if you go to the first page, I want to

13   make a statement here.  And just so we're clear, since

14   hope springs eternal, if you'll see on page 12 --

15             CHAIRMAN:  Of?

16             MR. KANE:  Of tab 15, I only have

17   January 4th, attend hearing eight hours.  In order to

18   keep the record leave and not have to amend it, I'm

19   going to leave it this way.  I'm not going to ask for

20   any more right now.  I think it's cleaner and more

21   efficient to keep this affidavit the way it is.

22             But I want to orally advise the panel that

23   it does not include January 5th.  I don't want that to

24   go against my client.

25             CHAIRMAN:  We'll take judicial notice that



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 599

308

1    you're here today.

2              MR. KANE:  And not to charge them as to

3    what it relates to seek from Mr. Shaffer.  More

4    importantly, on the itemization of the cost, the

5    $8,862.06 that ties to the affidavit, that does not

6    include my travel time here.  That doesn't include hotel

7    costs or airfare.  None of that is included in this.

8              We don't expect Mr. Shaffer to reimburse

9    Wells Fargo for my travel costs or things of that

10   nature.  And then all of that ties into Tab 16, which we

11   went through the summary of the unpaid principle of the

12   $74,617.76 accrued interest at the rate under the note.

13   It's a mathematical calculation.  And then the $29,814,

14   then the costs of eight $8,862 for the total of

15   $116,661.02.

16              Just for the record, I would note that the

17   $29,000 is approximately 38 percent of what Wells Fargo

18   is seeking, not that that necessarily is -- if you add

19   the unpaid principle and the accrued interest, that

20   figure comes to $77,984.96.  That's the $74,000 and the

21   $3,000.  So if I could move into evidence Exhibits 14,

22   15 and 16, that will be all of the evidence that we

23   would intend to present.

24              CHAIRMAN:  They will be admitted.

25              MR. SHAFFER:  Excuse me.  Am I allowed to



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 600

309

1   ask him questions about this?

2                  CHAIRMAN:  Yes, you can.

3                  MR. SHAFFER:  At this point?

4                  CHAIRMAN:  That would be appropriate yes.

5   They have not yet been admitted.  Go ahead, Mr. Shaffer.

6                  MR. SHAFFER:  Now, I'm not totally familiar

7   with the procedure here, as you're aware.  It seems to

8   me that I'm being billed for Wells Fargo's legal fees in

9   defense of my counterclaim.  And I wasn't -- I didn't

10  know that that was the case or that I would be possibly

11  responsible for legal fees in defense of my

12  counterclaim.  So could you just --

13                 CHAIRMAN:  Mr. Kane, do you want to

14  respond?

15                 MR. KANE:  Yes.  And I intend to address

16  that in my closing argument, if you'll just bear with

17  me.  I can do it now.

18                 CHAIRMAN:  I think his point is that his

19  agreement was with regard to the promissory note and the

20  fees and costs of that, but not necessarily the

21  counterclaim.

22                 MR. SHAFFER:  Exactly.

23                 MR. KANE:  Bear with me.  I have the --

24                 CHAIRMAN:  Agreement or alleged agreement.

25                 MR. KANE:  I'm doing that right now.  Bear



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 601

310

1    with me.  As the panel is aware, the promissory note

2    specifically provides that he agreed to repay all of

3    Wells Fargo's costs and is seeking to collect on the

4    note.

5              The promissory note that has such a claim,

6    Wells Fargo is entitled to its attorney's fees for

7    defending against his counterclaim.  And the case that I

8    was -- I'm going to cite to the panel in my closing

9    argument is Silego versus Castelluci, 21 California

10   Commission App. 4th, 873 at 879 and 80.  And it's 26

11   California Commission Reporter 2d, 439.  It's a

12   California Appellate Fourth District case in 1994.

13             The reason for that is that the courts have

14   concluded when somebody brings their promissory note

15   case and the other side challenges that with

16   counterclaims that are so intertwined with the payment

17   of the obligation on the promissory note, that those

18   issues are so intertwined that you are entitled to get

19   your attorney's fees for defending against the

20   counterclaim because you're seeking to enforce your

21   promissory note against all of these counterclaims to

22   set off against the promissory note.

23             Because of that, that's the rationale that

24   both the California courts and most courts have for

25   allowing parties to have their attorney's fees, because



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 602

311

1  it's essential to enforce this note that I had to defend

2  against all these counterclaims.  That's the case law in

3  California that supports that rationale.

4           CHAIRMAN:  Thank you.

5           MR. SHAFFER:  I have a question, if that's

6  okay.  I notice there are a number of your associates

7  listed here besides Mr. Chung.  And one during various

8  amounts of time and various amounts of fees.  I'm

9  wondering, are all of these people authorized to be

10 involved with the case in California?

11          MR. KANE:  Each one filed the certificate.

12 Mr. Volts is no longer with my firm.

13          CHAIRMAN:  Mr. Sohn?

14          MR. KANE:  Yeah.  He filed a certificate.

15          CHAIRMAN:  Do you understand what he's

16 saying?

17          MR. SHAFFER:  Yes.  Because I received this

18 with Mr. Kane's involvement in this case and

19 Mr. Chung's.  What about the others?

20          MR. KANE:  We have them.

21          MR. SHAFFER:  What about the others?

22          MR. KANE:  There's one for Mr. Volts as

23 well.

24          MR. SHAFFER:  That might be true.  What

25 about the others?



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 603

312

1           CHAIRMAN:  Some of these are paralegals.

2           MR. KANE:  Some of these are paralegals

3    where you don't need it.  And I will tell you that I

4    think the issue in California is if you're appearing at

5    the hearing as well, and not necessarily working out of

6    the Chicago office, but in any event, I can tell you the

7    three principle attorneys working on this case were

8    myself, Tom Volts and Mr. Chung, and all three of us

9    filed our California certificates.

10          CHAIRMAN:  Those are the only attorneys

11   working on it?

12          MR. KANE:  There may have been a Diane

13   Fischer who was just a supervisor.  But I don't think

14   she --

15          ARBITRATOR:  DCF?

16          MR. KANE:  Yeah.  She was a -- she didn't

17   sign any.  All she did was review pleadings and some of

18   the work of the other attorneys.  She didn't attend any

19   pre-hearing conferences or anything related to this

20   case.  And she did not file a California certificate,

21   nor was she required to.

22          CHAIRMAN:  Not required because she did not

23   appear here in California.  And I believe Mr. Kane is

24   correct.  It's the appearance in California, it's not

25   necessarily work that is done elsewhere.  But you're



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 604

313

1    certainly entitled to ask questions about this last

2    exhibit that he has introduced.

3               MR. SHAFFER:  Those are all of my

4    questions.

5               CHAIRMAN:  All right.  In that case, the

6    exhibit will be admitted and we're marking it as, what,

7    14, 15, 16?

8               MR. KANE:  I'm sorry, 14, 15 and 16.  I

9    apologize.

10               (Claimant's Exhibits 14, 15 and 16 were

11    admitted into evidence.)

12               ARBITRATOR:  Yeah.  That's what I have.

13               CHAIRMAN:  Okay.  Now we will be entitled

14    to hear your closing argument, and we're asking you to

15    limit your comments to summation of what you believe has

16    been proven.  It should include a summary of your final

17    request for damages.  We can do it as a range as opposed

18    to a specific monetary amount.  It's up to you.

19               And you may include a description of each

20    theory of the damages, why you think they are

21    appropriately or should be ordered.

22               The parties may begin their closing

23    arguments.  And the way we go is that the claimant

24    typically will make first presentation and then the

25    respondent makes their response or their closing



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 605

314

1   argument.  And the claimant can rebut the closing

2   argument of the respondent.

3            And it's also possible that the claimant

4   not make an opening statement, but include in the

5   rebuttal all of their remarks.  And Mr. Kane will advise

6   us what he wants to do in that respect.  And let me just

7   read further in the script to see if it's relevant.

8   Hold on just a second.  This statement is to be read.

9            We realize that at the time the claim was

10  initiated, the parties may not have had all the

11  information needed to accurately or completely

12  calculated claims for parties requesting damages.

13  Please provide us with a summary of your final request

14  for damages.  You may present your final damage request

15  as a range as opposed to a specific amount.

16            In other words, what you say to us now may

17  be different than what was originally put down in your

18  claim or counterclaim.  Okay.

19            The final question that it is suggested I

20  ask, do the parties have any other issues or objections

21  that you would like to raise that you have not

22  previously raised?  And that's objections or issues.

23            MR. KANE:  On behalf of Wells Fargo, we've

24  raised everything.

25            CHAIRMAN:  Okay.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 606

Arbitration                                          March 18, 2011

315

1          MR. SHAFFER:  I have a question as to could

2     I introduce information that -- a part of my exhibits

3     that I forgot to introduce before that I think may have

4     bearing on the situation, or are we past that phase?

5          CHAIRMAN:  What are you talking about?

6     Because we're going to take this up as kind of a special

7     request.

8          MR. SHAFFER:  Please.  Ms. Mortensen

9     commented that the --

10          CHAIRMAN:  What exhibit are you looking at?

11          MR. SHAFFER:  I'm looking at an e-mail

12     that's part of my package.

13          CHAIRMAN:  And is this the e-mail we talked

14     about before several times.

15          MR. SHAFFER:  No.  This is just one I

16     forgot to bring up.  But I just think it might be

17     pertinent in that Ms. Mortensen commented that --

18          CHAIRMAN:  Let's find the e-mail first.

19     You find it, and then --

20          MR. SHAFFER:  It's Number 4 under my

21     exhibits.

