MARCO FONTANI, Plaintiff and Respondent, v. WELLS FARGO INVESTMENTS, LLC, Defendant and Appellant.

A106304

COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT, DIVISION FOUR

129 Cal. App. 4th 719; 28 Cal. Rptr. 3d 833; 2005 Cal. App. LEXIS 800; 22 I.E.R. Cas. (BNA) 1677; 2005 Cal. Daily Op. Service 4259; 2005 Daily Journal DAR 5789

May 19, 2005, Filed

**SUBSEQUENT HISTORY:** Request denied by *Fontani v. Wells Fargo Invs.*, 2005 Cal. LEXIS 11345 (Cal., Oct. 12, 2005)

**PRIOR HISTORY:** [***1] Superior Court of San Francisco City and County, No. CGC-03-425502, Ronald E. Quidachay, Judge.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

A securities dealer sued his former employer for several claims arising from his termination. Following the dealer's termination, the employer had submitted an official form to the National Association of Securities Dealers (NASD) that described the reasons for the termination, as the employer was required to do. The dealer alleged that the report defamed him and interfered with his prospective business advantage. The trial court denied the employer's motion to strike under *Code Civ. Proc.*, §§ 425.16, 425.17, the anti-strategic lawsuit against public participation (anti-SLAPP) statutes. The trial court also overruled the employer's demurrer as to most of the claims. (Superior Court of the City and County of San Francisco, No. CGC-03-425502, Ronald Evans Quidachay, Judge.)

The Court of Appeal reversed the denial of the motion to strike as to the claims for defamation and interference with prospective business advantage. The court did not reach the trial court's ruling on the employer's demurrer because that ruling was not reviewable absent a final judgment. The motion to strike should have been granted because the report was a protected activity under § 426.16. The filing was before an official proceeding authorized by law because NASD was an official body for purposes of § 425.16, subd. (e)(1), and because an investigation was a potential consequence of the filing. The filing was also a protected activity because it was a matter of public interest under § 425.16, subd. (e)(4). The employer's allegation that the dealer misrepresented information when selling annuities concerned conduct that could directly affect a large number of people. Finally, the litigation privilege codified in *Civ. Code, § 47, subd. (b)*, protected the filing because it was before an official proceeding authorized by law. Therefore, the dealer could not show a probability of success on either the claim for defamation or the claim for interference with prospective business advantage. (Opinion by Kay, P. J., with Reardon and Sepulveda, JJ., concurring.) [*720]

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

(1) Pleading § 93--Anti-SLAPP Motions--Standard; Protected Activity and Probability of Success--De Novo Review.--Ruling on a motion under *Code Civ. Proc., § 425.16*, the anti-strategic lawsuit against public participation (anti-SLAPP) statute, is a two-step process. First, the court determines whether the moving party has demonstrated that the challenged action stems from protected activity. If an adequate step one showing is made, the court must then consider whether the plaintiff demonstrated a probability of success on the challenged claim, as required by *§ 425.16, subd. (b)(1)*. If so, the motion fails. The court reviews anti-SLAPP motion rulings de novo.

(2) Pleading § 93--Anti-SLAPP Motions--Protected Activity--Statement Before Official Proceed-

ing--Public Issue.--*Code Civ. Proc., § 425.16*, the anti-strategic lawsuit against public participation statute, protects any act in furtherance of the defendant's right of petition or free speech under the United States or California Constitution in connection with a public issue (*§ 425.16, subd. (b)(1)*). The categories of activity in furtherance of a person's right of petition or free speech set out in *§ 425.16, subd. (e)*, include a person's statements or writings made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, under *§ 425.16, subd. (e)(1)*. When this category is implicated, the moving party need not make an independent showing that an issue of public interest is present. Another category is any other conduct in furtherance of the exercise of the constitutional right of free speech in connection with a public issue or an issue of public interest, under § 425.16, subd. (e)(4). Under this category, the act at issue must connect in some manner to a matter of public interest.

(3) Pleading § 93--Anti-SLAPP Motions--Protected Activity--Statement Before Official Proceeding; National Association of Securities Dealers--Public Interest--Investigation of Securities Misrepresentation.--An anti-strategic lawsuit against public participation (anti-SLAPP) motion should have been granted on a securities dealer's claim that his former employer defamed him when it provided reasons for his termination to the National Association of Securities Dealers. The employer's filing was a protected activity under *Code Civ. Proc., § 425.16*, the anti-SLAPP statute, both because it was before an official [*721] proceeding and because the employer's allegation of misrepresentations about annuities was a matter of public interest.

[5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 962C; 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 580 et seq.; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 128A; *1 Kiesel et al., Matthew Bender Practice Guide: Cal. Pretrial Civil Procedure (2004-2005 ed.) § 13.06*.]

(4) Pleading § 93--Anti-SLAPP Motions--Protected Activity--Statement Before Official Proceeding--Official Body; National Association of Securities Dealers.--The National Association of Securities Dealers is an official body for purposes of the anti-strategic lawsuit against public participation statute, specifically *Code Civ. Proc., § 425.16, subd. (e)(1)*.

(5) Pleading § 93--Anti-SLAPP Motions--Protected Activity--Statement Before Official Proceeding--Official Body; National Association of Securities Dealers.--The National Association of Securities Dealers (NASD) acts under the aegis of the Securities and Exchange Commission, and its authority to regulate the broker-dealer industry stems from the federal securities laws that delegate governmental power to organizations like the NASD. NASD is thus unquestionably "authorized by law" under the anti-strategic lawsuit against public participation statute, specifically *Code Civ. Proc., § 425.16, subd. (e)*, to receive filings of the form titled Uniform Termination Notice for Securities Industry Registration.