22          CHAIRMAN:  And you might give us a general

23     description of what it is and why you think it's

24     appropriate.

25          MR. SHAFFER:  It's an e-mail that I had



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 607

316

1    sent to Mark Webster regarding concerns that I had had

2    concerning sales practices at Wells Fargo Investments.

3    The reason that I think it is pertinent is that

4    Ms. Mortensen commented that the policy infractions that

5    I committed were not ordinarily reason for termination,

6    but it was the total package of our relationship.  And I

7    think that our relationship may have been affected by

8    this particular e-mail.

9                MR. KANE:  If that's the reason he wants to

10   admit it, I'm going to object to it.  He hasn't raised

11   any of that in any of his counterclaims here.  He's got

12   issues here about reverse convertibles, the unexplained

13   disappearance of a convert.  None of that relates to the

14   issues here.

15               CHAIRMAN:  Except that Ms. Mortensen did

16   testify that it wasn't these two specific violations in

17   and of themselves, it was the whole bunch of things.

18   And one of the things that she talked about was e-mails

19   that are in the record somewhere.  That can come back to

20   bite you.  This one I hear Mr. Shaffer saying may be one

21   of those e-mails.

22               MR. KANE:  She's not listed on here as

23   having seen it.  If he wants to introduce it, somehow

24   she was tainted by what she saw her, unless she saw it.

25               ARBITRATOR:  I have a question.  The e-mail



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 608

317

1    is addressed to Mark Webster.  Was Mark Webster one of

2    the participants in that phone conversation.

3              MS. MORTENSEN:  I believe so.

4              MR. KANE:  Then to save time, I'm going to

5    withdraw my objection.

6              CHAIRMAN:  Okay.

7              MR. KANE:  He can refer to it in his

8    closing argument rather than testify to it now, if

9    that's acceptable to the panel.

10             CHAIRMAN:  Of course.  It then will be

11   introduced.  We are not I think -- I want to make clear,

12   taking into evidence this whole book, what we have taken

13   in are your remarks that you made, some of which were

14   read from pages here, which is fine.  And we also have

15   taken in those documents which you have referred to.

16   Just like we have taken into evidence all of the tabs

17   that Mr. Kane provided, including these last four.

18             I'm not sure how we can identify those

19   documents that are in your booklet which we have talked

20   about and about which there's been no objection as

21   opposed to the many other documents in here which we

22   have not talked about, other than to state that that

23   which has been referred to and has not been objected to

24   shall be considered in evidence.  So I'll let my

25   colleague figure out how to write that one up.  But I



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 609

1    think we all understand.

2              MR. KANE:   Yes.   I have no problem, no

3    objection.

4              CHAIRMAN:   I think it's the fairest way to

5    handle this.   Okay.   Any other issues or objections or

6    comments?

7              MR. SHAFFER:   I have one other question.

8              CHAIRMAN:   Okay.

9              MR. SHAFFER:   It was brought up by

10   Ms. Mortensen that I was in some type of agitated mental

11   state and that I had threatened taking my own life.   And

12   I have information that's in this original presentation

13   book regarding that situation.   And I was wondering if I

14   could bring that.

15             CHAIRMAN:   The one thing that I did see was

16   that fitness duty recommendation or memo.

17             MR. SHAFFER:   Ms. Mortensen brought up -- I

18   have in this information that's already been provided a

19   note about that fitness for duty memo, which I would

20   like to present.

21             CHAIRMAN:   Okay.   I think that would be

22   fair to bring in since the fitness memo was discussed.

23             MR. KANE:   I just want to make sure I know

24   which one he's referring to.

25             CHAIRMAN:   Which one are you looking at?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 610

1          MR. SHAFFER:  This memo or my comments

2     regarding that.

3          CHAIRMAN:  What do you want to reduce or

4     add?

5          MR. SHAFFER:  This is easy.  There's notes

6     on discovery materials, a cover page, and it's the one

7     right after that.

8          CHAIRMAN:  You may think it's easy.

9          MR. KANE:  The one after that is not the

10     document.  And --

11          MR. SHAFFER:  Not the e-mail.

12          MR. KANE:  So I object to that if --

13          MR. SHAFFER:  But the e-mail document was

14     introduced and I'd like to respond to that.

15          MR. KANE:  If he wants to introduce it,

16     Mr. Chairman --

17          CHAIRMAN:  Tell me about -- this testimony

18     page.

19          MR. KANE:  Yeah.  That I object to.

20          CHAIRMAN:  This amounts to your testimony.

21     This is not a document.

22          MR. SHAFFER:  No.  The document was

23     introduced by Ms. Mortensen.

24          MR. KANE:  No, she didn't introduce any

25     documents regarding that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 611

320

1              CHAIRMAN:  We have referred to the fitness,

2    and that will be included because it was referenced by

3    Ms. Mortensen.  I'm talking about the memo or the letter

4    suggesting a fitness --

5              MR. SHAFFER:  The whole fitness for duty,

6    I'd like to comment on that.

7              CHAIRMAN:  You can comment in the closing

8    statement because the subject has been introduced.

9              MR. SHAFFER:  But I never had a chance to

10   make any statement regarding that.

11             ARBITRATOR:  You can do that.

12             CHAIRMAN:  Go ahead.

13             MR. SHAFFER:  Right now?

14             CHAIRMAN:  Yeah.

15             MR. SHAFFER:  You see, I wondered if this

16   would come up.  Again, I had received several e-mails

17   and phone calls from Mr. Chung.

18             MR. KANE:  I'm going to object to e-mails.

19   That was in discovery.  That has nothing to do with

20   this.  I guess what I need to do is we might as well --

21   rather than having him testify to other documents, he

22   doesn't have it in his packet.  I'll pass it out to the

23   panel because it's exactly what we're talking about

24   here.

25             CHAIRMAN:  Are you familiar with what he



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 612

321

1    has here?

2                  MR. SHAFFER:  No, I'm not.  I think it's

3    the document Mr. Chung wanted me to release.

4                  ARBITRATOR:  Take a look and see if you --

5                  MR. KANE:  These are documents that we

6    produced in discovery to Mr. Shaffer that relate to the

7    fitness for duty issues and his responses to it.  It's

8    the actual documents as opposed to his narrative.

9                  CHAIRMAN:  We don't know what his response

10   was, do we?

11                 MR. KANE:  I have it here.

12                 CHAIRMAN:  Do you want to know what your

13   response was?

14                 MR. SHAFFER:  I have a written response

15   here and I never returned the form that Mr. Chung wanted

16   me to return to release this information.  But this has

17   been already introduced.  There's nothing new here.

18                 MR. KANE:  None of these documents have

19   been introduced.

20                 CHAIRMAN:  I don't think we've seen this.

21                 MR. KANE:  Let me be clear about what he's

22   referring to about Mr. Chung.  Mr. Chung asked him to

23   .sign an agreed protective order that the documents that

24   we marked confidential would be treated as confidential.

25   I have the proposed protective order.  Mr. Shaffer



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 613

Arbitration                                        March 18, 2011

322

1   refused to sign it.

2              In my closing argument, I'm going to ask

3   the panel to sign it and return any confidential

4   material.

5              CHAIRMAN:   What confidential material are

6   you concerned about?

7              MR. KANE:   In discovery, we provided him

8   all of the compensation plans of Wells Fargo.  All of

9   that is confidential and proprietary material.  We only

10  mark confidential things that were confidential and

11  proprietary.  Things such as his own records, we didn't

12  mark these confidential.

13             I'm going to ask -- at the conclusion of my

14  closing statement, I'm going to ask the panel as part of

15  their award to so instruct him.  That is the release

16  he's referring to.  I really resent the way he tries to

17  categorize things.

18             CHAIRMAN:   So this was a protective order

19  to keep confidential proprietary information of Wells

20  Fargo.

21             MR. KANE:   Yes.  And what I'm going to

22  do --

23             CHAIRMAN:   Anything else?

24             MR. KANE:   The order is a little more

25  extensive than what I've just said.  But what I'm going



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 614

323

1   to do in my closing argument, rather than have this

2   order entered, I'm going to ask that the panel have him

3   return any documents to Wells Fargo any documents that

4   were marked confidential.

5          CHAIRMAN:  Mr. Shaffer, do you have any

6   comments on this?

7          MR. SHAFFER:  I have comments on the whole

8   fitness for duty thing, and the reason.

9          CHAIRMAN:  Comments on what?

10         MR. SHAFFER:  The reason I didn't sign that

11  document is that I figure, you know, if -- what the

12  enemy -- if your friend is your enemy or however that

13  goes, why should I provide that information if they're

14  asking me for it?

15         I also think that is trying to get me to

16  surrender my rights you know the Americans with

17  Disabilities Act.

18         CHAIRMAN:  Whether you sign it or not, I

19  guess we don't care.  But Mr. Kane is asking us to order

20  you to return any proprietary information or proprietary

21  documents that are proprietary to Wells Fargo.  That's

22  what he's asking.

23         ARBITRATOR:  That they sent to you during

24  the exchange of documents.