(6) Pleading § 93--Anti-SLAPP Motions--Broad Construction of Statute.--*Code Civ. Proc., § 425.16*, contains an express directive in *§ 425.16, subd. (a)*, that it is to be construed broadly.

(7) Securities Regulations § 1--National Association of Securities Dealers as Regulatory Surrogate--Investigation.--The National Association of Securities Dealers (NASD) exercises governmental power because it is the primary regulatory body for the broker-dealer industry and thus performs uniquely regulatory functions typically performed by a governmental regulatory agency. More specifically, while NASD may perform some private functions, in its capacity as the recipient of the form titled Uniform Termination Notice for Securities Industry Registration (Form U-5) it stands as a regulatory surrogate for the Securities and Exchange Commission (SEC). The federal securities laws delegate government power to self-regulatory organizations such as NASD to enforce compliance by members of the industry with both the legal requirements laid down in the Exchange Act and ethical standards going [*722] beyond those requirements. Consequently, NASD supervises the conduct of its members under the general aegis of the SEC. Because at least one purpose of a Form U-5 is to trigger a regulatory investigation where warranted, NASD requires and receives them from members in its role as the primary regulatory body of the broker-dealer industry.

(8) Pleading § 93--Anti-SLAPP Motions--Protected Activity--Statement Before Official Proceeding--Official Body; National Association of Securities Dealers.--In its capacity as the recipient of the form titled Uniform Termination Notice for Securities Industry Registration, the National Association of Securities Dealers is the type of regulatory body before which communication is routinely protected by *Code Civ. Proc., § 425.16*.

(9) Pleading § 93--Anti-SLAPP Motions--Protected Activity--Statement Before Official Proceeding--Official Body; Public Funding Not Dispositive.--While public funding may be one identifying factor of bodies exercising governmental power for purpos-

es of *Code Civ. Proc., § 425.16*, that factor, alone, cannot be dispositive.

**(10) Pleading § 93--Anti-SLAPP Motions--Protected Activity--Statement Before Official Proceeding--Communications Prompting Official Action.**--*Code Civ. Proc., § 425.16, subd. (e)(1)*, encompasses communications designed to prompt official action.

**(11) Pleading § 93--Anti-SLAPP Motions--Protected Activity--Statement Before Official Proceeding--Communications Prompting Official Action.**--Communications preparatory to or in anticipation of the bringing of an action or other official proceeding are entitled to the benefits of *Code Civ. Proc., § 425.16*.

**(12) Securities Regulations § 10--Dealers--Investigation.**--An investigation of the National Association of Securities Dealers is at least one potential consequence of filing a Uniform Termination Notice for Securities Industry Registration (Form U-5) that contains allegations of improper conduct by a broker-dealer.

**(13) Pleading § 93--Anti-SLAPP Motions--Protected Activity--Public Interest.**--Statements that fit the definition of a public issue or an issue of public interest under *Code Civ. Proc., § 425.16, subd. (e)(4)*, generally fall into one of three categories. The first includes statements that concern a person or entity in the public eye. The second accounts for statements concerning conduct that could directly affect a large number of people beyond the direct participants. The third general category covers topics of widespread public interest. [*723]

**(14) Pleading § 93--Anti-SLAPP Motions--Protected Activity--Public Interest--Impact on Individuals; Investments.**--Because matters of public interest under *Code Civ. Proc., § 425.16*, may include activities of private entities that may impact the lives of many individuals, conduct capable of affecting a significant portion of the investing public can meet the test.

**(15) Pleading § 93--Anti-SLAPP Motions--Potential for Success.**--A plaintiff opposing a motion to strike under *Code Civ. Proc., § 425.16*, meets the probability of success requirement when he or she pleads legally sufficient claims and offers enough admissible evidence to make a prima facie showing of facts that would merit a favorable judgment. In deciding the potential for success, the court considers the pleadings and evidence of both the plaintiff and the defendant. In so doing, the court considers the defendant's presentation with a view toward whether it defeats the plaintiff's showing as a matter of law, such as by establishing a defense or the absence of a necessary element.

**(16) Libel and Slander § 18--Absolute Privilege--Litigation.**--*Civ. Code, § 47, subd. (b)*, protects publications or broadcasts made in any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law from becoming the source of an action for defamation.

**(17) Libel and Slander § 18--Absolute Privilege--Litigation--Investigatory Process--Securities Dealers.**--*Civil Code section 47, subd. (b)*, protects communications made in preparation for or to prompt an investigation. That is, the California privilege statute is intended to assure utmost freedom of communication between citizens and public authorities whose responsibility is to investigate and remedy wrongdoing. Its protection is not limited to statements made in a courtroom or administrative hearings, but also includes communications that are part of an investigatory process that may lead to a later proceeding. A Uniform Termination Notice for Securities Industry Registration (Form U-5) filed with the National Association of Securities Dealers can be a precursor to an investigation. Consequently, it is protected from a suit for defamation under *Civ. Code, § 47, subd. (b)*.

**(18) Libel and Slander § 18--Absolute Privilege--Litigation--Application to Interference with Prospective Business Advantage.**--While on its face the litigation privilege in *Civ. Code, § 47, subd. (b)* applies to actions for defamation, it has long been interpreted to bar other causes of action based upon the defamatory nature of a communication [*724] which is itself privileged under the defamation laws. This includes claims for interference with prospective business advantage.