25         MR. SHAFFER:  I don't have a problem with



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 615

324

```
 1   that.  I don't have any use for them.  I'm not sure I

 2   have them all.

 3              CHAIRMAN:  That's the order that we

 4   anticipate him to make.

 5              MR. SHAFFER:  So the documents they already

 6   sent me in the discovery?

 7              ARBITRATOR:  That are marked confidential,

 8   he wants those back.

 9              CHAIRMAN:  So that apparently will be

10   ordered.  Do you have any anything else to say on --

11              MR. SHAFFER:  I'd still like to make my

12   comments on the fitness for duty thing.  Here's what I

13   have.  It's in my book.  I truly did not notice the

14   letter -- there's a letter inviting me to take an

15   administrative leave.  That's been introduced; right?

16              MR. KANE:  No, the letter has not been

17   introduced.  What I'd like to do to make sure the record

18   is complete is have the panel accept this.

19              CHAIRMAN:  Accept what?  What is this?

20              MR. KANE:  When he finishes, he's talking

21   about administrative fitness for duty.  He's not using

22   any documents.  He's only using what he wrote after the

23   fact.  I could cross-examination him because we didn't

24   offer this before, is this the letter you received?  Is

25   this the response you made?  That's all I would do
```



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 616

ESQUIRE
an Alexander Gallo Company

Arbitration                                    March 18, 2011

325

1   because he's bringing it up.

2            MR. SHAFFER:  I'm happy to share those

3   documents with the panel.

4            CHAIRMAN:  What is that?

5            MR. SHAFFER:  Do you want to see them?

6            CHAIRMAN:  What are you holding in your

7   hand?

8            MR. SHAFFER:  It is a letter from Jan Krug.

9   It's also copied in my packet.  And it says this letter

10  is --

11           CHAIRMAN:  Right.

12           MR. SHAFFER:  -- regarding our concerns

13  about your behavior in the following areas.  One thing

14  I'd like to point out, and I have my wife's signature on

15  this, I do not have any recollection of ever receiving a

16  letter.  I received e-mails from Jan Krug, I never

17  received a letter in the mail.  This letter is to

18  confirm the conversation.

19           Part of my exhibits is my wife also signed

20  that that she does not have any recollection of ever

21  receiving this.

22           CHAIRMAN:  Right.  So I noted on that

23  letter that you stated that.

24           MR. SHAFFER:  Yes.  It goes on in bold

25  print, "We have reason to believe that you are not able



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 617

326

1     to work because of a possible medical problem.  You are

2     constantly negative in your attitude and express

3     thoughts of killing yourself."  And, again, that's what

4     prompted the fitness for duty item that Mary brought up

5     earlier, which I would like to respond to.  Because

6     it's --

7                CHAIRMAN:  Go ahead.

8                MR. SHAFFER:  I truly do not have any

9     recollection of receiving this letter.  Please see

10    second paragraph.  "We have to reason to believe that

11    you are not able to work because of a possible medical

12    problem."  Is this the reason that I was terminated?  I

13    think the ADA has wording to protect wrongful

14    termination based on health problems.

15               I do not understand the reference to

16    thoughts of killing myself.  It is possible that I said

17    the episodes of sleep apnea and the inability to catch

18    my breath made me fearful of death or made an offhand

19    remark to being better off dead.  But I don't think I've

20    he ever heard of anyone dying from sleep apnea, and I

21    did not harbor suicidal thoughts.  If I said something

22    in that regard, it must have been offhand and cynically

23    humorous.

24               I do not remember that in reference to one

25    short notice mandatory call event, I informed Ms. Krug



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 618

327

1    that I had a conflicting doctor appointment.  She sent

2    me back an e-mail that said just "Really?"  Suggesting

3    she thought that I was not telling the truth.  And in

4    what I thought was a humorous reply, I said, "No,

5    really.  This appointment has been scheduled for some

6    time.  Really, I think I will have to sell my house.

7    Really, I wish I were dead."

8                  If anyone had bothered to ask me, I could

9    have told them that I had no suicidal thoughts.  As far

10   as Ms. Krug's concern for my health, she never seemed to

11   be the least bit interested, nor was Ms. Brandell.  Her

12   comment on my return from two months leave was, "Well,

13   you look better."

14                 More telling is that another financial

15   advisor Ron Uren needed hip surgery --

16                 MR. KANE:  I'm going to object to that.

17                 MR. SHAFFER:  I thought that part might not

18   be -- so I'll stop there.

19                 MR. KANE:  Can you mark that 18 that I've

20   handed to you?  It's W12 through 14.  I'll hand it to

21   the panel.  Claimant's Exhibit 18.  It will be at the

22   back, the white notebook.

23                 CHAIRMAN:  And it is --

24                 MR. KANE:  I have them identified.

25                 CHAIRMAN:  Oh, this is the letter.



EXHIBIT X  Page 619

328

1           MR. KANE:  Well, there's more to it.  So as

2    it relates to the first page of Exhibit 18, this is the

3    letter -- I don't know if it's a letter or e-mail.  You

4    say you don't recall receiving it; is that correct?

5           MR. SHAFFER:  I never got a letter in the

6    mail.  I've never seen this letter before.  I've never

7    seen an e-mail with this information on it.

8           MR. KANE:  Go to the next page.  Did you

9    receive this e-mail from Cindy Mathes to you dated

10   August 10th of 2009?

11          MR. SHAFFER:  I believe so.  It's addressed

12   to me.  I must have got it.

13          MR. KANE:  "Per our conversation and as

14   previously communicated, you would be paid for your

15   salary for the administrative leave.  There is no

16   negotiation on the base pay for administrative leave.

17   If a doctor recommends medical leave, you would be

18   eligible for short-term disability.  And I've copied

19   below how the benefits base is calculated."

20          And you received that from her; correct?

21          MR. SHAFFER:  Correct.

22          MR. KANE:  If you go to the third page at

23   the bottom, you sent an e-mail after that on August 12th

24   to Jan Krug; correct?