**(19) Appellate Review § 15--Decisions Appealable--Final Judgments; What Constitutes--Overruled Demurrer--Anti-SLAPP Motions.**--While an order overruling a demurrer is generally not appealable before a final judgment has been entered, *Code Civ. Proc., § 904.1, subd. (a)(13)*, provides that an appeal may be taken from an order granting or denying a special motion to strike under *Code Civ. Proc., § 425.16. Code Civ. Proc., § 906*, states that upon an appeal pursuant to *Code Civ. Proc., § 904.1*, the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party.

**(20) Appellate Review § 15--Decisions Appealable--Final Judgments; What Constitutes--Overruled Demurrer.**--It is often unclear whether the overruling of a demurrer had a substantial affect on a party's rights until after a final judgment. An appeal following a final judgment is normally presumed to be an adequate remedy for an improperly overruled demurrer.

**(21) Appellate Review § 14--Decisions Appealable--Final Judgments.**--The long-standing one final judgment rule is a fundamental principle of appellate practice that prohibits review of intermediate rulings by appeal until final resolution of the case.

**(22) Pleading § 93--Anti-SLAPP Motions--Interlocutory Appeal--Impact on Otherwise Nonappealable Orders.**--*Code Civ. Proc., § 906*, does allow for an appeal from an interlocutory order that involves the merits of, or necessarily affects, an order under *Code Civ. Proc., § 425.16*, the anti-strategic lawsuit against public participation (anti-SLAPP) statute, from which an appeal is taken. In other words, where the propriety of an otherwise nonappealable order affects the validity of an anti-SLAPP order, an appeal will lie from the otherwise nonappealable order.

**COUNSEL:** Allen Matkins Leck Gamble & Mallory, Lindbergh Porter and Richard H. Rahm, for Defendant and Appellant.

Law Offices of Stephen J. Gorski and Stephen J. Gorski for Plaintiff and Respondent.

**JUDGES:** Kay, P. J., with Reardon and Sepulveda, JJ., concurring.

**OPINION BY:** KAY [*725]

**OPINION**

[**835] KAY, P. J.--Marco Fontani sued his former employer, Wells Fargo Investments, LLC (Wells Fargo), stating 10 claims all based on the circumstances surrounding his October 2002 termination. Among his allegations, Fontani claims Wells Fargo defamed him and interfered with his prospective business advantage when it submitted a Form U-5 to the National Association of Securities Dealers (NASD) that described the reasons for his termination. Wells Fargo moved to strike the defamation and interference with prospective business advantage claims under the anti-SLAPP law (strategic lawsuit against public participation; *Code Civ. Proc., §§ 425.16, 425.17*),[1] [***2] and demurred to most of the remaining claims. The superior court denied the motion to strike and overruled the majority of Wells Fargo's demurrer.

1 Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

Wells Fargo appeals, challenging the rulings on the anti-SLAPP motion and demurrer. We reverse the superior court's denial of the motion to strike. We do not reach the superior court's ruling on the demurrer, as it is unreviewable absent a final judgment.

**I. BACKGROUND**

Fontani's tenure at Wells Fargo lasted from November 1998 through October 2002. He was registered with the NASD as a broker-dealer and his principal duties included selling various Wells Fargo investment products. During his employment he received at least one promotion and was awarded several accolades. Nevertheless, the parties had a falling-out that culminated with Fontani's termination on October 17, 2002. According to Fontani's complaint, Wells Fargo first told him that his termination [***3] stemmed from failing to provide a prospectus with a solicitation, engaging in "twisting," and soliciting clients outside of California's borders. Wells Fargo then changed its story, alleges Fontani, when it disclosed his termination to the NASD and New York Stock Exchange (NYSE). Whatever Wells Fargo's stated reasons, Fontani contends that they were a pretext for the company's retaliation against him after he complained to higher-ups about supposedly unlawful sales practices.

Wells Fargo is a member of the NASD and, as such, must abide by that body's rules relating to the registration of employees. Article V, section 3 of the NASD by-laws requires members to notify it "on [**836] a form designated by the NASD" when the association of a registered person with that member is [*726] terminated. There is no dispute that the form so designated is the Uniform Termination Notice for Securities Industry Registration, also known as Form U-5. Wells Fargo filed a Form U-5 on November 4, 2002, noting that it terminated Fontani for "violation of company policies by misrepresenting information in the sale of annuities, not being properly registered and firm procedures regarding annuity applications."[2] Nothing [***4] in the record indicates that an investigation by the NASD into Fontani's conduct followed the Form U-5 filing. According to Fontani's complaint, though, an NYSE investigation did result. Additionally, the NASD maintains a Central Registration Depository that catalogs the registration records, including Form U-5 filings, of broker-dealers like Fontani and makes them available to prospective employers. Before a member firm registers a new employee, NASD rule 3010(e) requires it to review the

Form U-5 filed by that person's most recent previous NASD member employer.