25          MR. SHAFFER:  Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 620

329

```
 1              MR. KANE:  And you said, "I cannot afford
 2   to take you up on the administrative leave offer.  The
 3   income that I would receive from the recoverable draw,
 4   which you erroneously refer to as salary, would result
 5   in financial hardship if I was to be judged unsuitable
 6   for duty."
 7              In other words, you declined the offer that
 8   was made to you by Wells Fargo; right?
 9              MR. SHAFFER:  Right.  And I can explain
10   why.
11              MR. KANE:  I'd just like to move that into
12   evidence so that the record is complete.
13              CHAIRMAN:  Is that all right?
14              MR. SHAFFER:  Sure.
15              CHAIRMAN:  Okay.  Are we about ready to go
16   into closing arguments?
17              MR. KANE:  And as you had indicated, I will
18   reserve my entire closing for rebuttal.
19              CHAIRMAN:  Which is another way of saying,
20   Mr. Shaffer, that you go first.
21              MR. SHAFFER:  Okay.  Well, and please guide
22   me on this, because I realize that -- you know, I
23   understand what you've told me about the format, and I'm
24   trying to stick with that.  But obviously there's some
25   flexibility there.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 621

330

1          Okay.  Regarding the promissory note,

2     the -- remember page 2 of the promissory note agreement

3     states that this promissory note will be enforced,

4     interpreted and some other term based on the -- laws of

5     the State of California.

6          And the thing is that the promissory note

7     is unenforceable based on the laws of the State of

8     California.  And, please, if I could ask anything,

9     please review my excerpts from the Division of Labor

10    Standards Enforcement Policies and Interpretation Manual

11    or go to the website, because you will find that the

12    points I've made, which I don't need to review again

13    unless you'd like me to, basically make the promissory

14    note unenforceable.

15          And there is also contract law involved

16    here.  And the promissory note is also unenforceable

17    under a number of aspects of contract law that I have

18    quoted.  Those are my scratchy notes.  Excuse me.

19          The promissory note agreement states the

20    note shall be interpreted, enforced and governed under

21    the laws of the State of California.  Please review the

22    California Division of Labor Standards enforcement

23    policies and interpretation model.

24          A promissory note demand is clearly not

25    allowed under California labor law.  And in fact, it



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 622

331

1   creates a type of employment contract for the period of

2   the loan forgiveness.

3            My next point, wrongful termination,

4   nowhere in any Wells Fargo policy or compliance manual

5   is it stated that the types of infarctions that I

6   committed are grounds for termination.

7            And Ms. Mortensen has also replied verbally

8   that they would not ordinarily be causes for

9   termination.  In fact, the manual allows three client

10  complaints per year, according to the actual manual,

11  which is one of my exhibits, and does not specify

12  actions for not forwarding a complaint.  Moreover, even

13  an at-will employee has the right of justified

14  termination.

15           As far as withholding disability benefits,

16  my disability benefits were provided by Wells Fargo, I

17  thought, declined by Met Life while two physicians had

18  recommended that I needed to take time off for this

19  medical condition.  Those exhibits are in my booklet.  I

20  contacted Wells Fargo Employee Benefits regarding this

21  denial and received no response.

22           As far as withholding commissions is

23  involved, the situation is clearly addressed under the

24  California employment law defining commissions and

25  whether commissions can be withheld based on the



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 623

1   employer's cost of doing business.  And that's another

2   point that I have already addressed.

3              But as far as libel or slander on Form U5

4   and infractions that are not listed for reasons of

5   termination are ambiguously disclosed resulting in my

6   not being able to procure employment during a period

7   that could have been the most productive of my career.

8              And in regard to damages, my actual damages

9   are well over one million.  Many of these infractions

10  suggest treble damages.  My treatment was a malicious

11  response to my concern, Well's lack of fiduciary

12  responsibility, my health issues and disability.

13             I'm sure an attorney representing me would

14  suggest the damages be much higher to include emotional

15  damages as well, and that a message needs to be sent to

16  Wells Fargo regarding employee rights and their

17  violation of California's public policy doctrine.

18             Damages and sanctions should also be

19  assessed against Kane and Fischer because they obviously

20  are aware of California employment law and labor

21  contract law, or they should be.  So either they are not

22  even aware of California -- these provisions that I

23  pointed out, or they're aware of them and they're just

24  trying -- they're taking advantage of the arbitration

25  process, the panel and myself.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 624

333

1        Would this be the time when I can bring up
2   the e-mail that we discussed?  During my closing
3   arguments, right, which I think may have colored my --
4   no, the e-mail.
5        CHAIRMAN:  No, we're talking about Mary
6   Mortensen.  Which one are you talking about?
7        MR. SHAFFER:  Remember the e-mail that we
8   discussed that was to Mark Webster that I thought might
9   have affected the firm's feeling about my continued
10  employment?
11       CHAIRMAN:  Yes.
12       MR. SHAFFER:  This will be the time I
13  introduce this.  On March 9th of 2009, I wrote Mark
14  Webster an e-mail which is Exhibit 4 in my package.  It
15  says, "Hi, Mark.  I've been issued a formal written
16  warning for unsatisfactory production from Barbara.  My
17  monthly goal is $20,666, which is 80 percent of my
18  actual goal", but that was the rule for 2009 after the
19  markets collapsed in 2008.  Everyone was expected to
20  generate 80 percent or more of their goal.
21       "I had total production of $20,100, missing
22  the mark by 500.  My year-to-date is $41,439, an average
23  of $20,719.50 per month, and higher than the original
24  requirement.  And I am now threatened with termination
25  in a time when prior to this meeting I felt like I was



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 625

334

1   gaining momentum.

2              For March I booked my first TransAmerican

3   Heritage Builders sale, received my first in force

4   policy review and built business in fixed annuities.  I

5   feel my branch relations are excellent.  I have no

6   customer complaints.  I was 14 out of 29 reps for the

7   month the February and 8th percentage to goal.  This

8   is shortly after I received the threat for termination.

9              Complicating the situation is the fact that

10  I have an outstanding promissory note.  Barbara has

11  informed me that the unamortized amount would be due

12  back to Wells, a financially disastrous situation.  I

13  cannot believe that Ms. Brandell is subjecting not only

14  myself but other FCs to this type of mental duress in a

15  time of crisis.  Do you think this is fair and

16  reasonable?"

17             And then this is where I said that "This is

18  one of the discriminatory sorts of behaviors, that I

19  took eight weeks off last year, October, November for a

20  health problem that I'm still being treated for.  I

21  currently take eight pills a day.

22             I was denied short-term disability from

23  Metropolitan Insurance with the explanation that my

24  medical records do not support disability payments, even

25  though I would assume that the recommendation to take



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 626

335

1   time off was part of my records.  They effectively

2   overruled my doctor.  Amazing.

3              This situation affected my productivity

4   before I left and I had two months of zero production.

5   Barbara states that the condition of written warning is

6   based on last year's production as well.  I was on track

7   to achieve my annual sales goal last year until

8   July 1st.  I believe my treatment is partly based on

9   verifiable illness."

10             And then I get into a couple points that I

11  think Mr. Kane objected to, which is pointing out that

12  there's misrepresentation of a product.  Which on the

13  next page, also labeled 4, misrepresentation of material

14  facts is in the general code of conduct prohibited

15  business practices.

16             And do you think that with these -- this

17  problem I'm having with Ms. Krug and Brandell, do you

18  think that Mark Webster would have called or e-mailed or

19  taken any action to communicate with me, especially when

20  I pointed out that there was misrepresentation going on?

21  Well, he did not.  I have never had a personal

22  conversation with Mark Webster, never; not an e-mail

23  conversation to me, not a personal phone conversation.

24  I had never been invited to his office.

25             This, again, is after complaining of a



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 627

1  misrepresentation going on in the branch.  I can talk

2  more about that, but I believe Mr. Kane would like to

3  object to that.

4          "So in closing, I am hoping that I can be

5  on a more than month-to-month plan which is only

6  reasonable since it could compromise my ability to

7  suggest the best course of action to my clients.  And

8  I'm available to verify, discuss any of these items at

9  your request and will continue to provide support for

10  clients."

11          Again, I think that that e-mail has been

12  mentioned to me as something that never should have been

13  written and that I was, you know, tying my own noose for

14  having said it.  And I think it could have affected my

15  termination.

16          So in closing, we had Ms. Mortensen state

17  that the infraction that I was guilty of would not be

18  reason for termination, and that I think there's other

19  issues going on here.

20          I would like to briefly address her

21  statement that I scared her, and actually remember

22  Ms. Mortensen was driven to tears when describing the

23  situation of me returning the laptop.  And she mentioned

24  a couple times that I was slouched down in my car.

25          This is just a little humorous sideline.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 628

Arbitration                                    March 18, 2011

337

1   My car is a Mazda RX8, a sports car.  If it were sitting

2   here, the roof of the car is right here.  I'm 6-foot-2.

3   I have to be slouched down to enter the vehicle.

4              I was never -- never, never did I in any

5   way threaten Ms. Mortensen or anyone else.  You can see

6   by my e-mails, I never threatened any kind of violence.

7   I'm a nonviolent type of guy.  Right now I'm outraged.

8   I'm being held up here, I'm in a $100 a night motel

9   across the street.  I'm being hit with legal fees for

10  things that I don't understand.  I'm as outraged as I've

11  ever been.  I think you can see I'm not a violent

12  person.  I don't have it in me.  I never threatened

13  anyone.

14             For Mary to say she was afraid I was going

15  to go postal and I was slouched down in my car is just

16  ridiculous.  And Mary, congratulations on the crying

17  thing.  You never cried at the point of our meeting.

18  But I think that was a great little bit of acting.

19             And I never threatened anyone.  I returned

20  the laptop at that time.  And, again, a gentleman by the

21  name of Dave Godding was with Mary there and would know

22  that I handed her the laptop and we said goodbye and

23  that was it.  And then I had to get back down in my car

24  and slouch back down to my car.  I just wanted to say

25  something about that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 629

338