  2  The text of the Form U-5 does not identify the problem with firm procedures.

Fontani filed the underlying suit on October 16, 2003. The 10 causes of action stated in the operative complaint are for: (1) wrongful termination in violation of public policy; (2) retaliation for whistleblowing in violation of *Labor Code section 1102.5, subdivision (b)*; (3) harassment; (4) intentional interference with prospective business advantage; [***5] (5) negligent interference with prospective business advantage; (6) defamation; (7) breach of implied contract; (8) intentional infliction of emotional distress; (9) negligent infliction of emotional distress; and (10) a declaration that the judicial arbitration agreements signed by the parties are unenforceable. The claims for defamation and interference with prospective business advantage stem from the Form U-5 filed by Wells Fargo and the allegedly false allegations contained within. The claims that were the subject of the demurrer stem from the more general circumstances surrounding Fontani's termination.

On December 22, 2003, Wells Fargo demurred to all but Fontani's claim for declaratory relief and simultaneously moved to strike the claims for defamation, and intentional and negligent interference with prospective business advantage. In its special motion to strike under the anti-SLAPP law, Wells Fargo argued that Fontani's defamation and interference with prospective business advantage claims arose from its exercise of free speech on matters of public interest and/or in connection with an official proceeding. Wells Fargo claimed the U-5 filing with the NASD fell under the [***6] "official proceeding" rubric of the anti-SLAPP law because the NASD is a regulatory body of the securities industry. Wells Fargo argued in addition that its statements to the NASD concerned a matter of public interest because Fontani "had the opportunity to substantially impact the financial security of countless potential clients." Finally, Wells Fargo argued that Fontani could [*727] not meet his burden of showing a probability of success on the merits of his defamation and interference with prospective business advantage claims because the litigation privilege codified in *Civil Code section 47, subdivision (b)* protects the Form U-5 filing.

Fontani opposed the special motion to strike and the demurrer as to all causes of action except the harassment claim. In response to the special motion to strike, Fontani argued that the Form U-5 filing concerned neither a matter of public interest [**837] nor an official proceeding. In the alternative, he argued a probability of success on the merits of his claims. Fontani relied entirely on his own declaration to support the latter argument.

On March 18, 2004, the superior court sustained Wells Fargo's demurrer to the harassment claim. [***7] It overruled the demurrer as to the remaining claims and denied the special motion to strike without elaboration. This timely appeal followed.

## II. DISCUSSION

A. The Anti-SLAPP Motion

(1) Ruling on an anti-SLAPP motion is a two-step process. First, the court determines whether the moving party has demonstrated that the challenged action stems from protected activity. If an adequate step-one showing is made, the court must then consider whether the plaintiff demonstrated a probability of success on the challenged claim. (*§ 425.16, subd. (b)(1)*.) If so, the motion fails. (*Ibid.*) We review anti-SLAPP motion rulings de novo. (*Wilbanks v. Wolk (2004) 121 Cal.App.4th 883, 894 [17 Cal. Rptr. 3d 497]*.)

(1) Protected Activity

(2) Section 425.16 protects any act "in furtherance of the [defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue ... ." (*§ 425.16, subd. (b)(1)*.) Two categories of activity " 'in furtherance of a person's right of petition or free speech' " are relevant in this case. (*§ 425.16, subd. (e)*.) One of the categories covers a person's statements or writings made "before a [***8] legislative, executive, or judicial proceeding, or any other official proceeding authorized by law." (*§ 425.16, subd. (e)(1)*.) When this category is implicated, the moving party need not make an independent showing that an issue of "public interest" is present. (*Briggs v. Eden Council for Hope & Opportunity (1999) 19 Cal.4th 1106, 1123 [81 Cal. Rptr. 2d 471, 969 P.2d 564]* (*Briggs*).) The other relevant category is "any other conduct in furtherance of the [*728] exercise of the ... constitutional right of free speech in connection with a public issue or an issue of public interest." (*§ 425.16, subd. (e)(4)*.) Under this category, the act at issue must connect in some manner to a matter of "public interest." (*Ibid.*)

(3) Wells Fargo makes two contentions, either of which would be sufficient to satisfy the first prong of the anti-SLAPP test. First, Wells Fargo contends that the Form U-5 filing was made before an official proceeding authorized by law. Second, Wells Fargo contends that the filing concerned a matter of public interest. Either conclusion would be sufficient to satisfy the first prong of the anti-SLAPP test. In any event, we agree with both arguments.

(a) Official Proceeding

(4) There are two [***9] facets to our conclusion that the Form U-5 filing was before an official proceeding authorized by law. First, the NASD is an official body for purposes of *section 425.16, subdivision (e)(1)*. Second, the Form U-5 filing constituted a communication before an official proceeding.

(5) The NASD acts under the aegis of the Securities and Exchange Commission (SEC) (*Sparta Surgical v. Nat. Ass'n of Sec. Dealers* (9th Cir. 1998) 159 F.3d 1209, 1210 (*Sparta*)), and its authority to regulate the broker-dealer industry stems from the federal securities laws that delegate governmental power to organizations like the NASD and NYSE (*Credit Suisse First Boston Corp. v. Grunwald* (9th Cir. 2005) 400 F.3d 1119, 1128 (*Credit Suisse*). While the NASD is thus unquestionably "authorized by law" under *section 425.16, subdivision (e)* [**838] to receive Form U-5 filings, the question remains whether the NASD constitutes an "official" body for purposes of this section. The question is not often at issue; most cases considering the "official proceeding" categories of the statute [3] take for granted that the relevant body or organization is an "official" one. (See, e.g., *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1009-1111 [***10] (*ComputerXpress*) [challenged conduct included a filing with the SEC]; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 103 [15 Cal. Rptr. 3d 215] [challenged conduct included making reports to the Environmental Protection Agency].) [4] Here [*729] Fontani specifically argues that the NASD is not an official body for anti-SLAPP purposes.