```
 1              ARBITRATOR:  I have a question.  Are you
 2     saying that the laptop you gave was the correct laptop,
 3     it was not your personal laptop?
 4              MR. SHAFFER:  Not initially.  The Wells
 5     Fargo computer was a Compaq laptop computer and I happen
 6     to have a personal Compaq laptop computer.
 7              When I was called on an afternoon at the
 8     branch and I was told by Ms. Krug to -- first we
 9     discussed the e-mail and then she told me -- it was
10     approximately 1:15 at that time.  And she said, "Be at
11     the Roseville office at 2:00.  Bring your laptop and
12     your keys."
13              And that is from the -- you know, the
14     communication within Wells Fargo, everyone knows, all
15     the financial advisors know when the word is bring your
16     laptop and your keys, you're terminated.  I've even
17     heard that explained before.  So I knew that I was going
18     to be terminated.
19              And what I did was put the laptop in the
20     trunk and I had hoped to find someplace that could
21     remove the information regarding my clients that I
22     brought to Wells Fargo, which, again, was the most
23     substantial part of my client base that were not covered
24     by a noncompete agreement, and hopefully pull off a T12.
25     And I found that there was nothing that could be done.
```



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 630

339

1    The computer was locked up.

2              So I returned it to Mary the next morning.

3    I had both computers in the trunk of my car and I had

4    given her the incorrect computer.  That's the end of

5    that.

6              CHAIRMAN:  Anything more, Mr. Shaffer?

7              MR. SHAFFER:  Do I need to review those

8    items?  I don't think I need to review the items again

9    in regard to the Division of Labor Standards Enforcement

10   Policies.

11             CHAIRMAN:  No.  You have provided them and

12   they are available to us is.

13             MR. SHAFFER:  I would appreciate you

14   considering those and reading those over at your leisure

15   as a part of this decision.  Because, again, I don't

16   understand how the promissory note could possibly be

17   enforced given the provision or how Mr. Kane could

18   enforce this action upon all of us.

19             CHAIRMAN:  Well, Mr. Kane is not a party to

20   this matter.

21             MR. SHAFFER:  And that's the whole story.

22   Again, the other part of my exhibits is records of my

23   attempts at my employment.  Mr. Chung had subpoenaed

24   records of employment listed that I had worked for

25   without any kind of cooperation with me.



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 631

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

340

1          And the two that he brought back that said

2     they had no record of me applying for, one of which was

3     one of the most embarrassing situations of my

4     professional career, and the situation with E-Trade

5     where I was told -- and I refer to that in my documents

6     as well.

7          But I was told that I was the one that they

8     wanted there in the office and they could -- I was told

9     specifically they could benefit from my experience.

10          So on the appointment there, having gone to

11    see the branch manager, that coming back is one of the

12    qualifiers to interview with the other brokers in the

13    office.  The third time I was to meet with the branch

14    manager to formalize my agreement.  The branch manager

15    had already told me I was the candidate they wanted to

16    hire.

17          When I arrived at that appointment, the

18    branch manager, Lou Hudson, who won't return my call or

19    give me any information, came out and said, "We're not

20    going to be able to meet today."  Wow, just like that,

21    we're not going to meet.  I said, "Oh, okay.  Well,

22    you'll call me?"  He said, "Yeah.  Well, someone will

23    call you."

24          So I returned home and I called my contact

25    at E-Trade who had sent application documents to me.  I



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 632

Arbitration                                    March 18, 2011

341

1   said, "What is going on with Lou Hudson?"  She explained

2   to me -- it is in here and documented, she explained to

3   me that because of the entries on my U5 and because of

4   E-Trade's requirement that what they call investment

5   consultants be registered in all states so you could

6   take a call that came in from anywhere and help these

7   people, they said that the entries on my U5 would

8   require them to write a explanation in some states when

9   I was being registered in those states; that the state

10  regulatory agency would question the U5 entries.  And

11  for that reason, I was no longer considered a candidate.

12              And, again, I have a letter here signed by

13  my wife, if you'd like an independent opinion of how

14  this whole situation has affected me.  But, I mean, can

15  you imagine the dismay when you think you have a job

16  lined up and these U5 entries foiled it for you?

17              And that's why there were instances where

18  Mr. Chung had forwarded to me an e-mail of E-Trade

19  saying we don't have a record of this man applying.  I

20  tried to get some verification of that.  I am truly

21  black-listed from E-Trade.

22              And I have a list of other employers that I

23  have interviewed with as well as my rejects, my e-mail

24  rejects from Monster.com.

25              So as far as damages are concerned, the



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 633

342

1    problem is, you know, if I could find -- as you know, I
2    was unhappy at Wells Fargo.  I was particularly unhappy
3    with their constant concentration and concern with
4    revenue amounts irrespective of the client base or what
5    might be best for the clients.  So I might be happy to
6    leave if I could get a job making say $100,000 doing
7    anything else.  But, again, I'm not able to get a
8    face-to-face interview doing anything other than
9    brokerage.  I think that affects my damages.
10            Obviously, I'd love to get another job and
11   go to work again.  I haven't worked in over a year now.
12   What I've done is eroded my savings down to practically
13   nothing.  The next alternative is to withdraw money from
14   an IRA, which is a total of $100,000.  After that, I'll
15   be out of money.
16            You see these guys out here on the corner
17   with last week's clothes on.  I can understand their
18   plight much better now.  It's not too far from realizing
19   that if I can't find a job, I could be homeless at some
20   point.
21            The other thing I'd like to mention is
22   Mr. Reece was nice enough on an earlier conference call
23   to suggest that I write a letter to Wells Fargo and ask
24   that they might adjust the items on my U5.  And I just
25   wanted to mention that one of my exhibits is that I did



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 634

343

1    write that letter and I never got any kind of response.

2              That, I'm sure everyone will be happy to

3    know, is all.

4              CHAIRMAN:  Thank you, Mr. Shaffer.  Do you

5    want to take a short break?

6              ARBITRATOR:  5, 10 minutes.

7         (Thereupon, a break was taken.)

8              CHAIRMAN:  All right, Mr. Kane, your

9    closing comments?

10             MR. KANE:  Thank you.  At the outset, let

11   me take this opportunity on behalf of myself and Wells

12   Fargo to thank the panel.  The panel has showed obvious

13   attention and patience during this hearing.

14             I know Mr. Shaffer appreciates it, and it's

15   probably one of the only things that Mr. Shaffer and I

16   are going to agree on in my closing remarks.

17             Really, I ask the panel now what I asked at

18   the beginning of the hearing, and that is that you

19   require Mr. Shaffer to do nothing more than honor the

20   written contractual agreement that he signed when he

21   accepted the loan from Wells Fargo for $111,347.  And in

22   this regard, the evidence is really not in dispute.

23             And I think the evidence has clearly

24   established that prior to Mr. Shaffer joining Wells

25   Fargo, he was aware that he would be eligible to receive



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 635

1    a loan from Wells Fargo at the end of his 18th month of

2    employment if he met that production requirement of

3    $217,500 in his best 12 months, that he'd be eligible to

4    receive a loan.

5              And this is clearly set forth in the

6    documents.  The two offer memos that he signed, he

7    signed one on June 6th and one on June 9th.  They're in

8    Exhibits 2 and 3.  Those offer letters clearly state

9    that any such payment would be pursuant to a five-year

10   loan.

11             It clearly states -- and this is all before

12   he ever joins the firm.  It clearly states that it would

13   be forgiven over the five-year period each month.  It

14   clearly states that if he left the firm for any reason

15   after he accepted this loan, whether voluntary or

16   involuntary, he would have to repay the balance.

17             So this was spelled out to him long before

18   he joined the firm when he signed those two offer

19   letters.  The evidence is established, 18 months after

20   he joined Wells Fargo, Wells Fargo did exactly what it

21   promised to do.

22             Even before that, there's no dispute.

23   Wells Fargo paid him that nonrecoverable draw for the

24   four months, the $48,000.  He doesn't dispute that.

25   They gave him the 40 percent payout from June 15th of



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 636

Arbitration                                   March 18, 2011

345

1    '06 to December 31st of '07.  He doesn't take issue with

2    that.

3            And at the end of -- in January of 2008, at

4    the end of those 18 months, Wells Fargo again did what

5    it said it would do under that offer letter.  And that

6    is it lent him the $111,347 for which there's no

7    dispute.  Mr. Shaffer signed a promissory note and

8    that's Exhibit 5.

9            And all you have to do is look at

10   Claimant's Exhibit 5 and you can see from the language

11   that Exhibit 5 is clear and unambiguous.  It states it's

12   a loan.  It states it's payable over five years.  It

13   states it's going to accrue interest.  It states that he

14   is going to have to repay it if he leaves Wells Fargo

15   for any reason, whether voluntary or involuntary.

16           In this regard, I think it's significant

17   that Mr. Shaffer doesn't deny that he signed the

18   promissory note.  He doesn't deny that he received the

19   $111,347.  I went through the terms of the promissory

20   note, each of them.  He admits that he understood the

21   terms of the promissory note, including the fact that he

22   would have to repay the loan if he left, whether

23   involuntarily or voluntarily.

24           The evidence has established that he was

25   discharged from the firm on October 1st of 2009 and he



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 637

346

1    has not paid the unpaid balance or the accrued interest

2    on that loan.  And both factually and legally -- and as

3    arbitrators, you do have to follow the law.

4            Factually and legally, under the term of

5    the written contract that he signed, he has to repay

6    that money to Wells Fargo.  But rather than acknowledge

7    what is his clear contractual obligation, Mr. Shaffer

8    has come up with a myriad of theories to avoid honoring

9    his obligation.

10           And I understand he's not a lawyer.  But he

11   has taken things out of context and has stated the law

12   to the extent it's very difficult for me even to start

13   to address, but I need to do that.  So the first issue

14   he has is -- I'm using his issues, that I can address

15   each one of his issues.

16           It's in his issues, promissory note,

17   originally described as a bonus, never explained.  I

18   never understood the terms.  Well, it's clear from the

19   offer memo that it was explained to him that this was a

20   promissory note, a loan and not a bonus.  Nowhere in

21   either of those offer letters that he signed does it

22   ever refer to this as a bonus.  And it's not until even

23   18 months later after he's joined the film that he

24   receives the loan.

25           And it's clear under the promissory note



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 638

347

1    that that's exactly how it's described, as a loan.