  3  In addition to *section 425.16, subdivision (e)(1)*, *section 425.16, subdivision (e)(2)* covers "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."
  4  Review has recently been granted in the two cases that have considered the issue in earnest. (*O'Meara v. Palomar-Pomerado Health System* (2005) 125 Cal.App.4th 1324 [23 Cal. Rptr. 3d 406], review granted Apr. 27, 2005, S131874 [hospital peer review committee is not an official body under the anti-SLAPP law]; *Kibler v. Northern Inyo County Local Hospital Dist.* (2005) 126 Cal.App.4th 713 [24 Cal. Rptr. 3d 220], review granted Apr. 27, 2005, S131641 [reaching the opposite conclusion].)

[***11] (6) *Hackethal v. Weissbein* (1979) 24 Cal.3d 55, 61 [154 Cal. Rptr. 423, 592 P.2d 1175], interpreted the same language at issue here--"official proceeding authorized by law"--in a previous version of the litigation privilege statute (*Civ. Code, § 47*) to "appl[y] exclusively to government agencies." [5] The anti-SLAPP law, unlike the privilege statute construed in *Hackethal*, contains an express directive that it is to be "construed broadly." (*§ 425.16, subd. (a)*.) We will nevertheless assume for purposes of this opinion that the words "official proceeding authorized by law" in the anti-SLAPP law carry no broader meaning than they do in the privilege statute, and thus that, in order to qualify as an "official" body under the anti-SLAPP law, the entity must be one that exercises governmental power.

  5  (See also *Briggs, supra*, 19 Cal. 4th at p. 1121 [observing that the anti-SLAPP law protects "all direct petitioning of *governmental* bodies (including ... courts and administrative agencies) and petition-related statements and writings" (italics added)]; compare *Moore v. Conliffe* (1994) 7 Cal.4th 634, 652-653 [29 Cal. Rptr. 2d 152, 871 P.2d 204] [privilege statute was amended to cover quasi-judicial peer review proceedings of private associations].)

[***12] (7) In its capacity here, the NASD exercises governmental power because "it is the primary regulatory body for the broker-dealer industry" and thus performs uniquely regulatory functions typically performed by a governmental regulatory agency. (*Sparta, supra*, 159 F.3d at pp. 1210, 1214, citing *Barbara v. New York Stock Exchange, Inc.* (2d Cir. 1996) 99 F.3d 49, 59.) More specifically, while the NASD may perform some private functions, in its capacity as the recipient of the Form U-5 it stands as a regulatory surrogate for the SEC. The federal securities laws " '*delegate[] government power*' to [self-regulatory organizations] such as the New York Stock Exchange ... and the NASD 'to enforce ... compliance by members of the industry with both the legal requirements laid down in the *Exchange Act* and ethical standards going beyond those requirements.' " (*Credit Suisse, supra*, 400 F.3d at p. 1128, italics added.) Consequently, the NASD "supervises the conduct of its members under the general aegis of the [**839] SEC." (*Sparta, supra, at p. 1210*.) Because at least one purpose of a Form U-5 is to trigger a regulatory [***13] investigation where warranted (see *Glennon v. Dean Witter Reynolds, Inc.* (6th Cir. 1996) 83 F.3d 132, 138 (*Glennon*)), the NASD requires and receives them from members in its role as the primary regulatory body of the broker-dealer industry.

[*730] (8) As it stands here, then, the NASD is the type of regulatory body before which communication is routinely protected by the anti-SLAPP law. In *ComputerXpress, supra*, 93 Cal.App.4th at page 1009, for example, the court deemed a complaint filed with the SEC--the primary regulatory body of the securities industry--"a statement before an official proceeding."

*Braun v. Chronicle Publishing Co. (1997) 52 Cal.App.4th 1036, 1043 [61 Cal. Rptr. 2d 58]*, similarly identified an investigation by the state auditor as an official proceeding. (See also, e.g., *Mann v. Quality Old Time Service, Inc., supra, 120 Cal.App.4th at p. 105* [reports to the National Response Center protected under *section 425.16, subd. (e)(2)]*.) For these reasons, the NASD received the Form U-5 from Wells Fargo as an "official" body under the anti-SLAPP law.[6]

  6  Our inquiry into the NASD's status as an official body under *section 425.16, subdivision (e)(1)* is very different from that currently under consideration by our Supreme Court in *Jevne v. Superior Court*, review granted March 17, 2004, S121532.* There the issue is whether the rules promulgated by the NASD in its capacity as a neutral arbitration forum preempt state law. Here we answer a separate question--whether the NASD, in its capacity as a regulator, is an official body under the anti-SLAPP law.

  *Reporter's Note: For Supreme Court opinion, see *Jevne v. Superior Court (2005) 35 Cal.4th 935 [28 Cal.Rptr.3d 685]*.

[***14] (9) According to Fontani, the NASD is not "official" under the anti-SLAPP law because it is not publicly funded. While public funding may be one identifying factor of bodies exercising governmental power for anti-SLAPP purposes, that factor alone cannot be dispositive. This is shown by the discussion in *Arnett v. Dal Cielo (1996) 14 Cal.4th 4, 12 [56 Cal. Rptr. 2d 706, 923 P.2d 1]*, which distinguished a hospital peer review committee from a governmental agency on a number of grounds, none of which were identified as controlling: First, the review committee was created and funded by a single, private hospital, not the state. Second, the committee was, by definition, self-interested. In other words, it allowed peers to review one another instead of providing for independent oversight. Finally, the peer review committee protected only a relatively small set of people--patients at a particular hospital.