2    There's no reference in the promissory note that this is

3    a bonus.  It never happened.  It was never described as

4    a bonus and the documents confirm that.

5              Well, when he didn't like the fact that the

6    offer memo calls it a loan and the promissory note calls

7    it a loan, he said, well, look here, on the payroll it

8    says net pay; so therefore, it's not a loan because on

9    that payroll statement it's net pay.

10             Well, you know, that's simply frivolous.

11   What that was was an automatic deposit into his bank

12   account where they used the payroll system to make an

13   automatic deposit of $111,347 into his bank account.

14   And the documents --

15             MR. SHAFFER:  Objection.

16             CHAIRMAN:  The only objection that would be

17   heard here is if Mr. Kane is referring to something that

18   has not been put in evidence.  That's the only basis for

19   an objection to closing arguments.  Go ahead.  In other

20   words, introducing something new.

21             MR. SHAFFER:  That is something kind of

22   new, whether it was a direct deposit or a check.

23             CHAIRMAN:  That is not appropriate at this

24   time.  Go ahead, Mr. Kane.

25             MR. KANE:  So the theory that this was



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 639

1    somehow a bonus is contradicted by the offer memos, the

2    promissory note itself, and it's contradicted by his own

3    testimony where he admits that when he received this

4    $111,347 loan in January of '08, he didn't record that

5    as income on his taxes.  At that time, it wasn't

6    taxable.  It only became taxable when the forgiveness

7    occurred and that was the taxable event.  Because

8    forgiveness is an income.

9              So the documents, you know, support the

10   idea that his argument here is completely without merit.

11   Then he argues, and this is where I really have to take

12   some exception, then he argues in his issues that under

13   California state labor law states that balloon payment

14   demands for loans made to employees made at the time of

15   termination are not allowed even if the employee has

16   given his or her consent to such payments.  And he cites

17   Section 11.25 in the Barnhill case.

18             Well, first of all, the labor code doesn't

19   say anything such thing that Mr. Shaffer has propounded

20   throughout this hearing, nor does the Barnhill case.

21   Just so that we all are on the same page, I made sure

22   that the panel has copies of the Barnhill case, and I

23   don't think Mr. Shaffer ever read the Barnhill case.  I

24   don't think it says anything that he purports it to

25   conclude that it says.  I have a copy for him, three for



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 640

Arbitration                                    March 18, 2011

349

1    the panel.  The panel can consider it.

2              But if you'll look at the second page of

3    the Barnhill case on the left-hand side, what it's

4    saying here, the principle --

5              MR. SHAFFER:  Objection.  This was never

6    offered before.

7              CHAIRMAN:  You opened it up by referring to

8    the case.

9              MR. KANE:  The principle question presented

10   here is whether an employer has the right to set off an

11   employee's debt against wages due -- due the employee

12   upon the employee's discharge, whether it -- to do a

13   setoff as a penalty.

14             But going to the right-hand side, this was

15   an individual who was a bookkeeper for the company.  And

16   when the company discharged the person, Ms. Barnhill,

17   this is on the right-hand column, on that date, there

18   was a balance due on a promissory note that she had of

19   $475 plus interest, and she was owed two weeks' wages

20   against that $475.  So when she went to pick up her

21   check, she was given a stub of net 0 balance of what was

22   owing on the note.

23             That's what they're talking about here.  It

24   says here, "Labor Code 201 provides in relevant part if

25   an employer discharges the employee, the wages earned at



ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 641

350

1    the time are due and payable immediately." Well, that's

2    not what we have here.  That's not even close to what we

3    have here.

4              If you go to page 3 on the right-hand side,

5    it says, "Unquestionably, when respondent was

6    discharged, this is on the right-hand column before the

7    footnotes, all the wages due her were immune from

8    attachment."  That's true.  But that's not what we have

9    here, either.

10             Then if you go to the page 4 on the

11   left-hand side, it's merely saying here, this is before

12   the penalty section, "Permitting appellant to reach

13   respondent's wages by setoff would let it accomplish

14   what neither it or any other contributor could do by

15   attachment and would defeat the legislative policy

16   underlined at exception.

17             We conclude that the employer is not

18   entitled to a setoff of debts only to get -- by an

19   employee against wages due that employee."  That's what

20   Barnhill says.  It doesn't say balloon payments on loans

21   aren't permissible.

22             It has nothing to do with the facts of this

23   case.  And he should have read the case.  What he did is

24   he looked at a manual and looked at excerpts and

25   headnotes and he didn't bother to read the cases.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 642

351

1    He's made all kinds of accusations here

2    against me, my firm and Wells Fargo regarding the

3    enforceability of this note.  Going further, there's

4    another case where the Barnhill case was cited, and I

5    think that's significant as well, because this relates

6    to the issue of this issue unconscionability that he's

7    raised.  This is the Cole Vario case, another California

8    case.  And those are three for the panel.  And the

9    page --

10       CHAIRMAN:  Has this case been mentioned

11    before by you?

12       MR. KANE:  It has not been mentioned.  It's

13    in response to his calling these contracts

14    unconscionable and void.  And this to refute that.  This

15    is a legal argument as part of my closing.

16       CHAIRMAN:  Okay.  You may proceed.

17       MR. KANE:  So, basically, if you would go

18    to the page that has 15 in the upper-right-hand corner,

19    it was referencing the Barnhill case on the right-hand

20    side where it distinguished Barnhill and said Barnhill

21    doesn't apply to the setting that we have here.

22       And it went on to say at the bottom that

23    referring to wages paid prohibits an employer only from

24    collecting or receiving wages that have already been

25    earned by performance of agreed-upon requirements.  The



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 643

352

1     commissions here were not so earned.

2            And what it's doing is saying that

3     application of Barnhill to this setting is just not

4     appropriate.  But more importantly, this case goes on,

5     if you take a look on page 16 where it says no

6     unconscionability -- and Mr. Shaffer has referred to

7     these so-called sections in this promissory note is

8     unconscionable and an adhesion contract.

9            Well, if you go to page 17, it provides --

10    and this is what the panel needs to look at.  16

11    started -- I'm sorry, where it says there is no

12    unconscionability.  And it goes on.  And what I'm going

13    to read is from page 17.

14           Unconscionability analysis begins with an

15    inquiry into whether the contract is one of adhesion.

16    It sites an issue.  An issue which Vario points out is

17    not a direct subject of any meaningful testimony.  But

18    then he defines unconscionability has both a procedural

19    and substantive element.

20           The procedural element focuses on

21    impression or surprise due to equal -- unequal

22    bargaining power and substantive element overly harsh or

23    one-sided results.  Both elements must be present.

24           Here, as demonstrated, and here as well,

25    set forth there was nothing surprising about the



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 644

353

1   commission plans and nothing oppressive.  Well, there

2   was nothing surprising about the loan that he was going

3   to receive.  There certainly wasn't anything oppressive

4   about the loan.

5               He received $111,000 use of that money for

6   five years, not taxable when he first got it, and spread

7   the tax consequences over five years.  Thus, there is no

8   unconscionability, likewise, no substantive

9   unconscionability was described by the case.

10              Then it goes to the right-hand side.  "The

11  court concluded there was no unconscionability because

12  plaintiff was aware of her obligations under the

13  contract and voluntarily agreed to assume them.

14              Then, particularly opposite here, the court

15  concluded there was no substantive unconscionability.

16  Substantive unconscionability is shown only by contract

17  terms.  And that's certainly not what we have here.

18              And then it goes -- and so that's --

19  there's no adhesion contract, no unconscionability.  And

20  continuing along those lines, he continues to say that

21  this -- the problems in California, they have some

22  boilerplate language which is unenforceable.  And he

23  cites a code on that.

24              That's certainly not the case in

25  California.  The case on that is the Federal Savings



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 645

354

1    versus Versaccio.  I'll hand that up to the panel and

2    give him a copy as well.  It looks like I am one short.

3    I only have two copies of this case.  I apologize.  But

4    the case at page 8, and if you look at page 8, at the

5    top --

6                CHAIRMAN:  I'll make a copy.

7                MR. KANE:  I apologize I'm short one copy.

8                Contract of adhesion is listed at the

9    lower-right-hand corner.  And, basically, what it says

10   is California courts hold that as a matter of law,

11   standardized promissory note forms into which the

12   interest rate and other agreed upon terms are inserted

13   such as the notes at issue here, are not unenforceable

14   contracts of adhesion.  It is pretty clear that what

15   Mr. --

16               CHAIRMAN:  Where was that?

17               MR. KANE:  The page is 8 at the top.  If

18   you go down to the bottom on the right-hand side, the

19   last paragraph, it says "contracts of adhesion".  Under

20   that heading.

21               MR. SHAFFER:  On page 8?

22               MR. KANE:  And the reference is at the

23   lower-right-hand section.  So it's pretty clear that a

24   non-attorney has come in here and spewed forth things

25   that are really not the law, and cast aspersions on



ESQUIRE

an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 646

1   myself and my law firm, things he just really doesn't

2   know about.

3              It's pretty clear, and that's why I had to

4   go through to make sure all the cases were here to

5   demonstrate that there's nothing unenforceable about

6   these promissory notes under California law, factually

7   or legally.  And they must be enforced pursuant to

8   California law.

9              Now I'm going to address the next issue

10  that he has, and it's the next page.  And it's wrongful

11  termination.  And once again, Mr. Shaffer is not an

12  attorney, but he thinks he's one.  And he's not and he's

13  misstated what the California law is regarding

14  termination.

15             It's I think important to note here that

16  Mr. Shaffer wasn't terminated because he got production

17  warnings.  He wasn't terminated for low production.

18  Quite candidly, he could have been terminated for low

19  production because he was an at-will employee.  He could

20  have been terminated for any reason.  I'm going to give

21  you the California law on that in a minute.

22             He wasn't terminated for low production,

23  but for violating policy, which I'm going to get into in

24  a minute.  His own documents demonstrate that although

25  he had production warnings from time to time, there are



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X   Page 647

356

1  also times when he met the criteria and he was taken off

2  of the production warnings.  Even Mr. Shaffer just a

3  little while ago admitted that because of the production

4  warnings, from time to time, there were also times when

5  he met the criteria and he was taken off of the