Like a hospital peer review committee, the NASD is not publicly funded. Yet the similarities end there. Whereas such a committee is created by a private hospital, the NASD has been delegated regulatory authority by federal securities laws. (*Credit Suisse, supra, 400 F.3d at p. 1128.*) Further, [***15] the NASD is not a group of peers monitoring one another's compliance with securities laws; it is an independent regulatory body. Decisions by it are reviewable de novo by the SEC and thereafter by the United States Court of Appeals. (*Cariveau v. Halferty (2000) 83 Cal.App.4th 126, 130, fn. 5 [99 Cal. Rptr. 2d 417]*.) Also unlike a hospital peer review committee, the NASD protects the public at large by regulating broker-dealers in the securities [*731] industry. (See *id. at p. 134* [NASD protects the public from unethical practices and its rules are a valid source of public policy].) For these reasons, we are not persuaded by Fontani's argument that private funding precludes the NASD's classification under the anti-SLAPP law as an entity that exercises governmental power.

[**840] (10) Fontani contends that, even if the NASD qualifies as an official body, the Form U-5 could not have been presented before an official proceeding because there has been no showing that his conduct was ever under review or consideration by the NASD. Fontani contends that not every communication related to an official body, no matter how tangential that relation may be, qualifies as being made before an official [***16] proceeding under the anti-SLAPP law. (See *Blackburn v. Brady (2004) 116 Cal.App.4th 670, 677 [10 Cal. Rptr. 3d 696]*.) The argument does not apply here, because *section 425.16, subdivision (e)(1)* encompasses communications designed to prompt official action.

(11) Our Supreme Court has indicated that " 'communications preparatory to or in anticipation of the bringing of an action or other official proceeding ... are ... entitled to the benefits of *section 425.16*.' " (*Briggs, supra, 19 Cal.4th at p. 1115*, citing *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman (1996) 47 Cal.App.4th 777, 784 [54 Cal. Rptr. 2d 830]* (*Dove Audio*).) Thus, when the defendants in *ComputerXpress* were sued for complaining to the SEC about allegedly unlawful conduct on the part of the plaintiffs, the court considered the complaint as much a part of an official proceeding " ' "as a communication made after the proceedings had commenced." ' " (*ComputerXpress, supra, 93 Cal.App.4th at p. 1009.*) Regardless of whether the SEC considered or reviewed ComputerXpress's conduct in response to the complaint, the complaint was a " ' "communication to an official administrative agency ... [***17] designed to prompt action by that agency," ' " and so enjoyed protection. (*Ibid.*) Similarly, letters seeking information relating to, and support for, a potential complaint to the state Attorney General's office were deemed communications made in connection with an official proceeding in *Dove Audio*. The letters enjoyed the benefits of *section 425.16* because they were communications "preparatory to or in anticipation of" an official proceeding. (*Dove Audio, supra, at p. 784*.)

(12) The reasoning in *ComputerXpress, Dove Audio*, and *Briggs* applies here. The record is silent on whether the NASD actually investigated Fontani based on the Form U-5 allegations or otherwise. However, an NASD investigation is at least one potential consequence of a Form U-5 filing that contains allegations of improper conduct by a broker-dealer. (See *Glennon*, [*732] *supra, 83 F.3d at p. 138*.) Therefore, the Form U-5 was a

communication made "in anticipation of the bringing of an action or other official proceeding." (*Briggs, supra, 19 Cal.4th at p. 1115*.)

For the foregoing reasons, Wells Fargo's filing with the NASD constitutes a communication [***18] before an official proceeding authorized by law under *section 425.16, subdivision (e)(1)*.[7]

> 7 Because we conclude that the filing with the NASD is protected activity under the anti-SLAPP law we need not decide whether the same filing with the NYSE would be protected as well.

(b) Matter of Public Interest

(13) We also agree with Wells Fargo that its statement in the Form U-5 concerning the reasons for Fontani's termination falls under *section 425.16, subdivision (e)(4)*'s umbrella as conduct "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Statements that fit the [**841] definition of a public issue or an issue of public interest under *subdivision (e)(4)* generally fall into one of three categories. The first includes statements that "concern[] a person or entity in the public eye." (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO (2003) 105 Cal.App.4th 913, 924 [130 Cal. Rptr. 2d 81]* [***19] (*Rivero*).) The second accounts for statements concerning "conduct that could directly affect a large number of people beyond the direct participants." (*Ibid.*) The third general category covers topics of "widespread, public interest." (*Ibid.*) Wells Fargo's statement to the NASD alleging that Fontani misrepresented information when selling annuities concerns conduct that "could directly affect a large number of people." (*Ibid.*)

(14) Because "matters of public interest may include activities of private entities that may impact the lives of many individuals" (*ComputerXpress, supra, 93 Cal.App.4th at pp. 1007-1008*), conduct capable of affecting a significant portion of the investing public can meet the test. The *ComputerXpress* court considered whether disparaging statements about a publicly traded company, posted on a Web site, concerned a matter of public interest. In concluding that they did, the court noted that the company had somewhere between 12 million and 24 million outstanding shares. The company also alleged that, in the wake of the statements, "it lost $10,000,000 as a result of failure of potential investors to purchase its stock." (*Id. at p. 1008*.) [***20] Similarly, the defendants in *Global Telemedia Intern., Inc. v. Doe 1 (C.D.Cal. 2001) 132 F. Supp. 2d 1261, 1264*, were sued for posting "less-than-flattering" information about a publicly traded company on the Internet. The postings were in connection with a matter of public interest because they [*733] were about a publicly traded company and the successes and failures of that company could impact individual investors as well as "market sectors or the markets as a whole." (*Id. at p. 1265*.)