6  production warnings.

7          Even Mr. Shaffer a while ago said that

8  because of the economic conditions in 2008, that in late

9  2008 and 2009, all firms, and firm-wide, they required

10 that you meet 80 percent of the production goal.  It

11 wasn't anything that was directed toward him.  It was

12 firm-wide.

13         You saw in some of the rankings, he ranked

14 pretty well in connection with the other agents.  He

15 wasn't terminated for his low production.  I'll get into

16 that further.

17         The clear reason that he was terminated was

18 found in Exhibit 10.  And in Exhibit 10, and I want to

19 make sure the panel is very clear on this, the

20 commission schedule that he should have charged these

21 customers is reflected in Exhibit 10 at pages 23 and 26.

22 That's the commission calculators.

23         And there's been a lot of questions about

24 this -- the gray area and the maximum.  If you do the

25 math, the commission calculator generally follows when



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

EXHIBIT X  Page 648

357

1    you get to the 167 and the other figure, the FINRA rule

2    and the FINRA guide, it used to be a rule.  It's now a

3    guide.  That's the markup policy.  It's a FINRA rule,

4    and this is law.  And I'll leave a copy with the panel.

5    I'll give a copy to Mr. Shaffer.  Here's three for the

6    panel.

7              This is the markup policy.  The old

8    rule-of-thumb used to be can't -- I think I have enough

9    of that one.  The old rule of thumb used to be, and

10   still is, you can't mark up a trade more than 5 percent

11   of the principle.

12             As it indicates here, they made an

13   interpretation to make sure that was deemed to be a

14   guide, not a policy.  But if you do the numbers, those

15   maximum amounts that are in that gray area that has a

16   systems issue which I think Ms. McClaskey saw, it

17   demonstrates if we use that maximum number against that

18   trade, you would be way, way outside of the 5 percent

19   policy.

20             So the calculator was a guide that the

21   brokers were supposed to follow.  And it was on a

22   system, unless they overrode the system, which he did,

23   that would show what the correct commission was.

24             He overrode the system in order to charge

25   more than the schedule that was permitted to be charged



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 649

358

1   under the schedule that Wells Fargo had in place in the

2   system.   There is no doubt about that.   And there is no

3   doubt about that, that he did it to adjust his revenue

4   upward to meet these goals.   He wasn't terminated for

5   lack of meeting his goals.

6            It is not a justifiable reason for any

7   broker to charge excess commissions to meet quotas or

8   goals.   That is a Cardinal sin.   You are not then

9   using -- keeping the best interest of the client in

10  mind, you're keeping your own best interest in mind.

11  That's prohibited.   It was clearly in violation of this

12  policy.

13           Then he exacerbates that when he writes

14  this e-mail.   "I thought gouging was part of our

15  business plan."   Can you imagine, poor Ms. Mortensen, as

16  a compliance officer, seen a broker, knowing he's

17  charged these excess commissions and getting an e-mail

18  like this that gouging is part of the business plan.

19           She did what she was supposed to do, she

20  ran it up the totem pole to the supervisors.   Everybody

21  gave this strong consideration.   This was legal,

22  compliant.

23           With all due respect, this e-mail in

24  Exhibit 9 comes up.   And, again, I want to -- I think

25  there was some confusion about Exhibit 9.   This



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 650

359

1   violation was not corrected.  Just so we're clear, on

2   September 11th -- it's true, it's a true on

3   September 11th, 2009, he received a written complaint

4   from a customer.  There's just no two ways about it.

5   The customer said "I will contact my attorney if you

6   don't contact me.  I'm pissed you got me into this."  No

7   question.

8              He responds to the customer on Monday,

9   September 14th.  But that doesn't cure the violation.

10  He never gave this to his supervisors, and he was

11  required to do that.

12             And there's a reason why he was required to

13  do that.  There's nothing in this e-mail that says

14  everything was corrected as of Monday, September 14th or

15  that the customer is satisfied with his response and

16  there is still the risk that this customer is going to

17  have the attorney contact Wells Fargo.  There's still

18  the risk that this client is still, quote, unquote,

19  pissed that you got me into this and might bring some

20  action.

21             And the purpose of the rule is so the

22  compliance department and legal department don't get

23  surprised with things.  If they need to, they can't take

24  proactive action.

25             This violation was never corrected.  His



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 651

360

1    failure to report to the supervisor that written
2    complaint, and that's exactly what was required in the
3    compliance manual that's in the exhibit -- Exhibit 11,
4    that he affirmed he read in Exhibit 12.
5                So what we get to, then, so it's -- what we
6    get to, then is the -- and I'll get to the Exhibit 8 in
7    a minute.  But Exhibit 8 is the U5, and that contains
8    clear and accurate language.  And I'm going to get into
9    that in a minute.
10               Before he gets there, he next raises in his
11   issues wrongful termination.  It's still part of
12   wrongful termination, that he's claiming that as a
13   result of people thinking he had a bad attitude or these
14   warnings, that he was constructively discharged, if you
15   will, or wrongfully terminated instead of for the
16   reasons stated here.
17               Well, again, the law in California is not
18   what Mr. Shaffer would like it to be, but it's clear.
19   In California, an employment relationship may generally
20   be terminated by either party at-will.  This means that
21   unless they agree otherwise, either party may terminate
22   the employer/employee relationship without cause.
23               The leading case in California citing the
24   California labor code, Section 2922 is Stevenson versus
25   Superior Court that says that exactly.  And it's pretty



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 652

361

1    clear in the offer letters that were given to

2    Mr. Shaffer, he was an employee at at-will.  It's pretty

3    clear in the private client services agreement,

4    Exhibit 4, that he was an employee at-will.  They both

5    agreed to that.  And it's pretty clear in the promissory

6    note that he was an employee at-will.

7                And the clause goes further.  An at-will

8    employee like Mr. Shaffer may be discharged for no

9    reason or even for arbitrary or irrational reason.

10               But there is an exception:  An at-will

11   employee may not be terminated for an unlawful reason.

12   If you ask an employee to commit a crime and he refuses

13   to do that, you cannot dismiss an employee for that.  Or

14   a purpose that contravenes public policy.  Those are the

15   only two exceptions to the tort of a tortuous discharge

16   in California.

17               That is Gant versus Pasebry Insurance, 824

18   Pacific 2d, 6A.  To support a claim for tortuous

19   discharge, which is in essence what this is, the

20   violated policy must be supported by either a

21   Constitutional or statutory provision or be public in

22   the sense that it enures the benefit of the public

23   rather than serving an individual interest, and be

24   articulated at the time of discharge and be fundamental

25   and substantial.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 653

362

1       There's nothing like that that we have

2  here.  Absolutely nothing.  So none of the exceptions to

3  public policy or for statutory tortuous discharge are

4  applicable to the facts of this case.  He simply was not

5  wrongfully terminated.  As an at-will employee, he could

6  have been terminated for any reason.  But he was clearly

7  terminated for just and appropriate reasons.

8       I'm going to get into that next because the

9  facts have established that there was a very valid

10 reason to terminate Mr. Shaffer.  A firm simply cannot

11 risk harm to its clients by somebody who, one, charges

12 excess commissions over the schedule and then says it's

13 part of a gouging business plan and fail to report

14 customer complaints that might deprive the firm of

15 knowing that there's a problem, a potential problem out

16 there.

17      Those are appropriate reasons to terminate

18 an employee, even though the firm didn't need one.  He

19 was terminated for just reasons.

20      Then we get to the issue of libel, his next

21 issue, libel and slander.  Well, I alluded to it

22 yesterday, but I didn't get into all of it.  The facts

23 of the matter is that defamation or libel involves

24 intentional publication of a statement of fact which is

25 false, unprivileged and has a natural tendency to injure



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 654

Arbitration                                    March 18, 2011

363

1   or which causes special damages.

2            The case there is London versus Sears

3   Roebuck, Northern District of California, 619 F. Sub 2d,

4   854.

5            But the leading case is the Fontani case

6   that I referenced yesterday.  And that case, I'll give

7   Mr. Shaffer a copy of the Fontani case.  I do have an

8   extra copy of that.

9            This is Fantoni versus Wells Fargo.  It's a

10  California case from 2005.  And I'll just read the

11  headnote.  You can read the document.  But the headnote

12  on the right-hand side says, "Form submitted by employer

13  to the National Association of Securities", which that

14  used to be FINRA.  I'm reading from the right-hand side

15  that says "Cases".  This is just a headnote.  You can

16  look at the body of your case.

17           Describing reasons for an employer's

18  termination, a broker/dealer has a communication before

19  a, quote, official proceeding supporting employer's

20  motion to strike former employee's defamation and

21  interference with prospective business advantage claims

22  as a strategic lawsuit, not against public policy.

23           Although the record was silent as to

24  whether the NAS actually investigated the employee based

25  on the statements, the form was a communication made in



# ESQUIRE

an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 655

364

1    anticipation of an official proceeding, and thus, within

2    the last statute, which means it was absolutely

3    privileged.

4              So if you go to -- so what this case stands

5    for is the idea that -- and you can read it.  It's the

6    statute in California which made this an official

7    preceding in anticipation of -- and that people can make

8    statements in anticipation of an official proceeding and

9    have an absolute privilege against a defamation claim.

10   It's what the Fontani case stands for.

11             We cited that in our response to the

12   counterclaim at pages 15 and 16 where California law

13   extends an absolute privilege against defamation claims

14   arising out of statements obtained in a Form

15   U5 because a Form U5 is a communication made in

16   anticipation of bringing an action or other official

17   proceeding.  And that's the Fontani case that we cite

18   there.

19             And so first of all, the information

20   contained, as you heard from Ms. Mortensen on the U5, I

21   know the chair went into it in detail, is accurate

22   information.  Number one is accurate.  It's not false,

23   can't form the bases of a defamation claim because it's

24   accurate.

25             It also can't form the basis of a



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 656

365

1   defamation claim because it's absolutely privileged.

2   There's a reason for that.  Employers have to not fear

3   being candid with the regulators as to what happened and

4   then be sued for it.  As Ms. Mortensen said, it's a

5   damned-if-you-do-and-damned-if-you-don't type situation.

6   If you put something that's innocuous on this and a

7   customer sues, I can tell you what happens in most cases

8   to firms that do those types of things.

9            It's accurate, not defamatory and in no

10  way -- as Ms. Mortensen testified, none of these

11  discussions about the e-mail or the SS commissions have