Here too, Wells Fargo's statement to the NASD concerned possible conduct capable of affecting a significant number of investors. If true, Fontani's misrepresentation of information when selling annuities is conduct with the potential to affect not just Fontani's individual customers, but all those in the annuity market. For example, mistruths about an annuity may artificially inflate the purchase price and thereafter affect the market. Therefore, the Form U-5 contents concerning Fontani's purported misconduct in this regard likewise concern a matter of public interest under *section 425.16, subdivision (e)(4)*.

Fontani points to *Rivero* to support his argument that [***21] too few people were potentially affected by his alleged misrepresentations to make them a matter of public interest. In that case, a supervisor of eight employees was publicly criticized for acts done in his capacity as a supervisor. (*Rivero, supra, 105 Cal.App.4th at p. 924*.) Those remarks did not concern a matter of public interest, according to the court, because "the only individuals directly involved in and affected by the situation" were the supervisor and the eight employees. (*Ibid.*) Here, however, Fontani's reported conduct could potentially affect people beyond Wells Fargo, Fontani, and even his various customers. For this reason, Fontani's reliance on *Rivero* is misplaced.

(2) Probability of Success

The second inquiry under *section 425.16, subdivision (b)(1)* is whether Fontani can establish a probability of success on the merits of his defamation and interference [**842] with prospective business advantage claims. We conclude that because the litigation privilege codified in *Civil Code section 47, subdivision (b)* protects the Form U-5, Fontani cannot show a probability of success on these two claims.

(15) A plaintiff opposing [***22] an anti-SLAPP motion meets the probability of success requirement when he or she pleads legally sufficient claims and offers enough admissible evidence to make a prima facie showing of facts that would merit a favorable judgment. (*1-800 Contacts, Inc. v. Steinberg (2003) 107 Cal.App.4th 568, 584 [132 Cal. Rptr. 2d 789]*, citing *Wilson v. Parker, Covert & Chidester (2002) 28 Cal.4th 811, 821 [123 Cal. Rptr. 2d 19, 50 P.3d 733]*; *Wilcox v. Superior Court (1994) 27 Cal.App.4th 809, 823-824 [33 Cal. Rptr. 2d 446]*, disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc. (2002) 29*

*Cal.4th 53, 68, fn. 5 [124 Cal. Rptr. 2d 507, 52 P.3d 685]; Evans v. Unkow (1995) 38 Cal.App.4th 1490, 1497-1498 [45* [*734] *Cal. Rptr. 2d 624].)* In deciding the potential for success, the court considers the pleadings and evidence of both the plaintiff and defendant. (*Wilson, supra, at p. 821.*) In so doing, the court considers the defendant's presentation with a "view toward whether it defeats the plaintiff's showing as a matter of law, such as by establishing a defense or the absence of a necessary element." (*1-800 Contacts, Inc., supra, at p. 585.*)

(16) *Civil Code section 47, subdivision (b)* protects publications [***23] or broadcasts made in "any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law" from becoming the source of an action for defamation. As we have explained, Wells Fargo's Form U-5 filing was before an official proceeding authorized by law. Therefore, the document is absolutely privileged under *Civil Code section 47, subdivision (b).* (See *Dove Audio, supra, 47 Cal.App.4th at p. 784* [communication protected as being in connection with an official proceeding under the anti-SLAPP law also privileged under *Civ. Code, § 47, subd. (b)*].)

Fontani argues that a Form U-5 in this setting is entitled to qualified, not absolute, immunity under *Civil Code section 47, subdivision (b).* He relies entirely on out-of-state cases granting qualified immunity to Form U-5's under foreign privilege statutes. (See, e.g., *Glennon, supra, 83 F.3d at p. 137; Dawson v. New York Life Ins. Co. (7th Cir. 1998) 135 F.3d 1158, 1162; Baravati v. Josephthal, Lyon & Ross, Inc. (7th Cir. 1994) 28 F.3d 704, 708.*) [***24] However, when Form U-5 filings are granted only qualified immunity in our sister states it is generally because those states do not afford the litigation privilege to the preliminary or investigative stages of otherwise protected proceedings. Applying Tennessee law, for example, the *Glennon* court concluded that because the litigation privilege "does not extend to preliminary or investigatory stages of administrative proceedings," a Form U-5 filing was not absolutely privileged. (*Glennon, supra, 83 F.3d at p. 137*; see also *Baravati, supra, 28 F.3d at p. 708* [though Form U-5 can trigger an investigation it is not absolutely privileged].)