12  anything to do with his production.  None of it.

13           It was because of the circumstances

14  surrounding these two trades and the e-mail that he sent

15  regarding gouging as part of the business plan.

16  Regarding the withholding of the disability benefits, we

17  saw -- I took you through that, Met Life went to great

18  pains to try and satisfy Mr. Shaffer.  They had a

19  department consultant come in and review.

20           The fact of the matter is it has nothing do

21  with Wells Fargo.  Its insurer did everything that it

22  was supposed to do, and its insurer made the decision to

23  deny him the benefits, not Wells Fargo.

24           As to this licensed banker program

25  commissions, you heard that.  Nothing unusual about



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 657

366

1    that.  If a licensed banker referred him business, it

2    when into a joint rep code and it was split 50/50.  It

3    happens all the time and it's not the basis of any claim

4    that can be made here.  Nor could he quantify.  If

5    anything, he said it was a very insignificant dollar

6    amount.  So it really is not a factor here.

7              Then he made this claim of promissory

8    estoppel.  We responded to that in page 17 of our

9    response to the counterclaim.  Promissory estoppel is an

10   equitable doctrine to allow enforcement of a promise

11   that would otherwise be unenforceable.

12             In order to prevail on a cause of action

13   for promissory estoppel, Mr. Shaffer had to prove there

14   was a promise that was clear and unambiguous in a

15   promise that was made, and he relied on it.  And in his

16   reliance, he was injured.  This refers to the e-mail

17   where one person was on medical leave and Ms. Krug says,

18   "You can cover that.  It's going to be business as

19   usual."

20             Well, that's no promise that he's going to

21   continue that forever.  In fact, we know what happened

22   after that e-mail was the trade commission issue came

23   up.  So there's no promissory estoppel here.

24             So as it relates to this, none of his

25   claims have -- in our view, have been factually correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 658

367

1    But also insignificantly, they're legally without merit.

2    They can't be valid because it would be against the law.

3               They are all invalid despite Mr. Shaffer's

4    stating what is law when it really isn't. He's not an

5    attorney. I understand that.

6               But then we get to the next claim of

7    damages. And the law in California is also clear on

8    that. First of all, there are no damages if Wells Fargo

9    committed no wrongdoing. So Wells Fargo did nothing

10   wrong here.

11              He has not been able to establish any of

12   these claims. And accordingly, we don't even get to the

13   issue of damages. In the event the panel wants to think

14   about that at all, though, damages may not be based on

15   sheer speculation or surmise and the mere possibility or

16   even probability that damage will result from wrongful

17   conduct does not render it actionable. That's the

18   Ferguson case of 30 Cal. Commission 4th, 1037.

19              And there's also the Garion versus Chapman

20   University case at 121 Cal. Commission Ap. 4353, which

21   says, "Whatever the proper measure of damages may be in

22   a given case, the recovery therefore is still subject to

23   the fundamental rule that damages which are speculative,

24   remote, imaginary, contingent or merely possible cannot

25   serve as a legal basis for recovery."



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 659

368

1          In this case, he wanted to take the

2     ten-year average that has all kinds of market

3     fluctuations and moves in between.  That's not the type

4     of thing that he can just come in and say that a

5     ten-year average can be applied going forward for the

6     next X years that I'm in.  That requires an analysis

7     that was not done here.

8          What we did see is that, quite candidly,

9     Mr. Shaffer's business was in decline before he came to

10    Wells Fargo.  In 2005, the last year that he was at H &

11    R Block before he came over to Wells Fargo, his earnings

12    were $56,000.  Clearly, on his own calculations, he made

13    more than that on an average, $78,000 at Wells Fargo.

14    It just goes to show the speculative nature of this

15    thing.

16          Moreover, we know what the market

17    conditions were in 2008 versus the other areas that he

18    wants to compare.  Quite candidly, the damages analysis

19    that he presented is just not appropriate.  It's just

20    based on conjecture and speculation and is not probative

21    of any issue of damages.

22          It's been somewhat of a difficult case for

23    me.  I've tried to be patient because I understand

24    Mr. Shaffer is not an attorney.  But my personal

25    reputation, my firm's reputation has been challenged by



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 660

369

1   him at every -- Ms. Mortensen's reputation has been

2   challenged, and it's been difficult for me to be

3   patient.  And the panel has been very gracious in that

4   regard.

5                What he's done here is just wrong.  What

6   he's done is tried to throw as much mud against the wall

7   against as many people as he could.  And what I've had

8   to do with all of this is start scraping the mud away,

9   just scraping the mud away.  And I have stripped the mud

10  away.  And the wall is clean.  The wall is clean.

11               Wells Fargo did not do anything wrong as it

12  relates to Mr. Shaffer.  As unfortunate as his situation

13  might be, as unfortunate as the discharge might be,

14  that's the result of his own conduct, not the wrongful

15  conduct of me, not the wrongful conduct of my firm, not

16  the wrongful conduct of Ms. Mortensen, not the wrongful

17  conduct of Wells Fargo.  It's the results of his own

18  actions that has consequences.

19               However, he doesn't want to accept the

20  consequences.  I understand that.  He doesn't want to

21  accept the consequences of his own actions.  But

22  factually and legally, his claims are without merit.

23               And really, as a matter of law, pursuant to

24  the clear language of the promissory note, those claims

25  must be enforced according to the contractual terms.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 661

Arbitration                                    March 18, 2011

370

1              And pursuant to the law in California and

2     the facts that developed, all of his counterclaims must

3     be dismissed with prejudice, and this panel should award

4     Wells Fargo exactly what it asked for in Claimant's

5     Exhibit 16, and that is the unpaid principle and accrued

6     interest on the promissory note that would be

7     $74,617.76.  This is all in Tab 16, plus the accrued

8     interest of $3,367.20 for $77,984.96, plus the $29,814

9     in attorney's fees as I explained what that was to the

10    panel, and $8,862.06 in costs.

11             Because that's provided for in the

12    agreement and because as I cited the case to you, and I

13    can site it again, the reason we're able to get

14    attorney's fees for defending the counterclaim, and

15    that's the Soligo versus Castelluci, 21 Cal. App. 4th,

16    873, 26 Cal Reporter 2d 439.  That's a Sixth District

17    case, 1994.

18             So the total we would ask for is

19    $116,661.05.

20             These promissory notes, as Mr. Shaffer

21    himself has acknowledged are common in the industry.  He

22    had one at Morgan Stanley for $180,000.  It's important

23    to the industry that brokers be required to honor the

24    written agreements that they sign when they accept these

25    kinds of benefits.  It certainly sends the wrong message



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 662

371

1    in the industry to not do that.  So, again, we only ask

2    that you require him to do what he agreed to do.

3              I do again thank the panel for its time and

4    its patience.

5              CHAIRMAN:  Thank you, Mr. Kane.

6              The panel will confer and may require

7    several days.  But the decision will be forwarded to the

8    parties after it is sent to FINRA and to counsel, of

9    course.

10             In order to expedite delivery of the

11   panel's decision to the parties, the panel may either

12   execute a handwritten copy of the award or each

13   Arbitrator may execute a counterpart copy of the award.

14             As I failed to mention at the beginning of

15   the case, FINRA is asking each party and counsel to

16   complete an evaluation of this arbitration.  That

17   participation, which of course is voluntary, assists

18   FINRA's operation and ongoing effort to improve the

19   arbitration process.

20             You can find the evaluation form at

21   www.finra.org/arbevaluation.  And, actually, you can

22   Google FINRA and get their home page, and you can pick

23   out parts that are applicable and download an evaluation

24   form.  If you do not have internet access or have

25   difficulty completing the evaluation online, you can ask



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 663

372

1  your case administrator, who in this has turned out to

2  be Joanna Lamb, to provide a paper version of the

3  evaluation. And so FINRA does request that you do that.

4           Mr. Kane referred to certain documents that

5  were confidential and I request that they be returned.

6  And these documents were, as I understand it, in the

7  hands of Mr. Shaffer. Are there any such documents now

8  in the hands of the panel?

9           MR. KANE: No. I don't believe there are

10  any documents in the hands of the panel that have been

11  marked confidential. I think it's mainly the

12  compensation plans.

13          CHAIRMAN: So the panel has been asked to

14  request Mr. Shaffer to return them. As I understand it,

15  Mr. Shaffer does not have a problem returning those

16  confidential documents which Wells Fargo marked as

17  confidential and records as proprietary.

18          And do take all the stuff here that you

19  have brought in. I don't know what would happen to it

20  when we're through. So if there's anything that you

21  really want to retain, make sure that you secure control

22  over it.

23          The record will remain open until the panel

24  arrives at a decision and the panel determines that the

25  hearing is closed.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 664

373

1          No party will contact any member of the

2   arbitration panel directly.  All communications, you

3   recall, have to be directed to the staff person at FINRA

4   and then sorted out from there.  So we're going to pack

5   up and confer perhaps a little bit tonight, not much,

6   and we have made arrangements to confer over the next

7   day or so.

8          Thank you very much.  I appreciate it.  And

9   speaking on behalf of the panel, we appreciate the

10  civility and respect that all of the personnel, counsel,

11  witnesses, have provided each other and us during the

12  course of this.  This is the way these things should

13  operate and it gives testimony contra to some of the

14  horror stories one hears about these proceedings.  So

15  thank you very much.  We appreciate your cooperation.

16          Off the record.

17

18

19

20

21

22

23

24

25

ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 665

Arbitration                                    March 18, 2011

374

1                   CERTIFICATE OF REPORTER

2

3

4          I, Celena D. Moulton, Registered Professional

5    Reporter and Certified Court Reporter and Notary Public

6    within and for the State of Missouri do hereby certify

7    that the witness whose testimony appears in the

8    foregoing deposition was duly sworn by me; that the

9    testimony of said witness was taken by me to the best of

10   my ability and thereafter reduced to typewriting under

11   my direction; that I am neither counsel for, related to,

12   nor employed by any of the parties of the action in

13   which this deposition was taken, and further, that I am

14   not a relative or employee of any attorney or counsel

15   employed by the parties thereto, nor financially or

16   otherwise interested in the outcome of the action.

17

18

19

20          CELENA D. MOULTON, RPR, CCR

21          License No. 700
                 Notary Public, within and
22               for the State of Missouri

23

     My Commission expires September 9, 2014.
24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT X  Page 666