(17) These cases do not advance Fontani's cause because *Civil Code section 47, subdivision (b)* protects communications made in preparation for or to prompt an investigation. (*Hagberg v. California Federal Bank (2004) 32 Cal.4th 350, 370 [7 Cal. Rptr. 3d 803, 81 P.3d 244].*) That is, our privilege statute "is intended to ' "assure utmost freedom of communication between citizens and *public authorities whose responsibility* [**843] *is to investigate and remedy wrongdoing*." ' " (*Id. at p. 360.*) Its [***25] protection is not limited to statements made in a courtroom or administrative hearings, but also includes communications that are part of an investigatory process that may lead to a later proceeding. As set forth, *ante*, a Form U-5 filed with the NASD can be a [*735] precursor to an investigation. Consequently, it is protected from a suit for defamation under *Civil Code section 47, subdivision (b).*

(18) The privilege also applies to Fontani's claims for interference with prospective business advantage. While on its face the litigation privilege applies to actions for defamation, it has long been interpreted to bar other causes of action "based upon the defamatory nature of a communication which is itself privileged under the defamation laws." (*Brody v. Montalbano (1978) 87 Cal. App. 3d 725, 739 [151 Cal. Rptr. 206]*; see *Lebbos v. State Bar (1985) 165 Cal. App. 3d 656, 667 [211 Cal. Rptr. 847]* [noting the various claims similarly barred]; but see *Silberg v. Anderson (1990) 50 Cal.3d 205, 212 [266 Cal. Rptr. 638, 786 P.2d 365]* [malicious prosecution claim not similarly barred].) This includes claims for interference with prospective [***26] business advantage. (*Brody, supra, at p. 738.*) Therefore, having already determined that the Form U-5 is privileged, "we conclude that [Fontani] is precluded from utilizing it as the basis of an action for interference with prospective advantage." (*Ibid.*)

B. The Demurrer Ruling

Wells Fargo also appeals from the trial court's order overruling its demurrer. As set forth below, that order is unappealable because it does not substantially affect the rights of a party and does not affect or involve the merits of the anti-SLAPP order.

(19) Fontani contends that *section 904.1, subdivision (a)(13)* combines with *section 906* to allow appellate review of an order overruling a demurrer when, as here, an appeal is taken from a ruling on an anti-SLAPP motion. Specifically, while an order overruling a demurrer is generally not appealable before a final judgment has been entered (*San Diego Gas & Electric Co. v. Superior Court (1996) 13 Cal.4th 893, 912-913 [55 Cal. Rptr. 2d 724, 920 P.2d 669]*), *section 904.1, subdivision (a)(13)* provides that an appeal may be taken "[f]rom an order granting or denying a special motion to strike under *Section 425.16*." *Section 906* states that upon "an appeal [***27] pursuant to *Section 904.1* ... the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which [*736] substantially affects the rights of a party ... ." According to Wells Fargo, our ability to review intermediate orders that sub-

stantially affect the rights of a party makes the order overruling its demurrer reviewable. We disagree.

(20) Wells Fargo fails to point out any particular reason why the order overruling the demurrer here substantially affects the rights of a party. Thus we take its argument to be simply that every order overruling a demurrer substantially affects the rights of a party. Yet that is not so. (See, e.g., *Johnson v. Holmes Tuttle Lincoln-Merc. (1958) 160 Cal. App. 2d 290, 301 [325 P.2d 193].*) The *Johnson* court, for example, concluded that if an error existed in overruling a demurrer, it "did not affect the defendant's substantial rights in any way." (*Ibid.*) Indeed, it is often unclear whether the overruling of a demurrer has had a substantial affect on a party's rights until [**844] after a final judgment. An appeal following a [***28] final judgment is normally presumed to be an adequate remedy for an improperly overruled demurrer. (*San Diego Gas & Electric Co. v. Superior Court, supra, 13 Cal.4th at p. 913.*)

(21) Furthermore, Wells Fargo's reading of *sections 906* and *904.1* ignores the long-standing one final judgment rule--"a fundamental principle of appellate practice that prohibits review of intermediate rulings by appeal until final resolution of the case." (*Griset v. Fair Political Practices Com. (2001) 25 Cal.4th 688, 697 [107 Cal. Rptr. 2d 149, 23 P.3d 43].*) Wells Fargo's position would allow review of an otherwise unreviewable ruling on a demurrer whenever the trial court enters any appealable interlocutory order. That is a significant statement when taken in light of the number of intermediate orders for which *section 904.1* allows review. (See, e.g., *§ 904.1, subd. (a)(5)* [attachment order], *(a)(6)* [order dissolving injunction], and *(a)(7)* [order appointing a receiver].)

Nevertheless, according to Wells Fargo, an appeal of any of these orders gives rise to the right to appeal an entirely unrelated order on a demurrer. Wells Fargo cites no authority to support that proposition and it is inconsistent [***29] with the one final judgment rule.

(22) *Section 906* does allow for an appeal from an interlocutory order that involves the merits of, or necessarily affects, an anti-SLAPP order from which an appeal is taken. In other words, where the propriety of an otherwise nonappealable order affects the validity of an anti-SLAPP order, an appeal will lie from the otherwise nonappealable order. (See *City of Oakland v. Darbee (1951) 102 Cal. App. 2d 493, 504 [227 P.2d 909]* [otherwise nonappealable order for separation reviewable on proper appeal from order for transfer because validity of order for transfer depended on validity of order for separation].)

Here the merits of the order overruling the demurrer have no bearing on the validity of the order denying the anti-SLAPP motion. Consequently, the order overruling the demurrer cannot be said to "involve the merits" or otherwise have an "affect" on the anti-SLAPP ruling under *section 906*, and that order is not reviewable as part of this appeal.

[*737] III. CONCLUSION

The appeal from the order overruling the demurrer is dismissed. The order denying the motion to strike under the anti-SLAPP law is reversed, with directions to grant the motion. [***30] Costs on appeal to Wells Fargo.

Reardon, J., and Sepulveda, J., concurred.